Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, New York Bar No. 5414099
Federal Defender Services of Idaho, Capital Habeas Unit
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
         Christopher_M_Sanchez@fd.org

Stanley J. Panikowski
(*pro hac vice* application to be filed)
**DLA PIPER LLP (US)**
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone:  619.699.2700
Facsimile:  619.699.2701
stanley.panikowski@dlapiper.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| **GERALD ROSS PIZZUTO, JR.,** and **THOMAS EUGENE CREECH,** | ) ) ) | **CASE NO. 1:20-cv-114** |
| Plaintiffs, | ) ) | **COMPLAINT FOR EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |
| v. | ) ) | |
| **BRAD LITTLE**, Idaho State Governor, in his official capacity; **JOSH TEWALT**, Director, Idaho Department of Correction, in his official capacity, **KEITH YORDY**, Warden, Idaho Maximum Security Institution, in his official capacity, **CHAD PAGE**, Chief, Division of Prisons, Idaho Department of Correction, in his official capacity; and **Unknown Employees, Agents, or Contractors of the Idaho Department of Correction**, in their official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

COMPLAINT – Page 1

I.     **Nature of the Action**

1.     The plaintiffs are death-row inmates in Idaho[1] who bring this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of their constitutional rights in connection with the State's effort to execute them while providing them essentially zero information about its plans on how it will do so.

II.    **Justiciable Case or Controversy**

2.     For the reasons set forth below, absent judicial intervention, the plaintiffs will be executed in violation of their constitutional rights.

3.     There is a real and justiciable case or controversy between the parties.

III.   **Jurisdiction and Venue**

4.     This action arises under 42 U.S.C. § 1983 for violations of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

5.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

6.     The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are elected or appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

7.     Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including executions and the procurement and maintenance of drugs used in the executions—have occurred, are occurring, or will occur in the District of Idaho.

---

[1] The plaintiffs refer to Idaho as "Idaho," "the State of Idaho," and "the State." Likewise, throughout this complaint, the plaintiffs refer to the defendants, variously, as "the defendants," "the State," "IDOC," and other phrases, as appropriate.  Their use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

8.     Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

**IV.    Parties**

9.     Plaintiff Gerald Ross Pizzuto, Jr. ("Mr. Pizzuto") is a person within the jurisdiction of the State of Idaho.

10.     Mr. Pizzuto is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

11.     Mr. Pizzuto is confined at the Idaho Maximum Security Institution ("IMSI").

12.     Mr. Pizzuto is under sentence of death.

13.     Plaintiff Thomas Eugene Creech ("Mr. Creech") is a person within the jurisdiction of the State of Idaho.

14.     Mr. Creech is an inmate under the supervision of IDOC.

15.     Mr. Creech is confined at IMSI.

16.     Mr. Creech is under sentence of death.

17.     As set forth in greater detail below, the defendants are state officials, employees, agents, and/or contractors responsible for developing, overseeing, and/or implementing death by lethal injection in Idaho.

18.     Defendant Brad Little ("Governor Little") is the Governor of Idaho.

19.     Governor Little is the final executive authority in Idaho.  As Governor, he is charged with supporting the Constitution and seeing that the laws are faithfully executed.

20.     Governor Little has direct authority over IDOC.

21.     Defendant Josh Tewalt ("Director Tewalt") is the Director of IDOC.

22.     Director Tewalt is responsible for approving the substances and procedures to be used in any execution performed by IDOC.

23.     Defendant Keith Yordy ("Warden Yordy") is Warden of IMSI.

24.     Warden Yordy is the official executioner for inmates in Idaho state custody.

25.     Defendant Chad Page ("Mr. Page") is the Chief of the Division of Prisons for IDOC.

26.     Upon information and belief, Mr. Page will is currently charged with providing the official approval of Idaho's next execution protocol for IDOC.

27.     Upon information and belief, Other Unknown Employees, Agents, and/or Contractors of IDOC are involved in the development and carrying out of executions by lethal injection.  The plaintiffs do not know the identities of these persons.

28.     Upon information and belief, the plaintiffs and the defendants are all United States citizens.

29.     The defendants are all officials of the State of Idaho.

30.     All of the actions that have been and will be taken by the defendants towards executing the plaintiffs and any other actions at issue in this complaint were or will be taken under color of state law.

31.     The defendants are all sued in their official capacities.

**V.    General Factual Allegations**

32.     The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

33.     Mr. Pizzuto was convicted of first-degree murder for the killing of Delbert and Berta Herndon and sentenced to death in Idaho County District Court.

COMPLAINT – Page 4

34.     Mr. Pizzuto's murder convictions and sentence were upheld on direct appeal in 1991.

35.     There is no date set for Mr. Pizzuto's execution.

36.     Mr. Pizzuto has an appeal pending before the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") seeking habeas corpus relief from his death sentence.

37.     In Mr. Pizzuto's pending appeal, the panel affirmed the denial of habeas relief on August 14, 2019.

38.     A petition for panel and *en banc* rehearing was filed on November 27, 2019 and denied on December 31, 2019.

39.     On January 6, 2020, the Ninth Circuit stayed the mandate pending certiorari proceedings at the U.S. Supreme Court.

40.     Mr. Pizzuto intends to file a petition for certiorari at the U.S. Supreme Court.

41.     Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

42.     Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

43.     After Mr. Creech obtained federal habeas relief, he was resentenced to death.

44.     The new death sentence was upheld on direct appeal in 1998.

45.     There is no date set for Mr. Creech's execution.

46.     Mr. Creech has an appeal pending before the Ninth Circuit seeking habeas corpus relief from his death sentence.

47.     In Mr. Creech's pending appeal, briefing is still ongoing and oral argument has not yet been scheduled.

COMPLAINT – Page 5

48.     If relief is denied to the plaintiffs in the aforementioned pending appeals and they are denied executive clemency, they anticipate that the State of Idaho will seek to execute them.

49.     By statute, lethal injection is the only authorized method of execution in Idaho.  *See* Idaho Code § 19-2716.

50.     This same provision gives the IDOC Director the power and responsibility to approve the lethal injection protocols and methods, which includes the authority to approve the drug(s) and the procedures used in an execution.  *See* Idaho Code § 19-2716.

### A.     IDOC's Refusal to Provide Information to the Plaintiffs

51.     IDOC electronically publishes its rules governing a variety of matters, including lethal injection.  IDOC's website includes a copy of Idaho's Standard Operating Procedure ("SOP") for "Execution Procedures," Control Number 135.02.01.001, Version 3.6, adopted May 18, 1998, reviewed January 6, 2012 (hereinafter "SOP 135").

52.     The plaintiffs bring this action to challenge the defendants' practice of hiding, changing, and obfuscating the means by which they intend to execute them.

53.     On December 18, 2018, the Capital Habeas Unit of Federal Defender Services of Idaho ("CHU"), on behalf of eight of the nine Idaho state inmates (including the plaintiffs) then under sentence of death, wrote to then-Director Henry Atencio of IDOC, and Warden Yordy.

54.     The letter addressed the potential executions of those inmates and included a number of questions and requests relating to such executions in order for the CHU to assess the constitutionality and proprietary of any future executions ("December 2018 CHU Letter").

55.     The December 2018 CHU Letter sought answers to twenty-six questions, some with subparts, relating to the execution protocol of IDOC.

COMPLAINT – Page 6

56.     In sum, the CHU sought information on (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/would be obtained, their source, amounts, expiration date, how they were/would be acquired/transported/stored/tested, when IDOC would obtain the drugs, etc., (3) whether/when a new version of SOP 135 would be issued, and whether the current version on the website was in effect then, (4) whether witnesses would be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who would participate in the execution, what was their training/qualifications, and how would they be chosen, (7) whether there would be a consciousness check and the procedure for it, and (8) procedures for botched executions.

57.     The CHU also requested that (1) the drugs be tested in an independent laboratory and results of that testing shared with the CHU at least sixty days prior to any execution, (2) that CHU staff/agents be given access to inspect the execution chamber and adjoining room, (3) that CHU staff/agents be given access to the fixed cameras to determine quality for observing IV lines, (4) that the entire execution process be visible to witnesses, (5) that the whole execution chamber be filmed and audio recorded during the entire execution, (6) that at least two members of the CHU be permitted to attend the execution, (7) that at least one member of the CHU be permitted to bring a cell phone into the witness gallery with guaranteed cell phone reception, or access to a landline, (8) that an autopsy be performed after the execution at the facility of the CHU's choice, and (9) that records be preserved and centralized in one location.

58.     The CHU requested a response by January 18, 2019.

59.     Subsequently, IDOC told the CHU it needed more time to formulate an answer.

60.     On April 4, 2019, Director Tewalt responded to the December 2018 CHU Letter, and declined to address most of the questions, except to refer the CHU to the current version of the execution protocol, SOP 135 ("April 2019 IDOC Response").

61.     The April 2019 IDOC Response then went on to purportedly "respond" to the questions in the December 2018 Letter by generally referring to SOP 135, and refusing to answer the additional nine requests.

62.     IDOC also suggested an in-person meeting to address any specific concerns regarding SOP 135 and IDOC's execution process.

63.     On June 17, 2019, a meeting took place at IDOC between IDOC and the CHU ("June 17 Meeting").

64.     During the June 17 Meeting, IDOC informed the CHU that there will be changes to the current SOP 135 before any executions, but did not provide any detail on what those changes would entail or when they would be made.

65.     Thus, SOP 135 is not the protocol that the plaintiffs will be executed under, and the current version of SOP 135 is meaningless because IDOC has indicated that it will promulgate a new protocol before any future executions take place.

66.     Even if the current version of SOP 135 is considered binding in some relevant way, despite IDOC's assurance that it will not be in effect at the time of a future execution, it states: "The SOP is subject to revision at the discretion of the chief of the Operations Division or the director of the IDOC.  Either person may revise, suspend, or rescind any procedural steps, at any time, at his sole discretion."

67.     Therefore, apart from the fact that IDOC has disclaimed the relevance of SOP 135 for any future execution, its content has no real legal significance.

COMPLAINT – Page 8

68.     As a result, it remains necessary for this Court to order IDOC to state in legally binding terms its intentions with respect to future executions.

69.     In other jurisdictions where execution protocols afford correctional agencies unfettered discretion, state agents have abused it.

70.     For instance, in the January 2015 execution of Charles Warner ("Mr. Warner"), Oklahoma used potassium acetate rather than potassium chloride, contrary to its representations to opposing counsel and the U.S. Supreme Court.

71.     Mr. Warner's last words were that his "body [wa]s on fire."

72.     In Arizona, the Department of Corrections has deviated from its protocol numerous times.

73.     For example, Arizona changed its intended drug for Donald Beaty eighteen hours before his May 2011 execution.

74.     Arizona has also repeatedly administered dosages well above the amounts provided for in the protocol, which it did at Joseph Wood's July 2014 execution when it gave him thirteen more doses of each of the two drugs than the protocol allowed.

75.     The deviations of other states from their execution protocols, and the problems such deviations have caused, provide further reason for the Court to compel the defendants here to make clear their intentions for the plaintiffs' executions.

76.     That is the only way for the plaintiffs to challenge those intentions in a meaningful place and manner, as they have a constitutional right to do.

77.     Nothing other than judicial intervention will check IDOC's ability to abruptly change its plans for executions with the effect of evading accountability and judicial scrutiny.

78.     Unlike every other Idaho executive branch agency, IDOC is exempt from the rule-making requirements of the Idaho Administrative Procedure Act ("APA"), which include public notice and an opportunity for interested parties to comment.  *See* Idaho Code § 67-5201.

79.     The rule-making requirements that do apply to IDOC are far less rigorous than the APA.  *See* Idaho Code § 20-212.

80.     As a consequence, there are even fewer checks on IDOC's ability to change its plans for executions abruptly and even more of a need for judicial intervention to ensure it does not do so improperly and for the purpose of evading accountability and court scrutiny.

81.     During the June 17 Meeting, Director Tewalt also indicated that the revised SOP would continue to give the Director different possible drugs and combinations of drugs to choose from for an execution.

82.     This approach makes it difficult, and potentially impossible, for the CHU to decide whether it will need to challenge the use of any execution drugs, since pertinent information related to the use of execution drugs is being kept a secret.

83.     Director Tewalt promised that any drugs used in executions would be tested, and that the CHU would be provided with the results of such testing.

84.     At the July 17 Meeting, at IDOC's request, the CHU agreed to provide explanations as to how each question in the December 2018 CHU Letter relates to the CHU's representation of the inmates, including the plaintiffs.

85.     The CHU submitted a follow-up letter to IDOC on July 29, 2019 detailing the June 17 Meeting, and further elaborating on its previous December 2018 Letter ("July 2019 CHU Letter").

COMPLAINT – Page 10

86.     Specifically, the July 2019 CHU Letter sets forth each question with an explanation as to how the answer is critical to the CHU's ability to assess the constitutionality and propriety of any future executions.

87.     The CHU requested a response to the letter by August 30, 2019, indicating that if the CHU did not hear by that date, it would assume that IDOC was declining to reply.

88.     To date, IDOC has failed to respond.

**B.     IDOC's Execution History and Related Problems with Executions**

89.     IDOC's recent history with executions reflects a pattern of pursuing lethal injection drugs in an irresponsible manner and obfuscating its plans in order to frustrate legitimate litigation and public scrutiny.  As such, there is a heightened risk that IDOC will act in the same way in connection with future executions, which makes it even more important that it be required to reveal the information at issue in this complaint.

90.     The two most recent executions in Idaho were of Paul Rhoades ("Mr. Rhoades") on November 18, 2011 and Richard Leavitt ("Mr. Leavitt") on June 12, 2012.  The following allegations relate to these two executions.

**1.     Use of Unreliable Sources for Execution Drugs**

91.     The following allegations reflect IDOC's practice of seeking execution drugs in a reckless manner likely to result in the acquisition of unreliable chemicals.

92.     In March 2011—as IDOC was preparing to execute Mr. Rhoades and Mr. Leavitt— Randy Blades, then the Warden of IMSI ("Mr. Blades"), started trying to obtain lethal injection chemicals.

93.     To get the chemicals, Mr. Blades contacted a man named Chris Harris ("Mr. Harris") to inquire about the possibility of obtaining lethal injection chemicals from him.

COMPLAINT – Page 11

94.     At the time, Mr. Harris was based in Kolkata, India.

95.     Mr. Harris was a salesman whose career involved positions at a duty-free airport shop and call centers.

96.     Upon information and belief, Mr. Harris has no training in the practice of pharmacy or medicine.

97.     Mr. Harris has attempted to import drugs into the United States without the requisite approval by the Food and Drug Administration ("FDA").

98.     Upon information and belief, Mr. Harris has also engaged in acts of dishonesty.

99.     To obtain drugs to send to Nebraska for executions, for example, Mr. Harris falsely told Naari, a pharmaceutical company, that the medications would be shipped to Africa so they could be used for anesthetic purposes in the developing world.

100.     When Arizona and Texas purchased sodium thiopental from Mr. Harris for use at executions, the FDA seized the shipment upon arrival at the airport because it was imported unlawfully.

101.     Like Idaho, other states, including but not limited to Arizona, Arkansas, California, Georgia, Nebraska, South Carolina, South Dakota, and Tennessee, have resorted to dubious international sources for lethal injection drugs.

102.     For example, several states, including but not limited to Arizona, Arkansas, California, Georgia, South Carolina, and Tennessee, purchased mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor who operated out of a storefront driving school in London, England.

103.    These states did so even though they were not registered with the Drug Enforcement Administration ("DEA") as an importer of non-narcotic controlled substances and did not provide a declaration of importation to the DEA.

104.    The states also did not possess a DEA license to possess, dispense, or distribute a Schedule III non-narcotic controlled substance such as thiopental.

105.    After the U.S. Attorney General was notified of the illegal importation, the DEA seized the thiopental in March 2011.

106.    Before the thiopental was seized, it was used in two executions in September 2010 and January 2011 and both inmates' eyes were open in the midst of their executions, suggesting that they were inadequately sedated.

107.    States have used unreliable domestic sources for executions as well.

108.    For example, a pharmacy in Oklahoma called the Apothecary Shoppe provided drugs for at least three Missouri executions in 2013 and 2014.

109.    The Apothecary Shoppe had its license put on probation after it admitted to committing 1,892 regulatory violations, including the improper extension of expiration dates and the use of questionable sterilization practices.

110.    After the Apothecary Shoppe stopped providing drugs to Missouri for executions, it turned to Foundation Care, a compounding pharmacy in St. Louis.

111.    Missouri used drugs from Foundation Care for seventeen executions.

112.    Prior to Missouri's selection of Foundation Care, the FDA determined that the company was not testing all of its drugs for sterility and bacterial contamination, that it had inadequate controls for sterility, and that some of its drugs were contaminated with bacteria.

113.    The FDA deemed Foundation Care a high-risk pharmacy.

COMPLAINT – Page 13

114.    Other states' questionable practices, like Idaho's questionable practice in engaging Mr. Harris, make it likely that Idaho will continue to try to obtain chemicals from unreliable sources, and therefore make increased transparency even more necessary.

### 2.    Compounding Pharmacies

115.    For the Leavitt execution, IDOC obtained its chemicals from a compounding pharmacy.

116.    At the time of the Leavitt execution, Jeff Zmuda ("Mr. Zmuda") was the Deputy Chief of the Bureau of Prisons for IDOC.

117.    Mr. Zmuda was the Deputy Director of IDOC in 2008 and early 2009 at the time of the relevant trial proceedings in *Cover v. Idaho Bd. of Corr.*, Ada Cty., No. CV01-18-3877 (hereinafter "the *Cover* case").

118.    Mr. Zmuda testified in the *Cover* case that the drugs for the Leavitt execution were acquired from a compounding pharmacy.

119.    Mr. Zmuda further testified in the *Cover* case that the compounding pharmacy who provided the drugs for the Leavitt execution could not supply chemicals to IDOC for future executions because it was not in compliance with current regulations.

120.    The  IDOC has therefore previously relied upon an unreliable source for execution drugs, which in turn suggests a greater chance that it will do so again.

121.    IDOC has refused to make public the identity of its sources of drugs for either the Rhoades or Leavitt executions.

122.    In the *Cover* case, the Ada County District Court ordered IDOC to reveal the source of the drugs for the Leavitt execution.

123.    Rather than complying with the order, IDOC appealed the ruling to the Idaho Supreme Court.

124.    If IDOC revealed the sources of drugs for the Rhoades and Leavitt executions, it would help the plaintiffs evaluate the risks associated with their own executions.

125.    IDOC's refusal to do so handicaps the plaintiffs' ability to protect their right to be free from unconstitutional executions.

126.    Apart from specific problems with IDOC's previous source, its use of a compounding pharmacy suggests that it may do so again, and that in and of itself raises serious questions.

127.    Compounding is a practice used by pharmacists to combine, mix, or alter ingredients to create drugs.

128.    Compounding pharmacies typically follow informal recipes and attempt to approximate the patented process used in manufacturing drugs approved by the FDA.

129.    The finished product is designed to replicate a variation of—but is not the same as—an FDA-approved manufactured drug that goes by the same name.

130.    Compounded drugs are not FDA-approved.

131.    Compounding pharmacies are not subject to the FDA's good manufacturing practice regulations.

132.    The FDA does not verify the safety or effectiveness of drugs prepared by compounding pharmacies.

133.    Compounding involves the use of raw ingredients, including Active Pharmaceutical Ingredients ("APIs"), which are the active ingredients in the compounded drug.

134.    There are significant questions about the quality of APIs used in compounding.

COMPLAINT – Page 15

135.    Many APIs come from plants in India and China that are not registered with the FDA.

136.    In some instances, APIs are made on the same equipment as pesticides.

137.    Compounding pharmacies have been identified as a chief outlet for counterfeit bulk drugs.

138.    With compounders, it is difficult to trace the raw chemicals back to the original manufacturer for information about their quality and integrity, and difficult to determine expiration dates of individual ingredients.

139.    Accordingly, a chemical labeled as a particular active ingredient may actually be a different ingredient, and there is no way to have confidence that the APIs are not contaminated.

140.    Compounded drugs often degrade and lose efficacy more quickly than non-compounded drugs.

141.    Compounded drugs are not required to meet the stringent requirements regarding contamination, dilution, and degradation that manufactured drugs are required to meet.

142.    Compounding pharmacies generally are unable to test chemicals to confirm their identity, potency, and purity, or to detect contamination.

143.    While a compounding pharmacist might accurately measure or weigh individual ingredients, he or she would have no way of discovering in a pharmacy setting if the ingredients themselves were adulterated or counterfeit.

144.    This method for creating drugs unnecessarily adds enormous risk that the drugs will be ineffective, sub-potent, expired, or contaminated, or that they will contain unintended additives or a substantial level of particulates.

145.    Any one of these problems increases the danger that a compounded drug would not work as it is intended to and would therefore lead to a substantial risk of serious harm in an execution.

146.    Preparation of drugs intended for intravenous ("IV") administration is one of the most difficult of all pharmaceutical processes to execute.

147.    For a drug to be compounded effectively, the process must be carried out under specific environmental conditions, using precise equipment, and performed by highly trained personnel.

148.    There is little tolerance for error.

149.    If compounded drugs are prepared improperly, the pH can become off-balance, making the preparation more caustic than a manufactured version of the product, and causing intense, burning pain to the inmate upon injection.

150.    An out-of-balance pH can also cause ingredients to fall out of the solution in the form of particles, creating risks that the particle becomes contaminated or lodged in small blood vessels or in a prisoner's lungs, which would be extremely painful.

151.    If the preparation is created from non-sterile ingredients, or at a facility or by an individual who lacks the expertise to maintain sterility and quality of the drug, the drug can become contaminated with fungi, bacteria, and other contaminates.

152.    Contaminates include endotoxins, which would elicit an inflammatory reaction and can result in shock, or the preparations can become contaminated with a different drug from the same facility.

153.    Cross-contamination can occur during compounding when the air supply for the room in which one drug is being compounded is not scrupulously segregated from the air supply in the room in which another, allergy-causing agent is being produced.

154.    The consequence of contamination can be immediate anaphylaxis, i.e., a serious, life-threatening allergic reaction.

155.    These various problems with compounded drugs create a substantial risk of serious pain.

156.    Sterile preparations manufactured from non-sterile ingredients must be stored and transported within specific temperature requirements.

157.    If these are not followed, there is increased risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging.

158.    Compounded drugs must be kept in carefully prescribed conditions related to the stability and properties of the specific medicine in question.

159.    Stability depends on the purity and concentration of specific ingredients, packaging and environmental exposure and storage, especially for solutions.

160.    Small changes in any one of those variables can cause rapid loss of drug strength or much shorter than expected shelf life.

161.    Because the preparation of compounded drugs is so difficult and sensitive, the plaintiffs need to know the identity and backgrounds of the people involved, in order for them to evaluate the risks created for their executions.

162.    It is imperative to test both stability and sterility multiple times over a drug's shelf life, not just shortly after it is compounded.

163. Many laboratories that hold themselves out as facilities that test compounded drugs are sub-standard.

164. Therefore, in order to gauge the quality of any compounded drugs, the plaintiffs would need to know both the results of the testing and the identity of the laboratory that performed it.

165. Correctional departments have had problems with properly maintaining compounded drugs.

166. For example, in March 2015, the Georgia Department of Corrections discovered the compounded pentobarbital that it had for an execution had become cloudy because of the temperature of the drugs, which were kept in poor storage conditions.

167. Some executions with compounded drugs have been problematic.

168. For example, in January 2014, while Michael Lee Wilson was being executed in Oklahoma with compounded pentobarbital he cried out, upon administration of the drug, that he felt his "whole body burning."

169. A report prepared after the Oklahoma execution found that the injection likely contained cross-contaminates that the prisoner was allergic to, as well as bacteria and endotoxins.

170. An April 2014 Texas execution of Jose Luis Villegas involving compounded pentobarbital likewise spurred the inmate to complain of a burning sensation.

171. In October 2012, Eric Robert, a South Dakota inmate being executed with compounded pentobarbital, gasped heavily, and observers noticed that his skin turned a blue-purplish hue, his eyes remained open throughout the execution, and his heart continued to beat ten minutes after he stopped breathing.

172.    Subsequent analysis of the pentobarbital used in the South Dakota execution indicated that it was contaminated with fungi.

173.    All of the foregoing events are consistent with the administration of a compounded drug that was contaminated or sub-potent.

174.    The fact that other states have had problems with compounded drugs makes it more likely that Idaho will, which in turn means that the plaintiffs have to know whether IDOC will use compounded drugs, and if so where they will come from.

### 3.    IDOC's Obfuscation

175.    The following allegations reflect IDOC's practice of acting in such a manner as to obstruct lawful challenges to executions and to shield itself from public oversight.

176.    The U.S. Supreme Court denied certiorari ("cert.") review of Mr. Rhoades' habeas appeal on October 13, 2011.

177.    On October 14, 2011, IDOC issued a new execution SOP, providing for only three-drug executions.

178.    IDOC described the new SOP in litigation as "a completely revised execution procedure."

179.    On October 19, 2011, the State secured a death warrant for Mr. Rhoades, setting his execution for November 18, 2011.

180.    Given the timeline, it is apparent that the State was planning on seeking a death warrant as soon as the U.S. Supreme Court denied cert. in Mr. Rhoades' habeas case.

181.    The Supreme Court denies roughly ninety-nine percent of the cert. petitions it receives.

182.    Thus, IDOC knew or should have known that it was a near certainty that the Supreme Court would deny Mr. Rhoades' cert. petition.

183.    IDOC could sensibly have tied its release of the new execution SOP to significant and relevant legal events that took place far before the denial of cert.

184.    For example, the Ninth Circuit panel affirmed the denial of habeas relief on July 15, 2010.

185.    In addition, the Ninth Circuit denied Mr. Rhoades' petition for rehearing on February 10, 2011.

186.    Instead of using either of these dates, IDOC waited until a little more than a month before the execution to release its SOP, so as to give Mr. Rhoades as little time as possible to review, investigate, and challenge the State's plans.

187.    Since IDOC released a new execution SOP the day after the Supreme Court denied the petition for cert., it clearly began preparing the new protocol well before then.

188.    On November 18, 2011, Mr. Rhoades was executed with a three-drug combination of sodium thiopental, pancuronium bromide, and potassium chloride.

189.    On January 6, 2012, IDOC created a new execution SOP, now giving the Director two three-drug options and two one-drug options.

190.    The U.S. Supreme Court denied cert. in Mr. Leavitt's habeas case on May 14, 2012.

191.    On May 17, 2012, the State obtained a death warrant for Mr. Leavitt, setting his execution for June 12, 2012.

192.    On May 25, 2012, IDOC announced its intent to execute Mr. Leavitt with a single-drug protocol of pentobarbital.

193.    Given the timeline, it is apparent that the State was planning on seeking a death warrant for Mr. Leavitt when the Supreme Court denied cert. in his habeas case.

194.    IDOC knew or should have known that it was a near certainty that the Supreme Court would deny Mr. Leavitt's cert. petition.

195.    IDOC could sensibly have announced its intent to use a single-drug pentobarbital protocol on significant and relevant dates that took place far before the denial of cert.

196.    For example, the Ninth Circuit panel reversed this Court's grant of habeas relief on May 17, 2011.

197.    In addition, the Ninth Circuit denied Mr. Leavitt's petition for rehearing on September 13, 2011.

198.    Instead of using either of these dates, IDOC waited until eighteen days before the execution to announce its intention to use a single-drug protocol of pentobarbital, so as to give Mr. Leavitt as little time as possible to review, investigate, and challenge the State's plans.

199.    For the Rhoades execution, IDOC kept a separate cash log for lethal injection expenses.

200.    For the Leavitt execution, IDOC kept a separate cash log for lethal injection expenses.

201.    On information and belief, for the Rhoades execution, IDOC kept three different sets of accounting books.  Each book had more detail than the preceding one.  Former IDOC Purchasing Agent Joanne Sooter ("Ms. Sooter") was instructed by her boss Theo Lowe ("Ms. Lowe"), then IDOC's Executive Financial Officer, to provide the first book if a public record request was submitted.  Ms. Sooter was told that if the requester continued to press for more information, the second book was to be disclosed, as it had more details and would ideally placate

the individual seeking records.  The third book contained the real costs associated with the execution and it was not to be revealed.

202.    On information and belief, for the Leavitt execution, IDOC kept three different sets of accounting books.  Ms. Sooter was instructed by Ms. Lowe, then Project Manager for IDOC, to provide the first book if a public record request was submitted.  Ms. Sooter was told that if the requester continued to press for more information, the second book was to be disclosed, as it had more details and would ideally placate the individual seeking records.  The third book contained the real costs associated with the execution and it was not to be revealed.

203.    IDOC is refusing to make execution information available to the plaintiffs when they complain through the prison's grievance system on the ground that execution dates have not yet been set.

204.    However, by Idaho law, execution dates cannot be set more than thirty days in the future.  *See* Idaho Code § 19-2715(2), (3).

205.    Idaho death warrants can set execution dates fewer than thirty days in the future.

206.    For instance, Mr. Leavitt's death warrant set a date twenty-six days later for his execution.

207.    Thus, IDOC's position is apparently that no information about an execution can be provided to the inmate until his execution is roughly a month away.

208.    That position prevents any meaningful review of IDOC's plans for an execution.

209.    It is also illogical, as IDOC plainly does begin preparing for executions before the death warrant is officially issued.

210.    IDOC has in the past taken the additional view that inmates must exhaust their administrative remedies before challenging methods of execution in federal court.

COMPLAINT – Page 23

211.    Under IDOC's rules, inmates must pursue exhaustion through three separate levels of internal review.

212.    No regulations require IDOC to resolve grievances within thirty days.

213.    For example, when Mr. Pizzuto was exhausting his administrative remedies to prepare for this lawsuit, IDOC took forty-five days in total to reject his grievances, counting only the time that they were pending before prison authorities and not the time it took to write or submit them.

214.    Therefore, according to IDOC, it can wait until a death warrant has been issued to tell the plaintiffs anything about the drugs to be used in their executions and then kill them before they have had any chance to even *begin* litigating the protocol in federal court.

215.    This track record reinforces the need for judicial intervention, so that IDOC is not able to continue sabotaging legitimate litigation and obstructing the review of the courts and the public.

### 4.    IDOC's Misconduct

216.    On information and belief, for the Leavitt execution, Kevin Kempf ("Mr. Kempf") and now-Director Tewalt boarded a chartered plane on or around May 30, 2012, with a suitcase containing more than $10,000 in cash.

217.    Both Mr. Kempf and now-Director Tewalt were IDOC employees at the time of this trip.

218.    Upon information and belief, at the time of the May 30, 2012 trip, Mr. Kempf was the Division Chief of Operations for IDOC.

219.    Upon information and belief, at the time of the May 30, 2012 trip, now-Director Tewalt was the Deputy Chief of the Bureau of Prisons for IDOC.

220.    With their suitcase full of cash, Mr. Kempf and now-Director Tewalt flew to Tacoma Narrows Airport, in Washington State.

221.    After their plane landed, Mr. Kempf and now-Director Tewalt exchanged the money for lethal injection drugs in a Walmart parking lot.

222.    Mr. Kempf and now-Director Tewalt then brought the drugs back to Idaho for them to be used in Mr. Leavitt's execution.

223.    On information and belief, Mr. Kempf at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

224.    On information and belief, now-Director Tewalt at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

225.    Mr. Kempf and now-Director Tewalt and any agents acting in concert with them likely acted inconsistently with the federal statutes referenced below in their handling of the pentobarbital for the Leavitt execution.

226.    By federal law, pentobarbital is a Schedule II controlled substance.

227.    That being the case, in order for the drug to be delivered or transferred, a valid prescription written by a licensed practitioner is necessary.

228.    To be effective, the prescription must be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice.

229.    A person who issues a prescription and the person who knowingly fills a prescription that is not in the usual course of business is subject to penalties under the Controlled Substances Act.

230.    It is unlawful for any person, including a registrant, to distribute a Schedule II controlled substance without a prescription.

COMPLAINT – Page 25

231.    Whether the drugs provided to IDOC were made by a traditional compounding pharmacy or a non-traditional outsourcing facility, the absence of a prescription would violate the Federal Food, Drug and Cosmetic Act ("FFDCA") and the Drug Quality and Security Act ("DQSA").

232.    If the drugs were supplied by a traditional compounding pharmacy, the FFDCA requires pharmacies to compound only for an identified individual patient on receipt of a valid prescription order that a compounded product is necessary for the identified patient.

233.    Here, there is no valid prescription order and no identified individual patient for whom the compounded product is necessary.

234.    If the drugs were supplied by an outsourcing facility, the FFDCA provides that the facility may only compound with a bulk drug substance which appears on an FDA list of drugs for which there is a clinical need, or which are on the FDA's drug shortage list.

235.    In May 2012, pentobarbital was not on the drug shortage list.

236.    In May 2012, there was no clinical need for the drugs in these circumstances.

237.    Under the FFDCA, it is unlawful to compound drugs that are essentially copies of existing drugs, unless there is a shortage of those drugs, which there was not for pentobarbital.

238.    Upon information and belief, Mr. Kempf and now-Director Tewalt were directed to take the aforementioned trip to Tacoma by Brent Reinke ("Mr. Reinke"), who was the Director of IDOC at the time.

239.    On information and belief, Mr. Reinke was authorized by then-Governor Butch Otter to approve the trip.

240.     After they bought drugs for an execution with a suitcase full of cash, Mr. Kempf and now-Director Tewalt were both later promoted, at separate times, to IDOC Director, the highest position in the organization.

241.     Compounded pentobarbital is a high-risk sterile injectable.

242.     As such, compounded pentobarbital is meant to be administered within twenty-four hours, if stored at room temperature, and within seventy-two hours, if kept refrigerated.

243.     A pentobarbital preparation cannot be frozen, because freezing degrades the preparation.

244.     The plane that carried the drugs from Tacoma to Boise was parked for about three hours and was in the air for approximately an hour and twenty minutes, after which the chemicals presumably had to be driven elsewhere.

245.     Based on the previous facts, there is reason to suspect, on information and belief, that the pentobarbital acquired by Mr. Kempf and now-Director Tewalt may not have been properly stored during the time between when they obtained it and when it was used at Mr. Leavitt's execution.

246.     The Idaho Board of Correction appointed Mr. Kempf as IDOC Director in December 2014.

247.     The Idaho Board of Correction appointed Director Tewalt as IDOC Director in November 2018.

248.     Director Tewalt is currently IDOC Director.

249.     Mr. Kempf is now the Executive Director of the Association of State Correctional Administrators ("ASCA").

250.     Mr. Kempf took over in that position in December 2016.

COMPLAINT – Page 27

251.    ASCA's members are the leaders of each U.S. state correctional system.  In those roles, ASCA members oversee more than 400,000 correctional professionals and are in charge of more than eight million inmates and other convicts.

252.    Between approximately 2016 and 2018, now-Director Tewalt was Director of Operations for ASCA.

253.    IDOC's approach to acquiring drugs for the Leavitt execution makes it more likely that the organization will engage in similar conduct in connection with future executions, increasing the risk that it will acquire unreliable drugs.

254.    IDOC did not arrange for autopsies of either Mr. Rhoades or Mr. Leavitt after their executions.

255.    A valuable source of information about whether anything had gone wrong with the executions was thereby left untapped.

256.    The CHU represents seven of the eight inmates currently on Idaho's death row.

257.    The single inmate on Idaho death row who is not represented by the CHU is the one who is at the earliest stage of his case, and thus presumably the farthest from an execution.

258.    On March 21, 2019, the Ada County District Court found that IDOC and associated institutions and people acted in bad faith and with a lack of diligence in its execution-related responses to record requests in the *Cover* case.  The court fined Jeffrey Ray ("Mr. Ray"), IDOC's Public Information Officer and the designated records custodian, because he "did nothing to fulfill his responsibilities other than trust that others would," "did not even open the digital files to see what he had actually denied, [and] did not ensure the records he received were complete, or inquire into how the decision was made to deny any portions of the records."  In the district court's view, Mr. Ray's "inquiry and review was so lacking as to be an improper withholding that was performed

deliberately" and there was "substantial evidence" of "his lack of good faith compliance with Idaho's Public Records Act and avoidance of his mandatory duties under its provisions rising to the level of bad faith."

259.    In the *Cover* case, a pattern emerged of IDOC mishandling public record requests for execution-related material.

260.    For example, IDOC has provided certain records to requesters while withholding the same documents from other requesters seeking the same information, with no justification for the distinction.

261.    IDOC's responses to the plaintiff in the *Cover* case also reflected a highly disorganized and unreliable approach to the retention and disclosure of execution-related materials.

262.    Over the course of the *Cover* case, IDOC failed to provide execution-related material that was plainly responsive to the request and not exempt from disclosure.

263.    After the plaintiff in the *Cover* case took IDOC to court over its initial response, thousands more pages of records were located that had not been provided earlier.

264.    IDOC provided these materials in batches for months, each time explaining that it had found them in a place it had not searched earlier, such as a filing cabinet.

265.    Outside of the execution context, Idaho prison authorities have acted inappropriately in regards to health-related issues with its inmates.  That conduct further increases the need for transparency in how it conducts executions.

266.    For instance, on August 11, 2015, this Court sanctioned the Idaho Board of Correction for misleading a special master about mental health treatment, falsifying records, and

destroying evidence, all in connection with *Balla v. Idaho State Bd. of Corr.*, D. Idaho, No. 1:81-cv-1165.

267.    In the same case, this Court held the Idaho Board of Correction in contempt on September 28, 2017 and criticized prison personnel for failure to comply with judicial orders, medical malpractice, falsification of records, and possible sexual abuses.

268.    Although it was, on information and belief, never posted to IDOC's website, an updated version of at least part of its chemical protocol for executions was created on August 29, 2017.

269.    This shows that IDOC has worked on its protocol years after the latest execution.

270.    Nevertheless, IDOC has not finalized and released a complete new protocol, despite its knowledge that it will do so before any subsequent executions.

271.    The IDOC is intentionally delaying the issuance of a protocol in order to impede death row inmates who may wish to contest the State's proposed method of execution.

**C.      Problems With Execution Drugs**

272.    There have been significant questions raised about the efficacy of certain drugs used in executions.

273.    The plaintiffs may need to raise similar questions in their own cases, but they cannot do so when IDOC refuses to disclose what drugs it will use for their, and any future, executions.

**1.      Midazolam and Etomidate**

274.    One execution drug that has been problematic is midazolam.

275.    Midazolam has been used by states as the first ingredient in multi-drug execution protocols.

276.    There is evidence that midazolam lacks the chemical properties of an anesthetic and is not designed for anesthesia.

277.    Midazolam is a benzodiazepine, a family of drugs typically used to treat anxiety.

278.    Midazolam is not FDA-approved to serve as a stand-alone anesthetic or clinically used for that purpose.

279.    The use of midazolam in executions has consequently been criticized for not rendering the inmate insensate, and thereby leaving the inmate exposed to the intense pain caused by the subsequent drugs.

280.    In particular, with a three-drug protocol, the ineffectuality of midazolam would lead the prisoner to experience the feeling of suffocation or drowning caused by the second chemical, a paralytic, and an intense burning sensation caused by the third drug, the one designed to stop the heart.

281.    Similarly, midazolam has been contested on the ground that even when it induces unconsciousness it loses effectiveness rapidly, leading inmates to regain consciousness and experience the pain caused by the subsequent drugs.

282.    Additionally, midazolam has a ceiling, i.e., a limit to the effect the drug can exert on the body, even when administered in large doses.

283.    The ceiling effect means that, whatever the dosage, it is substantially likely that an inmate subjected to midazolam will be awake and sensate to the noxious stimuli he will experience as a result of the later drugs, such as air hunger (in which a person has the desire to breathe but no ability to do so), suffocation, the horror of paralysis, the sensation of being burned alive, the sensation of being buried alive, and/or cardiac arrest, depending on the other drugs used.

284.    Moreover, the amount of midazolam available to exert its effects on the brain is substantially lower than the amount in the injected dose, because a substantial amount—more than 50%—will precipitate, i.e., fall out of the solution, at the site of injection as it is first diluted in the blood.

285.    Finally, some people experience a paradoxical effect when administered midazolam, whereby they become agitated, hyperactive, or restless rather than experiencing sedation.

286.    Larger doses of midazolam cannot overcome the risks of paradoxical reactions.

287.    Paradoxical reactions are more likely in inmates who have brain damage, such as Mr. Pizzuto and Mr. Creech.

288.    Paradoxical reactions are also more likely in inmates who have been diagnosed with bipolar disorder.

289.    Paradoxical reactions are more likely in inmates who have been diagnosed with post-traumatic stress disorder ("PTSD").

290.    Mr. Pizzuto has been diagnosed with bipolar disorder.

291.    As a child, Mr. Pizzuto was subjected to extreme and repeated physical, sexual, and emotional abuse.

292.    Mr. Pizzuto has experienced symptoms consistent with PTSD, including suicidal ideation, and constant nightmares and flashbacks related to his life history.

293.    Therefore, Mr. Pizzuto is more likely to experience a paradoxical reaction.

294.    Observation of midazolam executions have confirmed fears about its use, as there have been reports of prolonged executions with prisoners struggling to breath, gasping, snorting,

heaving, coughing, clenching their fists, convulsing, twitching, writhing, grunting, and verbally expressing their extreme pain and suffering.

295.    Florida uses etomidate as the first chemical in its three-drug execution protocol.

296.    Many of the same flaws that midazolam suffers from have been ascribed to etomidate.

297.    In particular, the effects of etomidate wear off quickly and are likely to drop below anesthetic levels before the execution is complete.

298.    Etomidate also causes significant pain upon injection.

299.    Furthermore, etomidate has no analgesic properties.  It is not FDA-approved as the sole drug to produce anesthesia in minor surgical procedures.  It is never used as a sole anesthetic in any procedure that involves significant noxious stimuli.

300.    Lastly, if etomidate comes into contact with certain drugs in the IV tubing, it will precipitate, leading to incomplete drug delivery and loss of the IV in the middle of the procedure.

301.    There is evidence that etomidate has not worked as intended in executions.

302.    During the execution of Patrick Hannon in Florida in November 2017, witnesses observed his chest heave and his arms, legs, and body convulse for about two minutes following the administration of etomidate.

303.    During the execution of Eric Branch in Florida in February 2018, he screamed, then thrashed and shook for six minutes following the administration of etomidate.

### 2.    Paralytics

304.    Other multi-drug protocols, including some involving midazolam, have included the use of a paralytic before the administration of the final chemical, which stops the heart.

305.   IDOC used a paralytic—pancuronium bromide—as the second of three drugs when it executed Mr. Rhoades in November 2011.

306.   The use of paralytics in executions has been questioned, since they potentially prevent the prisoner from communicating or showing that he is feeling substantial pain.

307.   Moreover, paralytics serve no purpose in anesthetizing or killing inmates.

308.   They are administered purely for cosmetic reasons, so that viewers do not see prisoners writhing and showing outward signs of distress while the lethal final drug is administered, i.e., the one that disrupts the electrical activity of the heart and induces cardiac arrest.

309.   Two-drug executions that do not include a paralytic have demonstrated the problems caused by their use.

310.   For example, when Joseph Wood ("Mr. Wood") was executed in Arizona in July 2014, it took nearly two hours, during which time he gasped for air over 600 times.

311.   If Mr. Wood had been given a paralytic, that gasping would likely have not occurred, and the ineffectuality of the execution drugs would have been concealed.

312.   Aside from the pain induced by the lethal final drug, paralytics themselves create a feeling of suffocation.

313.   If a paralytic is used in Mr. Pizzuto's execution, it might expose him to extreme psychological suffering as a result of the trauma he experienced in his childhood.

314.   As a young child, Mr. Pizzuto was raped by his stepfather.

315.   If IDOC injects Mr. Pizzuto with a paralytic while executing him, it may recreate the feeling he had in childhood of being immobilized and tortured.

316.   To determine whether the drugs intended for future executions are safe and reliable, and to raise any appropriate challenges to them, the plaintiffs need to know what they are.

317.    IDOC's refusal to give the plaintiffs this information frustrates their ability to challenge the drugs and vindicate their rights.

### D.    Problems with the Viewing of Executions

318.    Multiple states have rejected requests by condemned prisoners to make telephones available to their counsel during executions.

319.    Inmates' attorneys need to have phone access during executions so that they can contact the appropriate court in the event that the process goes awry to seek an emergency stay.

320.    It would be inequitable to deny the CHU access to a phone during an execution, as the State has such access.

321.    Multiple CHU staff members need to be present at any execution so that they can observe different aspects of the proceedings and confer in the event that problems arise to determine what course of action to take.

322.    A number of states have obscured various parts of executions, including by the closing of curtains when problems have arisen.

323.    For example, during the Clayton Lockett ("Mr. Lockett") execution in April 2014 in Oklahoma, the curtains were closed after a catheter failed and while an IV was inserted.

324.    IDOC has assured the CHU that it will allow witness access to future executions consistent with *AP v. Otter*, 682 F.3d 821 (9th Cir. 2012).

325.     However, that decision does not address whether the curtains will remain open after the pronouncement of death, and while the inmate's body is being removed from the execution chamber.

326.    IDOC has refused to say whether it will keep the curtain open during that time.

327.    The question is important because its answer could shed light on whether a mistake was made during the execution, in which case the surviving plaintiff would use the information to help protect his own rights at his own execution.

328.    The *Otter* opinion likewise does not address whether, and for what portions, audio of an execution must be made available in real time to the witnesses.

329.    If such audio is not made available, the plaintiffs have a right to contest the limitation on constitutional grounds.

330.    The plaintiffs' lawyers here need to know whether they will be granted the access described herein so that they can, if denied it, challenge any unlawful restrictions.

331.    IDOC's refusal to answer the questions one way or another prevents the plaintiffs from raising the issue in court.

**E.      Human Error at Executions**

332.    Correctional staff and agents have made a variety of serious mistakes at executions.

333.    As a consequence, there is a higher risk that mistakes will be made at the plaintiffs' executions, making it more essential that they be given access to the information requested so they can ensure their constitutional rights are protected.

334.    For example, at the Lockett execution, the executioners apparently had problems setting an IV line, which took them fifty-one minutes to do.

335.    During the Lockett execution, staff punctured multiple parts of his body at least twelve times before essentially jury-rigging a solution by inserting a too-short catheter in his right femoral vein and attempting to secure it with tape.

336.   As a result of that failure, Mr. Lockett began to writhe and gasp after he had already been declared unconscious, kicked his leg, rolled his head, grimaced, and grunted, all for more than thirty minutes.

337.   In the course of Mr. Lockett's execution, some of the lethal injection drugs massed in his tissue, creating a swelling under his skin larger than a golf ball.

338.   Eventually, Mr. Lockett died of a heart attack.

339.   At the Arizona execution of Robert Towery ("Mr. Towery") in March 2012, it took fifty-nine minutes to set the IV lines.

340.   An autopsy later revealed that Mr. Towery had been punctured at least eleven times.

341.   At a Florida execution in December 2006, a misplaced IV line allowed caustic lethal injection drugs to leak into the soft tissue of the arms of inmate Angel Nieves Diaz ("Mr. Diaz").

342.   The drugs accordingly failed to render Mr. Diaz unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away.

343.   On information and belief, Mr. Diaz likely suffocated to death before the execution drugs could end his life.

344.   In 2009 in Ohio, in attempting to execute Romell Broom, the execution team stabbed him with needles for an hour and a half while trying to find a vein, using eighteen needle sticks in the process.  Finally, the governor halted the execution.

345.   Training and regular experience are required in order to obtain IV access.

346.   Errors in placing IV lines cause chemical solutions to escape into subcutaneous tissue, which can cause excruciating pain.

347.    For multiple-drug executions, protocols often provide for consciousness assessments, with the goal of ensuring that the inmate is insensate after the first chemical is administered, so that he will not experience the pain generated by subsequent chemicals.

348.    Execution teams have not been consistent or reliable in performing consciousness assessments.

349.    For example, in some states where the consciousness assessment is supposed to include a pinch test, correctional staff have failed to conduct it, as occurred with a number of executed inmates in Alabama, including Eddie Powell, Michael Land, Jimmy Dill, Willie McNair, Max Payne, Phillip Hallford, Leroy White, and Jason Williams.

350.    In Alabama and elsewhere, correctional departments have failed to provide sufficient training to personnel charged with conducting consciousness assessments.

351.    For example, Alabama correctional officers were not instructed, and did not know, how hard to pinch inmates when conducting the consciousness assessment.

352.    Alabama officers were also not told what reactions to look for, where to look for those reactions, or what significance particular reactions might have.

353.    In Alabama, officers were not given consistent and clear guidance on how to communicate the results of consciousness assessments.

354.    Deficiencies in the performance of consciousness checks in Alabama have caused problems, including indications that inmates exhibited movement and/or opened their eyes during the course of executions, even after the consciousness assessment was performed.

355.    Consciousness assessments are performed far less capably when done by lay persons, which has happened in states like Alabama, as opposed to trained medical professionals.

356.    Problems in executions can also be caused by errors in preparing IVs, labelling syringes, preventing IVs from leaking, preventing veins from leaking, waiting the appropriate amount of time between injections, and injecting the chemicals properly.

357.    Members of execution teams in other states have been revealed to have histories that raised questions about their suitability for the task.

358.    For example, a member of the execution team in Arizona had his nursing license suspended and had a lengthy arrest record.

359.    Similarly, it was found that a surgeon involved in Missouri executions was dyslexic and had prepared lower-than-expected amounts of anesthesia for several inmates who were put to death.

360.    Because of these risks of human error, it is critical that the plaintiffs know the identities and credentials of the personnel tasked with executing them.

361.    Execution equipment in some states has been found wanting.  For instance, there have been issues raised about adequate lighting in the room where the chemicals are prepared and about adequate sightlines from that room into the execution chamber.

362.    Consequently, it is important for the plaintiffs to be able to examine Idaho's execution facilities with the assistance of their expert well in advance of any execution, so they can find and explore any potential problems with the space and the equipment.

363.    IDOC's refusal to make that information available prevents the plaintiffs and their attorneys from ensuring that the execution does not pose a substantial risk of serious harm.

### F.      Plaintiffs' Individual Health Concerns

364.    Both Mr. Pizzuto and Mr. Creech have individual health conditions that would potentially complicate their executions, depending on what drugs, protocol, and procedures the State adopts.

365.    Both Mr. Pizzuto and Mr. Creech have a constitutional and statutory right to argue that their individual health conditions create a substantial risk that their executions would cause them serious harm in violation of the Eighth Amendment.

366.    Since IDOC refuses to tell Mr. Pizzuto and Mr. Creech which drugs it will use to execute them or how it will administer them, they cannot adequately explore and prepare such arguments.

### 1.      Mr. Pizzuto's Individual Health Concerns

367.    Mr. Pizzuto has a litany of serious health problems, which collectively make him a high risk to deteriorate during an execution and become critically unstable.

368.    As a result of Mr. Pizzuto's many health issues, he was placed on hospice care on November 1, 2019 because his life expectancy was considered to be six months or less.

369.    Due to his health conditions, Mr. Pizzuto has been hospitalized three times in the last year.

370.    Mr. Pizzuto has coronary artery disease.

371.    Mr. Pizzuto has chronic ischemic heart disease.

372.    Mr. Pizzuto has had at least two heart attacks, in September 2006 and July 2019.

373.    During the 2006 heart attack, Mr. Pizzuto became unresponsive and his breathing and pulse stopped.  He was brought back to life through electrical shocks and other CPR measures.

374.    Mr. Pizzuto's heart problems have also led to the placement of five separate stents.

375.    Given Mr. Pizzuto's decision to enroll in hospice, his palliative-care team has discontinued the medications intended to treat his heart conditions and his diabetes.

376.    Mr. Pizzuto's heart condition may create a substantial risk of serious harm, depending on what chemicals are used in his execution.

377.    That is because of a danger that certain protocols would induce a heart-attack-like experience before he became insensate.

378.    Mr. Pizzuto is diffusely diseased in both his left anterior descending artery and his left circumflex artery.

379.    Some of the vessels in those arteries are more than 90% diseased.

380.    An execution would upset Mr. Pizzuto's cardiovascular homeostasis, making it highly likely that he would experience sensations associated with a heart attack, including significant pain and a feeling of impending doom.

381.    Certain execution cocktails would not adequately render Mr. Pizzuto insensate before he underwent those experiences, including—for reasons noted elsewhere—a three-drug protocol involving midazolam as the first ingredient.

382.    Similarly, if the execution involves pentobarbital, that drug induces a rapid and dangerous reduction in blood pressure more quickly than it results in appropriate sedation.

383.    In individuals with clinically significant obstructive coronary disease, a rapid drop in blood pressure will result in the reduction or cessation of blood flow down the affected coronary artery, thus causing acute myocardial ischemia and/or infarction.

384.    Individuals not appropriately anesthetized at that point in time will experience significant pain and suffering, as do all individuals who suffer acute myocardial ischemia and/or infarction.

COMPLAINT – Page 41

385.    Mr. Pizzuto cannot adequately explore and litigate the substantial risks that Idaho's protocol may pose as a result of his heart condition until he knows what protocol and drugs the State will use.

386.    Mr. Pizzuto has multiple cancerous tumors in his bladder.

387.    Mr. Pizzuto underwent a resection of his bladder tumors in August 2016.

388.    However, the surgeon was unable to remove all of the tumors.

389.    Since then, the tumors have grown back and there has been no effort to remove them.

390.    In September 2019, bleeding from Mr. Pizzuto's bladder tumors caused him to experience severe sepsis and shock, which triggered an ambulance ride and a five-day hospitalization.

391.    Doctors have prescribed Mr. Pizzuto numerous medications to treat his many ailments.

392.    Over the last year alone, Mr. Pizzuto has been prescribed at least forty-two different drugs by medical staff, including high dosages of powerful painkillers, such as morphine and Oxycodone.

393.    Mr. Pizzuto has been given painkillers in such high doses that he began suffering from acute toxic encephalopathy in October 2019, a syndrome of temporary or permanent disturbance of brain functions that can cause mild mental disorders, deep coma, and death.

394.    In lethal injection protocols around the country, there are at least thirteen different chemicals listed for use in executions, including pentobarbital, sodium thiopental, sodium methohexital, midazolam, hydromorphone, vecuronium bromide, potassium chloride, pancuronium bromide, rocuronium bromide, etomidate, diazepam, fentanyl, and cisatracurium.

COMPLAINT – Page 42

395.    Recently, states have begun using types of drugs in executions that had not been employed for such purposes previously.

396.    For example, Nebraska became the first state in the country to use fentanyl in an execution in August 2018.

397.    Similarly, in August 2017, Florida became the first state in the country to use etomidate in an execution.

398.    Other states have begun using novel combinations of drugs.

399.    For instance, Nevada's current protocol is the first one that proposes the use of a paralytic as the final component of an execution and the agent of death.

400.    Therefore, there is a possibility that IDOC will select a drug for executions that has never before been used in that way, or a new combination of drugs.

401.    The plaintiffs have no way of knowing whether IDOC will do so or what drugs it would then choose and in what combination.

402.    The use of certain prescription medications can complicate executions, depending on what chemicals are used, and thereby creates an objectively intolerable risk of harm.

403.    For instance, a particular medication might interact with a specific execution chemical in such a way as to cause the inmate extreme suffering.

404.    Alternatively, the use of a particular medication might create a tolerance in the inmate that renders a certain execution chemical less effective, which could also lead to severe pain, especially if that chemical is intended to serve as a sedative.

405.    Other medications alter a person's brain chemistry in ways that can make an execution problematic.

406.    For example, a medication can increase the number of receptors susceptible to it. The receptors then become more and more tailored to the medication.  As a consequence, the receptors become less responsive to certain other drugs.  This results in what is known as competitive inhibitory effect, which can limit a lethal injection drug's ability to depress electrical activity in the brain.

407.    If that occurs in a one-drug protocol, the lethal chemical might not render the person unconscious, as intended, while exposing the individual to a series of substantial harms, including a prolonged and painful death process, awareness of the process of dying, an increased likelihood of seizures, the possibility of additional paradoxical reactions, and acute pulmonary edema, a buildup of fluid in the lungs which creates a sensation akin to suffocating or drowning.

408.    In addition, Mr. Pizzuto has documented allergies to certain types of drugs.

409.    If IDOC uses a drug in an execution that Mr. Pizzuto is allergic to, there could be a substantial risk of him experiencing severe pain.

410.    Mr. Pizzuto has a seizure disorder and suffers from epileptic fits.

411.    An individual with such conditions is at a greater risk for suffering a seizure during an execution, depending on what drugs are used.

412.    Mr. Pizzuto has coronary obstructive pulmonary disease ("COPD").

413.    Due to his COPD, Mr. Pizzuto has an estimated lung age of ninety-two years.

414.    Mr. Pizzuto has a history of obesity.

415.    Mr. Pizzuto's lung and heart conditions, as well as his obesity, create a potentially heightened risk of pulmonary edema during an execution.

416.    That risk may differ depending on the drugs IDOC uses at the execution.

417.    Mr. Pizzuto suffers from brain damage.

COMPLAINT – Page 44

418.   In particular, there are indications that Mr. Pizzuto has frontal lobe dysfunction, an atypically small brain, an abnormally high amount of atrophy, and a vacuum septum pellucidum, which is a congenital abnormality.

419.   Brain damage elevates the risk that Mr. Pizzuto would have an atypical reaction to an execution drug, potentially causing him to become agitated and confused and to decompensate.

420.   In such a state, there is a heightened likelihood that obtaining IV access will be difficult.

421.   Without any insight into what drugs will be used at his execution, Mr. Pizzuto has no way of determining whether those chemicals or the method of their administration poses a substantial risk of causing him serious harm.

422.   Mr. Pizzuto has Type 2 diabetes mellitus with diabetic neuropathy.

423.   Diabetic neuropathy is a type of nerve damage.

424.   Mr. Pizzuto's diabetic neuropathy primarily affects his legs and feet.

425.   Mr. Pizzuto has significant edema in his lower extremities.

426.   Edema is a visible swelling caused by a buildup of fluid within tissues.

427.   Mr. Pizzuto's baseline edema is Grade 3, which is the third-most severe level of four.

428.   Mr. Pizzuto's health conditions make it difficult and sometimes impossible to stand or to lie flat on his back.

429.   Prison authorities have allowed Mr. Pizzuto to use a wheelchair for many years.

430.   Mr. Pizzuto has had partial paraplegia since the 1990s.

431.   Mr. Pizzuto has chronic back pain caused by intervertebral degeneration.

432.     Mr. Pizzuto is unable to determine whether his health conditions create a substantial risk of a severely painful execution because IDOC will not inform him of its plans or issue a protocol in a timely fashion.

### 2.     Mr. Creech's Individual Health Concerns

433.     Mr. Creech suffers from brain damage.

434.     In particular, Mr. Creech has many signs that indicate abnormalities of circuits that are mediated through the frontal lobe.

435.     Mr. Creech has bilateral brain damage.

436.     The right side of the brain is more damaged than the left.

437.     Mr. Creech's neurological deficits are indicative of brain dysfunction.

438.     Mr. Creech has a history of migraine headaches, which at times have become so incapacitating that he cannot move.

439.     Mr. Creech has been prescribed a number of medications for his migraines.

440.     Mr. Creech's neuropsychological deficits are indicative of brain dysfunction.

441.     Over the years, Mr. Creech experienced a series of head injuries, including a fall from a staircase when he was a boy which led to a lapse in consciousness.  After that fall, his mother removed him from the hospital against doctors' orders.  In addition, Mr. Creech was in two serious car crashes at the ages of thirteen and seventeen respectively.

442.     Brain damage elevates the risk that Mr. Creech would have an atypical reaction to an execution drug, potentially causing him to become agitated and confused and to decompensate.

443.     In such a state, there is a heightened likelihood that obtaining IV access will be difficult.

444.     Mr. Creech has Type II diabetes.

445.    Mr. Creech has hyperlipidemia.

446.    Mr. Creech has hypertension.

447.    Mr. Creech has at times experienced edema.

448.    Mr. Creech has lower back pain.

449.    Over the course of his life, Mr. Creech has been diagnosed and treated for a variety of mental health conditions.

450.    Earlier in his life, Mr. Creech was hospitalized and subjected to electroshock therapy.

451.    Mr. Creech has been diagnosed with major depression.

452.    Mr. Creech has been prescribed a series of medications for his various psychological ailments, including drugs for schizophrenia, manic depression, and anxiety.

453.    As a result of his physical and psychological conditions, Mr. Creech has been prescribed at twenty-two different medications within the last two years.

454.    For the reasons stated above, and incorporated here by reference, the use of certain lethal injection chemicals might complicate Mr. Creech's execution as a result of his medications.

455.    Mr. Creech cannot adequately explore the possibility of such complications because the defendants refuse to tell him what chemicals they will use and how they will be administered.

## VI.    Claims

### A.    First Claim–Deprivation of Information Violates First and Fourteenth Amendment Rights to Access to Government Proceedings

456.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

457.    The public—and the press—has  an affirmative, enforceable right of access to certain government proceedings and records that is secured by the First and Fourteenth Amendments to the United States Constitution.

458.    This constitutional right of public access attaches specifically where (a) certain government proceedings or records historically have been open to the public, and (b) public access to these proceedings or records plays a significant positive role in the functioning of the government.

459.    The public right of access extends to the information about prison conditions and operations, including executions and all procedures inextricably intertwined with putting an inmate to death.

460.    Both the press and the public must be accorded substantial access to the prisons in order to observe and report the conditions they find there.

461.    This constitutional right of access attaches to information about (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/will be obtained, their source, amounts, expiration date, how they were acquired/transported/stored/tested, when IDOC obtain will the drugs, etc. (3) when a new version of SOP 135 will be issued, (4) whether witnesses will be able to observe the insertion of the IVs; (5) procedures for IV placement/length, (6) who will participate in the execution, what is their training/qualifications, and how will they be chosen, (7) whether there will be a consciousness check and the procedure for it, and (8) procedures for botched executions.  This right also attaches to the execution itself, and the public, through designated press representatives, has a right to view the entirety of an execution.

462.    This constitutional right of access also includes the CHU's right to access the execution chamber, the right to witness the entire execution procedure, and the right to be permitted access to cameras and phones during the execution.

463.    Historically, executions—and information concerning how executions are conducted—have been open to the public and press.

464.    Hangings, for example, were conducted using scaffolds that were specifically constructed to accommodate large crowds.

465.    Even after executions ceased to be public events, officials in many states continued to make information publically available about how convicts were executed.

466.    Indeed, SOP 135 provides executions are "open to the general public," and IDOC allots "four (4) seats for news media representatives to witness the execution."

467.    The United States Constitution compels access to historically available information about the source, composition, and quality of the drugs used for lethal injection executions, as well as the procedures to be used and the qualifications of those chosen to administer the drugs and participate in the execution because disclosure promotes the functioning of the process itself and is essential for democratic oversight.

468.    Public access to such information about the manner by which convicted individuals are put to death enhances the proper functioning of the execution process and promotes public integrity in the criminal justice system.

469.    It is essential to have an informed public debate to determine whether execution by lethal injection comports with evolving standards of decency, and even more so at this time in history, where there is intense public interest in whether lethal injection is capable of being administered in a humane manner.

COMPLAINT – Page 49

470.   Given the factual backdrop of the many botched executions and the unavailability of execution drugs manufactured by large pharmaceutical companies, more information about the drugs used in lethal injections can help the public make more informed decisions about the evolving standards of decency in this country surrounding lethal injection.

471.   Knowing the source of the drugs, and the qualifications, credentials, competence, protocols, and identification of the drug makers and other professionals involved in the execution process, among other information, allows the public to discern whether the defendants are using safe and reliable drugs, and would give the public the basic confidence, beyond the State's general assurances, that executions will be administered safely by personnel with the appropriate qualifications and pursuant to the appropriate standards.

472.   In order to exercise their rights of access to the courts under the First Amendment and Due Process Clause of the Fourteenth Amendment, the plaintiffs need access to this information.

473.   The disclosure of the relevant information reduces the risk that improper, ineffective, or defectively prepared drugs are used; it allows public oversight of the types of drugs selected to cause death and the qualifications of those manufacturing the chosen drugs; and it promotes the proper functioning of everyone involved in the execution process.

474.   No proper basis exists for the defendants to abridge the public's constitutional right of access to this information and to the execution.

475.   By withholding this information, the State of Idaho has closed critical governmental proceedings that have historically been open to the public and undermined the public's ability to ensure positive functioning of the government.

COMPLAINT – Page 50

**B.      Second Claim–Deprivation of Information Violates First Amendment Right to Petition Government for Redress of Grievances**

476.     The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

477.     The defendants have admitted that the current SOP 135 is not the protocol that will be used to execute the plaintiffs.

478.     The defendants' refusal to provide the plaintiffs with information that would enable them to determine how the State intends to execute them denies the plaintiffs' First Amendment right to petition the government for redress of grievances.

479.     The First Amendment right to petition the government for redress of grievances includes the right of access to the courts.

480.     The right of access to the courts is especially critical for inmates, because their access to other remedies is limited.

481.     State action that denies a plaintiff the opportunity to litigate gives rise to a claim that the State is violating the plaintiff's right of access to the courts.

482.     By deliberately concealing information about (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/will be obtained, their source, amounts, expiration date, how they were acquired/transported/stored/tested, when IDOC will obtain the drugs, etc., (3) when a new version of SOP 135 will be issued, (4) whether witnesses will be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who will participate in the execution, what is their training/qualifications, and how will they be chosen, (7) whether there will be a consciousness check and the procedure for it, and (8) procedures for botched executions, the defendants have erected a condition that frustrates the plaintiffs' ability to litigate their claims relating to the constitutionality of their executions.

COMPLAINT – Page 51

483.    This frustrating condition deprives the plaintiffs of their First Amendment right to petition the government for redress of grievances.

484.    This frustrating condition also deprives the plaintiffs of their right of access to the courts.

485.    The defendants' deliberate concealment of information that would enable the plaintiffs to determine how the State intends to carry out their death sentences, including information relating to lethal-injection drugs and qualifications of those involved in the executions, deprives the plaintiffs of their ability to determine whether the State is capable of carrying out their executions in a lawful, constitutional manner.

**C.    Third Claim–The Absence of A Real Execution Protocol Constitutes Cruel and Unusual Punishment in Violation of the Eighth Amendment Because The Plaintiffs Suffer Mental Anguish from Uncertainty Which Increases Their Punishment**

486.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

487.    The Eighth Amendment guarantees every person the right to be free from cruel and unusual punishment.  Cruel and unusual punishment is inflicted where a method of execution presents a substantial risk of significant harm.

488.    Implicit in that protection is a right to due process as to information about the method and means by which the State proposes to mete out that punishment.

489.    IDOC has indicated that the current SOP 135 will be amended prior to the next execution.

490.    This makes clear that currently there is no IDOC protocol in place mandating procedures that the defendants must follow when carrying out an execution.

COMPLAINT – Page 52

491.    The defendants cannot withhold or fail to provide critical information about the procedures by which the plaintiffs will be executed.

492.    At this time, the plaintiffs still do not know (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/will be obtained, their source, amounts, expiration date, how they were acquired/transported/stored/tested, when IDOC will obtain the drugs, etc., (3) when a new version of SOP 135 will be issued, (4) whether witnesses will be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who will participate in the execution, what is their training/qualifications, and how will they be chosen, (7) whether there will be a consciousness check and the procedure for it, and (8) procedures for botched executions.

493.    The Eighth Amendment requires a method of execution that is not arbitrary as a result of a secret and unexamined decision-making process.

494.    The defendants' refusal to disclose the true nature of the execution protocol to end each of the plaintiffs' lives nullifies those protections, and accordingly the plaintiffs' rights.

495.    The immense mental anxiety caused by the lack of clarity around the State's execution protocol triggers in the plaintiffs an intolerable, unnecessary, and unconstitutional degree of psychological trauma and anxiety, which amounts to an increase in the offender's punishment.  This is the type of unnecessary and wanton infliction of pain that is prohibited by the Eighth Amendment.

496.    Without the assurance of process or accountability, the plaintiffs do not know whether an amended execution protocol will ensure the protection of their rights to be free from cruel and unusual punishment under the Eighth Amendment.

COMPLAINT – Page 53

**D.      Fourth Claim – Deprivation of Information Violates the Plaintiffs' Fourteenth Amendment Right to Due Process**

497.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

498.    The Due Process Clause of the United States Constitution provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

499.    Fundamental fairness and due process require that an individual be given an opportunity to receive notice of how one's rights will be affected and an opportunity to respond and be heard.

500.    The defendants' refusal to provide the plaintiffs with information that would enable them to determine how the State intends to execute them violates their rights to due process; among other things, the lack of information raises a procedural barrier to challenging the constitutionality of IDOC's execution process.

501.    Further, executing the plaintiffs without giving them fair notice of the procedures to be used violates their rights to due process and fundamental fairness.

502.    The defendants are deprived of at least the following information in violation of their right to Due Process: (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/will be obtained, their source, amounts, expiration date, how they were acquired/transported/stored/tested, when IDOC will obtain the drugs, etc., (3) when a new version of SOP 135 will be issued, (4) whether witnesses will be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who will participate in the execution, what is their training/qualifications, how will they be chosen, (7) whether there will be a consciousness check and the procedure for it, and (8) procedures for botched executions.

COMPLAINT – Page 54

503.    The principles of fundamental fairness and due process prohibit the state from suppressing information about how a condemned prisoner's death sentence will be carried out. Without access to such information, the plaintiffs have no way to know whether their executions will comport with the Eighth Amendment's limitations on gratuitous infliction of pain and suffering.  The plaintiffs are further denied any effective remedy to enforce compliance with constitutional commands.  Without reliable information about the manner in which the prisoner will be executed, the courts cannot meaningfully review a state's execution procedure to ensure it complies with the commands of the Constitution.

504.    By depriving the plaintiffs of information necessary to challenge the execution procedures to be used, the defendants have violated the plaintiffs' rights to Due Process.

**E.      Fifth Claim – The Absence of A Real Execution Protocol and/or Allowed Variances in Execution Procedures Under the Current Protocol Violates the Plaintiffs' Fourteenth Amendment Right to Equal Protection**

505.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

506.    The Equal Protection Clause of the Fourteenth Amendment provides, "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

507.    Equal protection under the law requires minimal procedural safeguards providing at least some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied.

508.    The Equal Protection Clause's requirements are important here, where the United States Supreme Court has clearly emphasized the necessity of procedural safeguards in a state's lethal injection execution policy, especially including the written protocol, to ensure against Eighth Amendment and Fourteenth Amendment violations.

COMPLAINT – Page 55

509.    As set forth above, IDOC has established a pattern and practice of essentially creating a new protocol for each condemned inmate as soon as his execution is imminent.

510.    Consequently, inmates are not treated consistently with one another in regards to their executions.

511.    Furthermore, by waiting until the last minute to release protocols, IDOC prevents inmates from meaningfully challenging the procedures used at their executions.

512.    When such challenges are obstructed, inmates are unable to use the court system to ensure that their executions are carried out in a constitutional manner.

513.    That lack of judicial oversight further violates the plaintiffs' equal protection rights, because judicial actions that would help foster consistency are thwarted.

514.    In the variances of execution procedures that invariably exist if no protocols are currently in place whatsoever, defendants are violating the Equal Protection Clause's guarantee of equal treatment for similarly situated persons.

515.    Each plaintiff has been or will be singled out arbitrarily and irrationally as a class of one who will not be afforded equal protection of procedural safeguards in the defendants' written execution protocol, when such written safeguards are effectively non-existent.

**F.     Sixth Claim – Deprivation of Information Violates the Plaintiffs' Federal Statutory Right to the Assistance of Counsel**

516.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

517.    On July 20, 2006, this Court granted Mr. Pizzuto *in forma pauperis* ("IFP") status in the habeas case that is now on appeal.

COMPLAINT – Page 56

518.    On July 31, 2018, this Court appointed the CHU as clemency[2] counsel for Mr. Pizzuto in case number 1:05-cv-516 pursuant to 18 U.S.C. § 3599.

519.    The CHU continues to serve as Mr. Pizzuto's clemency counsel.

520.    On October 15, 2019, the Ninth Circuit appointed the CHU as counsel in Mr. Pizzuto's pending federal habeas appeal in case number 16-36082.

521.    The federal and state courts have permitted Mr. Pizzuto to enjoy IFP status in his habeas and post-conviction challenges to his convictions and sentence.

522.    On July 14, 1999, this Court appointed the CHU as counsel in Mr. Creech's habeas proceedings in case number 1:99-cv-224 and granted him IFP status.

523.    The CHU serves as Mr. Creech's counsel in his pending habeas appeal at the Ninth Circuit in case number 10-99015.

524.    The federal and state courts have permitted Mr. Creech to enjoy IFP status in his habeas and post-conviction challenges to his conviction and sentence.

525.    18 U.S.C. § 3599 provides a federal statutory right to counsel for state inmates under sentence of death.

526.    The statutory right to counsel under § 3599 extends to federal actions challenging methods of execution and the secrecy surrounding them.

527.    Because the CHU is Mr. Creech's federal habeas counsel under § 3599, it is also his clemency counsel under the same statute.

---

[2] For ease of reference, this complaint uses the term "clemency" to refer to any proceedings within the executive branch of the state government concerning whether to afford the plaintiffs relief from their death sentence or execution through any legal mechanism, including commutation, reprieve, pardon, and so forth.

528.    Because the plaintiffs have been deprived of any meaningful information about the State's plans for executing them, the CHU cannot provide adequate counsel to them regarding challenges they might have to such plans.

529.    As a result, the CHU has been obstructed by the State from providing to the plaintiffs the services they are guaranteed under § 3599.

530.    The statutory right to counsel under § 3599 extends to clemency proceedings.

531.    The plaintiffs are entitled under Idaho law to seek clemency.

532.    If they are denied judicial remedies, the plaintiffs intend to pursue clemency.

533.    Clemency can be granted for any reason seen fit by the appropriate authorities in the executive branch.

534.    If the CHU pursues clemency for the plaintiffs, and if there are sufficient flaws in the defendants' plans for carrying out their execution, the CHU will consider using those flaws in their clemency petitions as a reason for the executive branch to consider commuting their death sentences or postponing their executions.

535.    For example, the CHU would contemplate an argument, if appropriate, that the executive branch should delay the plaintiffs' executions because IDOC's protocol creates an excessive risk of their deaths being unduly painful.

536.    In other states, such arguments have been made.

537.    In other states, executive authorities have relied upon similar problems when taking action on executions in favor of death-row inmates.

538.    For instance, Ohio Governor Mike DeWine delayed several executions in 2019 because a federal district court concluded, in deciding a constitutional challenge to the state's protocol, that it subjected the inmates to an unacceptable risk of extreme pain and suffering.

539.    The CHU cannot make an argument to the executive in support of clemency about problems with the State's plans for executions if the defendants tell them essentially nothing about those plans, which they have—as described above—done.

540.    In this way, the defendants' actions have deprived the plaintiffs of their federal statutory right to the assistance of counsel in pursuing clemency.

### G.    Seventh Claim–Absence of Legislative Guidelines for Executions Violates the Separation of Powers Under the Idaho Constitution

541.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

542.    Article II, Section 1 of the Idaho Constitution provides for the separation of powers between the legislative, executive, and judicial branches of state government.

543.    Article 3, Section 1 of the Idaho Constitution vests the power to pass bills in the legislative branch.

544.    Article 3, Section 15 of the Idaho Constitution states that "[n]o law shall be passed except by bill."

545.    As a result of these provisions, only the legislature possesses the authority to make law under the Idaho Constitution.

546.    Therefore, when the legislature delegates power to an executive agency, it must provide meaningful standards for the exercise of that power.

547.    The Idaho Legislature has not done so with respect to the protocols and procedures for carrying out executions, which it has given IDOC unfettered discretion to promulgate.

548.    The sole guidance given by the Idaho Legislature to IDOC for the issuance of execution-related procedures is Idaho Code § 19-2716, which states only that the method will be the "continuous, intravenous administration of a lethal quantity of a substance or substances

COMPLAINT – Page 59

approved by the director" of IDOC, who "shall determine the procedures to be used in any execution."

549.    There is no other Idaho statute purporting to place any restraints on the procedures IDOC creates for carrying out executions.

550.    Therefore, IDOC has no meaningful legislative guidance on anything relating to its creation of lethal-injection procedures, including on the type of drugs to use; whether to employ a single- or multiple-drug protocol; the source to get the drugs from; the quantity to administer the drugs in; the timing of the drugs' administration; the equipment to utilize at an execution; the requisite credentials of personnel participating in the execution; the training to provide personnel participating in the execution; the witnesses that observe an execution; the portions of the execution to leave open to observation; the process to follow in crafting a protocol; the timing of the release of a protocol; and so forth.

551.    With respect to each of these critical issues, the state legislature has provided no reasonably clear standards to IDOC—in fact, it has provided no standards at all.

552.    Idaho's unconstitutional delegation of the decision-making authority to devise the lethal injection protocol also allows IDOC to change it at a moment's notice, effectively allowing it to evade judicial review.

553.    IDOC's established approach to executions exacerbates the separation-of-powers problem.

554.    IDOC has decided to issue its protocol in the form of an SOP, which IDOC also refers to as "controlled documents."[3]

---

[3] For consistency, this complaint will use the term "SOP" throughout instead of "controlled documents," while drawing no distinction between the two.

555.    SOPs are approved only by IDOC administrators and managers.

556.    There is no requirement that SOPs be approved by any other entity, such as the Idaho Board of Correction, or by the legislature itself.

557.    Consequently, IDOC has both no real oversight on what to put in the protocol and no real oversight on what they do end up putting in the protocol.

558.    IDOC has chosen to make its current execution protocol subject to revision at the discretion of the chief of the operations division or the director at any time in the sole discretion of that person.

559.    In the organizational chart and executive leadership list that IDOC currently has available to the public, there is no individual listed as chief of the operations division.

560.    Thus, it is not even clear who one of the two people is who is entrusted with the power of rewriting Idaho's execution procedures at any moment with no oversight whatsoever.

561.    IDOC's conduct during the most recent two executions demonstrates a special need for legislative oversight.

562.    Specifically, IDOC's approach to its promulgation of the protocol, as set forth above, exacerbates the separation-of-powers concerns, especially because it waited until an execution was imminent before issuing one, so as to make it as difficult and burdensome as possible for the condemned to raise any challenges, and even then it chose to give the Director four different chemical recipes to choose from, rather than picking one.

563.    Furthermore, IDOC's preparation for the Leavitt executions, as set forth above, exacerbates the separation-of-powers concerns, especially because senior officials traveled across state lines to a Walmart parking lot with a suitcase full of cash to buy drugs and bring them back

to Idaho, in violation of federal law, and because IDOC took measures to deceive the public about how it carried out the executions and otherwise obfuscated the same facts.

564.    Finally, IDOC's behavior in other contexts, as set forth above, exacerbates the separation-of-powers concerns, especially as it reflects an agency that has been careless and malfeasant in its handling of medical issues affecting the inmates in its custody.

565.    Other states have enacted statutes providing specifics for lethal-injection protocols, thus proving that it would not be unduly burdensome for the Idaho legislature to do so.

566.    For example, Mississippi, Montana, Oregon, and Wyoming all have statutes with some specifics about the drugs to be used in executions, such as descriptions of how many chemicals there will be or calls for fast-acting barbiturates, or the like.

### H.    Eighth Claim – Deprivation of Information Creates a Substantial Risk of Serious Harm in Violation of the Eighth Amendment

567.    The plaintiffs incorporate each and every statement and allegation set forth throughout this complaint as if fully rewritten.

568.    For the reasons stated, IDOC's refusal to provide any meaningful information to the plaintiffs about their executions prevents the CHU from taking steps to ensure that such executions are carried out humanely.

569.    Without adequate participation in the process by the CHU, and the judicial oversight it would bring, there is an especially great chance that the plaintiffs' executions could go awry in any of the ways set forth above.

570.    Therefore, IDOC's deprivation of information creates a substantial risk that the plaintiffs will be subjected to severely painful executions, in violation of the Eighth Amendment.

### VII.    Prayer for Relief

571.    In light of the above, the plaintiffs respectfully request that the Court:

COMPLAINT – Page 62

a)  Enter a declaratory judgment that the defendants' refusal to provide the information described above is unconstitutional;

b)  Enjoin the defendants from proceeding toward and carrying out an execution of the plaintiffs until the State discloses the information described above and there has been sufficient time for the plaintiffs to investigate and litigate any issues raised by the information;

c)  Enjoin the defendants from executing the plaintiffs until a new protocol has been promulgated and there has been sufficient time for the plaintiffs to investigate and to raise any challenges to it;

d)  Enjoin the defendants from executing the plaintiffs until the State permits the CHU and its expert to examine the execution facilities and gives it adequate time to raise and have addressed any concerns about the space and the equipment;

e)  Enjoin the defendants from executing the plaintiffs until the State can demonstrate that it can do so constitutionally;

f)  Enjoin the defendants from executing the plaintiffs until the Idaho Legislature has provided adequate guidance to IDOC on execution procedures;

g)  Enjoin the defendants from attempting to execute the plaintiffs until the Court orders otherwise;

h)  Authorize appropriate and necessary discovery and an evidentiary hearing to permit the plaintiffs to prove their claims;

i)  Grant any such other relief that is just and proper.

DATED this 5th day of March 2020.

/s/ Jonah J. Horwitz
Jonah J. Horwitz
Christopher M. Sanchez
Federal Defender Services of Idaho


/s/ Stanley J. Panikowski
Stanley J. Panikowski
DLA PIPER LLP (US)

*Attorneys for Plaintiffs*

COMPLAINT – Page 64