Charles Peterson
EXECUTIVE DIRECTOR
Jonah J. Horwitz, Idaho Bar No. 10494
Christopher M. Sanchez, New York Bar No. 5414099
Miles Pope, Alaska Bar No. 1508066
ASSISTANT FEDERAL DEFENDERS
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Jonah_Horwitz@fd.org
       Christopher_M_Sanchez@fd.org
       Miles_Pope@fd.org

Stanley J. Panikowski, California Bar No. 224232
Chelsea Dal Corso, California Bar No. 290663
Amanda Laufer Camelotto, New Jersey Bar No. 902142012
Sarah E. Kalman, Pennsylvania Bar No. 325278
(admitted *pro hac vice*)
DLA PIPER LLP (US)
401 B Street, Suite 1700
San Diego, CA 92101-4297
Telephone:  619.699.2700
Facsimile:  619.699.2701]
Email: Stanley.Panikowski@dlapiper.com
       Chelsea.Dalcorso@dlapiper.com
       Amanda.Camelotto@dlapiper.com
       Sarah.Kalman@dlapiper.com

*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO**

| | | |
|---|---|---|
| **GERALD ROSS PIZZUTO, JR.,** | ) | **CASE NO. 1:20-cv-114-DCN** |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM IN SUPPORT OF** |
| v. | ) | **MOTION FOR PRELIMINARY** |
| | ) | **INJUNCTION OR TEMPORARY** |
| **JOSH TEWALT**, et al., | ) | **RESTRAINING ORDER** |
| | ) | |
| Defendants. | ) | **Execution Scheduled for June 2, 2021** |
| | ) | |

For the reasons that follow, Plaintiff Gerald Ross Pizzuto, Jr. respectfully asks the Court to enjoin or restrain Defendants from executing him until the claim he has presented in this case have been resolved.

"To prevail on a motion for a preliminary injunction," Mr. Pizzuto "must show that: (1) he is likely to succeed on the merits on his state or federal claims; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest." *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019).[1]  The same test applies to motions for temporary restraining orders under Federal Rule of Civil Procedure 65.  *See Stuhlbarg Int'l. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  Mr. Pizzuto can satisfy each factor.[2]

## I.   Mr. Pizzuto is Likely to Succeed on the Merits.

First, Mr. Pizzuto is likely to succeed on the merits of his claim: that the use of pentobarbital at his execution violates his Eighth Amendment rights.

### A.   Cruel and Unusual Punishment

To begin, Mr. Pizzuto is likely to succeed on the merits of his claim, which alleges that the State's use of pentobarbital at his execution violates his Eighth Amendment rights, in large part because of the danger of a torturous death caused by his unique medical situation.  *See* Dkt. 52.

To prevail on a claim of this type, the plaintiff "must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of

---

[1] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

[2] Every part of this memorandum is incorporated into every other part.

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 2

severe pain and that the State has refused to adopt without a legitimate penological reason."

*Bucklew v. Precythe*, 139 S. Ct. 1112, 1125 (2019).   In other words, the inmate is required to

demonstrate 1) that the State's chosen method exposes the prisoner to a substantial risk of severe

pain; and 2) that there is a feasible and readily implemented alternative that would not do so.   Mr.

Pizzuto can establish a likelihood of success on both fronts.

   **1.  The Use of Unreliable, Compounded Pentobarbital Creates a Substantial Risk of
       Severe Pain.**

   For the reasons that follow, the Idaho Department of Correction's ("IDOC's") plan to use

compounded, unreliable pentobarbital creates a substantial risk of severe pain at his execution.

   **a)  Mr. Pizzuto's Health Concerns**

   To begin, Mr. Pizzuto's complex and serious medical situation makes pentobarbital an

unconstitutionally risky drug to use at his execution.[3]

   **i.  Mr. Pizzuto's Heart Condition**

   The first problem with pentobarbital is that it will likely trigger an excruciating heart attack,

the effects of which Mr. Pizzuto will acutely experience before he is adequately sedated.   Mr.

Pizzuto's heart-based challenge is supported by a declaration from Dr. Michael Rich, who is board

certified in cardiovascular disease and echocardiography, and who is a Fellow in the American

College of Cardiology.   *See* Ex. 1 at 1–2.[4]   Dr. Rich is a cardiologist at St. Alphonsus Heart Institute

with a typical caseload each week of 80–100 patients; he deals with every type of cardiovascular

disease.   *See id.*   After reviewing Mr. Pizzuto's medical records, Dr. Rich has opined that it is

---

[3] As discussed below, there are two health issues underlying the claim.  Mr. Pizzuto submits that
if either or both issues fall short of the standard individually, they satisfy it in the aggregate.

[4] All exhibits to this memorandum are incorporated herein as if fully set forth.

likely that he suffers from clinically significant obstructive coronary disease. *See id.* at 7. As a result, it is Dr. Rich's view that a pentobarbital execution would induce in Mr. Pizzuto a heart attack, the pain of which he would endure before he was sedated. *See id.* at 7–8.

These risks are highlighted by the troubling experiences other inmates with coronary artery disease have had during pentobarbital executions. Eddie Powell and Roy Blankenship both suffered from the condition. *See id.* at 8. Both were executed with pentobarbital. *See* Ex. 2 at 1; *Powell v. Thomas*, 643 F.3d 1300, 1302 (11th Cir. 2011) (per curiam). And both executions included unambiguous indications of pain and suffering by the inmate. *See* Ex. 2 at 1 (describing grimaces, jerking, lunges from side to side, and yells); Ex. 3 at 3 (noting that the execution lasted twenty-five minutes and that the inmate seemed to be in pain, with his eyes open and his jaw clenched).

In his declaration, Dr. Rich notes that he would be able to give a more conclusive statement about these risks if he could perform on Mr. Pizzuto a nuclear stress test. *See* Ex. 1 at 9. Mr. Pizzuto asserts that Dr. Rich's current assessment is sufficient to justify a preliminary injunction. However, to the extent the Court disagrees that the presumptive diagnosis is not enough, it is still necessary to provide undersigned counsel the time to arrange for the testing, have it performed, transmit the results to Dr. Rich for analysis, consult with Dr. Rich regarding his findings, and incorporate them as necessary into new pleadings (including supplements to his declaration and to this preliminary-injunction motion). The execution should be stayed for at least as long as it takes for all of these tasks to be performed.

### ii.   Mr. Pizzuto's Medication History

The second problem with pentobarbital is that it is likely to not work as intended on Mr. Pizzuto as a result of his medication history. Mr. Pizzuto has a complex medical situation, having

suffered from numerous illnesses over many years.  Aside from the heart disease described above, Mr. Pizzuto has been diagnosed with bladder cancer, type-2 diabetes, and chronic obstructive pulmonary disease.  *See* Ex. 4 at 1.[5]  Due to this variety of ailments, Mr. Pizzuto has been prescribed many medications.  The issue before the Court involves two categories of medications: gabapentin and opioids.  Gabapentin (sometimes referred to in Mr. Pizzuto's medical records by the brand name Neurontin) has been administered to Mr. Pizzuto primarily to treat back pain.  *See, e.g.*, *id.* at 3.  The opioids have been prescribed for pain caused by different sources.  Most significantly, Mr. Pizzuto has taken an escalating amount of OxyCodone to treat pain related to his bladder cancer, *see* Ex. 5 at 9—a condition he has had since at least 2016 (when the tumors were partly removed, *see* Ex. 4 at 6) and that led him to be placed in hospice care on November 2019 with a six-month life expectancy, where he remains, *see id.* at 4.  During the time he has been on OxyCodone, Mr. Pizzuto's dosage has been increased at least nine separate times and it is now more than 100% higher than what it originally was.  *See* Ex. 5 at 9.  His current dosage—160 milligrams per day, *see id.* at 9—is an extraordinarily high one that reflects the gravity of his illness and his proximity to a natural death.  *See id.*; *see also People v. Tseng*, 30 Cal. App. 5th 117, 124 n.15 (Ct. App. Cal. 2018) (noting expert testimony that a dosage of 80 milligrams per day of OxyContin was "an amount typically prescribed to a terminal cancer patient"); *Ruben v. Ariz. Med'l Bd.*, No. 1 CA-CV 18-0079, 2019 WL 471031, at *9 (Ariz. Ct. App. Feb. 7, 2019) ("Prescribing opioids—such as OxyCodone—in high doses, above 80 mg per day, exponentially increases the risk of accidental overdose death."); *State v. Greene*, 983 N.E.2d 773, 776 (Ohio Ct.

---

[5] For every exhibit that was not consecutively paginated in the original, Mr. Pizzuto has added page numbers in the lower-right corner, which is what he cites to.

App. 2012) (referring to testimony from a lab technician at the state highway patrol "that the maximum daily dosage of Oxycodone is 90 milligrams").[6]

The problems with Mr. Pizzuto's medication history vis-à-vis a pentobarbital execution are described in detail in Dr. Sergio D. Bergese's declaration. *See* Ex. 5. Dr. Bergese is board certified in anesthesiology. *See id.* at 1. He is a clinical professor of anesthesiology at Stony Brook University, and is the Senior Director of Neuroanesthesiology at that institution's medical school. *See id.* Dr. Bergese outlines in his declaration how Mr. Pizzuto's extensive history of taking gabapentin and various opioids have given rise to a tolerance that creates a substantial risk that the pentobarbital will cause unintended consequences at an execution, "including a prolonged and painful death process, awareness of the process of dying, an increased likelihood of seizures, and the possibility of additional paradoxical reactions." *Id.* at 10–11.

These two problems with pentobarbital—the cardiological issues and the medication-history issues—support preliminary relief in their own right. Collectively, there is no doubt that they give rise to a likelihood of success in demonstrating a substantial risk of severe pain. That is especially true because one type of complication exacerbates the other. In particular, Dr. Rich states that the interaction between Mr. Pizzuto's prescription medications and pentobarbital, as set forth by Dr. Bergese, further increases the delay in the sedation caused by pentobarbital, and thus further amplifies the pain associated with the heart attack. *See* Ex. 1 at 9.

---

[6] OxyContin is a trade name for the generic drug OxyCodone, and the dosage of one has the same significance as the dosage of another. *See, e.g.*, *State v. Hamlin*, No. 2002CA162, 2003 WL 245664, at *1 ((Ohio Ct. App. Feb. 3, 2003).

### iii.    Mr. Pizzuto's COPD

Finally, Mr. Pizzuto suffers from Chronic Obstructive Pulmonary Disease (COPD).  As set forth in Dr. Michaela Almgren's declaration, Mr. Pizzuto's lung age is that of a ninety-two year old.  *See* Ex. 6 at 12–13.  Dr. Almgren therefore opines that Mr. Pizzuto's lungs are severely damaged.  *See id.*  She explains that the lung problem increases the risk of pulmonary edema, a phenomenon that is always a danger with barbiturate overdoses and which "makes a person feel like they are suffocating and drowning."  *Id.*  Dr. Almgren concludes that "[f]or a person with very poor lung function," like Mr. Pizzuto, this sensation will be even more severe."  *Id.*

### b)  IDOC's Use of Unreliable Drugs

The risks posed to Mr. Pizzuto by pentobarbital generally are exacerbated by the unreliability of IDOC's drugs in particular.  That unreliability stems from two factors: 1) IDOC's use of questionable sources in the past; and 2) issues with compounding.

### i.    IDOC's Unreliable Drug Sources in the Past

In the two most recent executions in Idaho, the State went to unreliable sources for its drugs.  Unreliable drugs lead to even greater possibility of painful executions.  That checkered history raises concerns about how IDOC will approach Mr. Pizzuto's execution, and therefore adds an additional risk factor.  *See West v. Brewer*, No. 2:11-cv-1409, 2011 WL 2912699, at *3 (D. Ariz. July 20, 2011) (considering a correctional department's past practices while ruling on an execution claim).

In March 2011—as IDOC was preparing to execute Paul Ezra Rhoades and Richard Leavitt—Randy Blades, then the Warden of IMSI, started trying to obtain lethal injection chemicals.  To get the chemicals, Mr. Blades contacted a man named Chris Harris to inquire about the possibility of purchasing the drugs from him.  *See* Ex. 7.  At the time, Mr. Harris was based in

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 7

Kolkata, India.  *See* Chris McDaniel, *This is the Man in India Who is Selling States Illegally Imported Execution Drugs*, Buzzfeed, Oct. 20, 2015, available at https://www.buzzfeednews.com/article/chrismcdaniel/this-is-the-man-in-india-who-is-selling-states-illegally-imp [https://perma.cc/WZ46-85PN].   Mr. Harris was a salesman whose career involved positions at a duty-free airport shop and call centers.  *See id.*  He had no training in the practice of pharmacy or medicine.  *See id.*  In addition to his lack of qualifications, Mr. Harris's history suggests other reasons to be concerned about the integrity of his products.  For instance, in order to obtain drugs to send to Nebraska for executions, Mr. Harris falsely told Naari, a pharmaceutical company, that the medications would be shipped to Africa so they could be used for anesthetic purposes in the developing world.  *See id.*  Shipments of execution drugs sent by Mr. Harris to Arizona and Texas were detained at the direction of the Food and Drug Administration ("FDA") because their importation was illegal.  *See* Chris McDaniel, *There's A Standoff Between States And The Feds Over Illegal Execution Drugs*, June 26, 2016, available at https://www.buzzfeednews.com/article/chrismcdaniel/the-standoff-between-states-and-the-feds-over-illegal-drugs [https://perma.cc/4PSZ-MKXM].

        IDOC ultimately acquired the drugs for the Leavitt execution in 2012 from Kimela Burkes at Union Avenue Compounding Pharmacy of Tacoma, Washington.  *See* Ex. 8 at 1.  To purchase the drugs, IDOC officials went to a Walmart parking lot with more than $15,000 in cash.  *See* Rone Tempest, *Here's how a Salt Lake City pharmacy played a key role in the execution of an Idaho serial killer*, Salt Lake Tribune, Apr. 18, 2021, available at https://www.sltrib.com/news/2021/04/18/heres-how-salt-lake-city/    [https://perma.cc/4NSX-

34XJ].[7]  Mr. Tewalt, who is now Director of IDOC, personally went on that trip with one other official.  *See id.*  That Mr. Tewalt would purchase chemicals for an execution with cash from a suitcase in a parking lot suggests that IDOC, which he currently controls, will not apply the level of care and scrupulousness necessary to acquire reliable drugs now for Mr. Pizzuto's execution.

Moreover, records show that Union is not a trustworthy source.  In 2015, regulators inspected Union and found that it had twenty-seven outdated or expired items in its drug stock, and that it failed to properly record in its system the chronic condition of a number of patients.  *See* Ex. 8 at 2–3.  A follow-up inspection in 2016 discovered that Union had not fixed several of the problems, despite being warned by officials, and that some of them had actually gotten worse.  *See id.* at 3–4.  As a result of the regulators' complaint, Ms. Burkes agreed to a series of sanctions, including having her license placed on probation for a year.  *See id.* at 4–6.

The source of drugs for the Rhoades execution in 2011—University Pharmacy in Salt Lake City, *see* Ex. 9 at 1—has an even more troubled regulatory past.  In 2017, state regulators inspected University and concluded that it was in violation of six different rules, including those having to do with documentation, labeling, and expiration dates.  *See id.* at 22–26.  The regulators noted nineteen different items, comprising twenty-seven vials total, where there were problems with the documentation of the products' expiration dates.  *See id.*  In 2014, state regulators inspected University and found that 232 medications and compounding ingredients were expired or had indeterminate expiration dates in the pharmacy's regular stock.  *See id.* at 21.  Officials fined University $1,050 and filed a cease-and-desist order.  *See id.*

---

[7] To the extent any source cited here is deemed insufficient for preliminary-injunction purposes, Mr. Pizzuto asserts that an evidentiary hearing is necessary, so that he has the power to subpoena and examine the relevant witnesses.

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 9

In 2013, federal regulators with the FDA conducted several inspections of University and filed a report finding a number of problems.  *See id.* at 16–20.  These inspections were done only fourteen months after University provided drugs for the Rhoades execution.  *See id.*  In its report, the FDA concluded that University committed a variety of violations, including: failing to sanitize equipment enough to protect the integrity of the drugs; allowing splits, splatter, rust, and so forth to remain in sensitive areas; having a technician taking out garbage in the middle of a sterilization process and then sticking his hand back into the equipment without changing his gloves; and not checking products properly to make sure they were stable and could last.  *See id.*

In 2009, state regulators cited University for dispensing sixty prescriptions to practitioners around the country based on orders that did not include the patients' names and addresses, in violation of state law.  *See id.* at 6–7.  University admitted the misconduct and was issued a cease-and-desist order.  *See id.* at 7–9.  In 2008, FDA officials observed nineteen separate problems with University after a series of inspections, including irregularities with the pharmacy's sterilization practices, maintenance of its equipment, failure to properly document testing, inadequate measures to make sure drugs were clean and stable before they were sent to patients, improper storage of chemicals, flaws in the training regimen, and so forth.  *See id.* at 10–15.

This multitude of problems at University both pre- and post-date their supply of drugs to IDOC for the Rhoades execution.  IDOC was either aware of them and deliberately chose an unreliable source, or it was unaware, and failed to perform the easy and basic vetting that would have disclosed them.  In either event, the fact that IDOC went to such compromised businesses to acquire execution drugs raises questions about how responsibly it will carry out its duties now, which in turn increases the risk of low-quality chemicals and a painful execution.  *See* Ex. 6 at 8

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 10

(Dr. Almgren opining that Union and University "both had extremely poor pharmacy inspection records," which "shows disregard for patient safety").

### ii.    Problems with Compounding

The collective risks created by Mr. Pizzuto's ailments is heightened even further by the State's presumed intent to use compounded drugs at his execution.  Manufactured pentobarbital (which is sold under the trade name Nembutal) is not available to correctional departments for executions due to restrictions placed on the product by the company that makes it.  *See id.* at 5; *see also Arthur v. Dunn*, No. 2:11-cv-438, 2016 WL 1551475, at *5 n.4 (M.D. Ala. Apr. 15, 2016). As a result, the State must be utilizing compounded pentobarbital, like several other jurisdictions. *See, e.g.*, *United States v. Mitchell*, 971 F.3d 993, 998 (9th Cir. 2020); *Jordan v. Comm'r, Miss. Dep't of Corr.*, 947 F.3d 1322, 1325 (11th Cir.), *cert. denied*, 141 S. Ct. 251 (2020); *Whitaker v. Collier*, 862 F.3d 490, 493–94 (5th Cir. 2017).

Using the compounding process significantly increases the health risks described above. The flaws in that process are outlined in Dr. Almgren's declaration.  *See generally* Ex. 6.  Dr. Almgren is a pharmacologist.  *See id.* at 1.  She has a doctorate of pharmacy and a master's degree in pharmaceutical chemistry, and serves as an assistant professor in the Department of Clinical Pharmacy at the University of South Carolina College of Pharmacy.  *See id.*  In addition, Dr. Almgren serves as a practicing pharmacist at an outsourcing pharmacy, and has experience with pharmacy work in the hospital and the manufacturing settings.  *See id.* at 1.  Dr. Almgren details how compounding pentobarbital is a complex endeavor, and how easy it is for the process to go awry.  *See id.* at 4–7.  That raises questions about the reliability of the compounding process, and the potency, sterility, and efficacy of the drugs.  *See id.*  Such questions in turn increase the risk of an inhumane execution even more.  *See id.* at 7.  Most importantly, the risks associated with Mr.

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 11

Pizzuto's heart condition at the execution are exacerbated "by the problems with compounding," including "the issues with reliability, potency, sterility, efficacy, and so forth." *Id.* at 12.  This adds yet another substantial risk factor to an already extensive list.

### c)  Problems with the Protocol

The risks outlined above are exacerbated by flaws in the execution protocol.  Under the protocol, the medical team is instrumental to carrying out the execution.  Most critically, it is the medical team that inserts the IVs, administers the lethal chemicals, and monitors the inmate's "level of consciousness."  Ex. 10 at 5.  Members of the medical team are required by the protocol to have only "three years of medical experience," which they can acquire by serving in any number of roles, including as nurses, paramedics, and phlebotomists.  Ex. 11 at 7.  But individuals with those backgrounds do not have the requisite training to properly administer the chemicals in the protocol while accurately evaluating the possibility that the inmate is conscious, sensate, or in pain—a possibility that is extremely salient when the execution involves a man as severely ill as Mr. Pizzuto is.  *See* Ex. 5 at 11.  Only a practicing anesthesiologist would be fully qualified to perform that function during such an inherently risky execution.  *See id.*  For only anesthesiologists understand the pharmacology of anesthetic drugs and their interactions, which determines the sequence and timing of how chemicals should be injected.  *See id.*  Other types of medical professionals, like nurses and paramedics, do not have that scientific background.  *See id.*  When drugs are administered and the pacing is off, it can create a painful reaction.  *See id.*  Furthermore, the individual may be experiencing pain and yet not expressing it in a way that is visible to the naked eye.  *See id.*  For example, an inmate could receive a large dose of pentobarbital at an execution and appear to go to sleep, yet still be going through a painful experience.  *See id.*

In addition to their training, anesthesiologists rely on brain monitors, which are sophisticated pieces of equipment that measure and convert brain signals so that doctors can determine a patient's level of consciousness and his depth of anesthesia. *See id.* The protocol does not provide for the use of a brain consciousness monitor. *See generally* Exs. 10, 11. If an individual without proper training were handling the drug administration at the execution as directed under the protocol, and without a brain consciousness monitor, they would essentially be "guessing" the stage of consciousness and pain sensation. *See* Ex. 5 at 12. Again, such guesswork is unacceptable when it comes to executing a man with numerous and complicated medical issues.

In these ways, the absence of a practicing anesthesiologist and a brain consciousness monitor add yet more risk for pain at Mr. Pizzuto's execution. That is, Mr. Pizzuto's heart condition and medication history, in conjunction with problems with compounding and IDOC's use of unreliable drugs, create a risk of a painful execution. Then, the fact that the proper personnel and equipment will not be present at the execution make it more likely that the medical team will fail to notice or properly address Mr. Pizzuto's pain, increasing his suffering even more.

### 2. The Firing Squad is a Feasible Alternative to Pentobarbital.

Instead of risking an inhumane execution by using pentobarbital, the State could without undue difficulty implement the firing squad, which would be far more reliable. Mr. Pizzuto will first demonstrate that the firing squad is "feasible and readily implemented" and then that it poses a substantially reduced risk of severe pain as compared to pentobarbital. *See Bucklew*, 139 S. Ct. at 1125.[8]

---

[8] Mr. Pizzuto is not "proposing" that he be executed by firing squad. He is merely identifying a more humane alternative, as required by current caselaw. Mr. Pizzuto reserves the right to challenge such caselaw as wrongly decided.

a) **The Firing Squad is Feasible and Readily Implemented.**

There are multiple reasons why the firing squad must be regarded as available for Mr. Pizzuto's execution, some relating to nationwide circumstances and others concerning Idaho's situation in particular.

As a general matter, for the feasibility of the firing squad, Mr. Pizzuto relies on a report prepared by Dr. James S. Williams.  Dr. Williams has extensive experience with firearms—he has conducted numerous firearm trainings for law enforcement agencies and others, and has worked as a doctor with police departments, including as a SWAT team member whose proficiency with weapons had to match those of the other officers on the team.  *See* Ex. 12 at 1–3.  In Dr. Williams' report, he explains at length why the firing squad is a feasible method of execution in Idaho.  *See id.* at 8–13.  Mr. Pizzuto adopts those reasons, and adds the following comments of his own.

Beginning with the national landscape, the firing squad is currently authorized by statute in four states: Utah, Oklahoma, Mississippi, and South Carolina.  *See* Utah Code Ann. § 77-18-5.5; Okla. Stat. tit. 22 § 1014(D); Miss. Code Ann. § 99-19-51(4); Joseph Choi, *South Carolina governor signs law giving death row inmates choice between firing squad or electric chair*, The Hill, May 17, 2021, available at https://thehill.com/homenews/state-watch/553849-south-carolina-governor-signs-law-giving-inmates-choice-between-firing.  The U.S. Department of Justice has recently taken steps to allow for the firing squad in federal executions as well.  *See* 85 Fed. Reg. 75846, 75847-48 (Nov. 27, 2020).  The most relevant jurisdiction to the availability analysis is in Idaho's neighboring state of Utah.  Utah has carried out three firing-squad executions in the modern era of the death penalty (i.e., since 1976).  *See*  Death Penalty Information Center, Execution  Database,  https://deathpenaltyinfo.org/executions/execution-database?filters%5Bstate%5D=Utah (last visited Jan. 5, 2021).  Most recently, Utah executed

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 14

Ronnie Lee Gardner by firing squad in 2010. *See Guardian News & Media LLC v. Ryan*, 225 F. Supp. 3d 859, 875 n.8 (D. Ariz. 2016). Moreover, Utah has in effect an extremely detailed protocol for firing-squad executions. *See* Ex. 13. The U.S. Army has a similar set of guidelines for using the firing squad. *See* Ex. 14; *see also Baze v. Rees*, 553 U.S. 35, 102 (2008) (Thomas, J., concurring) (characterizing the firing squad as "well established in military practice"). There is nothing preventing Idaho from following these other authorities and taking their firing-squad manuals as, at a minimum, a jumping-off point for crafting its own.

Nor is there anything about the current circumstances in Idaho that would prevent the institution of the firing squad. To the contrary, the state is well situated to adopt the firing squad. In terms of access to personnel, firing squads involve only a handful of people. *See, e.g.*, Ex. 13 at 53 (indicating that Utah's protocol calls for five officers). It would be an easy thing to find five individuals with the interest and training to participate in a firing squad in Idaho. IDOC itself employs more than 2,000 people. *See* Idaho Department of Correction, Career Facts, https://www.idoc.idaho.gov/content/careers/career_facts_employment_faq [https://perma.cc/DR6G-M5PF] (last visited Jan. 5, 2021). There is a firearms component of the standard program for all new IDOC correctional officers as part of the Peace Officers Standards and Training ("POST") Academy. *See* Idaho Department of Correction, Correctional Officer Training, https://www.idoc.idaho.gov/content/careers/current_openings/steps_to_becoming_a_correctional _officer/correctional_officer_training [https://perma.cc/W5N2-LWNS]; Ex. 15 at 2. All IDOC facilities have a firearms instructor. *See* Ex. 15 at 7. One course available to IDOC officers is in marksmanship with the use of a rifle, which assesses the participants' accuracy from various distances extending up to 100 yards. *See id.* at App. J. A shooting range is located at the South

Boise Correctional Complex, which is where Idaho carries out executions.  *See* Idaho Department of Correction, Staff Photos: D-4 at the Range, https://www.idoc.idaho.gov/content/story/staff_photos_d_4_at_the_range [https://perma.cc/6KR7-CBLU].  More generally, Idaho has more gun enthusiasts than most of the country, ranking sixth out of fifty-three jurisdictions with more than 39,000 firearms registered to less than two million people.  *See* CBS News, https://www.cbsnews.com/pictures/most-heavily-armed-states-in-america/47/ [https://perma.cc/8SDU-QFDL].  Given IDOC's size and the nature of its workforce, as well as the overall population from which its employees are drawn, it would take little effort to recruit five people for a firing squad.

If for some reason IDOC was unable to pull a firing-squad team from its own ranks, it could do so with even less difficulty while using personnel from outside the Department.  For example, Mountain Home Air Force Base is less than fifty miles from the Idaho Maximum Security Institution, where death row and the current death chamber are located.  The Base employs more than 4,800 people.  *See* Mountain Home Air Force Base, https://www.mountainhome.af.mil/About/ [https://perma.cc/UP6J-ANL5] (last visited Jan. 5, 2021).  Basic military training in the Air Force touches repeatedly on firearms handling and use.  *See* U.S. Air Force, Basic Military Training Overview at weeks two, three, five and seven, https://www.airforce.com/education/military-training/bmt [https://perma.cc/U69V-TDYF].

If IDOC wished, it could assemble a firing squad in part or in full from Air Force members without difficulty.  Or it could do so while tapping Idaho's law enforcement community, many of whom go through the same POST firearms training referred to earlier.  *See* IDAPA 11.11.01.051.01 (requiring every peace officer in Idaho to obtain POST certification); Idaho

Official Website of Peace Officer Standards and Training, https://post.idaho.gov/tag/firearms/ [https://perma.cc/CUF9-DJJC] (listing the firearms courses offered by POST).

It would be equally simple for IDOC to acquire the equipment necessary to conduct firing-squad executions. IDOC rules allow for the use of several types of firearms and establish a process for the purchase of weapons and ammunition. *See* Ex. 15 at 3–4. Every IDOC facility has an armory to store such items and other firearm-related material. *See id.* at 5. In terms of weaponry, an execution calls for little more than rifles and ammunition. *See, e.g.*, Ex. 14 at 3; Ex. 13 at 61. If IDOC does not have them on-hand, it can purchase them in short order from any number of retailers. As for non-firearm materials, they are few and straightforward. For instance, the Army manual lists a post with rings to restrain the condemned, a black hood to cover his head, and a white target to affix to his chest. *See* Ex. 14 at 3. These items are all available to buy or make with only minimal effort.

In short, the firing squad is permitted by law in multiple jurisdictions, has actually been used within the last decade by a neighboring state, and it necessitates personnel and equipment that IDOC could marshal with no trouble. The method is certainly available to Idaho.

That availability is likewise underscored by the history of the firing squad in Idaho itself. Between 1982 and 2009, the firing squad was authorized by statute as a method of execution in the alternative to lethal injection. *See* Idaho Code § 19-2716 (1982) [Ex. 16]; Act of April 1, 2009, ch. 81, Idaho Sess. Laws 228 [Ex. 17]. In 2009, the firing squad was removed from the statute, making lethal injection the only option. *See* Act of April 1, 2009, ch. 81, Idaho Sess. Laws 228 [Ex. 17]. The legislature's statement of purpose noted that the elimination of the firing squad was "deemed appropriate in light of" *Baze*, "in which the Court concluded that a 'humane lethal injection protocol' does not constitute cruel and unusual punishment." Ex. 17 at 4. "There is no

similar Supreme Court authority," the statement of purpose continued, "addressing whether the firing squad as a method of execution, would constitute cruel and unusual punishment in violation of the Eighth Amendment." *Id.* Such reasoning was flatly mistaken. In fact, the U.S. Supreme Court expressly held that the firing squad is not cruel and unusual in *Wilkerson v. Utah*, 99 U.S. 130, 134–35 (1878). Legislation founded on an obvious misunderstanding of well-established law is not motivated by "a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125.

The statement of purpose also suggested that because "Idaho [was] one of only two states that have the firing squad as a method of execution," its "rarity" "could form the basis of an Eighth Amendment claim." Ex. 17 at 4. But the Supreme Court has never invalidated a method of execution due to its rarity. To the contrary, the Court's jurisprudence in this area expressly approves of the fact that states have historically "experimented with technological innovations aimed at making [executions] less painful." *Bucklew*, 139 S. Ct. at 1124. Indeed, the Court rejected an Eighth Amendment challenge to the electric chair, *see In re Kemmler*, 136 U.S. 436 (1890), at a time when it was employed by a single jurisdiction, *see Glossip v. Gross*, 576 U.S. 863, 867–88 (2015). Like its misunderstanding of *Wilkerson*, the legislature's apparent confusion over how Eighth Amendment challenges to executions are resolved is not "a legitimate penological reason" for retreating from the firing squad. *Bucklew*, 139 S. Ct. at 1124.

IDOC's exploration of the firing squad in recent years further confirms that it is an available option in Idaho. In 2014, officials from IDOC toured Utah's firing-squad facility to examine the method "as a possibility in the near future." Ex. 18 at 2. Having already researched the approach taken by a neighboring state, IDOC is particularly well-equipped to follow through and implement the firing squad in Idaho. To the extent Mr. Pizzuto is required to articulate a more

detailed procedure for the firing squad (which he disputes), he refers the Court to Dr. Williams' report.  *See* Ex. 12 at 10–12.

Finally, the circumstances of Mr. Pizzuto's situation in particular highlight the feasibility of using the firing squad on him.  Most significantly, as described earlier, the firing squad was a statutorily authorized method at the time when Mr. Pizzuto was sentenced to death in 1986.  *See supra* at 17 (explaining that the firing squad was codified in Idaho's execution statute between 1982 and 2009); *see also Pizzuto v. Yordy*, 947 F.3d 510, 515 (9th Cir. 2019) (per curiam) (observing that Mr. Pizzuto was sentenced to death in 1986).  Additionally, Mr. Pizzuto informed IDOC in 2000 that he preferred "the firing squad when it is his time."  Ex. 19.

In overview, to use the firing squad on Mr. Pizzuto would be to employ a method that was in effect in Idaho for many years, including when he was sentenced to death; a method that he himself requested from IDOC more than two decades ago; a method that Idaho abandoned without a legitimate penological reason; and a method that is authorized by statute in several states, including Utah, where it was used in recent memory.  Under such circumstances, the firing squad is "a feasible and readily implemented alternative method of execution."  *Bucklew*, 139 S. Ct. at 1125.

### b)  The Firing Squad Is Much Less Painful Than Pentobarbital

Aside from being feasible and available, the firing squad creates a greatly reduced risk of severe pain for Mr. Pizzuto as compared to pentobarbital.

Multiple Justices of the Supreme Court have recognized the virtues of the firing squad in terms of its humaneness and efficacy.  *See Arthur v. Dunn*, 137 S. Ct. 725, 733–34 (2017) (Sotomayor, J., dissenting from the denial of certiorari) (discussing how the firing squad likely causes nearly instantaneous death with little pain and emphasizing the ease of its use); *see also*

*Bucklew*, 139 S. Ct. 1136 (Kavanaugh, J., concurring) (referring approvingly to Justice Sotomayor's dissent in *Arthur* and describing how it "explained that the firing squad is an alternative method of execution that generally causes an immediate and certain death, with close to zero risk of a botched execution"); *Glossip*, 576 U.S. at 976–77 (Sotomayor, J., dissenting) (similar). Indeed, in *Glossip*, the majority opinion seemed to refer with agreement to the description in the dissent (which was joined by four Justices) of the firing squad as "relatively quick and painless," 576 U.S. at 880, which could be read to signify that all nine members of the Court shared that view.

These persuasive and well-supported statements are in line with well-founded commentary from the academy. *See* Deborah W. Denno, *The Firing Squad as "A Known and Available Alternative Method of Execution" Post-Glossip*, 49 U. Mich. J.L. Reform 749, 785–87 (2016) (gathering support for the proposition that the firing squad is a comparatively humane and reliable method of execution).

The scientific evidence is in accord. For that proposition, Mr. Pizzuto relies on Dr. Williams' report. Dr. Williams is an emergency physician with many years of experience who has treated numerous trauma patients and who also was himself a gunshot victim. *See* Ex. 12 at 1–3. As Dr. Williams explains with detailed reasoning based on medical knowledge and experience, "the firing squad causes death with minimal pain." *Id.* at 5.

History confirms this. Consider the execution of Nazi Major General Anton Dostler, who was killed in 1945 by a U.S. Army firing squad. *See* W. Hays Parks VI, *Special Forces' Wear of Non-Standard Uniforms*, 80 Int'l L. Stud. 69, 76 n.20 (2006) (describing the Dostler case). Video footage reflects that General Dostler showed no signs of pain or suffering after he was shot,

and instead became totally still moments later.  *See* Ex. 20.[9]  This is a far cry from the drawn out

and visibly problematic executions of Messrs. Powell and Blankenship detailed earlier.  *See supra*

at 4.  The comparison aptly underscores how much riskier a pentobarbital execution of Mr. Pizzuto

is compared to the firing squad.  Indeed, while Mr. Pizzuto's serious and complicated health

situation creates several grave risks for a pentobarbital execution, there is nothing about his

illnesses that calls into question the efficacy of the firing squad.

In sum, Mr. Pizzuto can show a likelihood of succeeding on the merits of his claim that a

pentobarbital execution would violate his Eighth Amendment rights.

## II.   Irreparable Harm

The next factor in evaluating the need for a preliminary injunction, irreparable harm, is

abundantly present, since Mr. Pizzuto will be put to death in the absence of judicial intervention.

*See Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012) (noting that the irreparable-harm factor

is always present when the plaintiff is challenging his execution); *accord Battaglia v. Stephens*,

824 F.3d 470, 475 (5th Cir. 2016) ("[I]n a capital case, the possibility of irreparable injury weighs

heavily in the movant's favor."); *Beaver v. Netherland*, 101 F.3d 977, 979 (4th Cir. 1996) ("In

cases involving the death penalty when an execution date has been set, as here, it is a certainty that

irreparable harm will result if the court of appeals' decision is not stayed.").  Simply put, Mr.

Pizzuto will have no recourse for any constitutional violations after he is killed by the State, and

so there is irreparable harm.

---

[9] Discs containing Exhibit 20 are being provided to the Court and opposing counsel.

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 21

### III.   The Balance of Equities and the Public Interest Favor an Injunction.

The last criteria for a preliminary injunction considers the balance of equities and the public interest.  First, the balance of equities tips heavily in favor of a stay because it is the State itself that has made a stay necessary.  It was almost two full years ago that Mr. Pizzuto requested basic information from Defendants about how their executions would be carried out, including the most rudimentary information of all—what drug or drugs would be used.  *See* Dkt. 29-1.  Rather than providing that information, Defendants chose to act in accordance with their track record and stonewall, forcing extensive litigation over their secrecy.

During that litigation, Defendants carried out a deliberate strategy to create both delay and a need for emergency litigation, all in the interest of their own desire to carry out an execution with as little judicial oversight as possible.  As relevant here, Defendants argued that all of Plaintiffs' claims were unripe because Messrs. Pizzuto and Creech both had pending challenges to their convictions and/or sentences.  *See* Dkt. 21-1 at 6.  In response, Plaintiffs contested Defendants' position on ripeness, partly because it would unnecessarily force execution litigation into a highly compressed, last-minute time frame.  *See* Dkt. 22 at 4.  This Court sided with Defendants, concluding that the claims were brought too early, as the existence of the ongoing post-conviction cases made a possible execution "speculative."  *See* Dkt. 34 at 8–9.  Having convinced the Court that post-conviction litigation made an execution speculative, the Attorney General's Office turned around and proceeded to request and obtain a thirty-day death warrant before that very same post-conviction litigation concluded, i.e., before Mr. Pizzuto had a chance to seek review at the U.S. Supreme Court.  The Attorney General's Office has thus carefully and effectively orchestrated a situation in which emergency litigation regarding grave and important matters was delayed until the last possible minute.  Given the Attorney General's success in that regard, it can hardly

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 22

complain about the need for a preliminary injunction now, to compensate for the needless urgency it has created.

Moreover, it would be especially inappropriate to allow the Attorney General's gambit to work when we now know from the Ninth Circuit's opinion that the State was wrong all along about its fundamental premise.  That is, as the Ninth Circuit explained, the pendency of post-conviction litigation does not in fact render an execution claim premature, as such a "bright-line rule effect effectively compels a result that [courts] have repeatedly and emphatically directed plaintiffs to avoid," i.e., "eleventh-hour challenges to their executions."  Dkt. 47 at 9.  In other words, the rule the State advocated in this case is the rule that "compelled" the current last-minute litigation.  To be sure, it was the State's prerogative to strategically seek to delay this case.[10]  Still, having made that tactical decision, the State should not be heard to complain about the resulting need to award Mr. Pizzuto equitable—and temporary—relief.  *See Masayesva v. Zah*, 65 F.3d 1445, 1457 (9th Cir. 1995) ("He who comes into equity must come with clean hands."); *see also Sierra Club v. Trump*, 963 F.3d 874, 896 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020) (applying the doctrine of unclean hands to the balance-of-the-equities prong of the preliminary-injunction test).  If the State suffers from any injury, it is a self-inflicted one, and that is no basis for it to object now.

Furthermore, the State's interest in finality is substantially diminished by the fact that it is responsible for a significant amount of the delay that has occurred in carrying out Mr. Pizzuto's

---

[10] It is obvious that the State was acting strategically and not because it felt obligated to challenge ripeness based on the law, because before the most recent previous execution IDOC attacked the complaint as being *late* in what were essentially the same circumstances.  *See Creech v. Reinke*, D. Idaho, No. 12-173, Dkt. 22 at 22 (criticizing an action as "last minute" when it was brought, as here, while post-conviction litigation was pending and before the issuance of the death warrant).  Further demonstrating the tactical nature of the State's approach, it accused Mr. Pizzuto of engaging in "last minute litigation" while simultaneously defending this Court's conclusion that his claims were *premature*.  Dkt. 38 at 3.

death sentence.  The reason that Mr. Pizzuto has not yet been executed is that he has had challenges pending in court to his convictions and death sentence for the last thirty-six years, including his initial state post-conviction proceeding, his first federal habeas action, and—later—timely attacks based on the ground that he is intellectually disabled, which were lodged in both state and federal court.  *See State v. Pizzuto*, 810 P.2d 680 (Idaho 1991) (direct appeal and initial state post-conviction proceeding); *Pizzuto v. Arave*, 280 F.3d 949 (9th Cir. 2002) (first federal habeas action); *Pizzuto v. State*, 202 P.3d 642 (Idaho 2007) (state case regarding intellectual disability); *Pizzuto v. Yordy*, 947 F.3d 510 (9th Cir. 2019) (per curiam), *cert. denied*, 141 S. Ct. 661 (2020) (federal case regarding intellectual disability).

Over the course of that lengthy history of litigation, the State has taken numerous extensions.  While Mr. Pizzuto was litigating his intellectual-disability claim in federal court (which is the underlying claim presented here), the State sought and obtained at least twenty-six separate enlargements of time, totaling 405 days.  *See* Exs. 21–23.  And that does not even account for the deadlines the State pushed in the various state cases or the first round of federal habeas review.  Counsel for Mr. Pizzuto likewise took many extensions.  More often than not, the extensions by both parties were acquiesced in by the other.  With each due date they postponed, the parties delayed the moment when Mr. Pizzuto's death sentence could be carried out.  They presumably did so because they agreed it was appropriate for the issues to be resolved on the basis of the fullest, most thorough presentations.  The same calculus applies now.  Mr. Pizzuto's interest in receiving careful consideration of his execution claim outweighs any interest in hastening the case to its end based on the artificially compressed timeline created by the State's choice to obtain a death warrant.  Just as the State did in the collateral cases challenging Mr. Pizzuto's convictions and death sentence, all litigants require time to research and craft pleadings to raise the arguments

MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION – Page 24

they are entitled to raise in court.  The State received such time in ample measure in the prior proceedings, and Mr. Pizzuto should be afforded his modest allotment here so that he can obtain meaningful review of his claim, as any party is entitled to do.  *See Zagorski v. Haslam*, No. 3:18-cv-01035, 2018 WL 4931939, at *4 (M.D. Tenn. Oct. 11, 2018) (granting a motion to preliminarily enjoin an execution because the issues raised in the case were "simply not amenable to development and ruling before the plaintiff's scheduled execution" and the delay was necessary "in order to allow for a full and fair litigation" of those issues).

## IV.     An Injunction Cannot be Denied Without an Evidentiary Hearing.

Mr. Pizzuto submits that the argument above is adequate to justify the entry of a preliminary injunction prohibiting his execution until the claim is completely resolved on its merits.[11]  Insofar as the Court disagrees, it would still be inappropriate to *deny* the injunction without holding an evidentiary hearing.  Such a proceeding is mandatory "if essential facts are in dispute."  *Charlton v. Estate of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988).  Mr. Pizzuto has presented substantial documentary evidence to meet his burden on all of the preliminary-injunction factors.  Therefore, the only reason to refuse an injunction would be if the State contradicts his presentation and the Court agrees with its account.  That would represent a dispute over the facts, which would call for an evidentiary hearing.

When a preliminary injunction is denied in an execution case, it means that the plaintiff's claims will forever be mooted by his death.  Before the Court sanctions such an "irremediable and unfathomable" act, *Ford v. Wainwright*, 477 U.S. 399, 411 (1986), it should allow Mr. Pizzuto to at least make his case at a live hearing through witnesses.  That is the only way for the Court to

---

[11] In a separate motion, Mr. Pizzuto is seeking an administrative stay of execution until the request for a preliminary injunction is resolved.

acquire the confidence necessary to authorize the execution without fearing the possibility of a torturous death.  It is perhaps for the same reasons that evidentiary hearings are commonly held by district courts around the country on motions for preliminary injunctions in method-of-execution cases.  *See, e.g.*, *Glossip*, 576 U.S. at 874 (recounting how a preliminary injunction hearing took place in the district court in an execution case); *Jones v. Kelley*, 854 F.3d 1009, 1012 (8th Cir. 2017) (same); *Chavez v. Fla. SP Warden*, 742 F.3d 1267, 1268 (11th Cir. 2014) (same); *Hamilton v. Jones*, 472 F.3d 814, 815 (10th Cir. 2007) (per curiam) (same).  The same level of scrutiny is warranted here.

## V.   Conclusion

For the reasons set forth above, undersigned counsel respectfully ask the Court to enjoin Mr. Pizzuto's execution until it has fully adjudicated his claim for relief on the merits and to hold an evidentiary hearing on the instant request if it will not be granted on the basis of the papers alone.

DATED this 18th day of May 2021.

/s/ Jonah J. Horwitz
Jonah J. Horwitz
Christopher M. Sanchez
Miles Pope
Federal Defender Services of Idaho

/s/ Stanley J. Panikowski
Stanley J. Panikowski
Chelsea Dal Corso
Amanda Laufer Camelotto
Sarah E. Kalman
DLA PIPER LLP (US)

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 18th day of May 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Mark Kubinski                                  Oscar Klaas
mkubinsk@idoc.idaho.gov                        oklaas@idoc.idaho.gov

                              /s/ Julie Hill
                              Julie Hill