Nicole Owens
EXECUTIVE DIRECTOR
Deborah A. Czuba, Idaho Bar No. 9648
Mary E. Spears, Indiana Bar No. 27353-49
ASSISTANT FEDERAL DEFENDERS
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:  Deborah_A_Czuba@fd.org
        Mary_Spears@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) | CASE NO. **1:20-cv-114** |
| ) | |
| Plaintiff, ) | |
| v. ) | **SECOND AMENDED** |
| ) | **COMPLAINT ON BEHALF OF** |
| **JOSH TEWALT**, Director, Idaho ) | **THOMAS EUGENE CREECH** |
| Department of Correction, **TIM** ) | **FOR EQUITABLE,** |
| **RICHARDSON**, Warden, Idaho ) | **DECLARATORY, AND** |
| Maximum Security Institution, **CHAD** ) | **INJUNCTIVE RELIEF** |
| **PAGE**, Chief, Division of Prisons, Idaho ) | |
| Department of Correction; and ) | **EXECUTION SCHEDULED** |
| **Unknown Employees, Agents, or** ) | **FOR FEBRUARY 28, 2024** |
| **Contractors of the Idaho Department** ) | |
| **of Correction**, ) | |
| ) | |
| Defendants. ) | |
| ) | |

SECOND AMENDED COMPLAINT – Page 1

I.    **Nature of the Action**

1.    Plaintiff Thomas Eugene Creech[1] is a death-row inmate in Idaho[2] who brings this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his constitutional rights in connection with the State's effort to execute him.

II.    **Justiciable Case or Controversy**

2.    For the reasons set forth below, absent judicial intervention, Mr. Creech will be executed in violation of his constitutional rights.

3.    There is a real and justiciable case or controversy between the parties.

III.    **Jurisdiction and Venue**

4.    This action arises under 42 U.S.C. § 1983 for violations of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

5.    The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

---

[1] Gerald Ross Pizzuto, Jr. was originally a plaintiff in this case. *See* Dkt. 1 at 1. On June 2, 2021, Mr. Pizzuto was dismissed from the proceedings. *See* Dkt. 65 at 6. The ensuing appeal was pursued by Mr. Creech alone, without Mr. Pizzuto's participation. *See* Dkt. 78. Therefore, Mr. Pizzuto is no longer a part of the present case. This second amended complaint does not relate to any of Mr. Pizzuto's litigation.

[2] The plaintiff refers to Idaho as "Idaho," "the State of Idaho," and "the State." Likewise, throughout this complaint, the plaintiff refers to the defendants, variously, as "the defendants," "the State," "IDOC," and other phrases, as appropriate. Their use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

SECOND AMENDED COMPLAINT – Page 2

6.      The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are elected or appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

7.      Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims—including executions and the procurement and maintenance of drugs used in the executions—have occurred, are occurring, or will occur in the District of Idaho.

8.      Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

## IV.   Parties

9.      Mr. Creech is a person within the jurisdiction of the State of Idaho.

10.     Mr. Creech is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

11.     Mr. Creech is confined at the Idaho Maximum Security Institution ("IMSI").

12.     Mr. Creech is under sentence of death.

13.     As set forth in greater detail below, the defendants are state officials, employees, agents, and/or contractors responsible for developing, overseeing, and/or implementing death by lethal injection in Idaho.

14.     Defendant Josh Tewalt ("Director Tewalt") is the Director of IDOC.

SECOND AMENDED COMPLAINT – Page 3

15.     Director Tewalt is responsible for approving the substances and procedures to be used in any execution performed by IDOC.

16.     Defendant Tim Richardson ("Warden Richardson") is Warden of IMSI.

17.     Warden Richardson is the official executioner for inmates in Idaho state custody.

18.     Defendant Chad Page ("Mr. Page") is the Chief of the Division of Prisons for IDOC.

19.     Upon information and belief, Mr. Page is currently charged with providing the official approval of Idaho's next execution protocol for IDOC.

20.     Upon information and belief, Other Unknown Employees, Agents, and/or Contractors of IDOC are involved in the development and carrying out of executions by lethal injection. Mr. Creech does not know the identities of these persons.

21.     Upon information and belief, the plaintiff and the defendants are all United States citizens.

22.     The defendants are all officials of the State of Idaho.

23.     All of the actions that have been and will be taken by the defendants towards executing Mr. Creech and any other actions at issue in this complaint were or will be taken under color of state law.

24.     The defendants are all sued in their official capacities.

## V.    General Factual Allegations

25.    Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

26.    Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

27.    Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

28.    After Mr. Creech obtained federal habeas relief, he was resentenced to death.

29.    The new death sentence was upheld on direct appeal in 1998.

30.    Once the State obtains a death warrant, which in this case it did on October 12, 2023, it has thirty days to execute Mr. Creech.

31.    Mr. Creech is scheduled to be executed on November 8, 2023.

32.    Mr. Creech brings this action to challenge the statute under which and by means of which the State intends to execute him, as well as the defendants' practice of hiding, changing, and obfuscating the means by which they intend to execute him.

### A.    IDOC's Refusal to Provide Information to the Plaintiff

33.    On December 18, 2018, the Capital Habeas Unit of Federal Defender Services of Idaho ("CHU"), on behalf of eight of the nine Idaho state inmates (including the plaintiff) then under sentence of death, wrote to then-Director Henry Atencio of IDOC, and then-Warden Keith Yordy.

SECOND AMENDED COMPLAINT – Page 5

34.     At that time, Idaho's execution protocol was version 3.6 of Standard Operating Procedure 135.02.01.001.

35.     Mr. Creech will henceforth refer to the protocol as SOP 135.

36.     The December 18, 2018 letter addressed the potential executions of those inmates and included a number of questions and requests relating to such executions in order for the CHU to assess the constitutionality and proprietary of any future executions ("December 2018 CHU Letter").

37.     The December 2018 CHU Letter sought answers to twenty-six questions, some with subparts, relating to the execution protocol of IDOC.

38.     In sum, the CHU sought information on (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/would be obtained, their source, amounts, expiration date, how they were/would be acquired/transported/stored/tested, when IDOC would obtain the drugs, etc., (3) whether/when a new version of SOP 135 would be issued, and whether the current version on the website was in effect then, (4) whether witnesses would be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who would participate in the execution, what was their training/qualifications, and how would they be chosen, (7) whether there would be a consciousness check and the procedure for it, and (8) procedures for botched executions.

39.     The CHU also requested that (1) the drugs be tested in an independent laboratory and results of that testing shared with the CHU at least sixty days prior to any execution, (2) that CHU staff/agents be given access to inspect the execution

SECOND AMENDED COMPLAINT – Page 6

chamber and adjoining room, (3) that CHU staff/agents be given access to the fixed cameras to determine quality for observing IV lines, (4) that the entire execution process be visible to witnesses, (5) that the whole execution chamber be filmed and audio recorded during the entire execution, (6) that at least two members of the CHU be permitted to attend the execution, (7) that at least one member of the CHU be permitted to bring a cell phone into the witness gallery with guaranteed cell phone reception, or access to a landline, (8) that an autopsy be performed after the execution at the facility of the CHU's choice, and (9) that records be preserved and centralized in one location.

40.     Since the 2018 correspondence, there have been many exchanges between the CHU and IDOC over access to execution information.

41.     However, IDOC has refused to provide answers to a number of basic questions regarding executions.

42.     Most significantly, as of today, IDOC has not told Mr. Creech what drug[3] it intends to use to execute him.

43.     In addition, IDOC has not told Mr. Creech whether the chemicals it has obtained have been compounded or manufactured.

44.     IDOC has likewise not told Mr. Creech a single thing about the source of the chemicals, such as whether they came from abroad, how they were transported, what form they are in (e.g., frozen or not), or anything else.

---

[3] Mr. Creech uses the term "drug" in the singular for consistency and ease of reference. He does not therefore imply anything about whether IDOC has chosen a single-drug or multi-drug protocol, which the defendants have refused to tell him.

SECOND AMENDED COMPLAINT – Page 7

45.     IDOC has taken the position that SOP 135 provides Mr. Creech with the necessary information about executions.

46.     However, SOP 135 states: "The SOP is subject to revision at the discretion of the chief of the Operations Division or the director of the IDOC.  Either person may revise, suspend, or rescind any procedural steps, at any time, at his sole discretion."

47.     Therefore, SOP 135 has limited legal significance.

48.     In other jurisdictions where execution protocols afford correctional agencies unfettered discretion, state agents have abused it.

49.     For instance, in the January 2015 execution of Charles Warner ("Mr. Warner"), Oklahoma used potassium acetate rather than potassium chloride, contrary to its representations to opposing counsel and the U.S. Supreme Court.

50.     Mr. Warner's last words were that his "body [wa]s on fire."

51.     In Arizona, the Department of Corrections has deviated from its protocol numerous times.

52.     For example, Arizona changed its intended drug for Donald Beaty eighteen hours before his May 2011 execution.

53.     Arizona has also repeatedly administered dosages well above the amounts provided for in the protocol, which it did at Joseph Wood's July 2014 execution when it gave him thirteen more doses of each of the two drugs than the protocol allowed.

SECOND AMENDED COMPLAINT – Page 8

54.     Nothing other than judicial intervention will check IDOC's ability to abruptly change its plans for executions with the effect of evading accountability and judicial scrutiny.

55.     Unlike every other Idaho executive branch agency, IDOC is exempt from the rule-making requirements of the Idaho Administrative Procedure Act ("APA"), which include public notice and an opportunity for interested parties to comment. *See* Idaho Code § 67-5201.

56.     The rule-making requirements that do apply to IDOC are far less rigorous than the APA. *See* Idaho Code § 20-212.

57.     As a consequence, there are even fewer checks on IDOC's ability to change its plans for executions abruptly and even more of a need for judicial intervention to ensure it does not do so improperly and for the purpose of evading accountability and court scrutiny.

58.     Idaho's execution protocol is now memorialized in version 4.0 of SOP 135, which was approved by Director Tewalt on March 30, 2021.

59.     SOP 135 does not identify what drug will be used at any execution.

60.     Instead, SOP 135 gives the IDOC Director four different drug options to select from in his unreviewable discretion and apart from his general authority to modify any aspect of the protocol whenever he sees fit.

61.     This approach makes it difficult, and potentially impossible, for the CHU to decide whether it will need to challenge the use of any execution drugs,

SECOND AMENDED COMPLAINT – Page 9

since pertinent information related to the use of execution drugs is being kept a secret.

**B.     Execution Procedures in Idaho**

62.     The current version of SOP 135 notes that the document was "revised to comply with changes in statute[ ]" that had occurred prior to March of 2021.[4]

63.     In 2021, when SOP 135 was revised for the fourth time, lethal injection was the only statutorily approved method of execution in Idaho.

64.     The only execution procedures referred to in version 4.0 of SOP 135 pertain to executions by lethal injection.

65.     Effective July 1, 2023, Idaho Code § 19-2716 was amended to include use of the firing squad as a secondary method of execution to lethal injection.

66.     Section 19-2716 provides that no later than five days after the issuance of a death warrant, the IDOC Director must determine whether execution by lethal injection is "available" and certify that availability by affidavit to the court that issued the warrant. Idaho Code § 19-2716(2). If it is "available," the execution must be by lethal injection; if it is not or if Director Tewalt does not so certify, the method of execution must be the firing squad. *Id.* § 19-2716(4).

67.     It is within Director Tewalt's sole and unqualified discretion to determine whether lethal injection is "available."

68.     The term "available" is not defined in the statute.

---

[4] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

SECOND AMENDED COMPLAINT – Page 10

69.     On October 10, 2023, the State submitted to the Court in *Pizzuto v. Labrador*, D. Idaho, No. 1:23-cv-00081, a proposed Order Granting Preliminary Injunction it had drafted.

70.     The language proffered by the State to this Court for its signature included the clause "the Idaho Department of Correction does not have the present ability to carry out an execution via lethal injection or firing squad[.]" *Id.*

71.     Two days later, however, Defendant Tewalt announced that contrary to that representation, execution by lethal injection is in fact "available" to use in Mr. Creech's case.

72.     A concomitant press release published by IDOC's press office advertised that IDOC "has secured the chemicals necessary to carry out an execution by lethal injection."

73.     Defendant Tewalt has affirmed, in a letter shared in part with the Idaho House Judiciary Committee on March 1, 2023, that "[s]hould the legislature choose to adopt firing squad as an alternate method, the Department of Correction will develop policies and procedures to ensure it is implemented with professionalism, respect, and dignity for everyone involved or impacted by this solemn process."

74.     Upon information and belief, however, SOP 135 has not been updated since July 1, 2023, when Section 19-2716 was amended to include the firing squad as a method of execution, or to include updated procedures pertaining to that method.

SECOND AMENDED COMPLAINT – Page 11

75.     IDOC's press release announcing Mr. Creech's execution states, "The Department's execution policies and procedures, in their entirety, are available online." *Id.* The word "online" is a hyperlink which, when clicked, takes the reader to version 4.0 of SOP 135, dated March 30, 2021.

76.     Mr. Creech will henceforth refer to version 4.0 of SOP 135 as "the now-outdated Protocol."[5]

### C.     IDOC's Execution History and Related Problems with Executions

77.     A host of issues have arisen with respect to lethal injection executions across the country that increase the risk of problems arising at any given execution.

78.     Those problems increase the possibility of something going wrong at a particular execution, such as the use of an unreliable drug.

79.     Such problems increase the risk of an unconstitutionally painful execution in violation of the Eighth Amendment.

80.     As a result, the problems exacerbate the risks described below in Claim One that create a danger that Mr. Creech will suffer an execution in violation of the Eighth Amendment if he is put to death by means of lethal injection.

81.     Additionally, IDOC's recent history with executions reflects a pattern of pursuing lethal injection drugs in an irresponsible manner and obfuscating its plans in order to frustrate legitimate litigation and public scrutiny. As such, there is

---

[5] When Mr. Creech refers to the now-outdated Protocol here, he also includes the associated documents hyperlinked therein, including the Execution Chemicals Preparation and Administration document, which was also updated and posted to IDOC's website on March 30, 2021.

a heightened risk that IDOC will act in the same way in connection with future executions, which makes it even more important that it be required to reveal the information at issue in this complaint.

82.     The two most recent executions in Idaho were of Paul Rhoades ("Mr. Rhoades") on November 18, 2011 and Richard Leavitt ("Mr. Leavitt") on June 12, 2012. The following allegations relate to these two executions.

### 1.     Use of Unreliable Sources for Execution Drugs

83.     The following allegations reflect IDOC's practice of seeking execution drugs in a reckless manner likely to result in the acquisition of unreliable chemicals.

84.     In March 2011—as IDOC was preparing to execute Mr. Rhoades and Mr. Leavitt—Randy Blades, then the Warden of IMSI ("Mr. Blades"), started trying to obtain lethal injection chemicals.

85.     To get the chemicals, Mr. Blades contacted a man named Chris Harris ("Mr. Harris") to inquire about the possibility of obtaining lethal injection chemicals from him.

86.     At the time, Mr. Harris was based in Kolkata, India.

87.     Mr. Harris was a salesman whose career involved positions at a duty-free airport shop and call centers.

88.     Upon information and belief, Mr. Harris has no training in the practice of pharmacy or medicine.

SECOND AMENDED COMPLAINT – Page 13

89.    Mr. Harris has attempted to import drugs into the United States without the requisite approval by the Food and Drug Administration ("FDA").

90.    Upon information and belief, Mr. Harris has also engaged in acts of dishonesty.

91.    To obtain drugs to send to Nebraska for executions, for example, Mr. Harris falsely told Naari, a pharmaceutical company, that the medications would be shipped to Africa so they could be used for anesthetic purposes in the developing world.

92.    When Arizona and Texas purchased sodium thiopental from Mr. Harris for use at executions, the FDA seized the shipment upon arrival at the airport because it was imported unlawfully.

93.    Like Idaho, other states, including but not limited to Arizona, Arkansas, California, Georgia, Nebraska, South Carolina, South Dakota, and Tennessee, have resorted to dubious international sources for lethal injection drugs.

94.    For example, several states, including but not limited to Arizona, Arkansas, California, Georgia, South Carolina, and Tennessee, purchased mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor who operated out of a storefront driving school in London, England.

95.    These states did so even though they were not registered with the Drug Enforcement Administration ("DEA") as an importer of non-narcotic controlled substances and did not provide a declaration of importation to the DEA.

SECOND AMENDED COMPLAINT – Page 14

96.     The states also did not possess a DEA license to possess, dispense, or distribute a Schedule III non-narcotic controlled substance such as thiopental.

97.     After the U.S. Attorney General was notified of the illegal importation, the DEA seized the thiopental in March 2011.

98.     Before the thiopental was seized, it was used in two executions in September 2010 and January 2011 and both inmates' eyes were open in the midst of their executions, suggesting that they were inadequately sedated.

99.     States have used unreliable domestic sources for executions as well.

100.    For example, a pharmacy in Oklahoma called the Apothecary Shoppe provided drugs for at least three Missouri executions in 2013 and 2014.

101.    The Apothecary Shoppe had its license put on probation after it admitted to committing 1,892 regulatory violations, including the improper extension of expiration dates and the use of questionable sterilization practices.

102.    After the Apothecary Shoppe stopped providing drugs to Missouri for executions, it turned to Foundation Care, a compounding pharmacy in St. Louis.

103.    Missouri used drugs from Foundation Care for seventeen executions.

104.    Prior to Missouri's selection of Foundation Care, the FDA determined that the company was not testing all of its drugs for sterility and bacterial contamination, that it had inadequate controls for sterility, and that some of its drugs were contaminated with bacteria.

105.    The FDA deemed Foundation Care a high-risk pharmacy.

SECOND AMENDED COMPLAINT – Page 15

106.    Other states' questionable practices, like Idaho's questionable practice in engaging Mr. Harris, make it likely that Idaho will continue to try to obtain chemicals from unreliable sources, and therefore make increased transparency even more necessary.

### 2.    Compounding Pharmacies

107.    For Mr. Leavitt's execution, IDOC obtained its chemicals from a compounding pharmacy.

108.    At the time of Mr. Leavitt's execution, Jeff Zmuda ("Mr. Zmuda") was the Deputy Chief of the Bureau of Prisons for IDOC.

109.    Mr. Zmuda was the Deputy Director of IDOC in 2008 and early 2009 at the time of the relevant trial proceedings in *Cover v. Idaho Bd. of Corr.*, Ada Cty., No. CV01-18-3877 (hereinafter "the *Cover* case").

110.    Mr. Zmuda testified in the *Cover* case that the drugs for the Leavitt execution were acquired from a compounding pharmacy.

111.    Mr. Zmuda further testified in the *Cover* case that the compounding pharmacy who provided the drugs for Mr. Leavitt's execution could not supply chemicals to IDOC for future executions because it was not in compliance with current regulations.

112.    The IDOC has therefore previously relied upon an unreliable source for execution drugs, which in turn suggests a greater chance that it will do so again.

113.    IDOC has refused to make public the identity of its sources of drugs for either the Rhoades or Leavitt executions.

SECOND AMENDED COMPLAINT – Page 16

114.   In the *Cover* case, the Ada County District Court ordered IDOC to reveal the source of the drugs for the Leavitt execution.

115.   Rather than complying with the order, IDOC appealed the ruling to the Idaho Supreme Court.

116.   If IDOC revealed the sources of drugs for the Rhoades and Leavitt executions, it would help Mr. Creech evaluate the risks associated with his own execution.

117.   IDOC's refusal to do so handicaps Mr. Creech's ability to protect his right to be free from unconstitutional executions.

118.   Apart from specific problems with IDOC's previous source, its use of a compounding pharmacy suggests that it may do so again, and that in and of itself raises serious questions.

119.   Compounding is a practice used by pharmacists to combine, mix, or alter ingredients to create drugs.

120.   Compounding pharmacies typically follow informal recipes and attempt to approximate the patented process used in manufacturing drugs approved by the FDA.

121.   The finished product is designed to replicate a variation of—but is not the same as—an FDA-approved manufactured drug that goes by the same name.

122.   Compounded drugs are not FDA-approved.

123.   Compounding pharmacies are not subject to the FDA's good manufacturing practice regulations.

SECOND AMENDED COMPLAINT – Page 17

124.    The FDA does not verify the safety or effectiveness of drugs prepared by compounding pharmacies.

125.    Compounding involves the use of raw ingredients, including Active Pharmaceutical Ingredients ("APIs"), which are the active ingredients in the compounded drug.

126.    There are significant questions about the quality of APIs used in compounding.

127.    Many APIs come from plants in India and China that are not registered with the FDA.

128.    In some instances, APIs are made on the same equipment as pesticides.

129.    Compounding pharmacies have been identified as a chief outlet for counterfeit bulk drugs.

130.    With compounders, it is difficult to trace the raw chemicals back to the original manufacturer for information about their quality and integrity, and difficult to determine expiration dates of individual ingredients.

131.    Accordingly, a chemical labeled as a particular active ingredient may actually be a different ingredient, and there is no way to have confidence that the APIs are not contaminated.

132.    Compounded drugs often degrade and lose efficacy more quickly than non-compounded drugs.

SECOND AMENDED COMPLAINT – Page 18

133.    Compounded drugs are not required to meet the stringent requirements regarding contamination, dilution, and degradation that manufactured drugs are required to meet.

134.    Compounding pharmacies generally are unable to test chemicals to confirm their identity, potency, and purity, or to detect contamination.

135.    While a compounding pharmacist might accurately measure or weigh individual ingredients, he or she would have no way of discovering in a pharmacy setting if the ingredients themselves were adulterated or counterfeit.

136.    This method for creating drugs unnecessarily adds enormous risk that the drugs will be ineffective, sub-potent, expired, or contaminated, or that they will contain unintended additives or a substantial level of particulates.

137.    Any one of these problems increases the danger that a compounded drug would not work as it is intended to and would therefore lead to a substantial risk of serious harm in an execution.

138.    Preparation of drugs intended for intravenous ("IV") administration is one of the most difficult of all pharmaceutical processes to execute.

139.    For a drug to be compounded effectively, the process must be carried out under specific environmental conditions, using precise equipment, and performed by highly trained personnel.

140.    There is little tolerance for error.

SECOND AMENDED COMPLAINT – Page 19

141.   If compounded drugs are prepared improperly, the pH can become off-balance, making the preparation more caustic than a manufactured version of the product, and causing intense, burning pain to the inmate upon injection.

142.   An out-of-balance pH can also cause ingredients to fall out of the solution in the form of particles, creating risks that the particle becomes contaminated or lodged in small blood vessels or in a prisoner's lungs, which would be extremely painful.

143.   If the preparation is created from non-sterile ingredients, or at a facility or by an individual who lacks the expertise to maintain sterility and quality of the drug, the drug can become contaminated with fungi, bacteria, and other contaminates.

144.   Contaminates include endotoxins, which would elicit an inflammatory reaction and can result in shock, or the preparations can become contaminated with a different drug from the same facility.

145.   Cross-contamination can occur during compounding when the air supply for the room in which one drug is being compounded is not scrupulously segregated from the air supply in the room in which another, allergy-causing agent is being produced.

146.   The consequence of contamination can be immediate anaphylaxis, i.e., a serious, life-threatening allergic reaction.

147.   These various problems with compounded drugs create a substantial risk of serious pain.

SECOND AMENDED COMPLAINT – Page 20

148.    Sterile preparations manufactured from non-sterile ingredients must be stored and transported within specific temperature requirements.

149.    If these temperature requirements are not followed, there is increased risk of microbial growth, chemical degradation, contamination from physical damage to packaging, and permeability of plastic packaging.

150.    Compounded drugs must be kept in carefully prescribed conditions related to the stability and properties of the specific medicine in question.

151.    Stability depends on the purity and concentration of specific ingredients, packaging and environmental exposure and storage, especially for solutions.

152.    Small changes in any one of those variables can cause rapid loss of drug strength or much shorter than expected shelf life.

153.    Because the preparation of compounded drugs is so difficult and sensitive, Mr. Creech needs to know the identity and backgrounds of the people involved, in order for him to evaluate the risks created for his executions.

154.    It is imperative to test both stability and sterility multiple times over a drug's shelf life, not just shortly after it is compounded.

155.    Similarly, it is imperative to test for contaminants including endotoxins prior to the drug's use.

156.    Many laboratories that hold themselves out as facilities that test compounded drugs are sub-standard.

SECOND AMENDED COMPLAINT – Page 21

157.   Therefore, in order to gauge the quality of any compounded drugs, Mr. Creech would need to know both the results of the testing and the identity of the laboratory that performed it.

158.   Correctional departments have had problems with properly maintaining compounded drugs.

159.   For example, in March 2015, the Georgia Department of Corrections discovered the compounded pentobarbital that it had for an execution had become cloudy because of the temperature of the drugs, which were kept in poor storage conditions.

160.   Some executions with compounded drugs have been problematic.

161.   For example, in January 2014, while Michael Lee Wilson was being executed in Oklahoma with compounded pentobarbital he cried out, upon administration of the drug, that he felt his "whole body burning."

162.   A report prepared after Mr. Wilson's execution found that the injection likely contained cross-contaminates that he was allergic to, as well as bacteria and endotoxins.

163.   An April 2014 Texas execution of Jose Luis Villegas involving compounded pentobarbital likewise spurred the inmate to complain of a burning sensation.

164.   In October 2012, Eric Robert, a South Dakota inmate being executed with compounded pentobarbital, gasped heavily, and observers noticed that his skin

SECOND AMENDED COMPLAINT – Page 22

turned a blue-purplish hue, his eyes remained open throughout the execution, and his heart continued to beat ten minutes after he stopped breathing.

165.   Subsequent analysis of the pentobarbital used in the South Dakota execution indicated that it was contaminated with fungi.

166.   All of the foregoing events are consistent with the administration of a compounded drug that was contaminated or sub-potent.

167.   The fact that Idaho's sister states have had problems with compounded drugs makes it more likely that Idaho will, which in turn means that Mr. Creech has to know whether IDOC will use compounded drugs, and if so where they will come from.

168.   Similarly, the fact that other states have had problems with compounded drugs makes it more likely that Idaho will, which in turn means that there is a greater risk that Mr. Creech will suffer an unconstitutional degree of pain at his execution.

169.   The manufacturers of pentobarbital prohibit its use in executions.

170.   Therefore, when pentobarbital is used in executions, it is either compounded pentobarbital or it is manufactured pentobarbital that was obtained through deceptive means.

### 3.   IDOC's Obfuscation

171.   The following allegations reflect IDOC's practice of acting in such a manner as to obstruct lawful challenges to executions and to shield itself from public oversight.

SECOND AMENDED COMPLAINT – Page 23

172.    The U.S. Supreme Court denied certiorari ("cert.") review of Mr. Rhoades' habeas appeal on October 13, 2011.

173.    On October 14, 2011, IDOC issued a new execution SOP, providing for only three-drug executions.

174.    IDOC described the new SOP in litigation as "a completely revised execution procedure."

175.    On October 19, 2011, the State secured a death warrant for Mr. Rhoades, setting his execution for November 18, 2011.

176.    Given the timeline, it is apparent that the State was planning on seeking a death warrant as soon as the U.S. Supreme Court denied cert. in Mr. Rhoades' habeas case.

177.    The Supreme Court denies roughly ninety-nine percent of the cert. petitions it receives.

178.    Thus, IDOC knew or should have known that it was a near certainty that the Supreme Court would deny Mr. Rhoades' cert. petition.

179.    IDOC could sensibly have tied its release of the new execution SOP to significant and relevant legal events that took place far before the denial of cert.

180.    For example, the Ninth Circuit panel affirmed the denial of habeas relief on July 15, 2010.

181.    In addition, the Ninth Circuit denied Mr. Rhoades' petition for rehearing on February 10, 2011.

182.    Instead of using either of these dates, IDOC waited until a little more than a month before the execution to release its SOP.

183.    IDOC did so in order to give Mr. Rhoades as little time as possible to review, investigate, and challenge the State's plans.

184.    Since IDOC released a new execution SOP the day after the Supreme Court denied the petition for cert., it clearly began preparing the new protocol well before then.

185.    On November 18, 2011, Mr. Rhoades was executed with a three-drug combination of sodium thiopental, pancuronium bromide, and potassium chloride.

186.    On January 6, 2012, IDOC created a new execution SOP, now giving the Director two three-drug options and two one-drug options.

187.    The U.S. Supreme Court denied cert. in Mr. Leavitt's habeas case on May 14, 2012.

188.    On May 17, 2012, the State obtained a death warrant for Mr. Leavitt, setting his execution for June 12, 2012.

189.    On May 25, 2012, IDOC announced its intent to execute Mr. Leavitt with a single-drug protocol of pentobarbital.

190.    Given the timeline, it is apparent that the State was planning on seeking a death warrant for Mr. Leavitt when the Supreme Court denied cert. in his habeas case.

191.    IDOC knew or should have known that it was a near certainty that the Supreme Court would deny Mr. Leavitt's cert. petition.

SECOND AMENDED COMPLAINT – Page 25

192.   IDOC could sensibly have announced its intent to use a single-drug pentobarbital protocol on significant and relevant dates that took place far before the denial of cert.

193.   For example, the Ninth Circuit panel reversed this Court's grant of habeas relief on May 17, 2011.

194.   In addition, the Ninth Circuit denied Mr. Leavitt's petition for rehearing on September 13, 2011.

195.   Instead of using either of these dates, IDOC waited until eighteen days before the execution to announce its intention to use a single-drug protocol of pentobarbital, so as to give Mr. Leavitt as little time as possible to review, investigate, and challenge the State's plans.

196.   For Mr. Rhoades's execution, IDOC kept a separate cash log for lethal injection expenses.

197.   For Mr. Leavitt's execution, IDOC kept a separate cash log for lethal injection expenses.

198.   On information and belief, for Mr. Rhoades's execution, IDOC kept three different sets of accounting books.

199.   Each of these books had more detail than the preceding one.

200.   Former IDOC Purchasing Agent Joanne Sooter ("Ms. Sooter") was instructed by her boss Theo Lowe ("Ms. Lowe"), then IDOC's Executive Financial Officer, to provide the first book if a public record request was submitted.

SECOND AMENDED COMPLAINT – Page 26

201.    Ms. Sooter was told that if the requester continued to press for more information, the second book was to be disclosed, as it had more details and would ideally placate the individual seeking records.

202.    The third book contained the real costs associated with the execution and it was not to be revealed.

203.    On information and belief, for Mr. Leavitt's execution, IDOC kept three different sets of accounting books.

204.    Ms. Sooter was instructed by Ms. Lowe, then Project Manager for IDOC, to provide the first book if a public record request was submitted.

205.    Ms. Sooter was told that if the requester continued to press for more information, the second book was to be disclosed, as it had more details and would ideally placate the individual seeking records.

206.    The third book contained the real costs associated with the execution and it was not to be revealed.

207.    In the past, IDOC has refused to make execution information available to Mr. Creech when he complains through the prison's grievance system on the ground that execution dates had not yet been set.

208.    However, by Idaho law, execution dates cannot be set more than thirty days in the future. *See* Idaho Code § 19-2715(2), (3).

209.    Idaho death warrants can set execution dates fewer than thirty days in the future.

210.   For instance, Mr. Creech's October 12, 2023, death warrant set a date twenty-seven days later for his execution.

211.   Thus, IDOC's position is apparently that no information about an execution can be provided to the inmate until his execution is roughly a month away.

212.   That position prevents any meaningful review of IDOC's plans for an execution.

213.   It is also illogical, as IDOC plainly does begin preparing for executions before the death warrant is officially issued.

214.   IDOC has in the past taken—and continues to take—the additional view that inmates must exhaust their administrative remedies before challenging methods of execution in federal court.

215.   Under IDOC's rules, inmates must pursue exhaustion through three separate levels of internal review.

216.   No regulations require IDOC to resolve grievances within thirty days.

217.   For example, when Mr. Pizzuto was exhausting his administrative remedies to prepare for this lawsuit, IDOC took forty-five days in total to reject his grievances, counting only the time that they were pending before prison authorities and not the time it took to write or submit them.[6]

---

[6] Again, Mr. Pizzuto is no longer a part of the present case; his experience is used only as an example.

SECOND AMENDED COMPLAINT – Page 28

218.   Therefore, according to IDOC, it can wait until a death warrant has been issued to tell Mr. Creech anything about the drugs to be used in his execution and then kill him before he has had any chance to even *begin* litigating the protocol in federal court.

219.   This track record reinforces the need for judicial intervention, so that IDOC is not able to continue sabotaging legitimate litigation and obstructing the review of the courts and the public.

### 4.   IDOC's Misconduct

220.   On information and belief, to prepare for Mr. Leavitt's execution, Kevin Kempf ("Mr. Kempf") and now-Director Tewalt boarded a chartered plane on or around May 30, 2012.

221.   On this flight, Mr. Kempf and now-Director Tewalt had in their possession a suitcase containing more than $10,000 in cash.

222.   Both Mr. Kempf and now-Director Tewalt were IDOC employees at the time of this trip.

223.   Upon information and belief, at the time of the May 30, 2012 trip, Mr. Kempf was the Division Chief of Operations for IDOC.

224.   Upon information and belief, at the time of the May 30, 2012 trip, now-Director Tewalt was the Deputy Chief of the Bureau of Prisons for IDOC.

225.   With their suitcase full of cash, Mr. Kempf and now-Director Tewalt flew to Tacoma Narrows Airport, in Washington State.

226.    After their plane landed, Mr. Kempf and now-Director Tewalt exchanged the money for lethal injection drugs.

227.    Upon information and belief, this occurred in a Walmart parking lot.

228.    Mr. Kempf and now-Director Tewalt then brought the drugs back to Idaho.

229.    These drugs were obtained to be used in Mr. Leavitt's execution.

230.    On information and belief, Mr. Kempf at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

231.    On information and belief, now-Director Tewalt at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

232.    Mr. Kempf and now-Director Tewalt and any agents acting in concert with them likely acted inconsistently with the federal statutes referenced below in their handling of the pentobarbital for the Leavitt execution.

233.    By federal law, pentobarbital is a Schedule II controlled substance.

234.    That being the case, in order for the drug to be delivered or transferred, a valid prescription written by a licensed practitioner is necessary.

235.    To be effective, the prescription must be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice.

SECOND AMENDED COMPLAINT – Page 30

236.    A person who issues a prescription and the person who knowingly fills a prescription that is not in the usual course of business is subject to penalties under the Controlled Substances Act.

237.    It is unlawful for any person, including a registrant, to distribute a Schedule II controlled substance without a prescription.

238.    Whether the drugs provided to IDOC were made by a traditional compounding pharmacy or a non-traditional outsourcing facility, the absence of a prescription would violate the Federal Food, Drug and Cosmetic Act ("FFDCA") and the Drug Quality and Security Act ("DQSA").

239.    If the drugs were supplied by a traditional compounding pharmacy, the FFDCA requires pharmacies to compound only for an identified individual patient on receipt of a valid prescription order that a compounded product is necessary for the identified patient.

240.    Here, there was no valid prescription order and no identified individual patient for whom the compounded product was necessary.

241.    If the drugs were supplied by an outsourcing facility, the FFDCA provides that the facility may only compound with a bulk drug substance which appears on an FDA list of drugs for which there is a clinical need, or which are on the FDA's drug shortage list.

242.    In May 2012, pentobarbital was not on the drug shortage list.

243.    In May 2012, there was no clinical need for the drugs in these circumstances.

SECOND AMENDED COMPLAINT – Page 31

244.    Under the FFDCA, it is unlawful to compound drugs that are essentially copies of existing drugs, unless there is a shortage of those drugs, which there was not for pentobarbital.

245.    Upon information and belief, Mr. Kempf and now-Director Tewalt were directed to take the aforementioned trip to Tacoma by Brent Reinke ("Mr. Reinke"), who was the Director of IDOC at the time.

246.    On information and belief, Mr. Reinke was authorized by then-Governor Butch Otter to approve the trip.

247.    After they bought drugs for an execution with a suitcase full of cash, Mr. Kempf and now-Director Tewalt were both later promoted, at separate times, to IDOC Director, the highest position in the organization.

248.    Compounded pentobarbital is a high-risk sterile injectable.

249.    As such, compounded pentobarbital is meant to be administered within twenty-four hours, if stored at room temperature, and within seventy-two hours, if kept refrigerated.

250.    A pentobarbital preparation cannot be frozen because freezing degrades the preparation.

251.    The plane that carried the drugs from Tacoma to Boise was parked for about three hours and was in the air for approximately an hour and twenty minutes, after which the chemicals presumably had to be driven elsewhere.

252.    Based on the previous facts, there is reason to suspect, on information and belief, that the pentobarbital acquired by Mr. Kempf and now-Director Tewalt

SECOND AMENDED COMPLAINT – Page 32

may not have been properly stored during the time between when they obtained it and when it was used at Mr. Leavitt's execution.

253.   IDOC ultimately acquired the drugs for Mr. Leavitt's execution in 2012 from Union Avenue Compounding Pharmacy ("Union") of Tacoma, Washington.

254.   On information and belief, the pharmacist who provided the drugs for Union was Kimela Burkes.

255.   In 2015, regulators inspected Union and found that it had twenty-seven outdated or expired items in its drug stock, and that it failed to properly record in its system the chronic conditions of a number of patients.

256.   A follow-up inspection in 2016 discovered that Union had not fixed several of the problems, despite being warned by officials, and that some of them had actually gotten worse.

257.   As a result of the regulators' complaint, Ms. Burkes agreed to a series of sanctions, including having her license placed on probation for a year.

258.   For Mr. Rhoades' execution in 2011, IDOC obtained the drugs from University Pharmacy ("University") in Salt Lake City.

259.   University compounded the drugs for Mr. Rhoades' execution.

260.   There are significant reasons to question the reliability of University.

261.   For example, state and federal regulators have cited University for a number of violations, including many in the few years before and after Mr. Rhoades' execution.

SECOND AMENDED COMPLAINT – Page 33

262.    In 2017, state regulators inspected University and concluded that it was in violation of six different rules, including those having to do with documentation, labeling, and expiration dates.

263.    The regulators noted nineteen different items, comprising twenty-seven vials total, where there were problems with the documentation of the products' expiration dates.

264.    In 2014, state regulators inspected University and found that 232 medications and compounding ingredients were expired or had indeterminate expiration dates in the pharmacy's regular stock. Officials fined University $1,050 and filed a cease-and-desist order.

265.    In 2013, federal regulators with the FDA conducted several inspections of University and filed a report finding a number of problems.

266.    These inspections were done only fourteen months after University provided drugs for Mr. Rhoades' execution.

267.    In its report, the FDA concluded that University committed a variety of violations, including: failing to sanitize equipment enough to protect the integrity of the drugs; allowing spills, splatter, rust, and so forth to remain in sensitive areas; a technician taking out garbage in the middle of a sterilization process and then sticking his hand back into the equipment without changing his gloves; and not checking products properly to make sure they were stable and could last.

268.   In 2009, state regulators cited University for dispensing sixty prescriptions to practitioners around the country based on orders that did not include the patients' names and addresses, in violation of state law.

269.   University admitted the misconduct and was issued a cease-and-desist order.

270.   In 2008, FDA officials observed nineteen separate problems with University after a series of inspections. The problems included issues with the pharmacy's sterilization practices, maintenance of its equipment, failure to properly document testing, inadequate measures to make sure drugs were clean and stable before they were sent to patients, improper storage of chemicals, flaws in the training regimen, and so forth.

271.   Mr. Leavitt was executed on June 12, 2012, thirteen days after the pentobarbital was obtained in the manner detailed above.

272.   The Idaho Board of Correction appointed Mr. Kempf as IDOC Director in December 2014.

273.   The Idaho Board of Correction appointed Director Tewalt as IDOC Director in November 2018.

274.   Director Tewalt is currently IDOC Director.

275.   Mr. Kempf is now the Executive Director of the Correctional Leaders Association ("CLA"), formerly known as the Association of State Correctional Administrators ("ASCA").

276.   Mr. Kempf took over in that position in December 2016.

SECOND AMENDED COMPLAINT – Page 35

277. CLA's members are the leaders of each U.S. state correctional system. In those roles, CLA members oversee more than 400,000 correctional professionals and are in charge of more than eight million inmates and other convicts.

278. Between approximately 2016 and 2018, now-Director Tewalt was Director of Operations for CLA.

279. IDOC's approach to acquiring drugs for Mr. Leavitt's execution makes it more likely that the organization will engage in similar conduct in connection with future executions, increasing the risk that it will acquire unreliable drugs.

280. IDOC did not arrange for autopsies of either Mr. Rhoades or Mr. Leavitt after their executions.

281. A valuable source of information about whether anything had gone wrong with the executions was thereby left untapped.

282. The CHU represents six of the eight inmates currently on Idaho's death row.

283. The inmates on Idaho's death row who are not represented by the CHU are in early litigation of their cases and thus far removed from an execution.

284. On March 21, 2019, the Ada County District Court found that IDOC and associated institutions and people acted in bad faith and with a lack of diligence in its execution-related responses to record requests in the *Cover* case. The court fined Jeffrey Ray ("Mr. Ray"), IDOC's Public Information Officer and the designated records custodian, because he "did nothing to fulfill his responsibilities other than trust that others would," "did not even open the digital files to see what he had

SECOND AMENDED COMPLAINT – Page 36

actually denied, [and] did not ensure the records he received were complete, or inquire into how the decision was made to deny any portions of the records." In the district court's view, Mr. Ray's "inquiry and review was so lacking as to be an improper withholding that was performed deliberately" and there was "substantial evidence" of "his lack of good faith compliance with Idaho's Public Records Act and avoidance of his mandatory duties under its provisions rising to the level of bad faith."

285.    In the *Cover* case, a pattern emerged of IDOC mishandling public record requests for execution-related material.

286.    For example, IDOC has provided certain records to requesters while withholding the same documents from other requesters seeking the same information, with no justification for the distinction.

287.    IDOC's responses to the plaintiff in the *Cover* case also reflected a highly disorganized and unreliable approach to the retention and disclosure of execution-related materials.

288.    Over the course of the *Cover* case, IDOC failed to provide execution-related material that was plainly responsive to the request and not exempt from disclosure.

289.    After the plaintiff in the *Cover* case took IDOC to court over its initial response, thousands more pages of records were located that had not been provided earlier.

SECOND AMENDED COMPLAINT – Page 37

290.   IDOC provided these materials in batches for months, each time explaining that it had found them in a place it had not searched earlier, such as a filing cabinet.

### D.   Human Error at Lethal Injection Executions

291.   Correctional staff and agents have made a variety of serious mistakes at executions.

292.   As a consequence, there is a higher risk that mistakes will be made at Mr. Creech's execution, making a torturous death more likely and also making it more essential that he be given access to the information requested so he can ensure his constitutional rights are protected.

293.   For example, at the Oklahoma execution of Clayton Lockett in April 2014, the executioners apparently had problems setting an IV line, which took them fifty-one minutes to do.

294.   During Mr. Lockett's execution, staff punctured multiple parts of his body at least twelve times before essentially jury-rigging a solution by inserting a too-short catheter in his right femoral vein and attempting to secure it with tape.

295.   As a result of that failure, Mr. Lockett began to writhe and gasp after he had already been declared unconscious, kicked his leg, rolled his head, grimaced, and grunted, all for more than thirty minutes.

296.   In the course of Mr. Lockett's execution, some of the lethal injection drugs massed in his tissue, creating a swelling under his skin larger than a golf ball.

SECOND AMENDED COMPLAINT – Page 38

297.    Eventually, Mr. Lockett died of a heart attack.

298.    At the Arizona execution of Robert Towery ("Mr. Towery") in March 2012, it took fifty-nine minutes to set the IV lines.

299.    An autopsy later revealed that Mr. Towery had been punctured at least eleven times.

300.    Arizona officials also struggled to insert IV lines into Clarence Dixon in May 2022, requiring forty minutes in order to do so.

301.    Members of Mr. Dixon's execution team ultimately inserted an IV line into his femoral vein rather than his arm or hand.

302.    Witnesses to Mr. Dixon's execution report that he was visibly in pain and copiously bleeding from the catheter inserted into his leg.

303.    Murray Hooper was also executed in Arizona in November 2022, but officials avoided the bloody mistakes of Mr. Dixon's execution by sewing the catheter into Mr. Hooper's groin.

304.    At a Florida execution in December 2006, a misplaced IV line allowed caustic lethal injection drugs to leak into the soft tissue of the arms of inmate Angel Nieves Diaz ("Mr. Diaz").

305.    The drugs accordingly failed to render Mr. Diaz unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away.

306.    On information and belief, Mr. Diaz likely suffocated to death before the execution drugs could end his life.

SECOND AMENDED COMPLAINT – Page 39

307.    In 2009 in Ohio, in attempting to execute Romell Broom, the execution team stabbed him with needles for an hour and a half while trying to find a vein, using eighteen needle sticks in the process. Finally, the governor halted the execution.

308.    2022 saw so many problematic experiences that it was deemed "the year of the botched execution."

309.    Alabama, Arizona, and Texas all had botches related to execution teams' inability to properly set IV lines.

310.    In Alabama, two executions were called off completely because of IV struggles.

311.    Training and regular experience are required in order to obtain IV access.

312.    Errors in placing IV lines cause chemical solutions to escape into subcutaneous tissue, which can cause excruciating pain.

313.    Problems in executions can also be caused by errors in preparing IVs, labelling syringes, preventing IVs from leaking, preventing veins from leaking, waiting the appropriate amount of time between injections, and injecting the chemicals properly.

314.    Members of execution teams in other states have been revealed to have histories that raised questions about their suitability for the task.

315.    For example, a member of the execution team in Arizona had his nursing license suspended and had a lengthy arrest record.

SECOND AMENDED COMPLAINT – Page 40

316.   Similarly, it was found that a surgeon involved in Missouri executions was dyslexic and had prepared lower-than-expected amounts of anesthesia for several inmates who were put to death.

317.   Because of these risks of human error, it is critical that Mr. Creech know the identities and credentials of the personnel tasked with executing him.

318.   Execution equipment in some states has been found wanting. For instance, there have been issues raised about adequate lighting in the room where the chemicals are prepared and about adequate sightlines from that room into the execution chamber.

## VI.   Claims

### A.   Claim One – The Use of Compounded Pentobarbital[7] at Mr. Creech's Execution Violates the Eighth Amendment

#### 1.   Mr. Creech's Health Concerns

319.   Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

320.   The use of pentobarbital at Mr. Creech's execution creates a substantial risk of serious pain and suffering because of his health conditions and medical history, amongst other factors, all in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

---

[7] If the defendants do not select pentobarbital for use at Mr. Creech's execution, he reserves the right to challenge their choice on whatever grounds are appropriate, which may include the State's violation of Mr. Creech's First Amendment right to access the courts, his Due Process right to notice and hearing, his Eighth Amendment right to be free from cruel and unusual punishment, and potentially other violations.

SECOND AMENDED COMPLAINT – Page 41

321.    Mr. Creech was diagnosed with type II diabetes mellitus in August 2018. Mr. Creech has been treated for the past five years with Metformin to help control his diabetes.

322.    Mr. Creech has a history for at least the last five years of edema in his legs, a swelling caused by the trapping of excess water. The severity of the edema has ranged over time. In May 2018, the edema was first diagnosed, Mr. Creech had +3 pitting edema in both of his lower legs. In June 2018, it was noted that Mr. Creech had +2-3 pitting edema in both of his lower legs, with his right leg worse than his left. Mr. Creech's edema has been a continuing issue over the past five years. Mr. Creech is taking hydrochlorothiazide for his edema.

323.    Mr. Creech has mixed hyperlipidemia due to his type II diabetes mellitus. Mixed hyperlipidemia is a condition characterized by elevated levels of fats in the blood, including low-density lipoprotein cholesterol and triglycerides.

324.    In September 2022, a large vascular aneurysm was found in Mr. Creech's abdomen. An aneurysm is a weak section of an artery wall. Pressure from inside the artery causes the weakened area to bulge out beyond the normal width of the blood vessel. An abdominal aortic aneurysm is an aneurysm in the lower part of the aorta, the large artery that runs through the torso. The aneurysm measured 5.8 centimeters, with a craniocaudal length of 8.5 centimeters.

325.    In addition to the aneurysm, Mr. Creech was found to have extensive atherosclerotic vascular disease and moderate to severe coronary artery disease. Atherosclerosis is the buildup of fats, cholesterol and other substances in and on the

SECOND AMENDED COMPLAINT – Page 42

artery walls. This buildup is called plaque. The plaque can cause arteries to narrow,
blocking blood flow. The plaque can also burst, leading to a blood clot.

326.    On October 23, 2022, Mr. Creech was admitted to the hospital after he
fell backwards, hitting his head, and being found unconscious by IMSI staff. Mr.
Creech's blood pressure was 148/85, and he had elevated glucose levels. A CT scan
of Mr. Creech's chest measured his aneurysm at 6.1 x 6.3 centimeters, with a
craniocaudal length of 8.9 centimeters.

327.    On November 17, 2022, Mr. Creech had surgery to place a stent graft
around the aneurysm. Despite this surgery, an endoleak developed and blood
continues to flow into the aneurysm. An endoleak happens when blood finds a way
around the stent graft and into the aneurysm. An endoleak can be life-threatening
without treatment.

328.    In December 2017, Mr. Creech underwent an MRI of his brain which
indicated mild cerebral white matter disease compatible with chronic small vessel
ischemic disease.

329.    Mr. Creech has been diagnosed as having an organic brain disorder.

330.    Additionally, Mr. Creech has been diagnosed as having a major
depressive disorder and post-traumatic stress disorder ("PTSD").

331.    In September 2016, Mr. Creech was determined to have an allergy to
Penicillin, Lithium, and Narcotics (Opium Alkaloids).

332.    Mr. Creech's medical conditions create a substantial risk of serious
harm at an execution involving pentobarbital.

SECOND AMENDED COMPLAINT – Page 43

333.    Large doses of pentobarbital are likely to cause acute drops in blood pressure.

334.    Individuals, like Mr. Creech, who suffer from an abdominal aortic aneurysm, are at a sharply increased cardiovascular risk.

335.    In addition, in individuals with extensive atherosclerotic vascular disease, a sudden drop in blood pressure such as that associated with large doses of pentobarbital is likely to cause myocardial ischemia and/or infarction, or what is commonly known as a heart attack. To fully assess Mr. Creech's heath conditions, further testing is necessary for coronary heart disease, including a current electrocardiogram, an exercise stress test, and echocardiogram, a nuclear stress test, and CT coronary angiogram.

336.    Mr. Creech is additionally being treated for his depressive disorder and PTSD with a higher than FDA recommended dose of Paxil. This dose carries a higher risk for cardiac complications.

337.    The onset of a heart attack under these circumstances is nearly immediate.

338.    The sedating effects of pentobarbital are likely to occur minutes after the heart attack begins.

339.    Heart attacks often cause substantial physical suffering, including chest pain, the feeling of a crushing weight, and difficulty breathing.

340.    Heart attacks often cause substantial psychological discomfort, including a feeling of impending doom, anxiety, or fear.

SECOND AMENDED COMPLAINT – Page 44

341.   It is likely that a pentobarbital execution of Mr. Creech would induce an acute heart attack.

342.   It is likely that Mr. Creech would experience cruel and unusual pain and suffering from a heart attack.

343.   It is likely that Mr. Creech would experience cruel and unusual pain and suffering from a heart attack for a significant amount of time before the pentobarbital completely sedates him.

344.   Two previous executions—that of Roy Blankenship in Georgia and Eddie Powell in Alabama—confirm the risk posed to Mr. Creech by a pentobarbital execution.

345.   Autopsies of Messrs. Blankenship and Powell indicated that both had clinically significant obstructive coronary disease.

346.   Messrs. Blankenship and Powell were both executed by pentobarbital.

347.   Both Mr. Blankenship and Mr. Powell appeared to be in pain during their executions, with witnesses observing grimacing, writhing, thrashing, and so forth.

348.   The observations of both men's executions were consistent with the physical manifestation associated with heart attacks.

349.   Other pentobarbital executions have taken place on different inmates who did not have obstructive coronary artery disease.

350.   Most of those executions did not include the kinds of painful reactions seen when Messrs. Blankenship and Powell were put to death.

SECOND AMENDED COMPLAINT – Page 45

351.    In addition to the risks caused by the above medical conditions, Mr. Creech's diabetes and mixed hyperlipidemia also increase the risk of a painful heart attack caused by pentobarbital.

352.    The use of *compounded* pentobarbital in particular increases the risk of a painful heart attack because of the issues with compounding summarized earlier involving reliability, purity, potency, sterility, efficacy, and so forth.

353.    This risk is further exacerbated when the compounding is conducted by a pharmacy with known regulatory violations like the two pharmacies IDOC selected for the Rhoades and Leavitt execution drugs.

354.    Additionally, Mr. Creech suffers from brain damage.

355.    In particular, Mr. Creech has many signs that indicate abnormalities of circuits that are mediated through the frontal lobe.

356.    Mr. Creech has bilateral brain damage.

357.    The right side of the brain is more damaged than the left.

358.    Mr. Creech's neurological deficits are indicative of brain dysfunction.

359.    Mr. Creech has a history of migraine headaches, which at times have become so incapacitating that he cannot move.

360.    Mr. Creech has been prescribed a number of medications for his migraines.

361.    Mr. Creech's neuropsychological deficits are indicative of brain dysfunction.

362.    Over the years, Mr. Creech experienced a series of head injuries, including a fall from a staircase when he was a boy which led to a lapse in consciousness. After that fall, his mother removed him from the hospital against doctors' orders. In addition, Mr. Creech was in two serious car crashes at the ages of thirteen and seventeen respectively.

363.    Brain damage elevates the risk that Mr. Creech could have an atypical reaction to an execution drug, potentially causing him to become agitated and confused and to decompensate.

364.    In such a state, there is a heightened likelihood that obtaining IV access will be difficult.

365.    Mr. Creech also has at times experienced edema, which could likewise complicate IV access.

### 2.    Problems With the Now-Invalidated Protocol

366.    Idaho Code Section 19-2716, which added the firing squad as a potential execution method in Idaho, also generates new risks of severe pain and suffering if the now-invalid Protocol were nevertheless to be employed in executing Mr. Creech.

367.    That statute refers to whether or not execution by lethal injection is "available," but the lack of definition of "available" creates the risk that the State could deem lethal injection "available" if it possessed only expired or contaminated chemicals.

SECOND AMENDED COMPLAINT – Page 47

368.    Injecting Mr. Creech with expired, sub-potent, or contaminated chemicals in turn creates the substantial risk that he will experience severe pain or suffering as a result, as described above.

369.    The risks of severe pain or suffering outlined above are also exacerbated by flaws in the now-outdated Protocol.

370.    Under the now-outdated Protocol, the medical team members are instrumental to the carrying out of executions, as they are the ones preparing and administering the lethal chemicals, as well as monitoring the inmate's level of consciousness.

371.    The now-outdated Protocol requires that members of the medical team have "three years of medical experience" in various positions, including as nurses, paramedics, and phlebotomists.

372.    Individuals with those backgrounds do not have the requisite training to properly administer the chemicals in the now-outdated Protocol while accurately evaluating the possibility that the inmate is conscious, sensate, or in pain when the individual has the kind of complicated medical status that Mr. Creech does.

373.    Only a practicing anesthesiologist would be fully qualified to perform that function.

374.    Under the now-outdated Protocol, members of the medical team need not be physicians.

375.    The now-outdated Protocol does not require that any member of the medical team be an anesthesiologist.

SECOND AMENDED COMPLAINT – Page 48

376.   No member of the medical team assembled for Mr. Creech's execution is an anesthesiologist.

377.   Indeed, no member of the medical team is even a doctor.

378.   Anesthesiologists understand the pharmacology of anesthetic drugs and their interactions, which determines the sequence and timing of how chemicals should be injected.

379.   Other types of medical professionals, like nurses and paramedics, do not have that scientific background.

380.   When drugs are administered and the pacing is off, it can create a painful reaction.

381.   A person may be experiencing pain and yet not express it in a way that is visible to the naked eye.

382.   For example, an inmate could receive a large dose of pentobarbital at an execution and appear to go to sleep, yet still be going through a painful experience.

383.   Anesthesiologists are experts in determining whether there is pain in such circumstances and adapting to those circumstances.

384.   To do so, they rely on their clinical training.

385.   Anesthesiologists also rely on brain monitors, sophisticated pieces of equipment that measure and convert brain signals so that doctors can understand a patient's level of consciousness and depth of anesthesia.

SECOND AMENDED COMPLAINT – Page 49

386.    The now-outdated Protocol does not provide for the use of a brain consciousness monitor.

387.    On information and belief, IDOC does not plan on using a brain consciousness monitor at Mr. Creech's execution.

388.    If an individual without proper training were handling the drug administration at the execution under the now-outdated Protocol, and without a brain consciousness monitor, they would essentially be "guessing" the stage of consciousness and pain sensation.

389.    The absence of a practicing anesthesiologist and a brain consciousness monitor add yet more risk for pain at Mr. Creech's execution in addition to the dangers described earlier.

390.    In other words, Mr. Creech's health conditions create the risk of a painful execution and the flaws in the now-outdated Protocol make it more likely that the executioners will not respond appropriately, which would increase and prolong Mr. Creech's suffering.

391.    This is because, if the execution does become unduly painful, the lack of a brain monitor and anesthesiologist would impede the execution team's ability to gauge the pain and therefore respond appropriately to it, such as by administering more or less pentobarbital.

392.    As a result, the presence of an anesthesiologist and a brain consciousness monitor at the execution would assist IDOC in avoiding a substantial risk of significant pain during Mr. Creech's execution process.

SECOND AMENDED COMPLAINT – Page 50

393.    None of the medical team members are pharmacologists.

394.    Nevertheless, the medical team is responsible under the protocol for "mixing the chemicals."

395.    Only a pharmacologist is equipped to reliably detect the kinds of problems with compounded drugs described above.

396.    The factors arrayed here—including Mr. Creech's medical and neurological conditions, as well as IDOC's use of unreliable drugs, the questions surrounding compounding, and the shortcomings in the now-outdated Protocol— independently and collectively create a substantial risk that his execution will cause him severe pain, in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

### 3.    Problems With the Execution Facilities

397.    The risks associated with pentobarbital and with the protocol are compounded by serious deficiencies in the physical layout of the execution chamber.

398.    During executions in Idaho, the medical team administers the lethal chemicals to the inmate, observes the individual, and has the responsibility to intervene in the event of complications.

399.    While the lethal chemicals are flowing into the inmate's veins, the medical team is positioned in a room adjacent to the execution chamber.

400.    This space is referred to in SOP 135 as the medical team room.

401.    There is no window between the execution chamber and the medical team room.

SECOND AMENDED COMPLAINT – Page 51

402.    Instead, there is a solid wall between the two rooms.

403.    The medical team watches the inmate on monitors on a closed-circuit television system, rather than directly.

404.    That system does not allow for the medical team to adequately observe problems arising during the execution.

405.    If the medical team cannot adequately detect problems in the execution, there is an increased risk the inmate will experience longer and more intense pain without assistance.

406.    Undersigned counsel are not aware of any other execution chambers in the country where there is no direct sightline for the medical team to see the inmate with their own eyes, unmediated by a camera.

407.    There are numerous execution chambers where such a direct sightline does exist.

408.    The other problem created by this layout is the excessive distance between the medical team room and the execution chamber.

409.    The amount of time that it takes to cover that distance makes it impossible for the medical team to react quickly enough to complications arising during the execution.

410.    That increases the risk that the inmate will experience longer and more intense pain without assistance.

SECOND AMENDED COMPLAINT – Page 52

### 4.    Reasonably Available and More Humane Alternative

411.    The State's refusal to provide information about Mr. Creech's execution means that he is litigating on a best-guess basis. Many aspects of his challenge imply their own reasonable alternative, dependent upon the State's choice of conduct: if the State relies on shady offshore compounding pharmacies to procure its lethal injection chemicals, it could simply not do so; or it could employ an anesthesiologist to monitor the execution; or it could establish a direct sight line between the medical team and Mr. Creech; or it could allow the medical team to be present in the execution chamber so that they can react quickly should complications arise. Removal of these failings could conceivably remove the risk of an Eighth Amendment violation occurring in Mr. Creech's execution.

412.    Yet to say further would, Mr. Creech submits, violate the ethical obligations of the undersigned attorneys. It is a conflict of interest for Mr. Creech's counsel to argue for a better way for the State to kill him.[8]

413.    Requiring the undersigned attorneys to put forth an alternative plan to execute Mr. Creech effectively requires Mr. Creech's counsel to advocate for the State. The duty of loyalty is "perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *see also* Idaho R. Prof. Conduct (hereinafter "IRPC") 1.7, cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."); *accord* Ind. R. Prof. Conduct 1.7,

---

[8] This conflict of interest cannot be resolved by appointing separate counsel to Mr. Creech on the question of a reasonably available and humane alternative as the conflict would extend to any attorneys appointed to represent Mr. Creech.

SECOND AMENDED COMPLAINT – Page 53

cmt 1. For undersigned counsel to represent the interests of the State in killing Mr.

Creech would be for counsel to effectively represent the State as a de facto client,

and thus violate counsel's duty of loyalty to refrain from representing conflicting

interests. *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980) ("Defense counsel

have an ethical obligation to avoid conflicting representations and to advise the

court promptly when a conflict of interest arises during the course of trial.").

414.    The duty of loyalty preventing counsel from advocating in the interest

of persons other than their client is broad. For example, under the Idaho Rules of

Professional Conduct, attorneys are duty-bound not to represent another client

whose position is "directly adverse" to their client or when there is a "significant

risk" that the representation of their client "will be materially limited" by the

representation of another client, former client, third person, or even "the personal

interests" of counsel. IRPC 1.7(a); *accord* Ind. R. Prof. Conduct 1.7(a).

415.    Additionally, counsel are duty-bound not to "use information relating

representation of a client to the disadvantage of the client . . . ." IRCP 1.8(b); *accord*

Ind. R. Prof. Conduct 1.8(b). Using the information undersigned counsel have

uncovered in the representation of Mr. Creech, such as his extensive medical

history, to point the State toward an alternative method of killing him forces

counsel to wield that information to Mr. Creech's disadvantage.

416.    Requiring undersigned counsel to represent the interests of the State

in killing Mr. Creech would be for counsel to represent an interest to Mr. Creech's

extreme detriment. Such a requirement effectively renders counsel a representative

SECOND AMENDED COMPLAINT – Page 54

of both Mr. Creech and the State, the diametrically opposed parties on either side of the adversarial process.

417.   Mr. Creech reserves the right to plead a reasonably available and more humane alternative to whatever method of execution Idaho chooses to use against him, whether it be lethal injection by pentobarbital or some other method, if this Court orders counsel to do so following briefing on and resolution of the ethical issues noted above.

**B.   Claim Two – The Lack of a Valid Execution Protocol Violates Mr. Creech's Rights to Due Process**

418.   Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

419.   Procedural due process requires fair notice of the procedures to be used in Mr. Creech's execution and an opportunity for his challenges to those procedures to be heard.

420.   No execution protocol yet exists which can validly govern either method of execution the State may use to kill Mr. Creech.

421.   Upon information and belief, no such protocol will be published within the twenty-two days remaining before Mr. Creech's scheduled execution.

422.   The now-outdated Protocol does not govern Mr. Creech's scheduled execution on November 8th.

423.   IDOC's statements about the execution create even more uncertainty around the process. Its press release announcing its intent to use lethal injection to kill Mr. Creech advertises the State's possession of "chemicals," plural, while IDOC

SECOND AMENDED COMPLAINT – Page 55

has told the CHU that it is "focusing" on obtaining pentobarbital for a single-drug protocol, without ruling out other options.

424.    IDOC's now-outdated protocol does not identify a recipe for executions, instead giving the Director four separate options to choose from at his unfettered discretion.

425.    As of this date, the Director has not told Mr. Creech or his counsel which option he has chosen—or whether he has selected some entirely different drug.

426.    Similarly, IDOC's press release signals its adherence to the new statute – "In accordance with Idaho Code § 19-2716(2), Director Tewalt has filed an affidavit certifying that execution by lethal injection . . . is available in this matter[,]" it proclaims, *id.* – even though the State has written and promulgated no new protocol to implement that new law.

427.    The mismatch between the statute, SOP 135, and IDOC's public pronouncements reflects a lack of consensus on what procedures are to govern Mr. Creech's execution.

428.    Without notice of the procedures to be used in his execution, Mr. Creech will be deprived of his life without being able to adequately challenge the constitutionality of the procedures used to do so.

429.    Idaho's lack of any current protocol governing how it expects to execute Mr. Creech therefore violates the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

SECOND AMENDED COMPLAINT – Page 56

**C.    Claim Three – Deprivation of Accurate Information Violates Mr. Creech's Fourteenth Amendment Right to Due Process**

430.    Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

431.    The Due Process Clause of the United States Constitution provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1.

432.    Fundamental fairness and due process require that an individual be given an opportunity to receive notice of how one's rights will be affected and an opportunity to respond and be heard.

433.    The defendants' refusal to provide Mr. Creech with information that would enable him to determine how the State intends to execute him violates his rights to due process; among other things, the lack of information raises a procedural barrier to challenging the constitutionality of IDOC's execution process.

434.    Instead of providing this information, the State has engaged in a pattern of misleading conduct with respect to methods of execution in the State of Idaho.

435.    Until Thursday, October 12, 2023, Attorney General Labrador (through his surrogate, Deputy Attorney General LaMont Anderson) and Tewalt were emphatic, to both the Idaho Legislature and the public, that lethal injection chemicals were unavailable to IDOC. On March 1, 2023, testifying in the House Judiciary Committee in support of House Bill 186, the bill proposing the addition of

SECOND AMENDED COMPLAINT – Page 57

the firing squad, Representative Bruce Skaug[9] reported that according to IDOC, the Department's "continued inability to secure [pentobarbital] seems to indicate it will be unavailable for the foreseeable future, making our ability to carry out the lawful sentence of anyone on death row impossible. So, it's a de facto end of executions in our state[.]"[10]

436.   Rep. Skaug also read from a letter written to him by Defendant Tewalt. Defendant Tewalt had written, Rep. Skaug said, that "[a]bsent an actionable alternative method of executions, a de facto moratorium on capital punishment exists since the current law is unenforceable." The passage of the secrecy statute shielding much of the information surrounding executions from disclosure had not helped, Defendant Tewalt reported; "still we [IDOC] cannot get those drugs."

437.   Further reporting what he had learned from IDOC, Rep. Skaug told the House Judiciary Committee that "executions . . . may never happen since we may never obtain these necessary drugs for the executions." Other states are going

---

[9] Representative Skaug is Attorney General Labrador's former employer. Attorney General Labrador has admitted to co-authoring HB 186. Kevin Fixler, *Firing Squad Bill Implementation Would Cost Idaho Taxpayers*, IDAHO STATESMAN (Feb. 27, 2023), *available at* https://www.idahostatesman.com/news/politics-government/state-politics/article272585057.html; Kevin Fixler, *Idaho Seeks to Execute Longtime Death Row Inmate Gerald Pizzuto, Again. Here's What We Know*, IDAHO STATESMAN (Feb. 24, 2023), *available at* https://www.idahostatesman.com/news/northwest/idaho/article272595101.html.

[10] A video recording of Rep. Skaug's and Deputy Attorney General Anderson's March 1, 2023, testimony is available at https://lso.legislature.idaho.gov/MediaArchive/MainMenu.do. All emphasis added to testimony quotations is the speaker's own.

SECOND AMENDED COMPLAINT – Page 58

through "the same situation, where we can't get the drugs for this." Asked whether the problem were the inability obtain the drugs or simply an inability to store them safely for long enough, Rep. Skaug responded, "I would think if we could store it we would, but apparently we cannot get it at all."

438.   Deputy Attorney General Anderson was even clearer in his own testimony to the House Judiciary Committee that same day. The switch from executions by firing squad to the use of lethal injection drugs was doomed to failure, he said, because "[w]e *cannot get them*. There's no one that will supply them."

439.   Elaborating, he further testified that, "[l]ike California, there is currently an execution moratorium in Idaho. Not a death penalty moratorium, an *execution* moratorium[,]" he said. "That's based upon the Idaho Department of Correction being unable to secure the necessary drugs to carry out an execution. And the reason for that is because drug companies refuse to sell the drugs. Others that may have the drugs beyond the drug companies refuse to sell them. And states that also use lethal injection refuse to share because then they're gonna put, be put in Idaho's position, and go – and have to go find some supplier for the drugs[.]"

440.   Indeed, Attorney General Labrador's surrogate Deputy Attorney General Anderson even personally intervened in an attempt to procure lethal injection chemicals, but failed. "I've talked to the individual who has my job in Texas[,]" he told the House Judiciary Committee. "And the one thing he told me was they weren't going to tell me where they got their drugs. And that's the problems we have with getting them. My understanding is that Texas uses pentobarbital. There's

SECOND AMENDED COMPLAINT – Page 59

also ongoing litigation right now in Texas because it's being alleged that the pentobarbital they're using is out of date. Although it is still – it still works, in other words they have it tested by an independent laboratory before it is used in execution. And it is my understanding don't quote me on this, that their supply is dwindling and they're going to be in trouble for a while."

441.   After HB 186 passed the House, Deputy Attorney General Anderson testified similarly to the Senate Judiciary Committee on March 13, 2023, that lethal injection executions were no longer available in Idaho.

442.   That claim was not made just to the public and the legislature, however; the State made identical representations to this Court as well. At approximately 2:00 pm. on October 10, 2023, the State submitted a proposed draft order to this Court in *Pizzuto v. Labrador*, D. Idaho, No. 1:23-cv-00081, in which it proffered that "the Idaho Department of Correction does not have the present ability to carry out an execution via lethal injection or firing squad[.]"

443.   Based on these representations, Mr. Creech believed that when he was executed, the method of execution would most likely be the firing squad.

444.   Forty-eight hours after its representation to this Court, however, the State put out an eight-line statement announcing that its claim in the proposed order and all its claims to the legislature and the Idaho public about the dire need for the firing squad were false, and that execution via lethal injection is in fact available in Idaho.

SECOND AMENDED COMPLAINT – Page 60

445.    IDOC's extreme lack of transparency here should be understood in the context of its general obfuscation surrounding executions.

446.    As stated above, IDOC revised its execution protocol shortly before both the Rhoades and Leavitt executions, creating a situation in which the inmates had insufficient time to challenge the process before they were executed.

447.    Following the same strategy, IDOC then revised its execution protocol against on March 30, 2021, which was shortly before Mr. Pizzuto's May 6, 2021 death warrant was signed.

448.    However, for Mr. Pizzuto's next two death warrants (on November 16, 2022 and February 24, 2023), IDOC announced that the protocol was "suspended."

449.    IDOC has never explained what it means for the protocol to be suspended, or what aspect of the protocol was suspended, or for how long.

450.    Nor has IDOC ever officially declared that any previous suspension was lifted.

451.    By taking this approach, IDOC has created a cloud of uncertainty over what its protocol even is at any given point in time or when it might be modified.

452.    *Pizzuto v. Tewalt*, D. Idaho, No. 1:21-cv-359, provides another example of the State's pattern of obfuscation surrounding executions. There, the plaintiff is challenging the use of pentobarbital at his execution as cruel and unusual.

453.    The plaintiff in that case is represented by the same office handling Mr. Creech's case here, i.e., the Capital Habeas Unit of Federal Defender Services of Idaho ("CHU").

SECOND AMENDED COMPLAINT – Page 61

454.    To facilitate the resolution of discovery disputes, this Court directed the CHU in the *Pizzuto* case to provide IDOC with a list of the information they desired to learn about the lethal drugs in connection with the plaintiff's execution, such as facts about testing protocols, facts about safeguards taken at the source, and many other things that go directly to the safety and reliability of the chemicals.

455.    The CHU provided that list to IDOC, through their attorneys at the AG's office, on April 5, 2023.

456.    IDOC has not responded to any of the questions on the list in the six-plus months since, despite discovery remaining ongoing in the case and despite being reminded multiple times by the CHU.

457.    The question of drug-testing in particular underscores the sweeping ramifications of IDOC's obfuscation.

458.    IDOC has maintained that it need not tell the CHU essentially any information about execution drugs if it provides the results of chemical testing.

459.    However, IDOC simultaneously refuses to offer the CHU any meaningful information about the testing itself.

460.    For example, Idaho's execution-secrecy statute, Idaho Code § 19-2716A(4)(b), explicitly prohibits the disclosure of the identity of the person or entity who tests execution drugs.

461.    Without knowing the identity of the testing laboratory, Mr. Creech cannot confirm that it is reliable.

SECOND AMENDED COMPLAINT – Page 62

462.   If Mr. Creech cannot confirm that the testing laboratory is reliable, the results from it are meaningless.

463.   In that way, Section 19-2716A(4) prevents Mr. Creech from adequately challenging his execution, and therefore violates due process.

464.   IDOC likewise will not tell IDOC anything about the testing protocols of the laboratory, its regulatory history, its training practices, and so forth.

465.   Without that knowledge, Mr. Creech cannot confirm the reliability of the testing laboratory's results.

466.   IDOC's prior conduct reinforces these concerns about testing.

467.   With respect to the Rhoades and Leavitt executions, IDOC has insisted that it tested the lethal chemicals.

468.   However, IDOC never provided any test results to counsel for Mr. Rhoades or Mr. Leavitt.

469.   Moreover, IDOC now claims that it is unable to find the test results for the Rhoades and Leavitt drugs.

470.   In addition, IDOC has moved to quash a subpoena for the test results that Mr. Pizzuto issued to the testing laboratory in case number 1:21-cv-359.

471.   IDOC is thereby attempting to facilitate a situation in which no one will be able to see the test results from the Rhoades or Leavitt executions—or even to confirm that testing actually was done.

472.   The testing laboratory chosen for the Rhoades and Leavitt executions further increases concerns about the integrity of the process.

SECOND AMENDED COMPLAINT – Page 63

473.   For the Rhoades and Leavitt executions, IDOC chose Professional Compounding Centers of America (PCCA) to do the drug testing.

474.   Eagle Analytical is the testing arm of PCCA.

475.   Regulatory authorities have found numerous violations at Eagle.

476.   For example, in 2013, the FDA determined that due to a host of deficiencies the companies "controls do not include the establishment of scientifically sound and appropriate specifications, standards, and test procedures designed to assure that components conform to appropriate standards of identity, strength, quality, and purity."

477.   Several of these deficiencies related to contamination, including the failure to "calculate endotoxin limits for drug product samples," the failure to properly test for "microbial contamination," and the failure to validate for potency assays.

478.   Eagle has also been identified as engaging in poor record keeping and having inadequately trained staff.

479.   Eagle's response to the FDA report was that it "does not hold itself out as compliant with current good manufacturing practices."

480.   The violations at Eagle are precisely the kind of problems—gaps in testing for contamination and endotoxins—that have cast doubt on the reliability of lethal injection protocols elsewhere.

481.   The fact that IDOC selected such a troubled testing laboratory for its most recent executions makes it even more problematic that defendants will now be

SECOND AMENDED COMPLAINT – Page 64

able to choose a completely secret laboratory, provide no information about that laboratory, and then rely entirely on that unknown laboratory's results in proclaiming the reliability of the drugs.

482.   The timeline involved also shows that IDOC's reliance on drug testing does not cure the due process violation it is engaging in.

483.   IDOC's protocol does not say when the drug testing will occur.

484.   The only timeline in the protocol with respect to the testing is that the administrative team is required to review the results between seven and two days before the execution.

485.   IDOC has not otherwise promised to provide the test results to the CHU any earlier than that.

486.   Thus, IDOC has permitted itself to wait until forty-eight hours before the execution to reveal to the CHU the test results.

487.   The idea that the CHU could review the results, consult with experts, raise claims, and have them adjudicated—all without knowing anything about the laboratory—is fantastical.

488.   IDOC has also notably declined to bind itself in its protocol to the commitment of actually providing the test results to the inmate's counsel—which, again, it did not do for the last executions—raising doubts about whether even that much will happen.

489.   In short, the testing does nothing to remedy the due process violation.

SECOND AMENDED COMPLAINT – Page 65

490.   The State's misleading and obstructionist conduct surrounding what execution method is available at which point in time and how it would be implemented prevented Mr. Creech from obtaining notice of the procedures to be used in his execution. This in turn means that the State will deprive Mr. Creech of his life both without his being able to adequately challenge the constitutionality of the procedures used to do so and in a manner incompatible with fundamental fairness.

491.   The State's warrant for Mr. Creech's execution on November 8, 2023, means that he will be killed without ever receiving from the defendants at a time in which he can meaningfully challenge and litigate, at the very least, the following information, in violation of his right to Due Process: (1) the number, amount, and type of drugs to be used, (2) how the drugs were made, how the drugs were/will be obtained, their source, amounts, expiration date, how they were acquired/transported/stored/tested, when IDOC will or did obtain the drugs, etc., (3) when a new version of SOP 135 will be issued, (4) whether witnesses will be able to observe the insertion of the IVs, (5) procedures for IV placement/length, (6) who will participate in the execution, what is their training/qualifications, how will they be chosen, (7) whether there will be a consciousness check and the procedure for it, and (8) procedures for botched executions.

492.   The principles of fundamental fairness and due process prohibit the state from suppressing information about how a condemned prisoner's death sentence will be carried out. Without access to such information, Mr. Creech has no

SECOND AMENDED COMPLAINT – Page 66

way to know whether his execution will comport with the Eighth Amendment's limitations on gratuitous infliction of pain and suffering. He is further denied any effective remedy to enforce compliance with constitutional commands. Without reliable information about the manner in which the prisoner will be executed, the courts cannot meaningfully review a state's execution procedure to ensure it complies with the commands of the Constitution.

493.   By depriving Mr. Creech of information necessary to challenge the execution procedures to be used and by misleading him, the Legislature, the public, and this Court about how it intends to execute him, the defendants have violated his rights to Due Process.

## VII.   Prayer for Relief

494.   In light of the above, Mr. Creech respectfully requests that the Court:

a)   Enjoin the defendants from proceeding toward and carrying out an execution of Mr. Creech with pentobarbital;

b)   Declare that any execution of Mr. Creech with pentobarbital is unconstitutional;

c)   If a drug other than pentobarbital is selected, enjoin the defendants from executing Mr. Creech until a new drug has been chosen and there has been sufficient time for his counsel to investigate and to raise any challenges to it;

d)   Enjoin the defendants from executing Mr. Creech until the State can demonstrate that it is able to do so constitutionally;

SECOND AMENDED COMPLAINT – Page 67

e) Enjoin the defendants from attempting to execute Mr. Creech until the Court orders otherwise;

f) Enter a declaratory judgment that the defendants' refusal to provide the information described above is unconstitutional;

g) Enjoin the defendants from proceeding toward and carrying out an execution of Mr. Creech until the State discloses the information described above and there has been sufficient time for him to investigate and litigate any issues raised by the information;

h) Enjoin the defendants from executing Mr. Creech until the Idaho Legislature has provided adequate guidance to IDOC on execution procedures;

i) Enjoin the defendants from attempting to execute Mr. Creech until the Court orders otherwise;

j) Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Creech to prove his claims;

k) Grant any such other relief that is just and proper.

DATED this 31st day of January 2024.

/s/ *Mary E. Spears*
Mary E. Spears
Deborah A. Czuba

*Attorneys for Plaintiff*

SECOND AMENDED COMPLAINT – Page 68

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 31st day of January 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kristina Schindele
krschind@idoc.idaho.gov

Karin Magnelli
kmagnell@idoc.idaho.gov

Michael Elia
mje@melawfirm.net

/s/ *Julie Hill*
Julie Hill