RAÚL LABRADOR
ATTORNEY GENERAL

Karin Magnelli (ISBN 6929)
Lead Deputy Attorney General
Kristina M. Schindele (ISBN 6090)
Deputy Attorney General
Idaho Department of Correction
1299 North Orchard St., Suite 110
Boise, Idaho 83706
Telephone: (208) 658-2094
Facsimile: (208) 327-7485
kmagnell@idoc.idaho.gov
krschind@idoc.idaho.gov

Michael J. Elia (ISBN 5440)
Special Deputy Attorney General
Tanner J. Smith (ISBN 12245)
MOORE ELIA & KRAFT, LLP
Post Office Box 6756
Boise, Idaho 83707
Telephone: (208) 336-6900
Facsimile: (208) 336-7031
mje@melawfirm.net
tanner@melawfirm.net

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRIC COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS E. CREECH,<br><br>      Plaintiff,<br><br>vs.<br><br>JOSH TEWALT, et al.,<br><br>      Defendants. | Case No. 1:20-cv-114-AKB<br><br>**OBJECTION AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br>**[Dkts. 123-126]** |

Defendants, by and through undersigned counsel, and pursuant to Dist. Idaho Loc. Civ. R.

7.1, hereby submit their response and opposition to Plaintiff's Motion for Preliminary Injunction

**OBJECTION AND OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION -**
**1**

("Motion") (Dkts. 123-126) as follows:

## **INTRODUCTION**

A preliminary injunction should not be entered because Creech has not demonstrated a likelihood of success on the merits of his three claims, he will not suffer "irreparable harm," as that term is meant for purposes of a preliminary injunction, and a preliminary injunction is against the balance of equities and the public's interest.

As it relates to his Eighth Amendment claim, Creech has failed to establish that he will experience "severe pain" by IDOC's compliance with SOP 135.02.01.001 ("SOP 135") and use of manufactured pentobarbital, and has not identified a feasible, readily implemented, alternative which significantly reduces a substantial risk of severe pain that the State refused to adopt without a legitimate penological reason. Further, while the Court and Ninth Circuit allowed Creech to *plead* his third claim, such reasonings are now moot because manufactured pentobarbital is to be used, and Creech has been on notice that IDOC will follow SOP 135 since October 2023. Regardless, Creech cannot use claim three as a basis to support a preliminary injunction because every court to decide whether such claim exists has rejected for being non-cognizable. Also, because firing squad is not being used and IDOC is following SOP 135, Creech's second claim fails. And all three claims fail the Prison Litigation Reform Act's ("PLRA") needs-narrowness-intrusiveness test.

Therefore, Defendants respectfully request this Court deny Creech's Motion.

## **BACKGROUND AND PROCEDURAL HISTORY**

Creech is an inmate committed to the Idaho Department of Correction ("IDOC") and housed at the Idaho Maximum Security Institution ("IMSI"). Creech was serving a life sentence for two counts of first-degree murder at the Idaho State Correctional Institution ("ISCI") when he

murdered another inmate, twenty-three-year-old David Jensen, in 1981 by beating him with a battery-filled sock until Jensen's skull shattered, caved in, and blood was splashed on the floors and walls. *State v. Creech* ("*Creech II*"), 105 Idaho 362, 364, 670 P.2d 463, 465 (1983); *see also State v. Creech* ("*Creech I*"), 99 Idaho 779, 589 P.2d 114 (1979). Once the battery-filled sock broke open, Creech kicked Jensen in the throat and the head while Jensen laid helpless. *Creech II*, 105 Idaho at 364, 670 P.2d at 465. After some time, a guard found Jensen, and he was taken to the hospital where he died that day. *Id.*

Creech pleaded guilty to first-degree murder for killing Jensen on August 28, 1981, and was sentenced to death. *Creech II*, 105 Idaho at 364-65, 670 P.2d at 465-66. Creech had four prior murder convictions when he killed Jensen. *See Creech v. Richardson* ("*Creech VI*"), 59 F.4th 372, 377 (9th Cir. 2023). Creech has claimed responsibility for killing twenty-six people. *Id.*

After the Ninth Circuit granted Creech habeas relief concerning the case of Jensen's murder and remanded the case for sentencing, the trial court resentenced Creech to death on April 17, 1995. (Ex. A., p. 1); *see Creech v. Arave* ("*Creech III*"), 947 F.2d 873 (9th Cir. 1991), *rev'd in part by* 507 U.S. 463; *see also State v. Creech* ("*Creech IV*"), 132 Idaho 1, 6, 966 P.2d 1, 6 (1998). Creech's death sentence was upheld by the Idaho Supreme Court in 1998. *See Creech IV*, 132 Idaho at 23, 966 P.2d at 23; (*see also* Ex. A, p. 2). Creech's two most recent direct attacks on his conviction were denied last week. *See Creech v. State* ("*Creech VIII*"), No. 51229, 2024 WL 510142 (Idaho Feb. 9, 2024), and *Creech v. State* ("*Creech IX*"), No. 50336, 2024 WL 510105 (Idaho Feb. 9, 2024). It has been over forty-three years since Creech pleaded guilty to murdering Jensen. *See Creech v. Richardson* ("*Creech V*"), 40 F.4th 1013, 1017-23 (9th Cir. 2022) (describing the various proceedings).

Creech filed this action in March 2020.[1]  After going up on appeal twice, *see Pizzuto v. Tewalt*, 997 F.3d 893 (9th Cir. 2021), and *Creech v. Tewalt* (*"Creech VII"*), 84 F.4th 777, 793 (9th Cir. 2023), this Court permitted Creech to amend his Complaint to plead three claims.  (Dkt. 118). On January 29, 2024, after Creech filed his Second Amended Complaint (Dkt. 119), the Idaho Commission of Pardons and Parole denied Creech's commutation petition.  (Ex. A., p. 2).  On January 30, 2024, Judge Jason Scott of the Fourth Judicial District of the State of Idaho entered Creech's current death warrant.  (*Id.*).  Creech's execution is scheduled for February 28, 2024. (*Id.*).  On February 6, 2024, Creech filed a Motion for Preliminary Injunction seeking a "preliminary injunction barring the defendants from executing him until his claim is fully resolved on the merits."  (Dkt. 123, pp.1-2).

## LEGAL STANDARD

Preliminary injunctions are "extraordinary remedies."  *Winter v. Nat. Resources Def. Council, Inc.,* 555 U.S. 7, 24 (2008).  "[A] stay of execution or a preliminary injunction, is 'not available as a matter of right' to a death-row inmate who has sued the State under § 1983."  *Ramirez v. Collier*, 595 U.S. 411, 450 (2022) (Thomas, J., dissenting).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 24.  Preliminary injunctions can take two forms: a prohibitory injunction or a mandatory injunction.

"A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits."  *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873, 878 (9th Cir. 2009) (cleaned up).  A mandatory injunction

[1] Creech was initially joined in this action with Gerald Pizzuto.  Pizzuto is no longer a party in this case. When referring to portions of this case which included Pizzuto, Defendants will only reference Creech.

orders a party to act. *Id.* at 879. Because a mandatory injunction "goes well beyond simply maintaining the status quo pendente lite[, it] is particularly disfavored." *Id.* (internal alterations omitted). "In general, mandatory injunctions 'are not granted unless extreme or very serious damage will result and are not issued in doubtful cases or where the injury complained of is capable of compensation in damages.'" *Id.* (quoting *Anderson v. United States,* 612 F.2d 1112, 1115 (9th Cir. 1979) (emphasis added)).

Creech's requested preliminary injunction is the functional equivalent of a request for a stay of execution. *See, e.g., Russell v. Johnson*, 210 F.Supp.2d 804, 808 (N.D. Miss. 2002) (citing *Martinez v. Texas Ct. of Crim. Appeals*, 292 F.3d 417 (5th Cir. 2002), *partially abrogated by Nelson v. Campbell*, 541 U.S. 637 (2004)). "[A] stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006) (citing *Nelson*, 541 U.S. at 649-50). The Supreme Court has "ma[de] clear, the mere fact that an inmate states a cognizable § 1983 claim does not warrant the entry of a stay as a matter of right." *Nelson*, 541 U.S. 637, 649 (2004).

The traditional test for a stay of execution considers four factors:

"(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." The party seeking the stay bears the burden of showing that these factors favor a stay. "The first two factors . . . are the most critical," and the "mere possibility" of success or irreparable injury is insufficient to satisfy them.

*U.S. v. Mitchell*, 971 F.3d 993, 996 (9th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 433-34 (2009)). Creech must "demonstrate that irreparable injury is <u>*likely*</u> in the absence of an injunction." *Winter,* 555 U.S. at 22 (emphasis added) (rejecting the possibility of harm standard).

A plaintiff seeking a preliminary injunction bears a high burden:

> And what is at issue here is not even a defendant's motion for summary judgment, but a plaintiff's motion for preliminary injunctive relief, as to which the requirement for substantial proof is much higher. "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis in original).

## ARGUMENT

### 1. Creech has not demonstrated a likelihood of success on the merits.

#### A. Claim one[2]

In his first claim, Creech alleges that the State's use of pentobarbital[3] violates the Eighth Amendment. Single-chemical pentobarbital execution protocols:

> Ha[ve] been adopted by five [,now six,] of the small number of States that currently implement the death penalty.
> Ha[ve] been used to carry out over 100 executions, without incident.
> Ha[ve] been repeatedly invoked by prisoners as a less painful and risky alternative to the lethal injection protocols of other jurisdictions.
> W[ere] upheld by th[e] Supreme Court [in 2019], as applied to a prisoner with a unique medical condition that could only have increased any baseline risk of pain associated with pentobarbital as a general matter. *See Bucklew*, 139 S. Ct. 1112.
> Ha[ve] been upheld by numerous Courts of Appeals against Eighth Amendment challenges similar to the one presented here. *See, e.g., Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017); *Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015); *Gissendaner v. Commissioner*, 779 F.3d 1275 (11th Cir. 2015).

*Barr v. Lee*, 591 U.S. ___, 140 S. Ct. 2590, 2591 (2020) (per curium).

The Eighth Amendment prohibits infliction of cruel and unusual punishment. U.S. Const. Eighth Amend. The United States Supreme Court has never "h[eld] that a State's method of

---

[2] Defendants will address Creech's claims in the order he set them out in his Memorandum in Support of Motion for Preliminary Injunction (Dkt. 123-1) (claim one, claim three, then claim two).

[3] In his Second Amended Complaint (Dkt. 119), Creech speculates that the State will use a compounded version of pentobarbital. Being that the State is using a manufactured version, much of Creech's "worries" are irrelevant. Defendants are not making this statement to say that compounded versions of the chemical are in any way unsafe or ineffective.

execution qualifies as cruel and unusual." *Bucklew v. Precythe*, 587 U.S. ___, 139 S. Ct. 1112, 1124 (2019). Defendants are not aware of any state's lethal-injection protocol being deemed unconstitutional. *See also Workman v. Bredesen*, 486 F.3d 896, 906 (6th Cir. 2007) (collecting cases and explaining, "No court to our knowledge has issued a final decision declaring a State's lethal-injection protocol unconstitutional."). "One cannot credibly establish a likelihood of success in attacking a death-penalty procedure when the theory of success has yet to succeed in a considerable number of cases over a considerable number of years." *Id.*

The Supreme Court has articulated the standards to be considered in a challenge to a state's intended method of execution in three cases: *Baze v. Rees*, 553 U.S. 35 (2008); *Glossip v. Gross*, 576 U.S. 863 (2015); and *Bucklew, supra*. That test involves considerations of two interrelated prongs: (a) whether the state's proposed method of execution creates a "substantial risk of severe pain;" and (b) whether the condemned person has identified a "feasible, readily implemented" alternative method which "in fact significantly reduces a substantial risk of severe pain" and "the State has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125.

i.   *The State's method does not create a substantial risk of severe pain.*

The Eighth Amendment "does not guarantee a prisoner a painless death—something that, of course, isn't guaranteed to many people, including most victims of capital crimes." *Bucklew*, 139 S. Ct. at 1124. The Supreme Court has recognized, "subjecting individuals to a risk of future harm—not simply actually inflicting pain—can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be '*sure or very likely* to cause serious illness and needless suffering,' and give rise to '*sufficiently imminent* dangers.'" *Baze*, 553 U.S. at 49-50 (emphasis in original) (citation omitted). "To prevail on such a claim, there must be a substantial risk of serious harm, an

objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." *Glossip*, 576 U.S. at 877 (cleaned up).

The Court has reiterated that the Constitution protects against a "substantial risk of serious harm." *Baze*, 553 U.S. at 50 (citation omitted). Further, "what unites the punishments the Eighth Amendment was understood to forbid, and distinguishes them from those it was understood to allow, is that the former were long disused (unusual) forms of punishment that intensified the sentence of death with a (cruel) superadd[ition] of terror, pain, or disgrace." *Bucklew*, 139 S. Ct. at 1124 (internal quotation marks omitted) (citing *Baze*, 553 U.S. at 48; *accord id.* at 96 (Thomas, J., concurring in judgment)). Generally, "[f]ar from seeking to superadd terror, pain or disgrace to their executions, the States have often sought more nearly the opposite . . . ." *Id.*

The United States Supreme Court has clarified that the level of pain necessary to meet the first prong of a method of execution challenge is severe pain. *Bucklew*, 139 S. Ct. at 1130 ("Even if a prisoner can carry his burden of showing a readily available alternative, he must still show that it would significantly reduce a substantial risk of severe pain"); *see also Nance v. Ward*, 597 U.S. 159, 164 (2022) ("To succeed [on a method of execution claim], he must establish that the State's method of execution presents a 'substantial risk of serious harm'—severe pain over and above death itself"). "[T]he mere fact that a method of execution might result in some unintended side effects does not amount to an Eighth Amendment violation." *Glossip*, 576 U.S. at 883 n.3.

The Sixth Circuit's discussion of severe pain is instructive:

To be constitutionally cognizable, the pain has to be "severe." How severe? *Bucklew* tells us that earlier modes of execution offer "instructive" examples, both of what qualifies as too severe ("[b]reaking on the wheel, flaying alive, rending asunder with horses") and what does not (hanging). Take death by hanging. "Many and perhaps most hangings were evidently painful for the condemned person," *Bucklew* observed, "because they caused death slowly," namely through

> suffocation over several minutes. Despite that risk of pain, despite indeed the near
> certainty of that pain, hangings have been considered constitutional for as long as
> the United States have been united. All of this puts Henness's claims about risks of
> pain in context. Yes, he points to the risks of chest tightness and chest pain. But
> that pales in comparison to the pain associated with hanging. And yes, he points to
> the risks of sensations of drowning and suffocation. But that looks a lot like the
> risks of pain associated with hanging, and indeed may present fewer risks in the
> typical lethal-injection case.

*In re Ohio Execution Protocol Litig.*, 946 F.3d 287, 290 (6th Cir. 2019) (cleaned up). The fact that

the State's method of execution might not prevent an inmate from experiencing pain does not

speak to whether the pain that might be experienced is unconstitutional. *Id.*

After extensive research, Defendants are not aware of any court issuing a final decision

establishing the existence of "substantial risk of severe pain." However, two seem to come close.

*Bucklew v. Lombardi* ("*Bucklew I*"), 783 F.3d 1120 (8th Cir. 2015), *see also Bucklew v. Precythe*

("*Bucklew II*"), 883 F.3d 1087 (8th Cir. 2018), *aff'd,* 139 S. Ct. 1112,; *Johnson v. Precythe*

("*Johnson I*"), 901 F.3d 973 (8th Cir. 2018), *cert. granted, judgment vacated,* 139 S. Ct. 1546

(2019), *see also Johnson v. Precythe* ("*Johnson II*"), 954 F.3d 1098 (8th Cir. 2020), *cert. denied*

141 S. Ct. 1622 (2021). Both cases found a "substantial risk of severe pain" when viewing the

allegations in a light most favorable to the plaintiff on a motion to dismiss, and were based on

particular and individualized medical conditions.

*Bucklew* involved an individual who,

> long suffered from a congenital condition called cavernous hemangioma, which
> causes clumps of weak, malformed blood vessels and tumors to grow in his face,
> head, neck, and throat. The large, inoperable tumors fill with blood, periodically
> rupture, and partially obstruct his airway. In addition, the condition affects his
> circulatory system, and he has compromised peripheral veins in his hands and arms.

*Buckley II*, 883 F.3d at 1090; *see also Bucklew I*, 783 F.3d at 1125. Missouri's protocol involved

an injection of methylene blue dye, which is a nitric oxide scavenger. Bucklew supported his

complaint with an affidavit from a doctor stating that if he is administered the methylene blue,

there is a "very, very high likelihood" his tumors will rupture and cause him to experience severe choking, visible hemorrhaging, and suffocation during the execution. *Bucklew II*, 883 F. 3d at 1093. The Court determined Bucklew sufficiently pleaded his claim because it "went well beyond the four corners of Bucklew's complaint." *Bucklew I*, 783 F.3d at 1127. Further,

> Defendants in responding to Bucklew's motions acknowledged his serious medical condition and stated that the Department's lethal injection procedure would be changed on account of his condition by eliminating the use of methylene blue dye. This concession bolstered the detailed allegations in Bucklew's complaint of a substantial risk of serious and imminent harm that is sure or very likely to occur, allegations far more specific than the allegations addressing this part of the *Baze* standard in the second amended complaint in *Zink*.

On remand, the district court granted the state summary judgment based on the second prong. *Bucklew II*, 883 F.3d at 1094. Notably, "[i]n granting defendants summary judgment, the district court declined to rely on the first *Glossip/Baze* requirement because [of factual discrepancies]." *Id.* (emphasis added). As relevant, *Bucklew II* only involved the second prong. *Id.* Bucklew passed peacefully during his execution without complication.[4]

*Johnson* involved an individual who "suffer[ed] from epilepsy as a result of a brain tumor and damage caused by significant brain surgery." *Johnson v. Precythe* ("*Johnson III*"), 141 S. Ct. at 1623 (Sotomayor, J., dissenting from denial of cert.). As alleged in the complaint, Johnson was,

> diagnosed with an "atypical parasagittal meningioma brain tumor." A portion of the tumor was removed during a craniotomy procedure in August 2008, but another part remains in Johnson's brain. The surgery also resulted in "scarring tissue" in Johnson's brain and a "significant brain defect." Johnson pleaded that "[t]he brain defect and the scarring tissue that resulted from the craniotomy procedure were not known until an MRI procedure was conducted in April 2011." As a result of his "brain defect, scarring, and tumor," Johnson allegedly has a seizure disorder and has suffered seizures.

*Johnson I*, 901 F.3d 978. Johson had roughly one-fifth of his brain tissue removed, which caused

---

[4] *See, e.g.,* https://www.cnn.com/2019/10/01/us/missouri-execution-russell-bucklew-rare-disease-trnd/index.html; https://www.cbsnews.com/news/missouri-execution-today-russell-bucklew-executed-crime-spree-despite-rare-medical-condition-concerns-2019-10-01/.

the scarring and brain defect. *Johnson III*, 141 S. Ct. at 1623. Johnson's seizures were described as "violent, uncontrollable, and painful." *Id.* at 1624. Johnson alleged that, due to his particular medical conditions, he <u>*will*</u> suffer an extremely painful and violent seizure as a result of execution chemical's administration. *Id.* at 1623 (emphasis added). Johnson supported his allegations with affidavits from a doctor "predict[ing] 'a violent seizure that is induced by Pentobarbital injection,' opin[ing] that a seizure 'would occur' during Johnson's execution, and stat[ing] that such seizures are 'severely painful.'" *Johnson I*, 901 F.3d at 978. The Eighth Circuit found these allegations sufficient for Rule 8's purposes. *Id.* Notably, the Court provided the following qualifier: "Whether Johnson can *prove* the claim through Dr. Zivot's testimony or other evidence is a different matter to be addressed at a later stage of the proceedings." *Id.* (emphasis in original). Johnson was executed peacefully without complication.[5]

Creech has failed to adequately identify a substantial risk of severe, unconstitutional pain. At most, Creech's allegations amount to a speculation that he might feel some pain during his execution. The pain alleged is pain caused by the death itself. Creech has not established that the use of pentobarbital will result in severe pain—much less that pentobarbital is sure or very likely to result in *unnecessary* suffering. *See Baze*, 533 U.S. at 49-50. Creech contends pentobarbital *may* result in a heart attack or confusion. These are mere symptoms associated with the death, and much less painful than those associated with hangings. *See Bucklew*, 139 S. Ct. at 1124 ("while hanging could and often did result in significant pain, its use was 'virtually never questioned.' Presumably that was because, in contrast to punishments like burning and disemboweling, hanging wasn't 'intended to be painful' and the risk of pain involved was considered 'unfortunate but

---

[5] *See, e.g.,* https://www.nbcnews.com/news/us-news/ernest-johnson-set-be-executed-few-hours-despite-questions-over-n1280799; https://www.usatoday.com/story/news/2021/10/07/missouri-executes-ernest-lee-johnson-claim-mentally-incompetent-murder/6022653001/.

inevitable.'" (citations omitted)).  Indeed, if Creech passes by natural causes, it will likely be by heart attack.

Creech makes four arguments to support his Eighth Amendment claim: (1) potential implications due to health concerns; (2) theories regarding the chemical's reliability; (3) opinions about how the chamber should be arranged; and (4) SOP 135 does not account for firing squad or require an anesthesiologist or brain consciousness monitor.

As it relates to his health concerns, Creech has pointed to a prior abdominal aortic aneurysm, which has been treated without complication, blood pressure, which his chosen cardiologist indicates can be controlled (*see* Dkt. 123-4, p.2), hypotheticals based on other individuals, and speculation that he may have heart disease.  (*Id.* at p.3).  Due his health, in his Complaint, Creech pleads that a large dose of pentobarbital *may* lead to a drop in blood pressure which *may* lead to a heart attack.  (Dkt. 119, ¶¶ 333-335).  Dr. Fradley's letter[6] does not state Creech has heart disease or any other ailments but suggests that he may be *at risk* of such.  (Dkt. 123-4, p. 2).  Such speculation is insufficient.  Further, while Creech cites to other individuals who were purportedly observed to be in "visible pain" during their executions, the three cited materials say nothing more than they were executed with pentobarbital—nothing regarding "visible pain." Notwithstanding, similar observations have been discounted as "highly biased" because the sources include the family and defense attorneys of the condemned.  *See In re Ohio Execution Protocol*, 860 F.3d 881, 888 (6th Cir. 2017).  Further, Creech's medical allegations are followed by a request for medical assessment to determine *if* his speculation can be supported.  (*Id.* at ¶ 335; *see also* Dkt. 123-1 p. 3 (same)).  By suggesting an examination for potential ailments, even Creech recognizes that his known health considerations do not guarantee an unconstitutionally painful

---

[6] Dr. Fradley's letter (Dkt. 123-4) does not satisfy the *Daubert*, *Kumho*, or Fed. R. Evid. 702 standards or comply with 28 U.S.C. § 1746's requirements.  Therefore, Defendants request the Court not consider it.

death.

Further, Creech's acknowledgement of the surgical repair to his aortic aneurysm directly undercuts his arguments. In order to perform the operation, Creech was put under general anesthesia. Creech successfully underwent the surgery without complication. Creech has not made any allegations to the contrary. Indeed, Dr. Fradley confirms Creech "had no[] cardiac complications during surgery." (Dkt. 123-4, p. 2).

Creech's concerns regarding the drug's reliability are similarly unfounded. Even in his Second Amended Complaint, Creech has argued that _compounded_ pentobarbital "increases the risk of a painful heart attack because of the issues with compounding . . . involving reliability, purity, sterility, efficacy, and so forth." (Dkt. 119, ¶ 352). Creech is not contending that the _manufactured_ version carries these same "concerns." Being that the State is using manufactured pentobarbital for Creech's execution, Creech's concerns are baseless.

Caught in a catch-22, Creech now argues that since the State obtained his desired version of pentobarbital, it must have been done dubiously, questionably, fraudulently, in violation of the law, and through shady backdoor dealings. Creech's argument, however, overlooks the fact that a particular chemical must be comprised of a particular and definite chemical makeup. The subject pentobarbital has been tested, certified as being pentobarbital, and has passed all applicable regulatory and quality standards. (*See* Dkt. 123-7, pp. 3-10). Indeed, Creech's attempts to impute speculative misconduct on part of Defendants is contrary to the good faith that is presumed for these public servants. *See Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd sub nom Sossamon v. Texas*, 563 U.S. 277 (2011) (explaining that "government actors in their sovereign capacity and in the exercise of their official duties are accorded a presumption of good faith because they are public servants, not self-interested private parties").

Creech next argues that the medical team's use of a real-time video feed is somehow unconstitutional. Creech relies entirely on Dr. Heath's[7] opinions for this point. Dr. Heath's concern is that the video system does not allow for "direct observ[ance] of the prisoner." (Dkt. 124-3, p. 4). However, Dr. Heath's following sentence indicates that he believes a medical team viewing the execution in a separate room through a window would be sufficient. The flaw in Dr. Heath's opinion is that a telescoping camera set up directly over Creech that can be used to closely monitor the intravenous catheters provides a better view than peering through a window in the room next over. (*See* Ex. D, ¶ 18). And the Medical Team regularly practices and trains with the system. (*Id*. at ¶¶ 3-6, 14-19). Indeed, Dr. Heath's statements recognize that real-time video footage is commonly used in certain situations. There is no reason it cannot be used here. *See West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 2836754 *7 (D. Ariz. July 18, 2011), *aff'd* 652 F.3d 1060 (9th Cir. 2011) (finding sufficient safeguards where medical team monitored condemned remotely via audio equipment and high-resolution camera before physical consciousness check before administration of paralytic in a three-drug protocol).

While, under Rule 8 and 12(b) standards, the Court has found a claim in Creech's pleadings of an alternative method requiring the medical team be in the room, even Dr. Heath considers that unnecessary given that that he believes separate rooms separated by a window is sufficient. As it relates to the Court's other finding in the pleadings regarding "direct sight," because the medical team is directly viewing the live footage from a telescoping high-definition camera positioned above Creech—which provides better viewing angles and detail than through a window in their

---

[7] Dr. Heath is an anesthesiologist. (*See* Dkt. 124-3, p. 2). Neither Creech nor Dr. Heath have submitted materials evidencing why Dr. Heath is qualified to proffer the opinions contained in his declaration. Dr. Heath does not satisfy the *Daubert*, *Kumho*, or Fed. R. Evid. 702 standards. Indeed, none of the four Rule 702 requirement are met. Accordingly, Defendants request the Court strike the declaration to the extent it finds it does not satisfy the necessary criteria. Being that the declaration has been submitted, Defendants will address the concerns accordingly.

room or otherwise in the gallery—such "direct sight" is not required. (*See also* Ex. D, ¶¶ 3-6, 14-19). Regardless, the sight issue is not connected with potential pain. Dr. Heath's only other concern is that this system is not used within other execution facilities. But just because IDOC's system is unique, does not make it unsafe or unconstitutional.

The only other argument Creech asserts concerning this claim is that SOP 135 does not require an anesthesiologist to administer the chemical, or a brain monitor to monitor Creech's level of consciousness. Creech's anesthesiologist claim has been rejected by appellate courts. *See Workman*, 486 F.3d at 910 (anesthesiologist not required to monitor consciousness); *Taylor v. Crawford*, 487 F.3d 1072, 1084 (8th Cir. 2007) ("The protocol is designed to ensure a quick, indeed a painless, death, and thus there is no need for the continuing careful, watchful eye of an anesthesiologist or one trained in anesthesiology, whose responsibility in a hospital's surgery suite (as opposed to an execution chamber) is to ensure that the patient will wake up at the end of the procedure"); *see also Baze*, 553 U.S. at 64 (Alito, J., concurring) (recognizing that anesthesiologists cannot be required).

Further, the United States Supreme Court has rejected the requirement of a brain monitor. S*ee Baze*, 553 U.S. at 59-60 ("the medical community has yet to endorse the use of a BIS monitor, which measures brain function, as an indication of anesthetic awareness" and ethical rules prohibit an anesthesiologist from participating in an execution in any event). Given the unique nature of a lawful execution, as opposed to a surgical procedure, Creech's claims regarding the need for an anesthesiologist and brain monitor fail. The execution chemical will do what it is designed to do—sedate a condemned person to death in as painless a way as possible under the circumstances. The Medical Team uses an EKG to monitor cardiac activity until the coroner confirms death. Additionally, Creech fails to articulate how *consciousness* relates to his superadded pain claim

using a one-drug protocol. Sufficient sedation may be required in a three-drug protocol, *see Baze*, 553 U.S. at 44 ("proper administration of the first drug ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the second and third drugs."), but a consciousness check does not play a role in the use of a single drug protocol.

Moreover, Creech's concerns regarding potential vein-access problems from his older age are unfounded and should not be used as support for a preliminary injunction. Creech has been litigating against the State's lawful imposition of the death penalty and overcoming death warrants for decades by waging litigation against the State. Creech's most recent attacks were rejected by the Idaho Supreme Court last week. *See Creech VIII*, 2024 WL 510142, and *Creech IX*, 2024 WL 510105. Creech should not be afforded the benefit of old age from these litigious attacks. *See Ramirez*, 595 U.S. at 450 (Thomas, J., dissenting) ("[F]ederal courts 'should police carefully' against abusive litigation designed 'to interpose unjustified delay' and deny relief if they detect gamesmanship." *Bucklew*, 139 S. Ct. at 1134). Notwithstanding, Creech's conclusory allegations and reasoning is contrary to medical professionals of all levels being able to easily and routinely insert IVs in persons of similar age and medical conditions, e.g., nursing homes. Indeed, the medical professionals involved in Creech's execution have been regularly practicing "mock" procedures (on individuals with various vein conditions) for years. (*See* Ex. D, ¶¶ 3-6, 14-19). Further, Creech admits he underwent surgery to correct his aneurysm at the end of 2022. (Dkt. 123-1, p. 3). Creech does not complain of "vein-access problems" during the operation or subsequent thereto. Regardless, at most, Creech's argument points towards negligence. (Dkt. 123-1, p. 10 ("There is also a concern of human error . . . .")). However, "[t]he risk of negligence in implementing a death-penalty procedure . . . does not establish a cognizable Eighth Amendment claim." *Baze*, 553 U.S. at 107 (quoting *Workman*, 486 F.3d at 907-08).

Creech has not met his burden of demonstrating that pentobarbital creates a substantial risk of severe pain in violation of Eighth Amendment protections.

ii. *Creech has not identified a feasible, readily implemented, alternative which significantly reduces a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason.*

"The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is 'substantial when compared to a known and available alternative.'" *Bucklew*, 139 S. Ct. at 1125 (citing *Glossip*, 576 U.S. at 880). The Court then explained, "[t]o decide whether the State has cruelly 'superadded' pain to the punishment of death isn't something that can be accomplished by examining the State's proposed method in a vacuum, but only by 'compar[ing]' that method with a viable alternative." *Id.* at 1126 (citations omitted). Indeed, "when it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence. *Id.* at 1126-27.

The Supreme Court has set forth <u>*mandatory requirements*</u> that prisoners identify a "feasible, readily implemented alternative" that "in fact significantly reduces a substantial risk of severe pain" compared to the State's chosen method, and which "the State has refused to adopt without a legitimate penological reason:"

> The Chief Justice's opinion in *Baze*, which a majority of the Court held to be controlling in *Glossip*, supplies critical guidance. It teaches that where (as here) the question in dispute is whether the State's chosen method of execution cruelly superadds pain to the death sentence, a prisoner <u>*must*</u> show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason. *Glossip* left no doubt that this standard governs "all Eighth Amendment method-of-execution claims."

*Bucklew*, 139 S. Ct. at 1125 (cleaned up) (emphasis added). This Court has recognized such. (Dkt. 118, p. 12); *see also Pizzuto v. Tewalt*, No. 1:23-CV-00081-BLW, 2023 WL 4901992, at *3 (D.

Idaho Aug. 1, 2023).

It is not sufficient for Creech to proffer a "slightly or marginally safer alternative." *Glossip*, 576 U.S. at 877 (citing *Baze*, 553 U.S. at 51). Rather, he must show the alternative "would significantly reduce a substantial risk of severe pain. A minor reduction in risk is insufficient; the difference must be clear and considerable." *Bucklew*, 139 S. Ct. at 1130 (citations omitted). Further, "the inmate's proposal must be sufficiently detailed to permit a finding that the State could carry it out relatively easily and reasonably quickly." *Id.* at 1129. In *Nance*, the Court explained that inmates "*must* make the case that the State really can put him to death, though in a different way than it plans," by "providing the State with a veritable blueprint for carrying the death sentence out." 597 U.S. at 169. Members of the Supreme Court have explained, "[t]he gravamen of the constitutional wrong is the State's unjustified 'refus[al] to adopt' that proffered alternative despite its 'documented advantages,' including its ready availability." *Hamm v. Smith*, 598 U.S. ___, 143 S. Ct. 1188, 1190 (2023) (Thomas, J,. with whom Alito, J. joins, in dissenting from denial from writ of cert.) (quoting *Bucklew*, 139 S. Ct., at 1125). Finally, the Supreme Court has stated, "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative—assuming, of course, that the inmate is more interested in avoiding unnecessary pain than in delaying his execution." *Bucklew*, 139 S. Ct. at 1128-1129.

Creech has not identified an alternative. Creech's counsel concedes as much. (Dkt. 213-1, p. 2 n. 2). Creech's counsel, however, contends they are "ethically prohibited" from asserting an alternative. Creech's counsel's position is yet another example of an insufficient "pleading game." *See Bucklew*, 139 S. Ct. at 1128.

Regardless, it is Creech—not his attorneys—that must identify a constitutionally acceptable substitute. The Supreme Court has repeatedly explained that a prisoner *must* make the

showing.  *E.g., Nance*, 597 U.S. at 164.  Creech's failure to do such is fatal to his claim.

Furthermore, because the State will use manufactured pentobarbital, and Creech's other concerns are insufficient to demonstrate cruel and unusual punishment, the Court's "alternative manners" which allowed Creech to overcome Defendants' Motion to Dismiss are insufficient for purposes of a preliminary injunction.  (*See* Dkt. 118, pp. 13-14 (finding Creech alleged alternatives such as not relying on "shady offshore compounding pharmacies," "employ[ing] an anesthesiologist to monitor the execution," "establish[ing] a direct sight line between the medical team and [Creech]," and "allowing the medical team to be present in the execution chamber so that they can react quickly should complications arise.").  As stated, the State is using manufactured pentobarbital which has been tested and passed all applicable standards and guidelines; thus, the compounding and source arguments are moot.  Second, an anesthesiologist is not required, and such claims have been rejected by other courts.  *See Workman*, 486 F.3d at 910; *Taylor*, 487 F.3d at 1084.  Indeed, members of the Supreme Court have noted that requests for anesthesiologists cannot be considered "feasible" or "readily" available, *Baze*, 553 U.S. at 59-60; *see id.* 64-66 (Alito, J., concurring).  Third, the medical team utilizes a telescoping, movable, high-definition camera to view the condemned, and such technological advancement allows them to have a better ability to monitor Creech than what Creech's "expert" recognizes as sufficient.  (*See* Dkt. 124-3, pp. 2-3).  Fourth, the medical team are not required to be in the same room because they are in the room next over with all of the functional tools, it only takes seconds to get from one room to the other, there are designated team members whose sole job is to monitor the live feed, and even Creech's "expert" opines that being in the same room is unnecessary.  (Dkt. 124-2, pp. 3-5).  Therefore, Creech cannot rest on this Court's findings beyond the 12(b) stage.

Creech's attorneys' reliance on Director Tewalt's discretionary functions under SOP 135

is an unavailing red herring and should not be permitted to be used by Creech and his attorneys as a chess piece in their pleading games. Creech has not made any indication that Director Tewalt will deviate from the prescribed plan of execution, and such imputation of ill will or bad faith is contrary to the presumption of good faith provided to Director Tewalt. *See Sossamon*, 560 F.3d at 325.

Therefore, Creech's first claim fails and cannot be used as a basis for a preliminary injunction.

B. <u>Claim Three</u>

Creech's third claim alleges the State violated his Due Process rights by not providing him "with information that would enable him to determine how the State intends to execute him." (Dkt. 119, ¶ 433; *see also* Dkt. 118, p. 15). When permitting Creech to plead such a claim, the Ninth Circuit did not state that such claim existed and acknowledged that "other circuits to consider the issue have rejected due process claims to execution-related information." *Creech VII*, 84 F.4th at 793. As pleaded, Creech's claim was contingent on uncertainty. However, being that the drug is known, has been tested, passes all applicable standards and guidelines, that such claim has not previously been recognized, and that the Ninth Circuit's reasoning for allowing amendment to assert this claim is no longer prevalent, this claim fails.

This Court allowed this claim to continue because:

The clear import of the Ninth Circuit's decision addressing Creech's procedural due process claim is that Creech could allege such a claim if the lack of execution-related information "rais[ed] some doubts about whether [he] will be able to have an Eighth Amendment method-of-execution challenge heard at a meaningful time and in a meaningful manner." *Creech [VII]*, 84 F.4th at 793. Creech's allegations in Claim [Three] raise those doubts. Specifically, Creech alleges he has been left to guess at IDOC's intended method of execution scheduled by the October 2023 death warrant, i.e.,. whether IDOC intended to use only pentobarbital or some other drug or combination of drugs. Further, now that the legislature has approved firing squad as an alternative to lethal injection if it is available, I.C. § 19-2716[], Creech

could conceivably be executed by firing squad (as Defendants' counsel acknowledged during oral argument) for which there is apparently no protocol presently. For these reasons, the Court grants Creech's motion to amend to assert Claim [Three] and denies Defendants' motion to dismiss the claim.

(Dkt. 118, p. 16). Because the State is to use manufactured pentobarbital at Creech's execution and Creech is aware of this fact, the Court's reasoning for allowing the claim to proceed is now moot.

While the Ninth Circuit acknowledged that the circuits that have considered such claims have rejected them as not cognizable under the Due Process clause, *see Jones v. Comm'r*, 811 F.3d 1288, 1295 (11th Cir. 2016); *Phillips v. DeWine*, 841 F.3d 405, 420 (6th Cir. 2016); *Zink v. Lombardi*, 783 F.3d 1089, 1108–09 (8th Cir. 2015) (en banc) (per curiam); *Trottie v. Livingston*, 766 F.3d 450, 452 (5th Cir. 2014) (per curiam), it gave Creech a "chance to amend this claim" because IDOC had twice suspended the revised protocol and the protocol does not specify the drug to be used in his execution. *Creech VII*, 84 F.4th at 793-94. Importantly, the Ninth Circuit's decision concerned pleading sufficiency—not the actual merits—and was premised on Miller's recommendation regarding amendment, "A wise judicial practice would be to allow at least one amendment *regardless of how unpromising* the initial pleading appears because it usually is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief." *Id.* (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2023)). In doing so, the Ninth Circuit "express[ed] no opinion on whether such a due process right exists, or even if it does exist, whether it would apply here." *Id.* at 794. Because SOP 135 is in effect (Creech was informed SOP 135 was to be used in October 2023), and manufactured pentobarbital is to be used, the Ninth Circuit's justification to allow the amendment no longer exists.

Indeed, the Ninth Circuit has previously rejected such a claim. *McKenzie v. Day*, 57 F.3d

1461, 1469 (9th Cir. 1995), *opinion adopted on reh'g en banc,* 57 F.3d 1493 (9th Cir. 1995). District courts within the Ninth Circuit have similarly rejected such claims. *See Schad v. Brewer*, No. CV-13-2001-PHX-ROS, 2013 WL 5551668, at *9-10 (D. Ariz. Oct. 7, 2013); *Cook v. Brewer*, No. CV-10-2454-PHX-RCB, 2011 WL 251470, at *5 (D. Ariz. Jan. 26, 2011), *aff'd,* 637 F.3d 1002 (9th Cir. 2011).

Because the courts that addressed the merits of claims similar to Creech's Due Process claim have rejected them, Creech cannot support a preliminary injunction with it here. *See Workman*, 486 F.3d at 906 ("One cannot credibly establish a likelihood of success in attacking a death-penalty procedure when the theory of success has yet to succeed in a considerable number of cases over a considerable number of years.").

Notwithstanding, Creech's arguments in support of the claim are unavailing. IDOC informed Creech he will be executed in accordance with the procedures set forth in SOP 135 back in October 2023. Therefore, his claim failed from the outset.

The majority of Creech's argument is addressed at obtaining information about the State's execution-chemical's identity. This is impermissible. I.C. § 19-2716A; *see also Pizzuto v. Tewalt*, 1:21-cv-359-BLW, (D. Idaho 2023), Dkt. 88, pp. 19-24 (attached hereto as Ex. B) (explaining that divulging such information places an undue burden on the State); and *id.* at Dkts. 104 (attached hereto as Ex. C), and 109 (filed herein as Dkt. 123-14) (specifically addressing the arguments Creech is asserting here)). Creech's efforts to obtain the State's source's identity, however, is not surprising. *See Glossip*, 576 U.S. at 869-71 (explaining anti-death penalty advocates' history of tracking down execution-drug suppliers and exerting extreme pressure which results in these suppliers refusing to supply states with the chemicals); *see also Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1341 (11th Cir. 2020) (same)).

Creech's arguments concerning the efficacy of the chemical also fail because the chemical was tested, verified as being pentobarbital, and passed all regulatory standards and recommendations. Creech's arguments surrounding the source's line of business, location, and identity fail for the same reasons.

As for Creech's reliance on Dr. Almgren,[8] his briefing drastically overstates what her opinions and speculations actually say. Creech tries to rely on Dr. Almgren as an authoritative source to support the chemical being somehow faulty. However, a review of Dr. Almgren's declaration (Dkt. 123-8) reveals that the statements Creech relies upon are only her opinion and wishes, not based on inspection or testing of the drug, but on speculation. Dr. Almgren concedes such. *E.g., id.* at ¶ 22 ("I would need to review additional information to confirm that the testing on the pentobarbital was properly done."); *id.* at ¶ 23 ("I cannot confirm . . . the laboratory that performed this testing is accredited"); *id.* at ¶ 24 ("it is not clear what training the members of this team have"). Beyond speculation, Dr. Almgren does not provide any actual evidence that the chemical is not pentobarbital, effective, safe, or properly tested.

Creech's contention that the State does not have enough pentobarbital for his execution is unfounded. Director Tewalt certified that IDOC has enough of the chemical for Creech's execution. (Dkt. 125-3).

Therefore, Creech is not likely to succeed on his third claim.

C. Claim Two.

In his second claim, Creech asserts that "the absence of a valid execution protocol violates

---

[8] Dr. Almgren's declaration does not satisfy the *Daubert*, *Kumho*, or Fed. R. Evid. 702 standards—particularly that it must be "based on sufficient facts or data," be "the product of reliable principles and methods, and must "reflect a reliable application of the principles and methods to the facts of the case." Accordingly, Defendants request the Court strike the declaration to the extent it finds it does not satisfy the necessary criteria. Being that the declaration was submitted, Defendants will address the concerns accordingly.

[his] right to due process." (Dkt. 123-1, p. 15). Creech predicates this claim on the Legislature's amendment to Idaho Code § 19-2716, permitting executions by firing squad. (*Id.*). Creech also points to SOP 135 allowing for one of four chemicals to be used. (*Id.* at p. 16). This Court permitted Creech to plead this claim because of the potential for firing squad to be used to execute him, and "there is no evidence in this case IDOC will not exercise its discretion to depart from the protocol at any time including after the death warrant issues." (Dkt. 118, p. 18).

Because manufactured pentobarbital has been chosen for Creech's execution, his arguments regarding the firing squad and four chemical options are moot. Additionally, IDOC has never deviated from its execution protocol. At a time when IDOC did not have the ability to carry out an execution, IDOC opted to forego full implementation of SOP 135 (*see* Dkt. 104) and IDOC suspended SOP 135 with respect to an individual condemned person so that it could best accommodate him—SOP 135 remained in effect with respect to all other purposes. (*See* Ex. D, ¶¶ 9-13). Neither of these "suspensions" violated the Constitution or a statutory right of that condemned person or Creech. As it relates to Creech, IDOC has never evinced an intent to deviate from SOP 135 and Creech has offered nothing to support his conclusory *ipse dixit* statements that it will. Such conduct is contrary to the presumption of good faith afforded IDOC and its staff. *Sossamon*, 560 F.3d at 325. Therefore, Creech cannot succeed on the merits of his second claim.

### D. Creech's claims do not pass the PLRA's needs-narrowness-intrusiveness test.

The PLRA "was enacted 'to stop federal courts from micromanaging our Nation's prisons' and 'from providing more than the constitutional minimum necessary to remedy the proven violation of federal rights.'" *Balla v. Idaho State Bd. of Correction*, No. 81-CV-1165-BLW, 2020 WL 2812564, *6 (D. Idaho 2020) (citation omitted). In furtherance of that purpose, the PLRA "sets the standards for when a court may grant prospective relief concerning prison conditions."

*Armstrong v. Newsom*, 58 F.4th 1283, 1293 (9th Cir. 2023); *see also* 18 U.S.C. § 3626. "Prospective relief" means all relief in any form that may be granted or approved by the court other than compensatory monetary damages. 18 U.S.C. §§ 3626(g)(7), 3626(g)(9); *Hallett v. Morgan*, 296 F.3d 732, 742-43 (9th Cir. 2002). A method of execution challenge is not exempt from PLRA's requirements. *Nelson v. Campbell*, 541 U.S. 637, 650-651 (2004).

The Act provides that a "court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626. "The PLRA 'mean[s] just what it says—before granting prospective injunctive relief, the trial court must make the findings' the PLRA mandates." *Newsom*, 58 F.4th at 1293 (quoting *Oluwa v. Gomez*, 133 F.3d 1237, 1239 (9th Cir. 1998)). This test is commonly referred to as the "needs-narrowness-intrusiveness" test. "In considering prospective relief, a court must also 'give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.'" *Balla*, 2020 WL 2812564, *7 (quoting 18 U.S.C. § 3626(a)(1)(A)).

Under the PLRA, "[w]hat is important, and what the PLRA requires, is a finding that the set of reforms being ordered—the 'relief'—corrects the violations of prisoners' rights with the minimal impact possible on defendants' discretion over their policies and procedures." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 783 (9th Cir. 2019) (quoting *Schwarzenegger*, 622 F.3d at 1070). Here, all three of Creech's claims fail the needs-narrowness-intrusiveness test. As discussed above, the merits of the claims fail. Thus, there is not a need.

In addition, the requested relief is not narrowly tailored. In evaluating this prong, "[t]he overarching inquiry is whether the same vindication of federal rights could have been achieved

with less involvement by the court in directing the details of prison operations." *Newsom*, 58 F.4th at 1297 (cleaned up). Because Creech's claims fail, any preliminary injunction would be overly broad. Further, as discussed below, Creech will not experience irreparable harm without a stay, but Creech's victims' families and the public at large will endure an injury if a stay is granted.

The requested relief would also be overly intrusive. The "core concern of the intrusiveness inquiry [is] whether the district court has 'enmeshed [itself] in the minutiae of prison operations,' beyond what is necessary to vindicate plaintiffs' federal rights." *Schwarzenegger*, 622 F.3d at 1071 (quoting *Lewis v. Casey*, 116 S. Ct. 2174, 2185 (1996)). Stated differently, "the question is not whether the relief the court ordered to vindicate those rights is expensive, or difficult to achieve, but whether the same vindication of federal rights could have been achieved with less involvement by the court in directing the details of defendants' operations." *Id.* Because there is not a violation of Creech's rights, any injunctive relief would be an unnecessary and overly obstructive to the State and IDOC.

Therefore, all three of Creech's claims fail the PLRA's needs-narrowness-intrusiveness test, and cannot be used to justify an preliminary injunction.

### 2. Creech will not experience irreparable harm.

The "irreparable harm" inquiry is not satisfied merely because a litigant will be unable to pursue their claims. Instead, the litigant must demonstrate an underlying constitutional violation. *See Powell v. Thomas*, 784 F.Supp.2d 1270, 1283 (M.D. Al. 2011) ("The alleged irreparable injury lies in his assertion that, under present protocols, he may be conscious after being injected with pentobarbital and able to feel pain . . . . Given the failure of Williams to establish a substantial likelihood that he can succeed on his claim that the use of pentobarbital will 'very likely . . . cause serious illness and needless suffering,' resulting in a substantial risk of serious pain, the irreparable

injury is not actual and imminent") (citations omitted); *but see Rhoades v. Reinke*, 830 F.Supp.2d 1046, 1070-1071 (D. Idaho 2011) (finding irreparable harm based on death and inability to continue litigation but the an injunction was not warranted given inability to satisfy other prongs).

Creech points to *Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012), for the following proposition: "We recognize that Towery and Moormann demonstrate irreparable harm, as does every § 1983 plaintiff in an injunction appeal involving an upcoming execution." While Defendants acknowledge this statement can be interpreted to provide a condemned person who has an active death warrant with *per se* evidence of irreparable harm, Defendants posit a pending death warrant is not alone sufficient and "irreparable harm" can only be shown if the inmate is likely to succeed on the merits. Any other interpretation would make the requirement entirely superfluous.

Lawfully executing Creech is not an irreparable harm for purposes of a preliminary injunction; nor is facing a lawfully imposed death sentence. Staying Creech's execution, on the other hand, which he has been able to avoid for decades, is more akin to the type of injury the requirement was designed to prevent. Because Creech cannot demonstrate a likelihood of success on the merits, he cannot demonstrate irreparable harm.

### 3. The balance of equities and public interest weigh against an injunction.

The "state and the victims of crime have an important interest in the timely enforcement of a sentence." *Ramirez*, 595 U.S. at 430 (quoting *Hill*, 547 U.S. at 584); *see also Bucklew*, 139 S. Ct. at 1144 (Breyer, J., dissenting) ("Undue delays in death penalty cases frustrate the interests of the State and of surviving victims, who have 'an important interest' in seeing justice done quickly."). "Endless delay harms 'the "powerful and legitimate interest in punishing the guilty," an interest shared by the State and the victims of crime alike.'" *Ramirez*, 595 U.S. at 456 (Thomas,

J., dissenting). "This interest is magnified when the offense is of a heinous nature." *Id.* (cleaned up). "The State's interest inheres in our form of government, given that 'our federal system' protects a State from 'repeated frustration' of its imposition of a capital sentence." *Id.* (quoting *Wainwright v. Spenkelink*, 442 U.S. 901, 903-04 (1979) (Rehnquist, J., dissenting)). "'[T]he question of capital punishment belongs to the people and their representatives . . . to resolve,' and the people are entitled to see their chosen sentence carried out." (quoting *Bucklew*, 139 S. Ct., at 1133–1134).

"Unsurprisingly, death-row inmates generally employ any means available to stave off their sentences and therefore often engage in abusive litigation." *Ramirez*, 595 U.S. at 451 (Thomas, J., dissenting). "[The] [Supreme] Court has warned that, while zealous 'counsel for the condemned in a capital case' understandably 'lay hold of every ground which, in their judgment, might tend to the advantage of their client,' they should not 'interfer[e]' with 'the administration of justice . . . on mere pretexts.'" *Id.* (quoting *Lambert v. Barrett*, 159 U.S. 660, 662 (1895)).

> Prisoners engage in abusive litigation in several different ways. For instance, some prisoners hold off bringing new claims until the last minute in order to force courts to stay or enjoin an execution simply to afford themselves more time to consider the merits of the claims. *See, e.g., Woodard*, 464 U.S. at 377–380 (Powell, J., concurring); *Bucklew*, 139 S. Ct. at 1134; *Price v. Dunn*, 139 S. Ct. 1533, 1540 (2019) (Thomas, J., concurring in denial of certiorari); *Dunn v. Ray*, 139 S. Ct. 661, 661 (2019). Other prisoners bring any "meritless" claim available, no matter how frivolous, in hopes a sympathetic court will grant relief. *Ibid.*; *see also Hill*, 547 U.S. at 584–585; *Lambert*, 159 U.S. at 662. Still others litigate their claims "piecemeal, challenging one aspect" of their execution "after another" in order to buy time. *Hill*, 547 U.S. at 581; *see also Woodard*, 464 U.S. at 380, (Powell, J., concurring); *Williams v. Kelley*, 854 F.3d 998, 1002 (C.A.8 2017) (per curiam); *cf. Sanders*, 373 U.S. at 18, 83 S. Ct. 1068 (noting that federal courts should not "tolerate needless piecemeal litigation, or entertain collateral proceedings whose only purpose is to vex, harass, or delay"). And, in many other ways, yet more prisoners "deliberately engage in dilatory tactics" designed to drag execution-delaying claims out "indefinitely." *Rhines v. Weber*, 544 U.S. 269, 277–278 (2005); *see also Ryan v. Valencia Gonzales*, 568 U.S. 57, 76–77 (2013). These tactics all too often succeed. *See, e.g., Bucklew*, 139 S. Ct. at 1133–1134 (describing two decades of delay).

Because of the prevalence of vexatious death penalty litigation, a court sitting in equity "must" consider whether a condemned criminal has made an "attempt at manipulation" that would disqualify him from equitable relief. *Gomez*, 503 U.S. at 654. Federal courts faced with abusive litigation "can and should" use their "equitable powers" to protect state judgments and sentences. *Bucklew*, 139 S. Ct. at 1134; *see also Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020) (describing "our responsibility" to ensure that lawful sentences are carried out "fairly and expeditiously"); 1 Pomeroy's Equity Jurisprudence § 397.

*Id.* (cleaned up).

"Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out." *Id.* To unsettle these expectations is to inflict a profound injury to the "powerful and legitimate interest in punishing the guilty, an interest shared by the State and the victims of crime alike." *Id.* (quoting *Calderon v. Thompson*, 523 U.S. 538, 556 (1998)). Additionally, "[d]elays can 'aggravate the cruelty of capital punishment' by subjecting the offender to years in solitary confinement, and delays also 'undermine [capital punishment's] jurisprudential rationale' by reducing its deterrent effect and retributive value." *Bucklew*, 139 S. Ct. at 1144 (Breyer, J. dissenting). Justice Thomas has explained that by "evading [their] sentence," capital inmates "inflict[] recurrent emotional injuries on the victims of [their] crime." *Ramirez*, 595 U.S. at 456.

The State and Creech's victim's families have been denied their relief since Creech pleaded guilty in 1982 and was lawfully resentenced to death in 1995. Creech should not be permitted to continue to evade his lawful sentence by way of litigation. Further, Creech's ability to stall and otherwise forego his sentence negatively impacts the purposes of the justice system: deterrence, retribution, and community protection. The balance of equities and public interest weigh against a stay or preliminary injunction.

#### 4. An evidentiary hearing is not necessary.

"A district court does not need to hold an evidentiary before ruling on a preliminary injunction." *Revelry Group LLC v. Jobe*, No. 22-CV-00510-DCN, 2023 WL 2456287, at *3 (D. Idaho Mar. 10, 2023). "The Ninth Circuit has 'rejected any presumption in favor of evidentiary hearings, especially if the facts are complicated.'" *Id.* (quoting *Kenneally v. Lungren*, 967 F.2d 329, 335 (9th Cir. 1992)). The Ninth Circuit has explained, "[w]here sharply disputed the facts are simple and little time would be required for an evidentiary hearing, proceeding on affidavits alone might be inappropriate. But an evidentiary hearing should not be held when the magnitude of the inquiry would make it impractical." *Intl. Molders' and Allied Workers' Loc. Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986) (citations omitted). "In addition, courts should consider general concepts of fairness, the underlying practice, the nature of the relief requested, and the circumstances of the particular cases." *Revelry Group*, 2023 WL 2456287, at *3.

In requesting an evidentiary hearing, Creech has simply repackaged his request for preliminary injunction to seek the same relief—delay. An evidentiary hearing is not needed here particularly given the sparsity of Creech's proffered evidence and because of the implications it would have on Creech's scheduled execution.

### CONCLUSION

Creech has not met his burden to justify the imposition of the "extraordinary remedy" that is his requested preliminary injunction or stay of execution. Creech has not demonstrated a likelihood of success of the merits of any of his claims, or irreparable harm for purposes of a preliminary injunction. Further, the balance of equities and public interest weigh against the imposition of an injunction. Therefore, Defendants respectfully request that this Court deny Creech's Motion for Preliminary Injunction. Moreover, Defendants respectfully request the Court

deny Creech's request for an evidentiary hearing as it is not needed.

Respectfully submitted this 13th day of February, 2024.

MOORE ELIA & KRAFT, LLP


*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Defendants


OFFICE OF THE ATTORNEY GENERAL


*/s/ Kristina M. Schindele*
Kristina M. Schindele
Deputy Attorney General
Attorneys for Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 13th day of February, 2024, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | |
|---|---|
| Deborah A. Czuba | ☐ U.S. Mail, postage prepaid |
| Mary E. Spears | ☐ Hand Delivered |
| Federal Defender Services of Idaho | ☐ Overnight Mail |
| 702 W. Idaho St., Ste. 900 | ☐ Facsimile Transmission |
| Boise, Idaho 83702 | ☒ E-Mail: Deborah_a_czuba@fd.org, |
| | Mary_spears@fd.org |

*Attorneys for Plaintiff*


MOORE ELIA & KRAFT, LLP


*/s/ Tanner J. Smith*
Tanner J. Smith
Attorneys for Defendants