UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| THOMAS EUGENE CREECH,<br><br>            Plaintiff,<br><br>    v.<br><br>JOSH TEWALT; Director, Idaho<br>Department of Correction; TIM<br>RICHARDSON, Warden, Idaho Maximum<br>Security Institution; CHAD PAGE, Chief,<br>Division of Prisons, Idaho Department of<br>Correction, in his official capacity; and<br>UNKNOWN EMPLOYEES, AGENTS,<br>OR CONTRACTORS OF THE IDAHO<br>DEPARTMENT OF CORRECTION,<br><br>            Defendants. | Case No. 1:20-cv-00114-AKB<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Plaintiff Thomas Eugene Creech is a death-row inmate in the custody of the Idaho Department of Correction (IDOC). On October 16, 2023, a state district court issued a death warrant for Creech's execution. That court subsequently stayed the warrant pending the Idaho Commission of Pardons and Parole's consideration of Creech's petition for clemency. The Commission held a hearing on that petition on January 19, 2024, and on January 29, it issued a decision denying commutation. The next day, January 30, the state district court again issued a death warrant for Creech's execution. That execution is presently scheduled for February 28. Creech requests this Court stay or enjoin the execution.

Specifically, pending before the Court in this case are Plaintiff's Motion for Preliminary Injunction (Dkt. 123) and Plaintiff's Motion for Administrative Stay of Execution (Dkt. 121). Related to his preliminary injunction motion, Creech also filed an Emergency Motion for Medical

Testing, asserting "it is necessary for [Creech] to undergo cardiac testing to fully develop and substantiate his request for the injunction." (Dkt. 127 at p. 1). In support of his preliminary injunction motion, Creech presents the Declaration of Dr. Michaela Almgren, a clinical associate professor in pharmacology, and the Declaration of Dr. Mark Heath, an anesthesiologist.[1] (Dkts. 123-8, 124-3). The remaining information Creech offers is not accompanied by an affidavit either authenticating or describing the information. Rather, the information is simply attached as "exhibits" to Creech's memorandum in support of his preliminary injunction motion. *See K-2 Ski Co. v. Head Ski Co.*, 467 F.2d 1087, 1088 (9th Cir. 1972) (noting basis for preliminary injunction should be supported by affidavits or verified complaint); 11A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2949 (3d ed. 2023) (noting preliminary injunction request should be supported by affidavits).

The Court finds oral argument will not significantly aid its decision-making process and decides the motions on the parties' briefing. Dist. Idaho Loc. Civ. R. 7.1(d)(1)(B). *See also* Fed. R. Civ. P. 78(b) ("By rule or order, the court may provide for submitting and determining motions on briefs, without oral hearings."). For the reasons discussed, the Court denies the motions. Although Creech will suffer irreparable harm in the absence of an injunction, he has not made a

---

[1]     Creech attaches to his memorandum in support of his request for a preliminary injunction other declarations which were prepared in other cases and not for purposes of this case. (*See* Dkt. 123-6 (attaching Affidavit of Christine Freeman related to execution of Alabama inmate Eddie Powell); Dkt. 124-4 (attaching Declaration of Dr. Sergio D. Bergese regarding risks of painful execution caused by Idaho inmate Gerald Pizzuto's prescription history); Dkt. 124-7 (attaching Declaration of Mary E. Spears regarding efforts to obtain preliminary injunction in Pizzuto's case)). Creech also attaches two Declarations of Josh Tewalt, the Director of IDOC. In one, Director Tewalt attests that he served the January 30, 2024, death warrant on Creech and that lethal injection is an available execution method. (Dkt. 125-3). The other was filed in Pizzuto's case. (Dkt. 125-5).

clear showing of a likelihood of success on the merits of any of his claims. Further, the balance of equities and the public interest weigh against granting a preliminary injunction.

## BACKGROUND

Creech originally filed this civil rights action under 42 U.S.C. § 1983 in March 2020. Since then, the district court has twice dismissed Creech's claims; Creech has appealed those dismissals to the Ninth Circuit; and the Ninth Circuit has reversed the dismissals and remanded the case to permit Creech to reallege his claims. *See Pizzuto, et al. v. Tewalt*, 997 F.3d 893, 905, 908 (9th Cir. 2021) (reversing dismissal of claims as unripe); *Creech v. Tewalt*, 84 F.4th 777, 783 (9th Cir. 2023) (reversing in part dismissal for failure to state a claim). After the Ninth Circuit's most recent remand, Creech moved to amend his complaint, and this Court granted that motion, in part, allowing Creech to allege three claims. (Dkt. 118).

On January 31, 2024—after the Commission denied Creech's clemency petition and the state court issued another death warrant—Creech filed his second amended complaint asserting those three claims. (Dkt. 119). In Claim One, Creech alleges "the use of compounded pentobarbital at [his] execution violates the Eighth Amendment." (*Id.* at § VI(A)). In support of this claim, Creech alleges that: (1) the use of pentobarbital "creates a substantial risk of serious pain and suffering because of his health conditions and medical history" (*id.* at ¶ 320); (2) the IDOC's execution protocol, Standard Operating Procedure 135.02.01.001 (SOP 135), has "problems," including that it does not require a "practicing anesthesiologist" to administer the chemicals or "the use of a brain consciousness monitor" (Dkt. 119 at § VI(A)(2), ¶¶ 373, 386); and (3) the medical team observes the execution through "a closed-circuit television system" rather than through a window from another room into the execution chamber. (*Id.* at ¶¶ 401, 403).

Claim Two alleges "the lack of a valid execution protocol violates [Creech's] rights to due process." (*Id.* at § VI(B)). He describes SOP 135 as "outdated," failing to identify "a recipe for executions," and inconsistent with the IDOC's "public pronouncements." (*Id.* at ¶¶ 424, 427). Claim Three alleges "deprivation of accurate information violates [Creech's] Fourteenth Amendment Right to Due Process." (*Id.* at § VI(C)). In support of this claim, Creech identifies the lack of various information including, for example, the method of execution, and he contends this absence of information precludes him from meaningfully challenging his execution. (*Id.* at ¶ 491).

Despite these allegations—many of which assert IDOC has failed to identify the execution method and express concern about the use of compounded pentobarbital—Creech now acknowledges in his emergency filings that IDOC possesses manufactured pentobarbital and that IDOC intends to use manufactured pentobarbital for his execution. (Dkt. 123-1 at p. 12; *id.* at p. 15 (acknowledging IDOC has chosen "single-drug-pentobarbital method" of execution)). According to Creech, he is now aware of the execution method in his case because IDOC produced a Certificate of Analysis of the pentobarbital which it intends to use for his execution to his counsel on January 25, 2024, six days before he filed his second amended complaint in this case.[2] (Dkt. 123-1 at p. 19).

The Certificate shows the tested chemical "conforms." (Dkt. 124-8 at pp. 2, 3). According to Defendants, the Certificate "documents the results of scientific testing completed on the chemicals," "details the process and materials used during manufacturing," "confirms compliance with regulatory and quality standards," and "establishes the quality and safety of the execution chemicals." (Dkt. 123-7 at p. 4). Further, Defendants have represented the manufactured

---

[2]     The Certificate of Analysis was originally produced to Creech's counsel in *Pizzuto v. Tewalt, et al.*, No. 1:21-cv-00359-BLW. Creech submits the Certificate in this case. (Dkt. 124-8).

pentobarbital has a February 2025 expiration date. (Dkt. 123-1 at p. 5). This recent information moots many of Creech's allegations in his second amended complaint.

## LEGAL STANDARD

Under Rule 65 of the Federal Rules of Civil Procedure, a party may obtain injunctive relief before final judgment in certain limited circumstances. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits; he is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in his favor; and an injunction is in the public interest. *Id.* at 20. The movant must carry his burden "*by a clear showing.*" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief. *Winter*, 555 U.S. at 24.

"Under the 'serious questions' version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Towery v. Brewer*, 672 F.3d 650, 657 (9th Cir. 2012) (quoting *Alliance for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1135 (9th Cir. 2011)). "This approach requires that the elements of the preliminary injunction test be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* "Serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* (brackets and quotations omitted).

"[T]hese principles apply even in the context of an impending execution." *Lopez*, 680 F.3d at 1072. In applying them, the Court considers the facts in the light most favorable to Creech, unless a fact is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (summary judgment context).

## ANALYSIS

**1.      Likelihood of Success on the Merits**

**a.   Claim One**

In Claim One, Creech alleges "the use of compounded pentobarbital at [his] execution violates the Eighth Amendment" as applied to him because of "his health concerns," "problems with the now invalidated protocol," and "problems with the execution facilities." (Dkt. 119 at § VI(A)(1)-(3)). Further, in support of his preliminary injunction motion, he argues "drug reliability issues create a substantial risk of severe pain." (Dkt. 123-1 at p. 4).

"[T]he Eighth Amendment does not guarantee a prisoner a painless death." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1124 (2019) (per curiam). Rather, the Eighth Amendment forbids forms of punishment that intensify the death sentence with a cruel, superaddition of terror, pain, or disgrace. *Id.* To successfully challenge an execution method under the Eighth Amendment, the plaintiff must establish two factors. First, the plaintiff must establish the method presents a risk that is "*sure or very likely* to cause serious illness and needless suffering" and to give rise to "sufficiently *imminent* dangers." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (quotations omitted). In other words, there must be an objectively intolerable, substantial risk of serious harm. *Id.*

Second, the plaintiff must show "a feasible and readily implemented alternative method of execution that would . . . significantly reduce a substantial risk of severe pain" and that "the State has refused to adopt [the alternative method] without a legitimate penological reason." *Bucklew*,

139 S. Ct. at 1125. "The Eighth Amendment does not come into play unless the risk of pain associated with the State's method is 'substantial when compared to a known and available alternative.'" *Id.* (quoting *Glossip*, 576 U.S. at 878). The plaintiff may not avoid showing this second prong. Rather, the Supreme Court has ruled that "identifying an available alternative is 'a requirement of *all* Eighth Amendment method-of-execution claims,' alleging cruel pain." *Id.* at 1126 (quoting *Glossip*, 576 U.S. at 867). Further, the Supreme Court has recently explained that Eighth Amendment method of execution claims face an "exceedingly high bar" because the Supreme Court has never held a State's method of execution qualifies as cruel and unusual. *Barr v. Lee*, 140 S. Ct. 2590, 2591 (2020); *see also Bucklew*, 139 S. Ct. at 1124 (same).

### (1) Health Concerns

Central to Claim One is Creech's allegation that he suffers from medical conditions, making the use of pentobarbital likely to create a substantial risk of serious pain and suffering. Specifically, Creech argues his "complex and serious medical situation makes pentobarbital an unconstitutionally risky drug to use at his execution given the danger of an excruciating heart attack, the effects of which [Creech] will acutely experience before he is adequately sedated." (Dkt. 123-1 at p. 3). In his complaint, Creech makes numerous allegations about his health. In his brief in support of his preliminary injunction, however, he only identifies an "abdominal aortic aneurysm" and "a history of uncontrolled high blood pressure." (*Id.*)

Importantly, Creech's allegations acknowledge he has not been diagnosed with the medical condition which he alleges will very likely cause a substantial risk of serious pain and suffering— "extensive atherosclerotic vascular disease." (Dkt. 119 at ¶ 335). According to his allegations, individuals with that disease, who suffer a sudden drop in blood pressure associated with large doses of pentobarbital, will likely suffer a heart attack. (*Id.*). Creech, however, repeatedly

acknowledges he has not been diagnosed with heart disease. For example, he alleges in his second amended complaint that "[t]o fully assess [his] health conditions, further testing is necessary for coronary heart disease, including a current electrocardiogram, an exercise stress test, an echocardiogram, a nuclear stress test, and CT coronary angiogram." (*Id.*)

Creech also acknowledges in his memorandum in support of his motions for a preliminary injunction and for an administrative stay that he does not have the medical condition which makes pentobarbital "an unconstitutionally risky drug." Specifically, Creech argues that "*if* [he] does have significant heart disease, there would be a grave prospect of him suffering an agonizing heart attack brought on by a large dose of pentobarbital. However, *to fully assess the precise contours of these risks, further testing is necessary.*" (Dkt. 123-1 at p. 3 (emphasis added); *see also id.* ("If [Creech] does have heart disease, the 'cardiovascular risks associated with' pentobarbital would cause 'serious complications during the execution.'"); Dkt. 121-1 at p. 3 (stating "heart testing" and review by experts is required)). Finally, in his emergency motion for medical testing, Creech again acknowledges he has not been diagnosed with a medical condition making the use of pentobarbital unconstitutionally risky. In that motion, he states "it is necessary for [him] to undergo cardiac testing to fully develop and substantiate his request for the injunction." (Dkt. 127 at p. 1).

The information Creech submits in the record regarding his health also does not establish he has an unstable heart condition of the nature which he alleges creates the substantial risk of severe pain and suffering. In support of his preliminary injunction, Creech submits an unsworn letter from Dr. Michael Fradley, who states:

> Pentobarbital is likely to be utilized in [Creech's] execution. Given the cardiovascular risks associated with this drug, *it would be reasonable to ensure he doesn't have an unstable cardiac condition* that could be exacerbated by the pentobarbital leading to serious complications during the execution. As such, I would recommend optimizing her [sic] cardiovascular status by ensuring his blood

pressure is well controlled and to consider a stress test to be certain he doesn't have any high risk ischemic territories in his heart.

(Dkt. 123-4 (emphasis added)).

This statement does not establish Creech is likely to suffer a heart attack during execution before being sedated, as Creech alleges. To the contrary, Dr. Fradley suggests testing to determine *if* Creech has "an unstable cardiac condition." (*Id.*) After reviewing Creech's medical records, Dr. Fradley was unable to conclude Creech has such a condition. Further, Dr. Fradley notes that in November 2022, Creech underwent an endovascular repair of an abdominal aortic aneurysm without complication despite his health conditions. (*Id.*). Based on this record and Creech's own concessions, Creech has not clearly shown he suffers a health condition making the use of pentobarbital "unconstitutionally risky."[3]

### (2) Drug Reliability Issues

Additionally, Creech has failed to make a clear showing the manufactured pentobarbital in IDOC's possession is unreliable. Claim One's title alleges "the use of compounded pentobarbital" violates the Eighth Amendment. (Dkt. 119, § VI(A)). Indeed, a vast majority of Creech's allegations relate to *compounded* versus manufactured pentobarbital. Creech, however, acknowledges IDOC now possesses and intends to use manufactured pentobarbital as the execution method. (Dkt. 123-1 at p. 12 ("IDOC intends to use supposedly manufactured pentobarbital for his execution."); *id.* at p. 15 (acknowledging IDOC has chosen "single-drug-pentobarbital method" of execution)).

---

[3]      Creech has also not made a showing of a "vein-access problems." (*See* Dkt. 123-1 at p. 11 (arguing "likelihood of vein-access problems arising")). Creech has not offered any evidence he suffers from this problem.

In 2020, the Supreme Court described pentobarbital as the "mainstay of state executions," noting pentobarbital "[h]as been adopted by five of the small number of States that currently implement the death penalty"; [h]as been used to carry out over 100 executions, without incident"; "[h]as been repeatedly invoked by prisoners as a *less* painful and risky alternative to the lethal injection protocols of other jurisdictions"; "[w]as upheld [by the Supreme Court] last year, as applied to a prisoner with a unique medical condition that could only have increased any baseline risk of pain associated with pentobarbital as a general matter"; and "[h]as been upheld by numerous Courts of Appeals against Eighth Amendment challenges." *Barr*, 140 S. Ct. at 2591 (citing *Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017); *Zink v. Lombardi*, 783 F.3d 1089 (8th Cir. 2015); *Gissendaner v. Commissioner*, 779 F.3d 1275 (11th Cir. 2015)).

Defendants represent that "the subject pentobarbital has been tested, certified as being pentobarbital, and has passed all applicable regulatory and quality standards." (*See* Dkt. 132 at p. 13). In support, they have provided Creech's counsel with a Certificate of Analysis showing the tested chemical is "conform[ing]." (Dkt. 124-8). Creech does not directly dispute IDOC possesses certified, manufactured pentobarbital.

Instead, Creech argues that the risks pentobarbital imposes are "intensified by the serious doubts surrounding the reliability of the specific chemicals" IDOC obtained and that "there is reason to suspect that IDOC has chosen a dubious source for its drugs." (Dkt. 123-1 at p. 4). In support, Creech contends states have been unable to obtain manufactured pentobarbital "[f]or a number of years." (*Id.*) As a result, Creech speculates IDOC obtained the pentobarbital from a veterinarian, a third-world country, or Akorn Pharmaceuticals, which he describes as a manufacturer that is "now-defunct" because of "massive recalls" for "pervasive defects in its merchandise." (*Id.* at pp. 5-7).

In support, Creech offers the Almgren Declaration. Almgren states she "cannot confirm from the Certificate of Analysis that the laboratory that performed [the] testing is accredited." (Dkt. 123-8 at ¶ 23). As discussed in greater detail below, however, under Idaho law the identity of the laboratory testing the chemicals is confidential. Idaho Code § 19-2716A (maintaining confidentiality of "[a]ny person or entity who . . . tests . . . the chemicals or substances for use in an execution"). In accord with this statute, one District Court in the District of Idaho has already ruled that requiring Defendants to disclose the execution-drug supplier's identity would seriously harm their interest in enforcing Idaho's death penalty laws. (Dkt. 132-2 (attaching memorandum decision in *Pizzuto v. Tewalt*, No. 1:21-cv-00359-BLW, Dkt. 88 at pp. 19-24)). Similarly, for the same reasons, requiring IDOC to disclose the identity of the drug-tester would be an undue burden on Defendants' enforcement of the law.

The hypothetical answers Almgren posits with respect to her remaining "questions" about "whether IDOC has obtained its pentobarbital from a reliable source" are speculative (Dkt. 123-8 at ¶ 44), and the additional information Creech offers about the drug's source is unauthenticated, inadmissible information attached to his brief. (*See, e.g.*, Dkt. 123-9 (article regarding Akorn's bankruptcy and recall of products); Dkt. 123-11 (same); Dkt. 123-12 (same); Dkt. 123-16 (article about man from India selling illegally imported drugs)). Further, Creech does not offer any admissible evidence in support of his assertion that IDOC "deliberately circumvented lawful limitations" to obtain pentobarbital "surreptitiously in violation of restrictions" against manufacturers' wishes. (*See* Dkt. 123-1 at p. 6).

Because Creech's allegations primarily focus on compounded pentobarbital; because IDOC now possesses certified, manufactured pentobarbital; and because Creech proffers nothing but inadmissible speculation about the source of the chemical, Creech fails to clearly show the use

of manufactured pentobarbital—which the Supreme Court has described as the "mainstay" of executions—is "unconstitutionally risky."

### (3) Other Challenges

Creech's other challenges likewise fail to establish a clear showing of a substantial risk of severe pain and suffering. Creech alleges that "there is no window between the execution chambers and the medical team room" and argues the absence of a window increases the danger of his execution "going painfully awry." (Dkt. 119 at ¶ 401; Dkt. 123-1 at p. 8). In support, Creech offers the Heath Declaration, in which Heath states that "the absence of a direct visual observation substantially and gratuitously increases the risk of a botched execution"; "the design of the facility departs from every other execution facility that [he has] inspected"; and "the current video system is utterly inadequate to detect intravenous infiltration." (Dkt. 124-3 at pp. 3-4).

Defendants respond that the medical team uses "a real-time video feed" with a "telescoping camera set up directly over Creech." (Dkt. 132 at p. 14). In support, they provide the Declaration of Liz Neville, who attests that, among other things, at least two members of the medical team "continuously monitor" the inmate using a "telescoping camera," which is capable of "zoom[ing] in on the sites of IV catheters" "to monitor for occlusions or blockages." (Dkt. 132-4 at ¶ 18). Additionally, the medical team "ensures that the IV catheter is working properly before leaving the execution chamber." (*Id.*). Further, Neville attests "IDOC has secured fixed cameras in the execution chamber to permit monitoring of the entire room." (*Id.*). The State argues this setup "provides a better view than peering through a window" from another room. (Dkt. 132 at p. 14).

Creech does not articulate why this monitoring method is inadequate. Although Heath describes the video system as "utterly inadequate," he fails to explain how the medical team could more effectively monitor IV sites through a window from another room—a scenario which seems

MEMORANDUM DECISION AND ORDER - 12

unlikely. Creech also does not cite any case law for the proposition that the medical team must have a direct line-of-sight through a window versus through a real-time video feed. Meanwhile, at least one district court has approved a protocol providing for the medical team to directly observe the inmate via a camera. *See West v. Brewer*, No. CV-11-1409-PHX-NVW, 2011 WL 2836754 *7 (D. Ariz. July 18, 2011), *aff'd* 652 F.3d 1060 (9th Cir. 2011) (finding sufficient safeguards where medical team monitored condemned remotely via audio equipment and high-resolution camera). Accordingly, Creech has failed to clearly show that the medical team's line of sight via a real-time video feed versus a window in another room creates a substantial risk of severe pain and suffering.

Similarly, Creech has not made a clear showing that an anesthesiologist must administer the chemical or that a brain monitor is necessary to avoid a substantial risk of severe pain. As the Supreme Court has noted, "the medical community has yet to endorse the use of a BIS monitor, which measures brain function, as an indication of anesthetic awareness" and an anesthesiologist is not required to be present at an execution. *Baze v. Rees*, 553 U.S. 35, 59 (2008); *id.* at 64 (Alito, J., concurring) (recognizing that anesthesiologists cannot be required); *see also Workman v. Bredesen*, 486 F.3d 896, 910 (6th Cir. 2007) (anesthesiologist not required to monitor consciousness); *Taylor v. Crawford*, 487 F.3d 1072, 1084 (8th Cir. 2007) ("The protocol is designed to ensure a quick, indeed a painless, death, and thus there is no need for the continuing careful, watchful eye of an anesthesiologist or one trained in anesthesiology, whose responsibility in a hospital's surgery suite (as opposed to an execution chamber) is to ensure that the patient will wake up at the end of the procedure."). Moreover, the Supreme Court has noted anesthesiologists are ethically prohibited from participating in capital punishment. *Baze*, 553 U.S. at 59-60 (noting anesthesiologists' ethical guidelines prohibit them from participating in capital punishment).

### (4) Alternative Method of Execution

Finally, Creech's refusal to identify an alternative method of execution is an independent reason Claim One necessarily fails as a matter of law. Creech's counsel has refused to identify an alternative execution method. The Supreme Court, however, requires that to establish "the State's chosen method of execution cruelly superadds pain to the death sentence, a prisoner *must* show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125 (emphasis added). The Supreme Court has concluded there is "no doubt that this standard governs all 'Eighth Amendment method-of-execution claims,'" explaining that "we see little likelihood that an inmate facing a serious risk of pain will be unable to identify an available alternative—assuming, of course, that the inmate is more interested in avoiding unnecessary pain than in delaying his execution." *Id.* at 1125, 1128-29.

Ruling on Creech's motion to amend and the State's motion to dismiss, this Court acknowledged Creech's attempts to dodge the issue of an alternative execution method by alleging his counsel has an ethical duty of loyalty not to identify such a method. (Dkt. 118 at p. 13). Regardless, the Court reasoned that Creech could not allege an alternative method if he was being forced to guess about the actual execution method IDOC intends to use. (*Id.*). Based on this reasoning, the Court concluded Creech had satisfied the pleading requirement to avoid dismissal by alleging the "removal" of certain "failings" (like obtaining chemicals from "shady offshore compounding pharmacies") "could conceivably remove the risk of an Eighth Amendment violation." (*Id.*).

Now, however, IDOC has informed Creech it intends to use manufactured pentobarbital as an execution method. Despite that IDOC has definitively identified its method, Creech continues to refuse to identify an alternative method. Instead, he "reserves the right to elaborate on the more humane alternative requirement if this Court orders counsel to do so following briefing on and resolution of the ethical conflict issue." (Dkt. 123-1 at p. 2, n.2). The Court, however, does not need further briefing on the issue because the Supreme Court has definitively ruled a plaintiff is required to show "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew*, 139 S. Ct. at 1125. Absent this showing, not only does Creech fail to clearly establish Claim One is likely to succeed on the merits, that claim fails on the merits as a matter of law.

### b.   Claim Two

In Claim Two, Creech alleges that "the lack of a valid execution protocol violates [his] rights to due process" and that no execution protocol yet exists which can "validly govern" the execution method. (Dkt. 119 at VI(B); *id.* at ¶ 420). In support of his assertion he is likely to succeed on the merits of this claim, Creech argues that IDOC has not updated SOP 135 since March 2021; SOP 135 "speaks only to lethal injection, not the firing squad"; newly amended Idaho Code § 19-2716, which now provides for a firing squad, contemplates a revised protocol;[4] and "since none has been issued, there is no valid protocol." (Dkt. 123-1 at p. 16).

---

[4]      Idaho Code § 19-2716 does not make any mention of a protocol or otherwise suggest IDOC will or is required to issue a revised protocol. Perhaps Creech's assertion that the statute "contemplates" a revised protocol relates to the fact that the statute provides for a new method of execution—firing squad—for which IDOC does not yet have a protocol. Because IDOC intends to use lethal injection, however, the absence of a firing squad protocol is irrelevant.

As Creech's argument acknowledges, however, SOP 135 "speaks" to lethal injection, i.e., SOP 135 sets forth IDOC's protocol in the event of an execution by lethal injection. Now that IDOC has identified the execution method—lethal injection by manufactured pentobarbital—Defendants represent SOP 135 is the applicable protocol for Creech's execution. In support of their representation that IDOC intends to follow SOP 135, they offer the Neville Declaration. (Dkt. 132-4).

Neville is IDOC's Deputy Chief of Prisons and is familiar with SOP 135's implementation. (Dkt. 132-4 at ¶ 2). She attests "SOP 135 continues in full force and effect." (Dkt. 132-4 at ¶ 11). Further, she attests IDOC has been and is presently following SOP 135 and provides details, among other things, about the composition of the medical team and their licensing and certification checks; their training and compliance with policy; their testing and maintenance of equipment and supplies; and their simulation of executions. (*See, e.g.*, Dkt. 132-4 at ¶¶ 3, 6-7, 14-17, 19).

Finally, Neville explains that in the past when a death warrant issued but IDOC was unable to carry out that execution, IDOC temporarily "suspended implementation of SOP 135," meaning IDOC "cease[d] efforts to prepare to carry out" the execution under SOP 135. (Dkt. 132-4 at ¶ 10). Contrary to Creech's allegations, the IDOC's prior "suspensions" of SOP 135 did not invalidate the protocol. Rather, IDOC's suspensions of SOP 135 merely meant IDOC ceased preparing for an execution it could not carry out.

As in other cases in which a court has addressed the adequacy of SOP 135's safeguards against the substantial risk of severe pain and suffering, the Neville Declaration resolves any concerns about SOP 135's implementation and the adequacy of its safeguards against the risk of harm. *See Rhoades v. Reinke*, 671 F.3d 856, 861 (9th Cir. 2011) (noting district court correctly concluded SOP 135 protocol "as it will be implemented" contained requisite safeguards); *Creech*

*v. Reinke*, No. 1:12-cv-00173-EJL, 2012 WL 1995085, *18 (D. Idaho June 4, 2012) (concluding "the supplemental evidentiary record" resolved any arguments about "the risk of harm"). For this reason, Creech's claim that "the lack of a valid protocol violates [his] rights to due process" is not likely to succeed on the merits. (Dkt. 119 at p. 55).

### c. Claim Three

In Claim Three, Creech alleges Defendants' "refusal to provide [him] with information that would enable him to determine how the State intends to execute him violates his rights to due process." (*Id.* at ¶ 433). By the time Creech filed his second amended complaint, however, he knew IDOC's execution method—manufactured pentobarbital. Creech now argues the disclosure of the execution method is not enough to satisfy his due process rights and complains he does not know "who made the drugs"; the "source" of the drugs, i.e., whether from "a veterinarian, a pharmacy, a hospital or some other type of business"; "what part of the world the drugs come from"; who tested the drugs; and how much of the drugs IDOC purchased and tested. (Dkt. 123-1 at pp. 12-13, 15).

Under Idaho law, however, who manufactures, sells, supplies, and tests the drugs is confidential. Idaho Code § 19-2716A maintains as confidential "[a]ny person or entity who compounds, synthesizes, tests, sells, supplies, manufactures, stores, transports, procures, dispenses, or prescribes the chemicals or substances for use in an execution or that provides the medical supplies or medical equipment for the execution process." Creech's preliminary injunction motion does not challenge this statute.

Further, in accord with the statute, one District Court in the District of Idaho has already ruled that requiring Defendants to disclose the identity of the "execution-drug supplier would seriously harm their interest in enforcing Idaho's death penalty laws"; the supplier's identity had

MEMORANDUM DECISION AND ORDER - 17

only "marginal relevance" to the petitioner's claims; and thus "requiring Defendants to identify

their execution-drug supplier would impose an undue burden by creating an unjustifiably high risk

that the supplier will be publicly identified and, consequently, that the State will be unable to obtain

execution drugs in the future." (Dkt. 132-2 at pp. 19-24 (attaching memorandum decision in

*Pizzuto v. Tewalt*, No. 1:21-cv-00359-BLW, Dkt. 88 at pp. 19-24)).[5] Based on this authority,

Creech is not likely to succeed on the merits of his claim that due process requires Defendants to

identify the manufacturer, seller, supplier, or tester of the manufactured pentobarbital in IDOC's

possession.[6]

## 2.    Irreparable Harm

Defendants argue Creech will not suffer irreparable injury if denied injunctive relief.

Specifically, they argue that, because the harm resulting from an Eighth Amendment as applied

claim is the substantial risk of severe pain and because Creech has failed to make a clear showing

such a substantial risk exists, he will not suffer irreparable harm if the Court denies his request for

---

[5]     In support of this conclusion, the Court relied on numerous cases concluding that a State intending to carry out an execution would be unduly burdened and prejudiced by having to identify an execution-drug supplier. *See also Jordan v. Comm'r, Mississippi Dep't of Corr.*, 947 F.3d 1322, 1340 (11th Cir. 2020) (holding that compelling the Georgia Department of Corrections to identify execution-drug supplier would impose undue burden); *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 192 (4th Cir. 2019) (holding that compelling Department of Corrections to disclose execution-drug supplier's identity would "impede Virginia's ability to carry out executions by chilling Virginia's current drug supplier, as well as potential future suppliers, from providing drugs for executions"); *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 238-39 (6th Cir. 2016) (finding that, if required to identify execution-drug supplier, "Defendants will suffer an undue burden and prejudice in effectuating Ohio's execution protocol and practices"); *In re Missouri Dep't of Corr.*, 839 F.3d 732, 736 (8th Cir. 2016) ("[T]he disclosure of [the execution-drug supplier's] identity will result in an undue burden on [the Missouri Department of Corrections].").

[6]     Although I.C. § 19-2716A does not address the remainder of the information Creech seeks to know—the chemical's industry source and country of origin—this collateral information is of minimal relevance, particularly because the Certificate of Analysis states the IDOC possesses pentobarbital which has been tested and conforms with regulatory and quality standards.

injective relief. In support, Defendants cite *Powell v. Thomas*, 784 F. Supp. 2d 1270, 1283 (M.D. Ala. 2011), which ruled that irreparable injury is not the fact the inmate will die by execution if injunctive relief is denied; rather, "[t]he alleged irreparable injury [is] he may be conscious after being injected with pentobarbital and able to feel pain during the administration of the final two chemicals." Because the inmate in *Powell* failed to establish a substantial likelihood of success that pentobarbital would likely cause serious illness and needless suffering, the court concluded he failed to show irreparable harm. *Id.*

*Powell*, however, is contrary to Ninth Circuit law. The Ninth Circuit has recognized that "every § 1983 plaintiff in an injunction appeal involving an upcoming execution" demonstrates irreparable harm. *Towery*, 672 F.3d at 661. Accordingly, the Court concludes Creech has made a clear showing he will likely suffer irreparable harm in the absence of preliminary relief if IDOC proceeds with the execution.

### 3.    Balance of Equities and Public Interest

As previously noted, "[u]nder the 'serious questions' version of the test, a preliminary injunction is appropriate when a plaintiff demonstrates that 'serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor.'" *Id.* at 657. Creech, however, has failed to demonstrate "serious questions going to the merits" because he fails to clearly show a likelihood of success on the merits of any of his claims. Moreover, the balance of equities and public interest do not weigh sharply in Creech's favor.

The Supreme Court has held a State has a "strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Hill v. McDonough*, 547 U.S. 573, 584 (2006). Likewise, crime victims "have an important interest in the timely enforcement of a sentence." *Id.* These interests are especially strong in cases in which the legal proceedings have

continued for many years. *Bible v. Schriro,* 651 F.3d 1060, 1066 (9th Cir. 2011) ("[T]he further delay from a stay [of execution] would cause hardship and prejudice to the State and victims, given that the appellate process in this case has already spanned more than two decades."). Further, the Supreme Court has concluded a State has a compelling interest in finality and is entitled to the assurance of finality after years of lengthy proceedings have run their course and once a mandate has issued denying habeas relief. *Calderon v. Thompson*, 523 U.S. 538, 556 (1998). "Only with real finality can the victims of crime move forward . . . ." *Id.* "To unsettle these expectations is to inflict a profound injury to the powerful and legitimate interest in punishing the guilty." *Id.* (quotation omitted).

The history of Creech's federal proceedings is too long and complicated to recount here. In brief, Creech has sought relief from his death sentence in the federal courts since the reimposition of his death penalty in 1995—almost thirty years of litigation. Recently, the Supreme Court denied Creech's petition for certiorari challenging the Ninth Circuit's denial of his second amended habeas petition. *Creech v. Richardson*, 59 F.4th 372 (9th Cir. 2023), *cert. denied* 144 S. Ct. 291 (Oct. 10, 2023). A few days later, on October 13, 2023, Creech filed his third federal habeas petition, alleging that evolving standards of decency render his death sentence unconstitutional. *Creech v. Richardson*, No. 1:23-cv-00463-AKB. This Court concluded it lacked jurisdiction over Creech's unauthorized successive petition under 28 U.S.C. § 2244(b), and that decision is now on emergency appeal. *Creech*, No. 1:23-cv-00463-AKB at Dkts. 15, 17.

A few days after Creech filed his third federal habeas petition, the Ninth Circuit issued the mandate on its decision remanding this case to this Court, in which Creech has attempted under § 1983 to challenge the State's execution protocol since March 2020. *See Creech*, 84 F.4th at 784. Although the Court allowed Creech to amend his complaint—for a third time—to attempt to allege

viable claims, his less than clear showing in support of his preliminary injunction motion demonstrates he is unlikely to succeed on the merits of any of his claims.

Finally, Creech filed another § 1983 case before this Court on February 5, 2024, challenging the Idaho Commission of Pardons and Parole's denial of his clemency petition. *Creech v. Idaho Comm'n of Pardons & Parole, et. al.*, No. 1:24-cv-00066-AKB. In a separate opinion, the Court will address that challenge. This litigation history demonstrates an instance in which the State's and the victims' interests in finality are especially strong given the lengthy legal proceedings that have delayed the State's timely enforcement of Creech's sentence.

Arguing the other side of the coin, Creech asserts "the public's interest in finality" is "substantially diminished" because it has taken forty years to litigate his death sentence. (Dkt. 123-1 at p. 20). Further, he argues that because he has been on death row for more than forty years, "a few more months to allow [him] to litigate the substantial issues in this case will do the State no harm." (*Id.* at p. 17). As discussed above, the Court disagrees this case involves "substantial issues." Moreover, Creech's argument for a delay ignores that a delay will undoubtedly beget more requests for further delays. Accordingly, the Court concludes the balance of equities and public interest are not in Creech's favor. Because Creech fails to make a clear showing of a likelihood of success on the merits of any of his claims and because the balance of equities and the public interest weigh against granting a preliminary injunction, the Court denies Creech's request for an injunction, even though he will suffer irreparable harm as a result.

### 4.    Evidentiary Hearing and Medical Testing

The Court disagrees it must hold an evidentiary hearing before denying Creech's request for injunctive relief, as Creech asserts. Specifically, Creech argues the Court "should allow [him] to at least make his case at a live hearing through witnesses." (*Id.* at p. 21). The Ninth Circuit,

however, has ruled that a court does not need to have a hearing on a motion for a preliminary injunction where the essential facts are not in dispute. *Charlton v. Est. of Charlton*, 841 F.2d 988, 989 (9th Cir. 1988). Further, a hearing is unnecessary when "the movant has not presented a colorable factual basis to support the claim on the merits or the contention of irreparable harm." *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1176 (3rd Cir. 1990).

It is undisputed Creech has not been diagnosed with the medical condition—heart disease—which he contends gives rise to a substantial risk of severe pain if IDOC uses pentobarbital. Further, it is undisputed IDOC now possesses manufactured pentobarbital rather than compounded pentobarbital. Finally, Defendants have established SOP 135 is in full force and effect; IDOC is and has been following SOP 135 for purposes of Creech's execution; and it is implementing adequate safeguards to avoid a substantial risk of severe pain and suffering. Because these facts are undisputed, an evidentiary hearing on Creech's preliminary injunction hearing is unnecessary.

Further, the Court declines to grant Creech's emergency motion for medical testing so that he can "undergo cardiac testing to fully develop and substantiate his request for the injunction." (Dkt. 127). Creech cites no authority for the proposition that a court should grant a stay to allow a party to conduct discovery to develop evidence to support a preliminary injunction motion. Such "preliminary injunction litigation," as Creech calls it, is antithetical to the Rule 65 standards for injunctive relief.

**5.     Administrative Stay**

Creech requests "his execution be administratively stayed until the Court can address [his] motion for a preliminary injunction."  (Dkt. 121-1 at p. 1). He contends that before the Court can address his request for injunctive relief, he must complete "substantial discovery," undergo

"[h]eart testing," have his experts review such testing, and have an evidentiary hearing with "live testimony" from his experts, who he states are "busy professionals with numerous personal and work-related obligations" that need "leeway" to appear at an in-person evidentiary hearing. (*Id.* at pp. 3-4). He estimates this "preliminary-injunction litigation cannot be adequately completed . . . in less than six months." (*Id.* at p. 5).

The Ninth Circuit has ruled that an administrative stay "is only intended to preserve the status quo until the substantive motion . . . can be considered on the merits, and does not constitute in any way a decision as to the merits of the motion . . . ." *Nat'l Urban League v. Ross*, 977 F.3d 698, 700-01 (9th Cir. 2020). This decision, however, does not address the applicable standard for an administrative stay of an execution in the district court for purposes of addressing a preliminary injunction motion. The parties dispute the standard for granting such a stay. Relying on *Hill*, 547 U.S. 573, Defendants argue Creech "is not entitled to a stay of execution without first making a strong showing that he is likely to succeed on the merits of his substantive claims." (Dkt. 134 at p. 2). Creech disagrees. Regardless, having concluded Creech fails to make a clear showing he is entitled to a preliminary injunction, the Court concludes an administrative stay is inappropriate.

## ORDER

**IT IS ORDERED:**

1.    Plaintiff's Motion for Preliminary Injunction (Dkt. 123) is **DENIED**.

2.    Plaintiff's Motion for Administrative Stay of Execution (Dkt. 121) is **DENIED**.

3.    Plaintiff's Emergency Motion for Medical Testing (Dkt. 127) is **DENIED**.

DATED: February 23, 2024

*Amanda K. Brailsford*

**Amanda K. Brailsford**
U.S. District Court Judge