# Exhibit C

No. 24-978
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| THOMAS EUGENE CREECH, | ) D.C. No. 1:20-cv-114-AKB |
| | ) District Court of Idaho |
| Plaintiff/Appellant, | ) |
| | ) |
| v. | ) **DEATH PENALTY CASE** |
| | ) |
| JOSH TEWALT, Warden, Idaho | ) **Execution Scheduled** |
| Maximum Security Institution, et al. | ) **For February 28, 2024** |
| | ) |
| Defendants/Appellees. | ) |

Appeal from the United States District Court
For the District of Idaho

**LETTER BRIEF**

> MARY E. SPEARS, IN No. 27353-49
> DEBORAH A. CZUBA, ID No. 9648
> Federal Defender Services of Idaho, Inc.
> 702 W. Idaho St., Ste. 900
> Boise, Idaho 83702
> Telephone: (208) 331-5530
> Email: Mary_Spears@fd.org
> Deborah_A_Czuba@fd.org
>
> *Attorneys for Plaintiff/Appellant*
> THOMAS EUGENE CREECH

1

For the reasons that follow, Appellant Thomas Eugene Creech respectfully requests that the Court reverse the district court's denial of his motion for preliminary injunction, as that denial was based on errors of law and clearly erroneous facts. Contrary to the district court's holding, where (as here) a plaintiff can demonstrate that "(1) he is likely to succeed on the merits on his . . . federal claims; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) a preliminary injunction is in the public interest[,]" *Cuviello v. City of Vallejo*, 944 F.3d 816, 825 (9th Cir. 2019), such an injunction should be issued.[1]

I. **Mr. Creech is likely to succeed on the merits of his due process claim**.

Mr. Creech's Second Amended Complaint alleged that the Idaho Department of Correction (IDOC) has, in violation of the Due Process Clause, deprived him of information that would allow him to attack the constitutionality of Idaho's execution plans. *See* Dist. Ct. Dkt. 119 at 57–67. The crux of such a claim is whether a state's obstructionism denies an inmate "the opportunity to have an Eighth Amendment method-of-execution challenge heard at a meaningful time and in a meaningful manner." *Creech v. Tewalt,* 84 F.4th 777, 793 (9th Cir. 2023). Because that is precisely what IDOC has done, contrary to the district court's

---

[1] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

2

assertions below, Dist. Ct. Dkt. 142 at 17-18, Mr. Creech can easily demonstrate a likelihood of success on that claim.

This Court has a lengthy history of raising concerns that a State's failure to provide accurate information about how it intends to execute a death row inmate might violate his procedural due process rights. *See, e.g.*, *First Amend. Coal. v. Ryan*, 938 F.3d 1069, 1072 (9th Cir. 2019); *Lopez v. Brewer*, 680 F.3d 1068, 1079-81 (9th Cir. 2012) (Berzon, J., concurring in part and dissenting in part); *Beaty v. Brewer*, 649 F.3d 1071, 1072-73 (9th Cir. 2011) (Reinhardt, J., dissenting from denial of rehearing en banc); *Landrigan v. Brewer*, 625 F.3d 1132, 1134-35 (9th Cir. 2010) (Wardlaw and Fletcher, JJs., concurring in denial of rehearing en banc); *see also Floyd v. Daniels*, No. 21-16134, 2021 WL 5406851, at *2 (9th Cir. Nov. 18, 2021) (Berzon, J., concurring) ("There is also, in my view, a procedural-due-process-based right to a reasonable period to contest the drug protocol."). To what extent that right exists and has been violated is a critical prerequisite to, and distinct from, the question of whether a death row litigant has demonstrated that his execution will violate the Eighth Amendment if allowed to proceed. *Lopez*, 680 F.3d at 1079 (opinion of Berzon, J.).

And it is State secrecy that is the touchstone of this right. As the Court noted in *First Amend. Coal. v. Ryan*, "serious due process concerns" arise when states cloak their execution proceedings in a "shroud of secrecy" and have a pattern of

3

deviating from their stated protocols without sufficient notice. 938 F.3d at 1072. Not only do these evasions "constrain[ ] the ability of death-row inmates to challenge the constitutionality" of the way in which the State intends to execute them, but they also "hamper[ ] judicial review and public evaluation of the process." *Id.*

The Court need not reach back far into this case's history to see the extent to which the hand of secrecy has muffled Mr. Creech's due process rights. Start instead on October 10, 2023, when the Supreme Court declined to grant certiorari in Mr. Creech's federal habeas case, *see Creech v. Richardson*, 144 S. Ct. 291 (2023) (Mem.), and on October 12, 2023, when the State of Idaho sought and obtained a warrant to execute him on November 8, 2023. Dist. Ct. Dkt. 86-1 at 6. Pursuant to Idaho's new statute regarding methods of execution, Idaho Code § 19-2716, the IDOC Director certified that lethal injection execution was "available" in Mr. Creech's case. Dist. Ct. Dkt. 86-9. But though he faced the execution chamber in just twenty-seven days, Mr. Creech was not told what drug or combination of drugs were "available" for the State to use to kill him.

Instead, after his execution was stayed pending a clemency hearing, he learned via the newspaper in mid-November of 2023 that the State had procured

4

one dose (15 grams) of pentobarbital for his execution, at a cost of $50,000.[2] The State did not formally disclose its choice of pentobarbital until November 27, 2023 – and then only in another death row inmate's case (that of Gerald Pizzuto[3]). Ninth Circuit ECF No. (Hereinafter "ECF No.") 5.2 at 37, 42. He also learned that in Mr. Pizzuto's case the State had paid for a heavily-redacted "certificate of analysis" from a contracted laboratory indicating that at some point some testing had been done on one 50ml vial of someone's pentobarbital. *Id.* at 12-13. Another document produced by the State in *Pizzuto* discovery seemed to indicate that the State had procured six such vials; if the vial that was tested was part of the lot sent to the State, then 16% of the pentobarbital was tested. *Id.* at 12-13, 44. Finally, the State claimed to Mr. Pizzuto it had somehow procured manufactured, not compounded, pentobarbital, which expires in February 2025. ECF No. 5.1 at 11, 37.

But the State's disclosures in *Pizzuto*, in which even such benign pieces of information as the date were redacted, raised more questions about the drug's provenance and reliability than they answered. Nothing the State produced in Mr. Pizzuto's case – and certainly not in Mr. Creech's own, where discovery has not

---

[2] Kevin Fixler, *Idaho Found Lethal Injection Drugs for Execution. Here's How Much They Cost Taxpayers*, Idaho Statesman (Nov. 17, 2023), *available at* https://www.idahostatesman.com/news/northwest/idaho/article281926143.html.
[3] Mr. Pizzuto was the former co-plaintiff of Mr. Creech in this case. However, he was dismissed as a plaintiff and has separate lethal injection litigation pending in the district court, which is currently in discovery. *See Pizzuto v. Tewalt*, No. 1:21-cv-267 (D. Idaho).

5

been ordered despite the case surviving a motion to dismiss and an Answer having been filed – answers those questions.

Even putting aside such questions about the pentobarbital's provenance and quality, the fact that the State claims it to be *manufactured* as opposed to compounded raises additional concerns that likewise have gone unanswered. Below, Mr. Creech raised the possibility that the State obtained the drug via Akorn, a pharmaceutical company that went out of business in February 2023. According to the declaration of one of his experts, Dr. Michaela Almgren, a pharmacologist with expertise in the Drug Quality and Security Act of 2013, the drug's alleged two-year expiration date, ending in February of 2025, is consistent with the drug having originated at Akorn. ECF No. 5.1 at 14 ¶2; 23 ¶33. Presented with the chance to deny it had obtained the drug via that now-defunct company, the State declined. ECF No. 5.2 at 4-5; Dist. Ct. Dkt. 132.

But the answer to that question is of particular importance. Akorn is an American manufacturer of pentobarbital which collapsed in part due to serial Food and Drug Administration (FDA) violations involving the quality of its product, fraudulent quality tests submitted to the FDA, and manipulated or even fabricated testing data. ECF No. 5.1 at 24 ¶34. Its last audit, three months before it filed for bankruptcy, reflected "serious problems[,]" such as process controls not being followed and equipment malfunctions leading to "alterations in the safety, identity,

6

quality, or purity of the drugs produced." *Id.* Akorn's bankruptcy likewise meant a complete recall of its product and consequent inability to enforce the drug controls which would ordinarily have prevented its pentobarbital from ending up in the hands of executioners.[4] *Id.* at 23 ¶33. According to Dr. Almgren, the potential that Akorn was the State's source of pentobarbital raised "serious concerns" about its quality and reliability. *Id.* at 24 ¶34.

Dr. Almgren also raised a number of additional concerns about the provenance, quality, and reliability of the State's pentobarbital as well as the paucity of information it had released about the drug's testing. Specifically, she questioned whether the pentobarbital had indeed been properly tested, since she could tell nothing about whether the testing laboratory was properly accredited and could be certified for regulatory compliance, or why the laboratory's proprietary testing protocols (not United States Pharmacopeia protocols) were used. ECF No. 5.1 at 18-20 ¶¶15-23. She also raised concerns about why only a fraction of the State's pentobarbital was tested and how much of the initial purchase order remains usable, since the testing process destroys the product. *Id.* at 21 ¶28; 26 ¶38. Finally, she wondered whether the pentobarbital might have been manufactured overseas in a country like China or India with less rigorous quality protections in place, *id.* 23 ¶32; 25-26 ¶¶37-38, and pointed out that the State had

---

[4] All American and European manufacturers of pentobarbital forbid the sale of their product for execution purposes. ECF No. 5.1 at 22 ¶30.

7

failed to rule out the drug having been made for veterinary, not human, use, *id.* at 25 ¶35.[5] Dr. Almgren swore under oath that the answers to such questions are of profound importance to the reliability and quality of the drugs, *see id.* at 28 ¶44; they are hence of profound importance to Mr. Creech's Eighth Amendment challenge.

Mr. Creech has been seeking answers to questions such as this since December of 2018. *Pizzuto v. Tewalt*, 997 F.3d 893, 897 (9th Cir. 2021). This information, he argued, was necessary in order to fully and meaningfully litigate his Eighth Amendment claim; the State's continued refusal to answer any of these questions, which were more specific versions of the ones he began asking back in 2018, was therefore a violation of his procedural due process rights, Mr. Creech claimed. Dist. Ct. Dkt. 119 at 6-7, 57-67.

The district court cited the secrecy statute enacted by Idaho in 2022, while this case was pending on the most recent appeal (Idaho Code § 19-2716A(4)), as valid grounds for the State to refuse to provide any more information and the basis for the failure of Mr. Creech's due process claim. *See* Dist. Ct. Dkt. 142 at 17. This was an error of law. First of all, state action cannot – for obvious reasons – trump the Fourteenth Amendment right to due process. *Shelley v. Kraemer*, 334 U.S. 1,

---

[5] Veterinary medications are suitable for animal physiologies and metabolisms, and need not meet the stringent quality, potency, and purity standards required for human-use medications. ECF No. 5.1 at 25 ¶35.

8

18, 20 (1948). Second, a different judge within the district court itself has already held that the State's secrecy statute does not create a federal evidentiary privilege and ordered the State to disclose to Mr. Pizzuto similar types of information.[6] Dkt. 88 at 16-18, 25, *Pizzuto v. Tewalt*, No. 1:21-cv-359-BLW (D. Idaho).

The district court also said Mr. Creech was not likely to succeed on the merits of his due process claim because he did not challenge the constitutionality of the secrecy statute, Dist. Ct. Dkt. 142 at 17, discounting its own order a month prior which noted that Mr. Creech's case "specifically [makes that] challenge[,]" Dist. Ct. Dkt. 118 at 15. But more importantly, the district court's opinion denying the preliminary injunction rebuts the idea that Mr. Creech is not likely to succeed. By calling Dr. Almgren's declaration unsupported "speculation", Dist. Ct. Dkt. 142 at 11 – the declaration raised concerns about the State's pentobarbital and the harms that drug might cause – the district court itself demonstrates that Mr. Creech is being denied critical information regarding the nature of the method that will be used to execute him. The district court misunderstands Mr. Creech's claim, another clear error; it does not rise and fall on the identity of the drug's supplier or the

---

[6] In October of 2023 Mr. Creech moved the district court to reassign his case to the same judge hearing Mr. Pizzuto's lethal injection challenge, Dist. Ct. Dkt. 87, but that request was denied. Now one death row inmate may die because one judge denied him access to the same type of information a different judge, with more experience in the issue, has granted.

9

testing laboratory, see Dist. Ct. Dkt. 142 at 18, but on access to information about the *drug itself*.

The district court's legally erroneous reliance on the state secrecy statute as grounds for denying the preliminary injunction also elevates form over function in a life-or-death situation. This in turn led, among other issues, to the district court taking the State's word for it that the "certificate of analysis" – which is not self-authenticating and could never be given a proper foundation, and so would never be admissible under the Federal Rules of Evidence – should have more weight than Dr. Almgren's sworn declaration. Likelihood of success on the merits for a preliminary injunction must be supported *by affidavits*, the district court held, Dist. Ct. Dkt. 142 at 2, 11, discounting the fact that the expediency of preliminary injunction litigation means that courts are entitled to consider evidence of much less formality than that in order to prevent irreparable harm, *see, e.g.*, *Flynt Distributing Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984).

The many barriers to accurate information the State has erected thus have been improperly fortified by the district court. But without accurate information as to how Idaho intends to execute him, and the content and quality of what it intends to use to do so, Mr. Creech cannot mount a meaningful Eighth Amendment challenge. The State's implacable secrecy has thus erected an "impenetrable roadblock[ ]" to Mr. Creech having that challenge heard at a meaningful time and

10

in a meaningful manner. *See Lopez*, 680 F.3d at 1082 (opinion of Berzon, J.). "This [type of] approach cannot continue." *Towery v. Brewer*, 672 F.3d 650, 653 (9th Cir. 2012). He therefore is likely to succeed on the merits of his due process claim.

**II.    Mr. Creech will be irreparably injured if denied a stay, but the State will not be substantially injured**.

The next factor, irreparable harm, is abundantly present, since Mr. Creech will be put to death in the absence of judicial intervention. *See id.* at 661. And since he has been on death row for more than forty years, *see State v. Creech*, 670 P.2d 463 (Idaho 1983), an injunction for a few more months to resolve Mr. Creech's substantial due-process issue does not constitute a hardship for the State. The district court heavily emphasized the State's and the victims' interest in finality. Dist. Ct. Dkt. 142 at 19-21. But because Mr. Creech is the only interested party to this case who will die if the injunction decision does not go his way, the balance of hardships must tip in his favor.

The district court also worries about delay begetting additional delay. *Id.* at 21. But Mr. Creech has been diligent in seeking this information. He also has twice prevailed on appeal before this Court on certain issues, a process which requires a certain amount of time. In light of the fact that delay in the instant case was not attributable to him, a brief stay to allow this Court to fully adjudicate Mr. Creech's due process claim likewise cannot substantially injure the State.

11

### III.   A stay is in the public interest.

Finally, the public interest favors an injunction, in large part due to the profound public interest that exists in the transparency surrounding how the State of Idaho will seek to execute an individual. For years they have failed to provide Mr. Creech the most rudimentary information about his execution, such as the drug they intend to use for it; indeed, it was only after a major manufacturer collapsed, and likely so too did its ability to control the distribution of its product, that manufactured pentobarbital miraculously became available. And now, at the eleventh hour, the sole document upon which IDOC is relying for the reliability of its drugs is a thoroughly opaque "certificate of analysis" which was not made available by Appellees until five days before the death warrant was issued in Mr. Creech's case, a mere thirty-three before his potential execution. This speaks volumes as to why the equities cut so strongly against State and in favor of an injunction.

In light of the above, the district court's denial of Mr. Creech's Motion for Preliminary Injunction should be reversed.

DATED this 23d day of February 2024.

/s/ Mary E. Spears
Mary E. Spears

/s/ Deborah A. Czuba
Deborah A. Czuba

*Attorneys for Petitioner/Appellant*
THOMAS EUGENE CREECH

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of February 2024, I electronically filed the foregoing Appellant's Motion for Stay Pending Appeal with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF/ACMS system.

I certify that all participants in the case are registered CM/ECF/ACMS users, and that service will be accomplished by the appellate CM/ECF/ACMS system.

/s/ Julie Hill
Julie Hill

13