Nicole Owens
EXECUTIVE DIRECTOR
Mary E. Spears, Indiana Bar No. 27353-49
Deborah A. Czuba, Idaho Bar No. 9648
ASSISTANT FEDERAL DEFENDERS
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:  Mary_Spears@fd.org
        Deborah_A_Czuba@fd.org

*Attorneys for Plaintiff Thomas Eugene Creech*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,** ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> **JOSH TEWALT**, Director, Idaho ) <br> Department of Correction, **RANDY** ) <br> **VALLEY**,[1] Warden, Idaho Maximum ) <br> Security Institution, **CHAD PAGE**, ) <br> Chief, Division of Prisons, Idaho ) <br> Department of Correction; **LIZ** ) <br> **NEVILLE**, Deputy Chief, Division of ) <br> Prisons, Idaho Department of Correction; ) <br> and **Unknown Employees, Agents, or** ) <br> **Contractors of the Idaho Department** ) <br> **of Correction**, ) <br> ) <br> Defendants. | **CASE NO. 1:20-cv-114** <br><br> **THIRD AMENDED COMPLAINT ON BEHALF OF THOMAS EUGENE CREECH FOR EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF** |

---

[1] Randy Valley is now Warden of the Idaho Maximum Security Institution.  *See* https://www.idoc.idaho.gov/content/locations/prisons/idaho_maximum_security_institution.  As such, he should be automatically substituted in for Tim Richardson in this case.  *See* Fed. R. Civ. P. 25(d).

THIRD AMENDED COMPLAINT – Page 1

## I.    Nature of the Action

1.      Plaintiff Thomas Eugene Creech[2] is a death-row inmate in Idaho[3] who brings this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his constitutional rights in connection with the State's effort to execute him.

## II.    Justiciable Case or Controversy

2.      For the reasons set forth below, absent judicial intervention, Mr. Creech will be executed in violation of his constitutional rights.

3.      There is a real and justiciable case or controversy between the parties.

## III.    Jurisdiction and Venue

4.      This action arises under 42 U.S.C. § 1983 for violations of the First, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

5.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201(a) (declaratory relief), and 2202 (further relief).

---

[2] Gerald Ross Pizzuto, Jr. was originally a plaintiff in this case. *See* Dkt. 1 at 1. On June 2, 2021, Mr. Pizzuto was dismissed from the proceedings. *See* Dkt. 65 at 6. The ensuing appeal was pursued by Mr. Creech alone, without Mr. Pizzuto's participation. *See* Dkt. 78. Therefore, Mr. Pizzuto is no longer a part of the present case. This third amended complaint does not relate to any of Mr. Pizzuto's litigation, but does refer to that litigation where necessary or helpful.

[3] The plaintiff refers to Idaho as "Idaho," "the State of Idaho," and "the State." Likewise, throughout this complaint, the plaintiff refers to the defendants, variously, as "the defendants," "the State," "IDOC," and other phrases, as appropriate. His use of these expressions does not limit the scope of the claims, which are brought against each and every named defendant.

THIRD AMENDED COMPLAINT – Page 2

6.      The Court has personal jurisdiction over the defendants as they are residents of the State of Idaho and are presently located in the State of Idaho, or are elected or appointed officials of the State of Idaho or otherwise acting on behalf of the State of Idaho.

7.      Venue in this Court is proper under 28 U.S.C. § 1391 because most of the events giving rise to the claims – including executions and the procurement and maintenance of drugs used in the executions – have occurred, are occurring, or will occur in the District of Idaho.

8.      Venue is further proper because, upon information and belief, the defendants all reside in the District of Idaho.

IV.   **Parties**

9.      Mr. Creech is a person within the jurisdiction of the State of Idaho.

10.     Mr. Creech is an inmate under the supervision of the Idaho Department of Correction ("IDOC").

11.     Mr. Creech is confined at the Idaho Maximum Security Institution ("IMSI").

12.     Mr. Creech is under sentence of death.

13.     As set forth in greater detail below, the defendants are state officials, employees, agents, and/or contractors responsible for developing, overseeing, and/or implementing death by lethal injection in Idaho.

14.     Defendant Josh Tewalt ("Director Tewalt") is the Director of IDOC.

15.     Director Tewalt is responsible for approving the substances and procedures to be used in any execution performed by IDOC.

16.     Defendant Randy Valley ("Warden Valley") is Warden of IMSI.

17.     Warden Valley is the official executioner for inmates in Idaho state custody.

18.     Defendant Chad Page ("Mr. Page") is the Chief of the Division of Prisons for IDOC.

19.     Upon information and belief, Mr. Page is currently charged with providing the official approval of Idaho's next execution protocol for IDOC.

20.     Defendant Liz Neville ("Ms. Neville") is Deputy Chief of Prisons for IDOC.

21.     For purposes of this Complaint, Mr. Creech will use the term "execution team" to refer to the individuals who assess an inmate's veins before an execution, prepare the lethal chemicals for administration, set the peripheral IV lines, and administer the lethal chemicals.

22.     Ms. Neville is responsible for coordinating and monitoring the training and conduct of the IDOC execution team.

23.     As part of those responsibilities, Ms. Neville is tasked with conducting inquiries into the qualifications and backgrounds of the execution team members.

24.     Ms. Neville is in charge of requesting the equipment that will be used at executions.

THIRD AMENDED COMPLAINT – Page 4

25.     Ms. Neville is in charge of maintaining the equipment that will be used at executions.

26.     Ms. Neville assists Director Tewalt in his choice of source for execution chemicals.

27.     Upon information and belief, Other Unknown Employees, Agents, and/or Contractors of IDOC are involved in the development and carrying out of executions by lethal injection. Mr. Creech does not know the identities of these persons.

28.     Upon information and belief, the plaintiff and the defendants are all United States citizens.

29.     The defendants are all officials of the State of Idaho.

30.     All of the actions that have been and will be taken by the defendants towards executing Mr. Creech and any other actions at issue in this complaint were or will be taken under color of state law.

31.     The defendants are all sued in their official capacities.

**V.     General Factual Allegations**

32.     Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

33.     Mr. Creech was convicted of first-degree murder for the killing of David Jensen and sentenced to death for that offense in Ada County District Court.

34.     Mr. Creech's murder conviction and death sentence were upheld on direct appeal in 1983.

THIRD AMENDED COMPLAINT – Page 5

35.     After Mr. Creech obtained federal habeas relief, he was resentenced to death.

36.     The new death sentence was upheld on direct appeal in 1998.

37.     Once the State obtains a death warrant, it has thirty days to execute Mr. Creech.

38.     Mr. Creech brings this action to challenge both the statute under which and by means of which the State intends to execute him and the statute the State employs as justification for refusing to reveal information pertinent to his execution and necessary to his Eighth Amendment challenge.

39.     Mr. Creech also brings this action to challenge the defendants' practice of hiding, changing, and obfuscating the means by which they intend to execute him.

**A.      The State's Attempt to Execute Mr. Creech**

40.     The State's most recent execution warrant for Mr. Creech was obtained on January 30, 2024.

41.     Mr. Creech sought a preliminary injunction and administrative stay of his execution, alleging (inter alia) that he has severe vascular issues and other health conditions which could lead to difficulty accessing his veins or otherwise cause a substantial risk of serious harm during his execution.

42.     On February 23, 2024, this Court denied those motions.

43.     On February 28, 2024, the State attempted to execute Mr. Creech.

THIRD AMENDED COMPLAINT – Page 6

44.    Mr. Creech was brought into the execution chamber and strapped to the gurney therein.

45.    Members of the execution team then tried at least eight times to access his veins in order to administer the lethal injection chemicals.

46.    Catheters of different sizes were used in the execution team's various attempts to access Mr. Creech's veins.

47.    But each time, they failed.

48.    After nearly an hour of trying, the State abandoned the execution attempt at approximately 11:00 a.m. on February 28th.

49.    Defendant Tewalt has acknowledged publicly that the execution team's failure to access Mr. Creech's veins was not because Mr. Creech intentionally dehydrated himself.

50.    Mr. Creech did not attempt to dehydrate himself prior to the execution attempt.

51.    Rather, he ate and drank normally.

52.    Additionally, at least one member of the execution team assessed Mr. Creech's veins prior to the execution attempt and believed them to be accessible.

53.    There has been no inquiry on IDOC's part into why the execution team could not access Mr. Creech's veins on February 28th.

54.    IDOC has indicated that no such inquiry will occur.

55.    There has been no report prepared by IDOC examining why the execution team could not access Mr. Creech's veins on February 28th.

THIRD AMENDED COMPLAINT – Page 7

56.     Upon information and belief, no such report will be prepared.

57.     There has been no third-party investigation into why the execution team could not access Mr. Creech's veins on February 28th.

58.     Upon information and belief, no such investigation will be commissioned.

59.     IDOC has released no information to the public indicating why the execution team could not access Mr. Creech's veins on February 28th.

60.     Upon information and belief, no such information will be disseminated.

61.     As of the date of filing of this Complaint, the members of the execution team remain the same as they were on February 28, 2024.

**B.     IDOC's Refusal to Provide Information to the Plaintiff**

62.     On December 18, 2018, the Capital Habeas Unit of Federal Defender Services of Idaho ("CHU"), on behalf of eight of the nine Idaho state inmates (including the plaintiff) then under sentence of death, wrote to then-Director Henry Atencio of IDOC, and then-Warden Keith Yordy.

63.     At that time, Idaho's execution protocol was version 3.6 of Standard Operating Procedure 135.02.01.001 ("SOP 135").

64.     The December 18, 2018, letter addressed the potential executions of those inmates and included a number of questions and requests relating to such executions in order for the CHU to assess the constitutionality and proprietary of any future executions ("December 2018 CHU Letter").

THIRD AMENDED COMPLAINT – Page 8

65.     The December 2018 CHU Letter sought answers to twenty-six questions, some with subparts, relating to the execution protocol of IDOC.

66.     In sum, the CHU sought information on (1) the number, amount, and type of drugs to be used; (2) how the drugs were made, how the drugs were/would be obtained, their source, amounts, expiration date, how they were/would be acquired/transported/stored/tested, and when IDOC would obtain the drugs, etc.; (3) whether/when a new version of SOP 135 would be issued, and whether the current version on the website was in effect then; (4) whether witnesses would be able to observe the insertion of the IVs; (5) procedures for IV placement/length; (6) who would participate in the execution, what was their training/qualifications, and how would they be chosen; (7) whether there would be a consciousness check and the procedure for it; and (8) procedures for botched executions.

67.     The CHU also requested that (1) the drugs be tested in an independent laboratory and results of that testing shared with the CHU at least sixty days prior to any execution, (2) CHU staff/agents be given access to inspect the execution chamber and adjoining room, (3) CHU staff/agents be given access to the fixed cameras to determine quality for observing IV lines, (4) the entire execution process be visible to witnesses, (5) the whole execution chamber be filmed and audio recorded during the entire execution, (6) at least two members of the CHU be permitted to attend the execution, (7) at least one member of the CHU be permitted to bring a cell phone into the witness gallery with guaranteed cell phone reception, or access to a landline, (8) an autopsy be performed after the execution at the

THIRD AMENDED COMPLAINT – Page 9

facility of the CHU's choice, and (9) records be preserved and centralized in one location.

68.     Since the 2018 correspondence, there have been many exchanges between the CHU and IDOC over access to execution information.

69.     However, IDOC has refused to provide answers to a number of basic questions regarding executions.

70.     Most recently, on October 10, 2023, the State submitted to the Court in *Pizzuto v. Labrador*, D. Idaho, No. 1:23-cv-00081, a proposed Order Granting Preliminary Injunction it had drafted.

71.     The language proffered by the State to this Court for its signature included the clause "the Idaho Department of Correction does not have the present ability to carry out an execution via lethal injection or firing squad[.]" *Id.*

72.     Two days later, however, Defendant Tewalt announced that contrary to that representation, execution by lethal injection was in fact "available" to use in Mr. Creech's case.

73.     A concomitant press release published by IDOC's press office advertised that IDOC "has secured the chemicals necessary to carry out an execution by lethal injection."

74.     Mr. Creech will henceforth refer to these lethal injection chemicals, which were obtained for his February 2024 execution attempt, as the "Old Execution Drugs."

THIRD AMENDED COMPLAINT – Page 10

75.     Mr. Creech's former co-plaintiff Mr. Pizzuto, whose own method-of-execution challenge (*Pizzuto v. Tewalt*, D. Idaho, No. 1:21-cv-359) is in the discovery stage, asked the State to admit it had obtained the Old Execution Drugs prior to October 12, 2023.

76.     The State refused to answer.

77.     Mr. Pizzuto sought and obtained from this Court an order compelling the answer to that question.

78.     The State still refused to answer.

79.     Instead, the State sought an interlocutory appeal of the order compelling discovery at the Ninth Circuit.

80.     That appeal (*Pizzuto v. Tewalt*, No. 24-2275) remains pending as of the date of filing of the instant Complaint.

81.     Mr. Pizzuto also asked the State to disclose whether it had procured the Old Execution Drugs from a domestic or foreign source.

82.     The State refused to answer.

83.     Mr. Pizzuto sought and obtained from this Court an order compelling the answer to that question.

84.     The State still refused to answer.

85.     Instead, the State sought an interlocutory appeal of the order compelling discovery at the Ninth Circuit.

86.     That appeal (*Pizzuto v. Tewalt*, No. 24-2275) remains pending as of the date of filing of the instant Complaint.

THIRD AMENDED COMPLAINT – Page 11

87.     Mr. Pizzuto also asked the State to disclose whether the Old Execution Drugs came from a hospital, a wholesaler, a pharmacy, or a veterinary source.

88.     The State refused to answer.

89.     Mr. Pizzuto sought and obtained from this Court an order compelling the answer to that question.

90.     The State still refused to answer.

91.     Instead, the State sought an interlocutory appeal of the order compelling discovery at the Ninth Circuit.

92.     That appeal (*Pizzuto v. Tewalt*, No. 24-2275) remains pending as of the date of filing of the instant Complaint.

93.     Finally, Mr. Pizzuto asked the State to admit or deny that the Old Execution Drugs were made by Akorn Pharmaceuticals.

94.     Akorn is a now-defunct pharmaceutical company that manufactured pentobarbital before it went bankrupt and laid off its entire staff.

95.     When that occurred, Akorn issued a massive recall of many of its products.

96.     The State refused to say whether or not the Old Execution Drugs came from Akorn.

97.     Mr. Pizzuto sought and obtained from this Court an order compelling the answer to that question.

98.     The State still refused to answer.

THIRD AMENDED COMPLAINT – Page 12

99.   Instead, the State sought an interlocutory appeal of the order compelling discovery at the Ninth Circuit.

100.   That appeal (*Pizzuto v. Tewalt*, No. 24-2275) remains pending as of the date of filing of the instant Complaint.

101.   IDOC has disclosed a few bits of information regarding its lethal injection chemicals in discovery in Mr. Pizzuto's lethal injection case.

102.   For instance, IDOC has said in Mr. Pizzuto's case that the pentobarbital it acquired for the February 2024 execution attempt of Mr. Creech was manufactured, not compounded.

103.   The manufacturers of pentobarbital prohibit its use in executions.

104.   Therefore, when pentobarbital is used in executions, it is either compounded pentobarbital or it is manufactured pentobarbital that was obtained through deceptive means.

105.   IDOC has denied that IDOC itself imported the Old Execution Drugs.

106.   IDOC has not denied that the Old Execution Drugs were imported by a third-party reseller.

107.   Prior to the February 2024 execution attempt, IDOC produced a document it called a "Certificate of Analysis" ("COA").

108.   According to IDOC, the COA purports to show that the Old Execution Drugs satisfied relevant testing standards for pentobarbital.

109.   The COA is unsigned.

110.   The COA is unverified.

THIRD AMENDED COMPLAINT – Page 13

111.   The COA contains no information regarding who prepared it.

112.   The COA contains no information indicating where it was prepared.

113.   The COA appears to have been prepared using the "Tables" function of Microsoft Word.

114.   The COA contains no indication that any tests performed on any portion of the Old Execution Drugs were verified, peer-reviewed, checked, or confirmed in any way.

115.   The date of the COA is redacted.

116.   IDOC has claimed the COA pre-dates October 12, 2023.

117.   Mr. Pizzuto, in discovery in his own method-of-execution case, asked the State to disclose a copy of the COA with the date unredacted.

118.   The State refused.

119.   Mr. Pizzuto sought and obtained from this Court an order compelling an unredacted copy of the COA.

120.   The State still refused to provide one.

121.   Instead, the State sought an interlocutory appeal of the order compelling discovery at the Ninth Circuit.

122.   That appeal (*Pizzuto v. Tewalt*, No. 24-2275) remains pending as of the date of filing of the instant Complaint.

123.   The United States Pharmacopeia ("USP") testing protocols are the industry standard for testing sterile injectable medications such as pentobarbital.

THIRD AMENDED COMPLAINT – Page 14

124.    IDOC's COA does not state that USP testing protocols were used to determine the safety, sterility, potency, contamination levels, or any other qualities of the Old Execution Drugs.

125.    Instead, the COA employs an opaque numbering or labeling system to refer to the testing methods used.

126.    This numbering or labeling system does not correspond to any known pharmacopoeia's testing protocols.

127.    In discovery in Mr. Pizzuto's case, IDOC refused to admit that the Old Execution Drugs were made by a manufacturer approved by the Food and Drug Administration ("FDA") to make pentobarbital.

128.    Instead, it admitted in discovery only that the Old Execution Drugs themselves complied with federal regulatory requirements.

129.    IDOC has claimed that it lawfully obtained the Old Execution Drugs.

130.    IDOC has also claimed that the Old Execution Drugs were manufactured by a company listed in the FDA's Orange Book.

131.    The Orange Book is the FDA's database of approved drug products.

132.    There are only three pharmaceutical companies which both are listed in the Orange Book and currently manufacture pentobarbital.

133.    Those three companies are Rising Pharmaceuticals, Hikma, and Sagent.

134.    Rising Pharmaceuticals assumed control of several aspects of Akorn Pharmaceuticals after Akorn's bankruptcy.

THIRD AMENDED COMPLAINT – Page 15

135.   Akorn, Hikma, and Sagent have expressed opposition to the use of their products in executions.

136.   The Old Execution Drugs had an expiration date of February 2025.

137.   Akorn Pharmaceuticals declared bankruptcy in February of 2023.

138.   Manufactured pentobarbital commonly has an expiration date of two years.

139.   Two years from the date of Akorn's bankruptcy is February 2025.

140.   IDOC has not told Mr. Creech or Mr. Pizzuto a single other thing about the source of the Old Execution Drugs, such as whether they came from abroad, how they were transported, from what industry they originated, or anything else.

141.   After the February 2024 execution attempt, IDOC disclosed in discovery to Mr. Pizzuto that it has obtained additional pentobarbital.

142.   Mr. Creech will henceforth refer to the pentobarbital acquired after February 28, 2024, as the "New Execution Drugs."

143.   IDOC has disclosed even less about the New Execution Drugs than it has about the Old Execution Drugs.

144.   For instance, it has not produced a COA for the New Execution Drugs.

145.   It has also not disclosed the expiration date of the New Execution Drugs.

146.   Nor has it disclosed the industry from which the New Execution Drugs came.

147.   Possible industry sources for the New Execution Drugs include a pharmacy, a hospital, a wholesaler, or a veterinary source.

148.   All that is known about the New Execution Drugs is that they are pentobarbital that the State claims was manufactured.

### C.   Execution Procedures in Idaho

149.   IDOC has taken the position that SOP 135 provides Mr. Creech with the necessary information about executions.

150.   However, SOP 135 states: "The SOP is subject to revision at the discretion of the chief of the Operations Division or the director of the IDOC.  Either person may revise, suspend, or rescind any procedural steps, at any time, at his sole discretion."

151.   These qualifications increase the risks associated with Mr. Creech's execution because they mean that the most important documents supposedly governing the process have no constancy or reliability.

152.   IDOC has taken advantage of its unfettered discretion with respect to the protocol.

153.   For example, IDOC has "amended" the protocol through a declaration signed by Director Tewalt and filed in court that has never been incorporated into the protocol and that is squarely inconsistent with the language in the protocol.

154.   IDOC has also created confusion over what in the protocol is in effect at any given moment in time by periodically "suspending" the document while purportedly continuing to adhere to some unclear number of provisions within it.

THIRD AMENDED COMPLAINT – Page 17

155.    The deficiencies in the protocol are exacerbated by the complete lack of oversight that any actor or agency, let alone the public, exercises over its drafting and revision.

156.    For instance, the Board of Correction ("the Board") – the entity that nominally oversees the Director – has no role in approving the protocol.

157.    Furthermore, the Board seems to barely exercise any oversight function more generally.

158.    The Board went more than a year, from February 24, 2023, until March 25, 2024, without having a single meeting.

159.    The Board failed to meet for that thirteen-month period despite the fact that it is legally required to meet four times a year.

160.    During that time, a death warrant was in effect from February 24 until March 23, 2023; from October 12, 2023, until November 8, 2023; and from January 30, 2024, until February 28, 2024.

161.    During the same time, IDOC actually attempted to carry out an execution, on February 28, 2024.

162.    The fact that the Board did not have a single meeting during a period of time in which IDOC had three executions scheduled and one attempted, which implicates by far the most extreme power possessed by the Department, reflects the body's profound indifference to its duties.

163.    The same attitude is reflected in the fact that Board Vice Chairman Dodds Hayden emailed Director Tewalt on February 5, 2023 – nineteen days before

THIRD AMENDED COMPLAINT – Page 18

the issuance of a death warrant – to make light of Director Tewalt's "clandestine trips" to purchase execution drugs.

164.    These trips are discussed in more detail below.

165.    Despite his apparent indifference in exercising oversight responsibilities with respect to executions, Mr. Hayden offered to attend the Creech execution on February 28, 2024, and was present for that botched execution.

166.    The Board's oversight failures create yet more room for mistakes to be made by IDOC in the execution process at the cost of pain and suffering by the inmates.

167.    In other jurisdictions where execution protocols afford correctional agencies unfettered discretion, state agents have abused that power.

168.    For instance, in the January 2015 execution of Charles Warner ("Mr. Warner"), Oklahoma used potassium acetate rather than potassium chloride, contrary to its representations to opposing counsel and the U.S. Supreme Court.

169.    Mr. Warner's last words were that his "body [wa]s on fire."

170.    In Arizona, the Department of Corrections has deviated from its protocol numerous times.

171.    For example, Arizona changed its intended drug for Donald Beaty eighteen hours before his May 2011 execution.

172.    Arizona has also repeatedly administered dosages well above the amounts provided for in the protocol, which it did at Joseph Wood's July 2014

execution when it gave him thirteen more doses of each of the two drugs than the protocol allowed.

173.   Nothing other than judicial intervention will check IDOC's ability to abruptly change its plans for executions with the effect of evading accountability and judicial and public scrutiny.

174.   Unlike every other Idaho executive branch agency, IDOC is exempt from the rule-making requirements of the Idaho Administrative Procedure Act ("APA"), which include public notice and an opportunity for interested parties to comment. *See* Idaho Code § 67-5201.

175.   The rule-making requirements that do apply to IDOC are far less rigorous than the APA. *See* Idaho Code § 20-212.

176.   As a consequence, there are even fewer checks on IDOC's ability to change its plans for executions abruptly and even more of a need for judicial intervention to ensure it does not do so improperly and for the purpose of evading accountability and court scrutiny.

177.   The most recent version of Idaho's execution protocol is now memorialized in version 4.0 of SOP 135, which was approved by Director Tewalt on March 30, 2021.

178.   SOP 135 does not identify what drug will be used at any execution.

179.   Instead, SOP 135 gives the IDOC Director four different drug options to select from in his unreviewable discretion and apart from his general authority to modify any aspect of the protocol whenever he sees fit.

THIRD AMENDED COMPLAINT – Page 20

180.    In discovery in Mr. Pizzuto's case, IDOC stated at least seven different times that in addition to pentobarbital, it is currently also seeking any chemical authorized by SOP 135.

181.    The current version of SOP 135 notes that the document was "revised to comply with changes in statute[ ]" that had occurred prior to March of 2021.[4]

182.    In 2021, when SOP 135 was revised for the fourth time, lethal injection was the only statutorily approved method of execution in Idaho.

183.    The only execution procedures referred to in version 4.0 of SOP 135 pertain to executions by lethal injection.

184.    Effective July 1, 2023, Idaho Code § 19-2716 was amended to include use of the firing squad as a secondary method of execution to lethal injection.

185.    Section 19-2716 provides that no later than five days after the issuance of a death warrant, the IDOC Director must determine whether execution by lethal injection is "available" and certify that availability by affidavit to the court that issued the warrant. Idaho Code § 19-2716(2). If it is "available," the execution must be by lethal injection; if it is not or if Director Tewalt does not so certify, the method of execution must be the firing squad. *Id.* § 19-2716(4).

186.    It is within Director Tewalt's sole and unqualified discretion to determine whether lethal injection is "available."

187.    The term "available" is not defined in the statute.

---

[4] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

THIRD AMENDED COMPLAINT – Page 21

188.    Defendant Tewalt has affirmed, in a letter shared in part with the Idaho House Judiciary Committee on March 1, 2023, that "[s]hould the legislature choose to adopt firing squad as an alternate method, the Department of Correction will develop policies and procedures to ensure it is implemented with professionalism, respect, and dignity for everyone involved or impacted by this solemn process."

189.    Upon information and belief, however, SOP 135 has not been updated since July 1, 2023, when Section 19-2716 was amended to include the firing squad as a method of execution, or to include updated procedures pertaining to that method.

190.    IDOC's press release announcing Mr. Creech's February 2024 execution attempt states, "Per IDOC policy, immediately after being presented with the death warrant, Mr. Creech was moved to a cell in the [IMSI]'s F-block, where the execution will take place." The words "IDOC policy" are a hyperlink which, when clicked, takes the reader to version 4.0 of SOP 135, dated March 30, 2021.

191.    Mr. Creech will henceforth refer to version 4.0 of SOP 135 as "the now-outdated Protocol."[5]

192.    The now-outdated Protocol mentions potentially using a central line to access the veins of a condemned person during an execution.

---

[5] When Mr. Creech refers to the now-outdated Protocol here, he also includes the associated documents hyperlinked therein, including the Execution Chemicals Preparation and Administration document, which was also updated and posted to IDOC's website on March 30, 2021.

THIRD AMENDED COMPLAINT – Page 22

193.     Access to a condemned person's veins typically occurs via peripheral access, in which the lethal chemicals are injected into the person's hand, arm, foot, or leg.

194.     By contrast, a central line execution requires gaining access to one of the major veins in an individual's body.

195.     The technique is most commonly attempted on one of three central veins: the internal jugular vein in the neck, the femoral vein in the groin, or the subclavian vein near the clavicle.

196.     The now-outdated Protocol contains no details about how a central line placement might be accomplished, who might do so, what that person's qualifications might be, or where that placement might take occur.

### D.     Problems with Lethal Injection Executions in Idaho and Elsewhere

197.     A host of issues have arisen with respect to lethal injection executions across the country that increase the risk of problems arising at any given execution.

198.     Those problems increase the possibility of something going wrong at a particular execution, such as the use of an unreliable drug.

199.     Such problems increase the risk of an unconstitutionally painful execution in violation of the Eighth Amendment.

200.     As a result, the problems exacerbate the risks described below in Claim One that create a danger that Mr. Creech will suffer an execution in violation of the Eighth Amendment if he is put to death by means of lethal injection.

THIRD AMENDED COMPLAINT – Page 23

### 1.     Other States' Use of Unreliable Sources for Execution Drugs

201.   States around the country, including but not limited to Arizona, Arkansas, California, Georgia, Nebraska, South Carolina, South Dakota, and Tennessee, have resorted to dubious international sources for lethal injection drugs.

202.   For example, several states, including but not limited to Arizona, Arkansas, California, Georgia, South Carolina, and Tennessee, purchased mislabeled sodium thiopental for use in lethal injections from Dream Pharma, Inc., a fly-by-night pharmaceutical wholesaler/distributor who operated out of a storefront driving school in London, England.

203.   These states did so even though they were not registered with the Drug Enforcement Administration ("DEA") as an importer of non-narcotic controlled substances and did not provide a declaration of importation to the DEA.

204.   The states also did not possess a DEA license to possess, dispense, or distribute a Schedule III non-narcotic controlled substance such as thiopental.

205.   After the U.S. Attorney General was notified of the illegal importation, the DEA seized the thiopental in March 2011.

206.   Before the thiopental was seized, it was used in two executions in September 2010 and January 2011 and both inmates' eyes were open in the midst of their executions, suggesting that they were inadequately sedated.

207.   States have used unreliable domestic sources for executions as well.

208.   For example, a pharmacy in Oklahoma called The Apothecary Shoppe provided drugs for at least three Missouri executions in 2013 and 2014.

THIRD AMENDED COMPLAINT – Page 24

209.   The Apothecary Shoppe had its license put on probation after it admitted to committing 1,892 regulatory violations, including the improper extension of expiration dates and the use of questionable sterilization practices.

210.   After the Apothecary Shoppe stopped providing drugs to Missouri for executions, that state turned to Foundation Care, a compounding pharmacy in St. Louis.

211.   Missouri used drugs from Foundation Care for seventeen executions.

212.   Prior to Missouri's selection of Foundation Care, the FDA determined that the company was not testing all of its drugs for sterility and bacterial contamination, that it had inadequate controls for sterility, and that some of its drugs were contaminated with bacteria.

213.   The FDA deemed Foundation Care a high-risk pharmacy.

214.   Another state, Texas, used a compounding pharmacy in San Antonio called Rite-Away to compound its pentobarbital from 2019 until at least 2023.

215.   Rite-Away produced execution drugs for more than twenty executions during this time period.

216.   The Texas State Board of Pharmacy investigated Rite-Away and found it violated more than a dozen rules over the course of a decade.

217.   Some of the rules apparently violated included those governing sterility in preparing drugs.

218.   Rite-Away was also sued by the federal government for fueling and profiting from the opioid epidemic.

THIRD AMENDED COMPLAINT – Page 25

219.    Rite-Away agreed to pay a $275,000 penalty in that case.

220.    Other states' questionable practices make it likely that Idaho will also try to obtain chemicals from unreliable sources, and therefore make increased transparency even more necessary.

### 2.    IDOC's Procurement of Unreliable Chemicals in 2011 and 2012

221.    IDOC's own recent history with executions reflects a pattern of pursuing lethal injection drugs in an irresponsible manner and obfuscating its plans in order to frustrate legitimate litigation and public scrutiny. As such, there is a heightened risk that IDOC will act in the same way in connection with future executions.

222.    The two most recent executions in Idaho were of Paul Rhoades ("Mr. Rhoades") on November 18, 2011, and Richard Leavitt ("Mr. Leavitt") on June 12, 2012. The following allegations relate to these two executions.

223.    The following allegations also reflect IDOC's practice of seeking execution drugs in a reckless manner likely to result in the acquisition of unreliable chemicals.

224.    In March 2011 – as IDOC was preparing to execute Mr. Rhoades and Mr. Leavitt – Randy Blades, then the Warden of IMSI ("Mr. Blades"), started trying to obtain lethal injection chemicals.

225.    To get the chemicals, Mr. Blades contacted a man named Chris Harris ("Mr. Harris") to inquire about the possibility of obtaining lethal injection chemicals from him.

THIRD AMENDED COMPLAINT – Page 26

226.    At the time, Mr. Harris was based in Kolkata, India.

227.    Mr. Harris was a salesman whose career involved positions at a duty-free airport shop and call centers.

228.    Upon information and belief, Mr. Harris has no training in the practice of pharmacy or medicine.

229.    Mr. Harris has attempted to import drugs into the United States without the requisite approval by the Food and Drug Administration ("FDA").

230.    Upon information and belief, Mr. Harris has also engaged in acts of dishonesty.

231.    To obtain drugs to send to Nebraska for executions, for example, Mr. Harris falsely told Naari, a pharmaceutical company, that the medications would be shipped to Africa so they could be used for anesthetic purposes in the developing world.

232.    When Arizona and Texas purchased sodium thiopental from Mr. Harris for use at executions, the FDA seized the shipment upon arrival at the airport because it was imported unlawfully.

233.    For Mr. Rhoades' execution in 2011, IDOC obtained the drugs from University Pharmacy ("University") in Salt Lake City.

234.    University is a compounding pharmacy which compounded the drugs for Mr. Rhoades' execution.

235.    There are significant reasons to question the reliability of University.

THIRD AMENDED COMPLAINT – Page 27

236.   For example, state and federal regulators have cited University for a number of violations, including many in the few years before and after Mr. Rhoades' execution.

237.   In 2017, state regulators inspected University and concluded that it was in violation of six different rules, including those having to do with documentation, labeling, and expiration dates.

238.   The regulators noted nineteen different items, comprising twenty-seven vials total, where there were problems with the documentation of the products' expiration dates.

239.   In 2014, state regulators inspected University and found that 232 medications and compounding ingredients were expired or had indeterminate expiration dates in the pharmacy's regular stock. Officials fined University $1,050 and filed a cease-and-desist order.

240.   In 2013, federal regulators with the FDA conducted several inspections of University and filed a report finding a number of problems.

241.   These inspections were done only fourteen months after University provided drugs for Mr. Rhoades' execution.

242.   In its report, the FDA concluded that University committed a variety of violations, including: failing to sanitize equipment enough to protect the integrity of the drugs; allowing spills, splatter, rust, and so forth to remain in sensitive areas; a technician taking out garbage in the middle of a sterilization process and then

sticking his hand back into the equipment without changing his gloves; and not checking products properly to make sure they were stable and could last.

243.    In 2009, state regulators cited University for dispensing sixty prescriptions to practitioners around the country based on orders that did not include the patients' names and addresses, in violation of state law.

244.    University admitted the misconduct and was issued a cease-and-desist order.

245.    In 2008, FDA officials observed nineteen separate problems with University after a series of inspections. The problems included issues with the pharmacy's sterilization practices, maintenance of its equipment, failure to properly document testing, inadequate measures to make sure drugs were clean and stable before they were sent to patients, improper storage of chemicals, flaws in the training regimen, and so forth.

246.    For Mr. Leavitt's execution in 2012, IDOC again obtained its chemicals from a compounding pharmacy.

247.    That pharmacy was Union Avenue Compounding Pharmacy ("Union") of Tacoma, Washington.

248.    On information and belief, the pharmacist who provided the drugs for Union was Kimela Burkes ("Ms. Burkes").

249.    In 2015, regulators inspected Union and found that it had twenty-seven outdated or expired items in its drug stock, and that it failed to properly record in its system the chronic conditions of a number of patients.

THIRD AMENDED COMPLAINT – Page 29

250.    A follow-up inspection in 2016 discovered that Union had not fixed several of the problems, despite being warned by officials, and that some of them had actually gotten worse.

251.    As a result of the regulators' complaint, Ms. Burkes agreed to a series of sanctions, including having her license placed on probation for a year.

252.    On information and belief, to prepare for Mr. Leavitt's execution, Kevin Kempf ("Mr. Kempf") and now-Director Tewalt boarded a chartered plane on or around May 30, 2012.

253.    On this flight, Mr. Kempf and now-Director Tewalt had in their possession a suitcase containing more than $10,000 in cash.

254.    Both Mr. Kempf and now-Director Tewalt were IDOC employees at the time of this trip.

255.    Upon information and belief, at the time of the May 30, 2012 trip, Mr. Kempf was the Division Chief of Operations for IDOC.

256.    Upon information and belief, at the time of the May 30, 2012 trip, now-Director Tewalt was the Deputy Chief of the Bureau of Prisons for IDOC.

257.    With their suitcase full of cash, Mr. Kempf and now-Director Tewalt flew to Tacoma Narrows Airport, in Washington State.

258.    After their plane landed, Mr. Kempf and now-Director Tewalt exchanged the money for lethal injection drugs.

259.    Upon information and belief, this occurred in a Walmart parking lot.

THIRD AMENDED COMPLAINT – Page 30

260.   Mr. Kempf and now-Director Tewalt then brought the drugs back to Idaho.

261.   These drugs were obtained to be used in Mr. Leavitt's execution.

262.   On information and belief, Mr. Kempf at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

263.   On information and belief, now-Director Tewalt at that time had no training in pharmacy science or medicine, and no education on the proper transportation and storage of drugs.

264.   Mr. Kempf and now-Director Tewalt and any agents acting in concert with them likely acted inconsistently with the federal statutes referenced below in their handling of the pentobarbital for the Leavitt execution.

265.   By federal law, pentobarbital is a Schedule II controlled substance.

266.   That being the case, in order for the drug to be delivered or transferred, a valid prescription written by a licensed practitioner is necessary.

267.   To be effective, the prescription must be issued for a legitimate medical purpose by a practitioner acting in the usual course of his professional practice.

268.   A person who issues a prescription and the person who knowingly fills a prescription that is not in the usual course of business is subject to penalties under the Controlled Substances Act.

269.   It is unlawful for any person, including a registrant, to distribute a Schedule II controlled substance without a prescription.

THIRD AMENDED COMPLAINT – Page 31

270. Upon information and belief, Mr. Kempf and now-Director Tewalt were directed to take the aforementioned trip to Tacoma by Brent Reinke ("Mr. Reinke"), who was the Director of IDOC at the time.

271. On information and belief, Mr. Reinke was authorized by then-Governor Butch Otter to approve the trip.

272. After they bought drugs for an execution with a suitcase full of cash, Mr. Kempf and now-Director Tewalt were both later promoted, at separate times, to IDOC Director, the highest position in the organization.

273. The Board appointed Mr. Kempf as IDOC Director in December 2014.

274. The Board appointed Director Tewalt as IDOC Director in November 2018.

275. Director Tewalt is currently IDOC Director.

276. Mr. Kempf is now the Executive Director of the Correctional Leaders Association ("CLA"), formerly known as the Association of State Correctional Administrators ("ASCA").

277. Mr. Kempf took over in that position in December 2016.

278. CLA's members are the leaders of each U.S. state correctional system. In those roles, CLA members oversee more than 400,000 correctional professionals and are in charge of more than eight million inmates and other convicts.

279. Between approximately 2016 and 2018, now-Director Tewalt was Director of Operations for CLA.

280. Compounded pentobarbital is a high-risk sterile injectable.

THIRD AMENDED COMPLAINT – Page 32

281.    As such, compounded pentobarbital is meant to be administered within twenty-four hours, if stored at room temperature, and within seventy-two hours, if kept refrigerated.

282.    A pentobarbital preparation cannot be frozen because freezing degrades the preparation.

283.    The plane that carried the drugs from Tacoma to Boise was parked for about three hours and was in the air for approximately an hour and twenty minutes, after which the chemicals presumably had to be driven elsewhere.

284.    Based on the previous facts, there is reason to suspect, on information and belief, that the pentobarbital acquired by Mr. Kempf and now-Director Tewalt may not have been properly stored during the time between when they obtained it and when it was used at Mr. Leavitt's execution.

285.    At the time of Mr. Leavitt's execution, Jeff Zmuda ("Mr. Zmuda") was the Deputy Chief of the Bureau of Prisons for IDOC.

286.    Mr. Zmuda was the Deputy Director of IDOC in 2008 and early 2009 at the time of the relevant trial proceedings in *Cover v. Idaho Bd. of Corr.*, Ada Cty., No. CV01-18-3877 (hereinafter "the *Cover* case").

287.    Mr. Zmuda testified in the *Cover* case that the drugs for Mr. Leavitt's execution were acquired from a compounding pharmacy.

288.    Mr. Zmuda further testified in the *Cover* case that the compounding pharmacy who provided the drugs for Mr. Leavitt's execution could not supply

chemicals to IDOC for future executions because it was not in compliance with current regulations.

289.    The IDOC has therefore previously relied upon an unreliable source for execution drugs, which in turn suggests a greater chance that it will do so again.

### 3.    IDOC's Obfuscation

290.    The following allegations reflect IDOC's practice of acting in such a manner as to obstruct lawful challenges to executions and to shield itself from public oversight.

291.    IDOC has refused to make public the identity of its sources of drugs for either the Rhoades or Leavitt executions.

292.    In the *Cover* case, the Ada County District Court ordered IDOC to reveal the source of the drugs for the Leavitt execution.

293.    Rather than complying with the order, IDOC appealed the ruling to the Idaho Supreme Court.

294.    If IDOC revealed the sources of drugs for the Rhoades and Leavitt executions, it would help Mr. Creech evaluate the risks associated with his own execution.

295.    IDOC's refusal to do so handicaps Mr. Creech's ability to protect his right to be free from unconstitutional executions.

296.    The U.S. Supreme Court denied certiorari ("cert.") review of Mr. Rhoades' habeas appeal on October 13, 2011.

THIRD AMENDED COMPLAINT – Page 34

297.    On October 14, 2011, IDOC issued a new execution SOP, providing for only three-drug executions.

298.    IDOC described the new SOP in litigation as "a completely revised execution procedure."

299.    On October 19, 2011, the State secured a death warrant for Mr. Rhoades, setting his execution for November 18, 2011.

300.    Given the timeline, it is apparent that the State was planning on seeking a death warrant as soon as the U.S. Supreme Court denied cert. in Mr. Rhoades' habeas case.

301.    The Supreme Court denies roughly ninety-nine percent of the cert. petitions it receives.

302.    Thus, IDOC knew or should have known that it was a near certainty that the Supreme Court would deny Mr. Rhoades' cert. petition.

303.    IDOC could sensibly have tied its release of the new execution SOP to significant and relevant legal events that took place far before the denial of cert.

304.    For example, the Ninth Circuit panel affirmed the denial of habeas relief on July 15, 2010.

305.    In addition, the Ninth Circuit denied Mr. Rhoades' petition for rehearing on February 10, 2011.

306.    Instead of using either of these dates, IDOC waited until a little more than a month before the execution to release its SOP.

THIRD AMENDED COMPLAINT – Page 35

307.    IDOC did so in order to give Mr. Rhoades as little time as possible to review, investigate, and challenge the State's plans.

308.    Since IDOC released a new execution SOP the day after the Supreme Court denied the petition for cert., it clearly began preparing the new protocol well before then.

309.    On November 18, 2011, Mr. Rhoades was executed with a three-drug combination of sodium thiopental, pancuronium bromide, and potassium chloride.

310.    Judge Ronald Bush, who before his retirement sat on this Court and oversaw the litigation pertaining to Mr. Rhoades's execution, was concerned about the hasty manner in which the State went about that execution.

311.    He expressed that concern to IDOC.

312.    IDOC did not disclose to Judge Bush the manner in which the State obtained the execution chemicals for Mr. Rhoades's execution.

313.    Had it done so, Judge Bush told the Idaho Legislature in 2022, he would have wanted to hear from IDOC in greater detail about IDOC's actions.

314.    On January 6, 2012, IDOC created a new execution SOP, now giving the Director two three-drug options and two one-drug options.

315.    The U.S. Supreme Court denied cert. in Mr. Leavitt's habeas case on May 14, 2012.

316.    On May 17, 2012, the State obtained a death warrant for Mr. Leavitt, setting his execution for June 12, 2012.

317.   On May 25, 2012, IDOC announced its intent to execute Mr. Leavitt with a single-drug protocol of pentobarbital.

318.   Given the timeline, it is apparent that the State was planning on seeking a death warrant for Mr. Leavitt when the Supreme Court denied cert. in his habeas case.

319.   IDOC knew or should have known that it was a near certainty that the Supreme Court would deny Mr. Leavitt's cert. petition.

320.   IDOC could sensibly have announced its intent to use a single-drug pentobarbital protocol on significant and relevant dates that took place far before the denial of cert.

321.   For example, the Ninth Circuit panel reversed this Court's grant of habeas relief on May 17, 2011.

322.   In addition, the Ninth Circuit denied Mr. Leavitt's petition for rehearing on September 13, 2011.

323.   Instead of using either of these dates, IDOC waited until eighteen days before the execution to announce its intention to use a single-drug protocol of pentobarbital, so as to give Mr. Leavitt as little time as possible to review, investigate, and challenge the State's plans.

324.   For Mr. Rhoades's execution, IDOC kept a separate cash log for lethal injection expenses.

325.   For Mr. Leavitt's execution, IDOC kept a separate cash log for lethal injection expenses.

THIRD AMENDED COMPLAINT – Page 37

326.   On information and belief, for Mr. Rhoades's execution, IDOC kept three different sets of accounting books.

327.   Each of these books had more detail than the preceding one.

328.   Former IDOC Purchasing Agent Joanne Sooter ("Ms. Sooter") was instructed by her boss Theo Lowe ("Ms. Lowe"), then IDOC's Executive Financial Officer, to provide the first book if a public record request was submitted.

329.   Ms. Sooter was told that if the requester continued to press for more information, the second book was to be disclosed, as it had more details and would ideally placate the individual seeking records.

330.   The third book contained the real costs associated with the execution and it was not to be revealed.

331.   On information and belief, for Mr. Leavitt's execution, IDOC kept three different sets of accounting books.

332.   Ms. Sooter was instructed by Ms. Lowe to provide the first book if a public record request was submitted.

333.   Ms. Sooter was told that if the requester continued to press for more information, the second book was to be disclosed, as it had more details and would ideally placate the individual seeking records.

334.   The third book contained the real costs associated with the execution and it was not to be revealed.

THIRD AMENDED COMPLAINT – Page 38

335.    In the past, IDOC refused to make execution information available to Mr. Creech when he complained through the prison's grievance system on the ground that execution dates had not yet been set.

336.    However, by Idaho law, execution dates cannot be set more than thirty days in the future. *See* Idaho Code § 19-2715(2), (3).

337.    Idaho death warrants can set execution dates fewer than thirty days in the future.

338.    For instance, Mr. Creech's October 12, 2023, death warrant set a date twenty-seven days later for his execution.

339.    Thus, IDOC's position has apparently been that critical information about an execution can be withheld from the inmate until his execution is roughly a month away.

340.    That position has prevented any meaningful review of IDOC's plans for an execution.

341.    It is also illogical, as IDOC plainly does begin preparing for executions before the death warrant is officially issued.

342.    IDOC has in the past taken – and continues to take – the additional view that inmates must exhaust their administrative remedies before challenging methods of execution in federal court.

343.    Under IDOC's rules, inmates must pursue exhaustion through three separate levels of internal review.

344.    No regulations require IDOC to resolve grievances within thirty days.

THIRD AMENDED COMPLAINT – Page 39

345.    For example, when Mr. Pizzuto was exhausting his administrative remedies to prepare for this lawsuit, IDOC took forty-five days in total to reject his grievances, counting only the time that they were pending before prison authorities and not the time it took to write or submit them.[6]

346.    Therefore, according to IDOC, it can wait until a death warrant has been issued to tell Mr. Creech anything about the drugs to be used in his execution and then kill him before he has had any chance to even *begin* litigating the protocol in federal court.

347.    This track record reinforces the need for judicial intervention, so that IDOC is not able to continue sabotaging legitimate litigation and obstructing the review of the courts and the public.

348.    Mr. Leavitt was executed on June 12, 2012, thirteen days after the pentobarbital was obtained in the manner detailed above.

349.    IDOC's approach to acquiring drugs for Mr. Leavitt's execution makes it more likely that the organization will engage in similar conduct in connection with future executions, increasing the risk that it will acquire unreliable drugs.

350.    On March 21, 2019, the Ada County District Court found that IDOC and associated institutions and people acted in bad faith and with a lack of diligence in its execution-related responses to record requests in the *Cover* case. The court fined Jeffrey Ray ("Mr. Ray"), IDOC's Public Information Officer and the designated

---

[6] Again, Mr. Pizzuto is no longer a part of the present case; his experience is used only as an example.

THIRD AMENDED COMPLAINT – Page 40

records custodian, because he "did nothing to fulfill his responsibilities other than trust that others would," "did not even open the digital files to see what he had actually denied, [and] did not ensure the records he received were complete, or inquire into how the decision was made to deny any portions of the records." In the district court's view, Mr. Ray's "inquiry and review was so lacking as to be an improper withholding that was performed deliberately" and there was "substantial evidence" of "his lack of good faith compliance with Idaho's Public Records Act and avoidance of his mandatory duties under its provisions rising to the level of bad faith."

351.   In the *Cover* case, a pattern emerged of IDOC mishandling public record requests for execution-related material.

352.   For example, IDOC has provided certain records to requesters while withholding the same documents from other requesters seeking the same information, with no justification for the distinction.

353.   IDOC's responses to the plaintiff in the *Cover* case also reflected a highly disorganized and unreliable approach to the retention and disclosure of execution-related materials.

354.   Over the course of the *Cover* case, IDOC failed to provide execution-related material that was plainly responsive to the request and not exempt from disclosure.

355.   After the plaintiff in the *Cover* case took IDOC to court over its initial response, thousands more pages of records were located that had not been provided earlier.

356.   IDOC provided these materials in batches for months, each time explaining that it had found them in a place it had not searched earlier, such as a filing cabinet.

### E.   Human Error at Lethal Injection Executions

357.   Correctional staff and agents have made a variety of serious mistakes at executions.

358.   As a consequence, there is a higher risk that mistakes will be made at Mr. Creech's execution, making a torturous death more likely and also making it more essential that he be given access to the information requested so he can ensure his constitutional rights are protected.

359.   Lethal injection executions require correctional staff and agents to insert IV lines into the condemned.

360.   Training and regular experience are required in order to obtain IV access.

361.   Errors in placing IV lines cause chemical solutions to escape into subcutaneous tissue, which can cause excruciating pain.

362.   Problems in executions can also be caused by errors in preparing IVs, labelling syringes, preventing IVs from leaking, preventing veins from leaking,

waiting the appropriate amount of time between injections, and injecting the chemicals properly.

363.    For example, between July 28, 2022, and November 17, 2022, Alabama failed at three straight execution attempts to put the inmates to death.

364.    These failures were largely due to issues accessing the prisoners' veins.

365.    On November 17, 2022, the final of these three incidents took place.

366.    That episode, involving Kenneth Eugene Smith, is the longest in U.S. history at over three hours.

367.    Similarly, between May 11, 2022, and November 16, 2022, Arizona struggled to set IV lines at three consecutive executions.

368.    At the Oklahoma execution of Clayton Lockett ("Mr. Lockett") in April 2014, the executioners apparently had problems setting an IV line, which took them fifty-one minutes to do.

369.    During Mr. Lockett's execution, staff punctured multiple parts of his body at least twelve times before essentially jury-rigging a solution by inserting a too-short catheter in his right femoral vein and attempting to secure it with tape.

370.    As a result of that failure, Mr. Lockett began to writhe and gasp after he had already been declared unconscious, kicked his leg, rolled his head, grimaced, and grunted, all for more than thirty minutes.

371.    In the course of Mr. Lockett's execution, some of the lethal injection drugs massed in his tissue, creating a swelling under his skin larger than a golf ball.

THIRD AMENDED COMPLAINT – Page 43

372.    Eventually, Mr. Lockett died of a heart attack.

373.    At the Arizona execution of Robert Towery ("Mr. Towery") in March 2012, it took fifty-nine minutes to set the IV lines.

374.    An autopsy later revealed that Mr. Towery had been punctured at least eleven times.

375.    Arizona officials also struggled to insert IV lines into Clarence Dixon ("Mr. Dixon") in May 2022, requiring forty minutes in order to do so.

376.    Members of Mr. Dixon's execution team ultimately inserted an IV line into his femoral vein rather than his arm or hand.

377.    Witnesses to Mr. Dixon's execution report that he was visibly in pain and copiously bleeding from the catheter inserted into his leg.

378.    Murray Hooper ("Mr. Hooper") was also executed in Arizona in November 2022.

379.    Arizona officials avoided the bloody mistakes of Mr. Dixon's execution by sewing the catheter into Mr. Hooper's groin.

380.    At a Florida execution in December 2006, a misplaced IV line allowed caustic lethal injection drugs to leak into the soft tissue of the arms of inmate Angel Nieves Diaz ("Mr. Diaz").

381.    The drugs accordingly failed to render Mr. Diaz unconscious while causing chemical burns so severe that a great deal of the skin on his arms sloughed away.

THIRD AMENDED COMPLAINT – Page 44

382.   On information and belief, Mr. Diaz likely suffocated to death before the execution drugs could end his life.

383.   In 2009 in Ohio, in attempting to execute Romell Broom, the execution team stabbed him with needles for an hour and a half while trying to find a vein, using eighteen needle sticks in the process. Finally, the governor halted the execution.

384.   2022 saw so many problematic experiences that it was deemed "the year of the botched execution."

385.   Alabama, Arizona, and Texas all had botched executions related to execution teams' inability to properly set IV lines.

386.   Members of execution teams in other states have also been revealed to have histories that raised questions about their suitability for the task.

387.   For example, a member of the execution team in Arizona had his nursing license suspended and had a lengthy arrest record.

388.   Similarly, it was found that a surgeon involved in Missouri executions was dyslexic and had prepared lower-than-expected amounts of anesthesia for several inmates who were put to death.

389.   Execution equipment in some states has also been found wanting.

390.   For instance, there have been issues raised about adequate lighting in the room where the chemicals are prepared and about adequate sightlines from that room into the execution chamber.

THIRD AMENDED COMPLAINT – Page 45

391.    Because of these risks of human error, it is critical that Mr. Creech know the identities and credentials of the personnel tasked with executing him.

## VI.    Claims

### A.    Claim One – The Use of Pentobarbital[7] at Mr. Creech's Execution Violates the Eighth Amendment

392.    Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

393.    The use of a pentobarbital lethal injection as the means of executing Mr. Creech creates a substantial risk of serious pain and suffering because of his health conditions and medical history, amongst other factors, all in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

394.    The pain described below that Mr. Creech is at risk of suffering is created by his medical conditions, including the state of his veins, as well as the other factors specific to his execution discussed below.

#### 1.    Mr. Creech's Veins

395.    There are demonstrated issues with accessing Mr. Creech's veins.

396.    The execution team on February 28, 2024, were unable to access Mr. Creech's veins despite nearly an hour of trying.

---

[7] If the defendants do not select pentobarbital for use at Mr. Creech's execution, he reserves the right to challenge their choice on whatever grounds are appropriate, which may include the State's violation of Mr. Creech's First Amendment right to access the courts, his Due Process right to notice and hearing, his Eighth Amendment right to be free from cruel and unusual punishment, and potentially other violations.

397.    The execution team members remain the same as they were on February 28, 2024.

398.    During the lead-up to February 28, 2024, Ms. Neville was responsible for coordinating and monitoring the training and conduct of the IDOC execution team.

399.    Ms. Neville remains in the same position today.

400.    Ms. Neville does not have any medical or pharmaceutical training or experience.

401.    Director Tewalt does not have any medical or pharmaceutical training or experience.

402.    Warden Valley does not have any medical or pharmaceutical training or experience.

403.    Consequently, there is a substantial risk that IDOC's execution team will once again struggle to obtain vein access in any subsequent attempt to execute Mr. Creech by lethal injection.

404.    Mr. Creech is also seventy-three years old.

405.    As such, Mr. Creech is notably older than the average executed inmate.

406.    The average age of the inmates executed so far in 2024 is fifty-five.

407.    Merely being elderly increases the risk that a person's veins will be difficult to access.

408.    For example, a study published in April 2024 found that the chances of a botched execution increase 6% for each additional year of age.

THIRD AMENDED COMPLAINT – Page 47

409.   That risk is compounded by Mr. Creech's severe vascular issues, which are described in detail below.

410.   Mr. Creech also has at times experienced edema, which can likewise complicate IV access.

411.   The risk that IDOC's difficulties obtaining vein access will repeat are heightened by the State's refusal to conduct any meaningful and transparent inquiry into what went wrong on February 28, 2024.

412.   For example, IDOC will not have an independent review conducted into the events of February 28, 2024.

413.   Nor will IDOC issue a written report about what occurred that day.

414.   Idaho's resistance to any public accounting of its problems is out of step with the approach taken elsewhere after problematic executions.

415.   For example, in 2022, after issues with execution-drug testing in Tennessee the Governor commissioned a former federal prosecutor to conduct an investigation into the matter and he issued a full public report.

416.   Similarly, the Governor of Arizona appointed a former federal magistrate judge to conduct a similar investigation after a series of problematic executions, including several involving vein-access issues.

417.   Idaho's refusal to take any of the same basic measures reflects a desire for the State to avoid a public accounting of IDOC's problems, which will only increase the likelihood of more flawed executions taking place in the future.

THIRD AMENDED COMPLAINT – Page 48

418. When execution teams encounter difficulty with obtaining vein access, the inmates involved experience serious physical and psychological pain and suffering.

419. Vein-access problems lead to prolonged executions.

420. A protracted death process is an Eighth Amendment injury.

421. The movements of the needles during such executions cause an Eighth Amendment injury as the inmate experiences sharp stabbing sensations while the equipment punctures the skin and is moved around.

422. Efforts to move inmates' bodies during these executions cause severe pain, as (for example) when Alabama left Alan Eugene Miller hanging vertically from an execution gurney for twenty minutes as staff responded to vein-access difficulties.

423. These executions also cause inmates intense emotional anguish.

424. For example, Mr. Creech was forced to look into the face of his wife of twenty-five-plus years over the course of nearly an hour while both expected him to die.

425. Similarly, during his failed execution, Mr. Creech did not realize that the team had been unable to set his IV up, so he thought the lethal chemicals were being administered every time he felt a prick in one of his extremities.

### 2. Mr. Creech's Other Health Concerns

426. Mr. Creech was diagnosed with type II diabetes mellitus in August 2018. Mr. Creech was treated for five years with Metformin to help control his diabetes.

427.    Mr. Creech has a history for at least the last five years of edema in his legs, a swelling caused by the trapping of excess water. The severity of the edema has ranged over time.

428.    In May 2018, when the edema was first diagnosed, Mr. Creech had +3 pitting edema in both of his lower legs. In June 2018, it was noted that Mr. Creech had +2-3 pitting edema in both of his lower legs, with his right leg worse than his left.

429.    Mr. Creech's edema has been a continuing issue over the past five years. Mr. Creech is taking hydrochlorothiazide for his edema.

430.    Mr. Creech has mixed hyperlipidemia due to his type II diabetes mellitus. Mixed hyperlipidemia is a condition characterized by elevated levels of fats in the blood, including low-density lipoprotein cholesterol and triglycerides.

431.    In September 2022, a large vascular aneurysm was found in Mr. Creech's abdomen.

432.    An aneurysm is a weak section of an artery wall. Pressure from inside the artery causes the weakened area to bulge out beyond the normal width of the blood vessel. An abdominal aortic aneurysm is an aneurysm in the lower part of the aorta, the large artery that runs through the torso.

433.    The average (non-aneurysmic) aorta is about 3 centimeters across.

434.    Mr. Creech's aneurysm when it was first discovered measured 5.8 centimeters, with a craniocaudal length of 8.5 centimeters.

435.    That means his aneurysm was about as wide as a golf tee is tall, and about as long as a credit card.

436.    In addition to the aneurysm, Mr. Creech was found to have extensive atherosclerotic vascular disease and moderate to severe coronary artery disease.

437.    Atherosclerosis is the buildup of fats, cholesterol and other substances in and on the artery walls. This buildup is called plaque. The plaque can cause arteries to narrow, blocking blood flow. The plaque can also burst, leading to a blood clot.

438.    On October 23, 2022, Mr. Creech was admitted to the hospital after he fell backwards, hit his head, and was found unconscious by IMSI staff. Mr. Creech's blood pressure was 148/85, and he had elevated glucose levels. A CT scan of Mr. Creech's chest measured his aneurysm at 6.1 x 6.3 centimeters, with a craniocaudal length of 8.9 centimeters.

439.    On November 17, 2022, Mr. Creech had surgery to place a stent graft around the aneurysm. Despite this surgery, an endoleak developed and blood continues to flow into the aneurysm. An endoleak happens when blood finds a way around the stent graft and into the aneurysm. An endoleak can be life-threatening without treatment.

440.    Mr. Creech also suffers from hypertension, or high blood pressure.

441.    The morning of the February 28, 2024, execution attempt, Mr. Creech's blood pressure was 178/94. Later that day, about an hour after IDOC called off the execution, it was still 158/62.

THIRD AMENDED COMPLAINT – Page 51

442.   Although his blood pressure reading improved somewhat the next day, by March 3, 2024, it was back up to 146/75.

443.   On March 5th – nearly a week after the execution attempt – it was higher still, at 148/79.

444.   In December 2017, Mr. Creech underwent an MRI of his brain which indicated mild cerebral white matter disease compatible with chronic small vessel ischemic disease.

445.   Mr. Creech has been diagnosed as having an organic brain disorder.

446.   Additionally, Mr. Creech has been diagnosed as having a major depressive disorder and post-traumatic stress disorder ("PTSD").

447.   In September 2016, Mr. Creech was determined to have an allergy to Penicillin, Lithium, and Narcotics (Opium Alkaloids).

448.   Mr. Creech's medical conditions create a substantial risk of serious harm at an execution involving pentobarbital.

449.   Large doses of pentobarbital are likely to cause acute drops in blood pressure.

450.   Individuals, like Mr. Creech, who suffer from an abdominal aortic aneurysm, are at a sharply increased cardiovascular risk.

451.   In addition, in individuals with extensive atherosclerotic vascular disease, a sudden drop in blood pressure such as that associated with large doses of pentobarbital is likely to cause myocardial ischemia and/or infarction, or what is commonly known as a heart attack.

THIRD AMENDED COMPLAINT – Page 52

452.   To fully assess Mr. Creech's heath conditions, further testing is necessary for coronary heart disease, including a current electrocardiogram, an exercise stress test, and echocardiogram, a nuclear stress test, and CT coronary angiogram.

453.   Mr. Creech requested that testing prior to the February 2024 execution attempt, but the Court denied it.

454.   Mr. Creech is additionally being treated for his depressive disorder and PTSD with a higher than FDA recommended dose of Paxil. This dose carries a higher risk for cardiac complications.

455.   The onset of a heart attack under these circumstances is nearly immediate.

456.   The sedating effects of pentobarbital are likely to occur minutes after the heart attack begins.

457.   Heart attacks often cause substantial physical suffering, including chest pain, the feeling of a crushing weight, and difficulty breathing.

458.   Heart attacks often cause substantial psychological discomfort, including a feeling of impending doom, anxiety, or fear.

459.   It is likely that a pentobarbital execution of Mr. Creech would induce an acute heart attack.

460.   It is likely that Mr. Creech would experience cruel and unusual pain and suffering from a heart attack.

THIRD AMENDED COMPLAINT – Page 53

461.    It is likely that Mr. Creech would experience cruel and unusual pain and suffering from a heart attack for a significant amount of time before the pentobarbital completely sedates him.

462.    Two previous executions—that of Roy Blankenship ("Mr. Blankenship") in Georgia and Eddie Powell ("Mr. Powell") in Alabama—confirm the risk posed to Mr. Creech by a pentobarbital execution.

463.    Autopsies of Messrs. Blankenship and Powell indicated that both had clinically significant obstructive coronary disease.

464.    Messrs. Blankenship and Powell were both executed by pentobarbital.

465.    Both Mr. Blankenship and Mr. Powell appeared to be in pain during their executions, with witnesses observing grimacing, writhing, thrashing, and so forth.

466.    The observations of both men's executions were consistent with the physical manifestation associated with heart attacks.

467.    Other pentobarbital executions have taken place on different inmates who did not have obstructive coronary artery disease.

468.    Most of those executions did not include the kinds of painful reactions seen when Messrs. Blankenship and Powell were put to death.

469.    In addition to the risks caused by the above medical conditions, Mr. Creech's diabetes and mixed hyperlipidemia also increase the risk of a painful heart attack caused by pentobarbital.

470.    Additionally, Mr. Creech suffers from brain damage.

THIRD AMENDED COMPLAINT – Page 54

471.     In particular, Mr. Creech has many signs that indicate abnormalities of circuits that are mediated through the frontal lobe.

472.     Mr. Creech has bilateral brain damage.

473.     The right side of the brain is more damaged than the left.

474.     Mr. Creech's neurological deficits are indicative of brain dysfunction.

475.     Mr. Creech has a history of migraine headaches, which at times have become so incapacitating that he cannot move.

476.     Mr. Creech has been prescribed a number of medications for his migraines.

477.     Mr. Creech's neuropsychological deficits are indicative of brain dysfunction.

478.     Over the years, Mr. Creech experienced a series of head injuries, including a fall from a staircase when he was a boy which led to a lapse in consciousness. After that fall, his mother removed him from the hospital against doctors' orders. In addition, Mr. Creech was in two serious car crashes at the ages of thirteen and seventeen respectively.

479.     Brain damage elevates the risk that Mr. Creech could have an atypical reaction to an execution drug, potentially causing him to become agitated and confused and to decompensate.

480.     In such a state, there is also a heightened likelihood that obtaining IV access will be difficult.

### 3.   Problems With the Now-Invalidated Protocol

481.   Idaho Code Section 19-2716, which added the firing squad as a potential execution method in Idaho, also generates new risks of severe pain and suffering if the now-invalid Protocol were nevertheless to be employed in executing Mr. Creech.

482.   That statute refers to whether or not execution by lethal injection is "available," but the lack of definition of "available" creates the risk that the State could deem lethal injection "available" if it possessed only expired or contaminated chemicals.

483.   Injecting Mr. Creech with expired, sub-potent, counterfeit, or contaminated chemicals in turn creates the substantial risk that he will experience severe pain or suffering as a result, as described above.

484.   The risks of severe pain or suffering outlined above are also exacerbated by flaws in the now-outdated Protocol.

485.   Under the now-outdated Protocol, the execution team members are instrumental to the carrying out of executions, as they are the ones preparing and administering the lethal chemicals, as well as monitoring the inmate's level of consciousness.

486.   The now-outdated Protocol requires that members of the execution team have "three years of medical experience" in various positions, including as nurses, paramedics, and phlebotomists.

THIRD AMENDED COMPLAINT – Page 56

487.    The protocol does not provide for these individuals to have specialized training in accessing the veins of elderly individuals with vascular issues, such as Mr. Creech.

488.    Indeed, the February 2024 execution attempt demonstrates that the execution team members were unequipped to establish peripheral IV access to Mr. Creech's veins.

489.    The execution team members remain the same as they were on February 28, 2024.

490.    Individuals with the backgrounds set forth in the now-outdated Protocol also do not have the requisite training to properly administer the chemicals in the now-outdated Protocol while accurately evaluating the possibility that the inmate is conscious, sensate, or in pain when the individual has the kind of complicated medical status that Mr. Creech does.

491.    Only a practicing anesthesiologist would be fully qualified to perform that function.

492.    Under the now-outdated Protocol, members of the execution team need not be physicians.

493.    The now-outdated Protocol also does not require that any member of the execution team be an anesthesiologist.

494.    No member of the execution team assembled for Mr. Creech's execution is an anesthesiologist.

495.    Indeed, no member of the execution team is even a doctor.

THIRD AMENDED COMPLAINT – Page 57

496.    Rather, the execution team consists entirely of EMTs, paramedics, and nurses.

497.    Anesthesiologists understand the pharmacology of anesthetic drugs and their interactions, which determines the sequence and timing of how chemicals should be injected.

498.    Other types of medical professionals, like nurses and paramedics, do not have that scientific background.

499.    When drugs are administered and the pacing is off, it can create a painful reaction.

500.    A person may be experiencing pain and yet not express it in a way that is visible to the naked eye.

501.    For example, an inmate could receive a large dose of pentobarbital at an execution and appear to go to sleep, yet still be going through a painful experience.

502.    Anesthesiologists are experts in determining whether there is pain in such circumstances and adapting to those circumstances.

503.    To do so, they rely on their clinical training.

504.    Anesthesiologists also rely on brain monitors, sophisticated pieces of equipment that measure and convert brain signals so that doctors can understand a patient's level of consciousness and depth of anesthesia.

505.    The now-outdated Protocol does not provide for the use of a brain consciousness monitor.

THIRD AMENDED COMPLAINT – Page 58

506.    IDOC does not plan on using a brain consciousness monitor at Mr. Creech's execution.

507.    If an individual without proper training were handling the drug administration at the execution under the now-outdated Protocol, and without a brain consciousness monitor, they would essentially be "guessing" the stage of consciousness and pain sensation.

508.    The absence of a practicing anesthesiologist and a brain consciousness monitor add yet more risk for pain at Mr. Creech's execution in addition to the dangers described earlier.

509.    In other words, Mr. Creech's health conditions create the risk of a painful execution and the flaws in the now-outdated Protocol make it more likely that the executioners will not respond appropriately, which would increase and prolong Mr. Creech's suffering.

510.    This is because, if the execution does become unduly painful, the lack of a brain monitor and anesthesiologist would impede the execution team's ability to gauge the pain and therefore respond appropriately to it, such as by administering more or less pentobarbital.

511.    As a result, the presence of an anesthesiologist and a brain consciousness monitor at the execution would assist IDOC in avoiding a substantial risk of significant pain during Mr. Creech's execution process.

512.    None of the execution team members are pharmacologists.

513.   Nevertheless, the execution team is responsible under the protocol for "mixing the chemicals."

514.   The now-outdated Protocol also contemplates but does not explain or set forth any procedures regarding a possible central line execution.

515.   The factors arrayed here – including Mr. Creech's medical and neurological conditions, as well as IDOC's use of unreliable drugs and the shortcomings in the now-outdated Protocol – independently and collectively create a substantial risk that his execution will cause him severe pain, in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

### 4.   Problems With a Central Line

516.   The potential use of a central line at Mr. Creech's execution further increases the risk that he will suffer an unconstitutional degree of pain and suffering at his death.

517.   The now-outdated Protocol provides that if "it is not possible to reliably place two peripheral lines," then the execution team leader will direct other team members to "place an IV catheter in a central line for the purpose of administering the chemicals."

518.   As discussed above, the execution team failed to set a peripheral IV line on Mr. Creech.

519.   Again, the same individuals remain on the execution team now as were on it when the group failed to set a peripheral IV line on Mr. Creech.

THIRD AMENDED COMPLAINT – Page 60

520.   Those facts create a substantial risk that the execution team will again fail to set a peripheral IV line on Mr. Creech.

521.   That leads to a substantial risk that the execution team will resort to a central line on Mr. Creech.

522.   The fact that IDOC failed to complete a peripheral IV execution makes it likely that it will also fail to properly carry out the more complicated central-line execution.

523.   An execution involving a central line implicates a substantial risk of severe pain.

524.   Unlike peripheral IV access, the placement of a central line is an invasive surgical procedure.

525.   On February 29, 2024, Director Tewalt described the setting of a central line to the Idaho legislature as "a surgical procedure."

526.   Central line placement is more involved than peripheral IV placement, requiring more equipment, time, and expertise.

527.   Central line placement is a procedure that takes place in hospitals.

528.   Insertion of a central line requires a completely sterile field and atmosphere.

529.   The individual inserting the central line must wear protective clothing due to the substantial risk that blood will spurt out and splash onto that individual's person.

530.   Central line placement is a procedure properly performed only by a medical doctor.

531.   To competently insert a central line it is necessary for personnel to have immediate access to a variety of drugs and equipment, including but not limited to an ultrasound machine, an X-ray machine, suction, surgical lighting, surgical instruments, cautery, chest tubes, EKG monitors and equipment, and a defibrillator.

532.   Upon information and belief, IDOC is renovating F-Block in order to create a new room in which a central line can be inserted.

533.   Upon information and belief, the purpose of this new room is to enable IDOC agents and staff to insert a central line without witnesses being able to directly observe the central line's placement.

534.   Upon information and belief, even after this renovation F-Block will not contain the equipment necessary for placement of an execution central line.

535.   In the past, central lines have been inserted "blind." This technique has fallen out of favor.

536.   Instead, the placement of the central line and catheter is guided by ultrasound.

537.   The placement of the catheter is then confirmed by X-ray.

538.   Absent this equipment, there is a substantial risk that the central line will be malpositioned.

539.   A malpositioned central line can cause serious injury and pain.

THIRD AMENDED COMPLAINT – Page 62

540. Central line executions are by nature more painful than peripheral IV executions.

541. For example, the placement of a central femoral line requires the use of a larger needle than would be used for establishing a peripheral line.

542. The needle must go not only through the skin, as in a peripheral IV placement, but through the subcutaneous tissue and the muscle.

543. For this reason, central lines require administration of a properly calculated amount of local anesthesia.

544. Painful complications can arise from central lines that are not at issue in peripheral IVs.

545. Some examples include the perforation of an artery or vein, puncture of a lung, or infliction of nerve damage.

546. Other potential complications from central lines involve tension pneumothorax (a suffocating condition caused by the collection of air in the space between the lung and the inner chest wall which collapses the lung), massive hemorrhage, subcutaneous hematoma, air embolism (which can result in a massive stroke), cardiac rhythm disturbances, cardiac perforation, cardiac tamponade (compression of the heart by blood collecting in the surrounding space), puncture of a nerve, bowel perforation, and bladder perforation.

547. The seriousness of these potential complications is another reason why central line placements occur in a hospital setting.

548.   The execution team lacks sufficient training and qualifications to competently carry out a central line execution.

549.   Upon information and belief, no member of the execution team has ever participated in a central line execution.

550.   Upon information and belief, prior to their selection no member of the execution team was screened for their ability to place a central line.

551.   Upon information and belief, prior to their selection no member of the execution team was specifically screened for or questioned about their knowledge of central line procedure.

552.   Upon information and belief, the volunteer Director Tewalt selected to insert a central line has never participated in a central line execution.

553.   The volunteer Director Tewalt selected to insert a central line is not a medical doctor.

554.   IDOC has never carried out a central-line execution.

555.   Other states, such as Arizona and Arkansas, have required that only medical doctors could oversee central line executions.

556.   IDOC staff have not trained to place a central line at an execution.

557.   Central line executions elsewhere have caused pain and suffering to the prisoners.

558.   In 2014, Arizona used a central line on Mr. Lockett.

559.   When staff tried to set a central line in Mr. Lockett's groin area, blood squirted on the doctor's clothing.

THIRD AMENDED COMPLAINT – Page 64

560.   The team hit an artery, sending "blood everywhere."

561.   The warden later described the scene as "a bloody mess."

562.   During the execution attempt, Mr. Lockett groaned, writhed, and repeatedly attempted to speak.

563.   When Alabama tried to execute Doyle Lee Hamm ("Mr. Hamm") in 2018, staff stabbed his groin roughly six times while attempting to set a central line.

564.   The team may have punctured Mr. Hamm's bladder and his femoral artery.

565.   Mr. Hamm was gushing blood as the execution attempt proceeded and he urinated blood for most of the following day.

566.   When Arizona executed Mr. Dixon in 2022, witnesses observed the inmate grimacing and in pain while staff made an incision and inserted a central line into his groin.

567.   A journalist present at Mr. Dixon's execution noted that after "cutting into the groin," the staff had "to wipe up a fair amount of blood."

**5.    Problems With the Execution Facilities**

568.   The risk of a painful execution is compounded by flaws in the physical layout of the execution chamber.

569.   Specifically, the execution team will not be able to directly observe Mr. Creech while the lethal chemicals are injected into his body.

THIRD AMENDED COMPLAINT – Page 65

570.   The execution team will not be in the execution chamber with Mr. Creech while the lethal chemicals are injected into his body.

571.   The execution team will be in a room adjoining the execution chamber while the lethal chemicals are injected into Mr. Creech's body.

572.   While the lethal chemicals are being administered, the execution team will only see Mr. Creech on monitors in images projected by cameras in the execution chamber.

573.   There is no window in the wall that will separate the execution chamber from the room holding the execution team.

574.   There is no other type of aperture in the wall that will separate the execution chamber from the room holding the execution team.

575.   The execution will be carried out by remote injection.

576.   Such an arrangement is inappropriate for an execution.

577.   The execution team is unable to directly observe the prisoner and the IV sites.

578.   On information and belief, Idaho's layout is different from that of every other state in the country.

579.   Video cameras are not an adequate substitution for direct visual observation.

580.   Video cameras are inadequate to detect intravenous infiltration.

581.   Intravenous infiltration involves chemicals being delivered into the tissue instead of the vein.

THIRD AMENDED COMPLAINT – Page 66

582.    Intravenous infiltration is a common problem with lethal injection.

583.    Undetected intravenous infiltration is likely to cause the inmate substantial pain.

584.    On information and belief, every other state in the country either stations the execution team in the chamber or provides a window for direct physical observation.

585.    Another problem created by the execution facility's layout arises in the case of a central line execution.

586.    Upon information and belief, IDOC contemplates that placement and insertion of a central line will occur in a room separate from the execution chamber.

587.    The central line insertion will be visible only by closed-circuit television.

588.    There will be no medical doctor in the room while the central line is being inserted.

589.    It is inappropriate for a person who is not a medical doctor to place and insert a central line without the direct supervision of a medical doctor who is physically in the procedure room.

590.    Another problem created by the execution facility's layout is the excessive distance between the execution team room and the execution chamber.

591.    The amount of time that it takes to cover that distance makes it impossible for the execution team to react quickly enough to complications arising during the execution.

THIRD AMENDED COMPLAINT – Page 67

592.    That increases the risk that the inmate will experience longer and more intense pain without assistance.

593.    The factors arrayed here – including Mr. Creech's medical and specifically vascular complaints, as well as IDOC's use of unreliable drugs, the shortcomings in the protocol, and the risks associated with a central line – both independently and collectively create a substantial risk that his execution will cause him severe pain, in violation of the Eighth Amendment, as incorporated against the states by the Fourteenth Amendment.

### 6.    Reasonably Available and More Humane Alternative

594.    Mr. Creech submits that it is a violation of the ethical obligations of the undersigned attorneys to propose a reasonably available alternative method for Idaho to use to execute him. It is a conflict of interest for Mr. Creech's counsel to argue for a better way for the State to kill him.[8]

595.    Requiring the undersigned attorneys to put forth an alternative plan to execute Mr. Creech effectively requires Mr. Creech's counsel to advocate for the State. The duty of loyalty is "perhaps the most basic of counsel's duties." *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *see also* Idaho R. Prof. Conduct (hereinafter "IRPC") 1.7, cmt. 1 ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client."); *accord* Ind. R. Prof. Conduct 1.7, cmt 1.

---

[8] This conflict of interest cannot be resolved by appointing separate counsel to Mr. Creech on the question of a reasonably available and humane alternative as the conflict would extend to any attorneys appointed to represent Mr. Creech.

THIRD AMENDED COMPLAINT – Page 68

596.    For undersigned counsel to represent the interests of the State in killing Mr. Creech is for counsel to effectively represent the State as a de facto client, and thus violate counsel's duty of loyalty to refrain from representing conflicting interests. *See, e.g.*, *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980) ("Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial.").

597.    The duty of loyalty preventing counsel from advocating in the interest of persons other than their client is broad. For example, under the Idaho Rules of Professional Conduct, attorneys are duty-bound not to represent another client whose position is "directly adverse" to their client or when there is a "significant risk" that the representation of their client "will be materially limited" by the representation of another client, former client, third person, or even "the personal interests" of counsel. IRPC 1.7(a); *accord* Ind. R. Prof. Conduct 1.7(a).

598.    Additionally, counsel are duty-bound not to "use information relating to representation of a client to the disadvantage of the client . . . ." IRCP 1.8(b); *accord* Ind. R. Prof. Conduct 1.8(b). Using the information undersigned counsel have uncovered in the representation of Mr. Creech, such as his extensive medical history, to point the State toward an alternative method of killing him forces counsel to wield that information to Mr. Creech's disadvantage.

599.    Requiring undersigned counsel to represent the interests of the State in killing Mr. Creech requires counsel to represent an interest to Mr. Creech's extreme detriment. Such a requirement effectively renders counsel a representative

of both Mr. Creech and the State, the diametrically opposed parties on either side of the adversarial process.

600.   In his Second Amended Complaint, Mr. Creech reserved the right to plead a reasonably available and more humane alternative to whatever method of execution Idaho chose to use against him, whether it be lethal injection by pentobarbital or some other method, if this Court ordered counsel to do so following briefing on and resolution of the ethical issues noted above.

601.   The Court declined to do so.

602.   Instead, when denying Mr. Creech's requested preliminary injunction in February of 2024, the Court inaccurately treated counsel's offer to brief the above-described ethical issues as a categorical refusal to plead an alternative method of execution. Dkt. 142 at 14-15.

603.   Counsel's adherence to their ethical obligations made Claim One of the Second Amended Complaint "fail[ ] as a matter of law[,]" the Court stated. *Id.* at 14.

604.   Therefore, notwithstanding and without waiving his objection to counsel's conflict of interest above, Mr. Creech now identifies a gunshot to the head as a more humane alternative to a pentobarbital execution.

605.   Idaho law now provides for the firing squad as an alternative method of execution to lethal injection executions.

606.   Execution by firearm is thus recognized by the State itself as a reasonably available and readily implemented method of execution.

THIRD AMENDED COMPLAINT – Page 70

607.    However, the State has not drafted or circulated an execution protocol that provides policies and procedures governing the use of the firing squad as an execution method.

608.    Upon information and belief, when and if Idaho adopts a protocol for its firing squad executions, that protocol will be identical to or a slightly revised version of the state of Utah's protocol.

609.    Utah is the only state in the country that currently uses the firing squad to execute prisoners.

610.    It has not done so since 2010.

611.    Utah's protocol establishes a five-person team of executioners made up of peace officers.

612.    Utah's protocol further provides that all five executioners are to be given .30-caliber rifles, one of which is loaded with blanks.

613.    The only requirements for these peace officers are that they be POST (Peace Officer Standards and Training Council) certified and that they demonstrate proficiency with the weapons to be used in the execution.

614.    In Idaho, all that is necessary in order to become POST certified are a clean background check, basic aptitude test and basic law enforcement academy training, forty hours of field training, and six months of employment in a law enforcement agency.

THIRD AMENDED COMPLAINT – Page 71

615.   Utah's protocol does not require any psychological screening or training to ensure the executioners can endure the psychological stress of shooting a live human being to death while maintaining accuracy.

616.   POST certification likewise does not involve any advanced training in marksmanship or training on how to maintain shot accuracy while under stress.

617.   Under Utah's protocol, all that is required to be deemed "proficient" with a weapon is the ability to fire it and hit a target, of the same size as the one which will be affixed to the condemned during the execution, from a distance of twenty-one feet.

618.   Utah's protocol allows for "proficiency" with a weapon to be established by hitting the target one time.

619.   Once the execution begins, Utah's protocol calls for the warden of the prison to direct that a target be placed over the condemned's heart.

620.   Utah's protocol does not specify any qualifications for the person who places the target or set forth any way of determining how to locate the condemned's heart.

621.   The common lay person's understanding of where the heart is located – under the left pectoral muscle, or where one places one's hand during the national anthem – is not where it is actually located. The precise location of the heart in the chest cavity varies by individual.

622.   Utah's protocol then provides that a volley of four shots is to be fired at the target affixed to the condemned.

THIRD AMENDED COMPLAINT – Page 72

623.   Mr. Creech will henceforth refer to this version of a firing squad execution as Utah's "chest shot protocol."

624.   Utah's chest shot protocol provides that if the condemned is still obviously conscious after the first volley of four shots is fired, the firing squad team leader will collect the weapons, prepare them to fire again, and redistribute them to the firing squad.

625.   Utah's chest shot protocol does not dictate a time limit for this process.

626.   If the condemned remains obviously conscious after the weapons are redistributed, Utah's chest shot protocol provides that the team will fire a second volley.

627.   If the condemned is not obviously conscious, Utah's chest shot protocol provides that the warden may wait up to three minutes before calling on a physician to check for signs of life.

628.   Utah's chest shot protocol authorizes such vital sign checks every minute for an additional ten minutes.

629.   Thus, depending on how long it takes to ready the weapons for re-firing, Utah's chest shot protocol provides that a condemned not killed by the initial volley may remain alive, maimed and bleeding out from the four gunshot wounds to the chest, for approximately a quarter of an hour.

630.   Utah has been the only state in the country to use the firing squad for executions since 1920.

THIRD AMENDED COMPLAINT – Page 73

631.   Since 1850, Utah has carried out forty-one firing squad executions. Only three of those have occurred since the United States resumed executions after *Furman v. Georgia*, 408 U.S. 238 (1972).

632.   At least five percent of Utah's firing squad executions have been "botched," meaning the prisoner suffered for a prolonged period before ultimately succumbing to his injuries.

633.   Utah executed a prisoner named Wallace Wilkerson ("Mr. Wilkerson") by firing squad in 1878.

634.   Before shooting Mr. Wilkerson, Utah officials affixed a paper target to what they believed to be his heart and then fired four shots at it.

635.   Three of the bullets hit the target, but it was located an inch above his heart. The fourth hit Mr. Wilkerson's left arm, approximately six inches above his heart.

636.   After he was shot, Mr. Wilkerson collapsed onto the ground, crying, "Oh my God! My God! They've missed!"

637.   Accounts vary on how long it took Mr. Wilkerson to bleed to death, with some observers claiming fifteen minutes and some as long as twenty-seven.

638.   After Mr. Wilkerson's botched execution, the *Ogden Junction* newspaper published an article reminding the state of Utah that "the French guillotine never fails."

639.   In 1951, Utah executed a prisoner named Eliseo Mares ("Mr. Mares") by firing squad.

THIRD AMENDED COMPLAINT – Page 74

640.   Utah officials fired four shots at Mr. Mares, these from a distance of fifteen feet away.

641.   Two of the bullets struck Mr. Mares in the hip and abdomen, nowhere close to his heart.

642.   Reports of Mr. Mares's execution vary on whether Utah officials had to fire a second volley of shots or whether he bled to death after the first volley.

643.   In any event, it was "several minutes" before Mr. Mares could be declared dead.

644.   A *Salt Lake Tribune* reporter present for the execution later reported that Mr. Mares died "silently and horribly."

645.   When executed by a firing squad following Utah's chest shot protocol, the condemned dies from blood loss caused by rupture of the heart, the lungs, or a large blood vessel like the aorta.

646.   When the heart is completely ruptured, blood circulation and flow of oxygen to the brain ceases.

647.   After blood circulation ceases and the brain stops receiving new oxygen, the condemned will remain conscious for approximately fifteen to thirty seconds after being shot.

648.   This is because the brain will continue to function using oxygen in the blood already present in the brain even if there is no ongoing blood circulation.

649.    There are numerous documented examples of individuals who, despite having been shot in the heart, are nevertheless able not only to remain conscious but perform strenuous physical activity.

650.    For example, one man was able to run sixty-five feet – about the length of a bowling lane – prior to collapsing, despite having been shot in the chest with a 12-gauge shotgun (firing #7.5 shot), an act which literally shredded his heart.

651.    Another survived for over seventy-five minutes despite gunshots that perforated his aorta, left main pulmonary artery, and left lung.

652.    One Scandinavian study found that up to forty percent of patients with penetrating injuries to the heart survive long enough to be transported to the hospital.

653.    During the time the condemned remains conscious, he will experience the pain of the fractured bones and soft tissue injuries caused by the bullets.

654.    Shots that are fired at the heart will almost certainly fracture the condemned's ribs and/or sternum.

655.    Gunshot wounds that fracture bones are among the most painful wounds.

656.    Shots to the chest, because they compromise respiratory mechanisms, will also cause a person to experience "air hunger" or the feeling of being suffocated.

657.    The feeling or fear of being suffocated is a well-documented torture tactic, used for example in waterboarding.

658.   Utah's history of firing squad executions reflects that even when conducted successfully and not botched, the condemned still experienced a period of continued consciousness after being shot.

659.   In 1938, Utah executed John Deering ("Mr. Deering") by firing squad.

660.   Mr. Deering allowed a doctor to monitor his heart rate via electrocardiogram during the execution.

661.   Mr. Deering's heart continued to beat for fifteen seconds after the volley of bullets struck it.

662.   The additional fifteen- to thirty-second period of consciousness following cessation of the heartbeat indicates that Mr. Deering was likely conscious and capable of feeling pain for approximately thirty to forty-five seconds after being shot.

663.   Utah executed Ronnie Lee Gardner ("Mr. Gardner") by firing squad in 2010.

664.   Mr. Gardner sustained four gunshot wounds to the left chest, which destroyed his heart.

665.   The bullets also damaged Mr. Gardner's left lung and disrupted the left side of his diaphragm.

666.   The bullets also fractured Mr. Gardner's ribcage in at least four places.

667.   Mr. Gardner sustained no brain injuries, so he would have remained conscious for the fifteen to thirty seconds it took for the brain to deplete its existing oxygen.

THIRD AMENDED COMPLAINT – Page 77

668.    Observers confirm that Mr. Gardner was moving after being shot in ways that indicate he remained conscious.

669.    For example, six observers report that Mr. Gardner moved his left arm upward and backward, then released it and repeated the same motion in a slow and deliberate manner.

670.    Four observers similarly report that Mr. Gardner was rubbing his thumb and fingers together both before and after being shot, a coordinated and fine muscle movement indicative of purposeful action and continued consciousness.

671.    During the time he remained conscious, Mr. Gardner would have experienced severe pain from his fractured ribs and associated soft tissue injuries.

672.    Mr. Gardner also would have experienced pain every time he attempted to breathe.

673.    Mr. Gardner's ability to breathe, however, was compromised by his injuries, which would have resulted in a sensation of air hunger.

674.    A firing squad execution protocol that required a gunshot to the head, not the chest, would obviate the above-described problems.

675.    A gunshot to the head is much more likely to result in instant and painless death than a gunshot or shots to the chest.

676.    A firing squad execution that required a gunshot to the head is also much less likely to be botched.

THIRD AMENDED COMPLAINT – Page 78

677. For instance, one study found that even those victims of gunshot wounds to the head who survived long enough to be administered cardiopulmonary resuscitation have only a 2.1% survival rate.

678. In order to be most effective, a gunshot to the head would require the shot to be fired at point-blank range.

679. This in turn would alleviate the need for a firing squad as large as the one contemplated in Utah's chest shot protocol.

680. A firing-squad execution under a protocol requiring a gunshot to the head would not pose a substantial risk of causing severe pain to Mr. Creech.

681. The medical and vascular conditions of Mr. Creech's which are discussed above do not create a substantial risk of causing severe pain to Mr. Creech in a firing-squad execution.

682. Mr. Creech's health issues also do not create any special risks for a firing-squad execution.

## B. Claim Two – The Lack of a Valid Execution Protocol Violates Mr. Creech's Rights to Due Process

683. Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

684. Procedural due process requires fair notice of the procedures to be used in Mr. Creech's execution and an opportunity for his challenges to those procedures to be heard.

685. No execution protocol yet exists which can validly govern either method of execution the State may use to kill Mr. Creech.

THIRD AMENDED COMPLAINT – Page 79

686.   Upon information and belief, no such protocol will be published before the State once again attempts to execute Mr. Creech.

687.   The now-outdated Protocol does not govern the next attempt to execute Mr. Creech.

688.   IDOC's statements about the 2023 and 2024 death warrants for Mr. Creech create even more uncertainty around the process. Its press release announcing its intent to use lethal injection to kill Mr. Creech advertises the State's possession of "chemicals," plural, while IDOC has told the CHU that it is "focusing" on obtaining pentobarbital for a single-drug protocol, without ruling out other options.

689.   IDOC's now-outdated protocol does not identify a recipe for executions, instead giving the Director four separate options to choose from at his unfettered discretion.

690.   Similarly, IDOC's press release announcing the execution date for Mr. Creech signals its adherence to the new statute – "In accordance with Idaho Code § 19-2716(2), Director Tewalt has filed an affidavit certifying that execution by lethal injection . . . is available in this matter[,]" it proclaims – even though the State has written and promulgated no new protocol to implement that new law.

691.   The mismatch between the statute, SOP 135, and IDOC's public pronouncements reflects a lack of consensus on what procedures are to govern Mr. Creech's execution.

THIRD AMENDED COMPLAINT – Page 80

692.   IDOC's now-outdated protocol also does not explain how the Department intends to possibly employ a "surgical procedure" – placement of a central line – in executing Mr. Creech.

693.   As described above, that surgical procedure is properly performed only by a medical doctor.

694.   The now-outdated Protocol does not contemplate that a medical doctor will be involved in any way in administering lethal chemicals to Mr. Creech.

695.   Mr. Creech thus has no notice of any possible way in which the Department can safely perform a surgical procedure on him as part of his execution.

696.   Without notice of the procedures to be used in his execution, Mr. Creech will be deprived of his life without being able to adequately challenge the constitutionality of the procedures used to do so.

697.   Idaho's lack of any current protocol governing how it expects to execute Mr. Creech therefore violates the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

## C.   Claim Three – Deprivation of Accurate Information Violates Mr. Creech's Fourteenth Amendment Right to Due Process

698.   Mr. Creech incorporates each and every statement and allegation set forth throughout this complaint as if fully rewritten.

699.   The Due Process Clause of the United States Constitution provides, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

THIRD AMENDED COMPLAINT – Page 81

700.    Fundamental fairness and due process require that an individual be given an opportunity to receive notice of how one's rights will be affected and an opportunity to respond and be heard.

701.    The defendants' refusal to provide Mr. Creech with information that would enable him to determine how the State intends to execute him violates his rights to due process; among other things, the lack of information raises a procedural barrier to challenging the constitutionality of IDOC's execution process.

702.    Instead of providing this information, the State has engaged in a pattern of misleading conduct with respect to methods of execution in the State of Idaho.

703.    Until Thursday, October 12, 2023, Attorney General Labrador (through his surrogate, Deputy Attorney General LaMont Anderson) and Director Tewalt were emphatic, to both the Idaho Legislature and the public, that lethal injection chemicals were unavailable to IDOC.

704.    On March 1, 2023, Idaho Representative Bruce Skaug ("Rep. Skaug") testified in the House Judiciary Committee in support of House Bill 186, the bill proposing the addition of the firing squad.

705.    Rep. Skaug is Attorney General Labrador's former employer.

706.    Attorney General Labrador has admitted to co-authoring HB 186.

707.    Rep. Skaug said to the Legislature that according to IDOC, the Department's "continued inability to secure [pentobarbital] seems to indicate it will be unavailable for the foreseeable future, making our ability to carry out the lawful

THIRD AMENDED COMPLAINT – Page 82

sentence of anyone on death row impossible. So, it's a de facto end of executions in our state[.]"[9]

708.   Rep. Skaug also read from a letter written to him by Director Tewalt. Director Tewalt had written, Rep. Skaug said, that "[a]bsent an actionable alternative method of executions, a de facto moratorium on capital punishment exists since the current law is unenforceable." The passage of the secrecy statute shielding much of the information surrounding executions from disclosure had not helped, Director Tewalt reported; "still we [IDOC] cannot get those drugs."

709.   Further reporting what he had learned from IDOC, Rep. Skaug told the House Judiciary Committee that "executions . . . may never happen since we may never obtain these necessary drugs for the executions." Other states are going through "the same situation, where we can't get the drugs for this." Asked whether the problem were the inability to obtain the drugs or simply an inability to store them safely for long enough, Rep. Skaug responded, "I would think if we could store it we would, but apparently we cannot get it at all."

710.   Deputy Attorney General Anderson was even clearer in his own testimony to the House Judiciary Committee that same day. The switch from executions by firing squad to the use of lethal injection drugs was doomed to failure, he said, because "[*w*]e *cannot get them*. There's no one that will supply them."

---

[9] A video recording of Rep. Skaug's and Deputy Attorney General Anderson's March 1, 2023, testimony is available at https://lso.legislature.idaho.gov/MediaArchive/MainMenu.do. All emphasis added to testimony quotations is the speaker's own.

THIRD AMENDED COMPLAINT – Page 83

711.   Elaborating, he further testified that, "[l]ike California, there is currently an execution moratorium in Idaho. Not a death penalty moratorium, an *execution* moratorium[,]" he said. "That's based upon the Idaho Department of Correction being unable to secure the necessary drugs to carry out an execution. And the reason for that is because drug companies refuse to sell the drugs. Others that may have the drugs beyond the drug companies refuse to sell them. And states that also use lethal injection refuse to share because then they're gonna put, be put in Idaho's position, and go – and have to go find some supplier for the drugs[.]"

712.   Indeed, Attorney General Labrador's surrogate Deputy Attorney General Anderson even personally intervened in an attempt to procure lethal injection chemicals, but failed. "I've talked to the individual who has my job in Texas[,]" he told the House Judiciary Committee. "And the one thing he told me was they weren't going to tell me where they got their drugs. And that's the problems we have with getting them. My understanding is that Texas uses pentobarbital. There's also ongoing litigation right now in Texas because it's being alleged that the pentobarbital they're using is out of date. Although it is still – it still works, in other words they have it tested by an independent laboratory before it is used in execution. And it is my understanding don't quote me on this, that their supply is dwindling and they're going to be in trouble for a while."

713.   After HB 186 passed the House, Deputy Attorney General Anderson testified similarly to the Senate Judiciary Committee on March 13, 2023, that lethal injection executions were no longer available in Idaho.

THIRD AMENDED COMPLAINT – Page 84

714.    That claim was not made just to the public and the legislature, however; the State made identical representations to this Court as well. At approximately 2:00 pm. on October 10, 2023, the State submitted a proposed draft order to this Court in *Pizzuto v. Labrador*, D. Idaho, No. 1:23-cv-00081, in which it proffered that "the Idaho Department of Correction does not have the present ability to carry out an execution via lethal injection or firing squad[.]"

715.    Based on these representations, Mr. Creech believed that when he was executed, the method of execution would most likely be the firing squad.

716.    Forty-eight hours after its representation to this Court, however, the State put out an eight-line statement announcing that its claim in the proposed order and all its claims to the legislature and the Idaho public about the dire need for the firing squad were false, and that execution via lethal injection is in fact available in Idaho.

717.    IDOC's extreme lack of transparency here should be understood in the context of its general obfuscation surrounding executions.

718.    As stated above, IDOC revised its execution protocol shortly before both the Rhoades and Leavitt executions, creating a situation in which the inmates had insufficient time to challenge the process before they were executed.

719.    Following the same strategy, IDOC then revised its execution protocol against on March 30, 2021, which was shortly before Mr. Gerald Pizzuto's May 6, 2021 death warrant was signed.

THIRD AMENDED COMPLAINT – Page 85

720.    However, for Mr. Pizzuto's next two death warrants (on November 16, 2022 and February 24, 2023), IDOC announced that the protocol was "suspended."

721.    IDOC has never explained what it means for the protocol to be suspended, or what aspect of the protocol was suspended, or for how long.

722.    Nor has IDOC ever officially declared that any previous suspension was lifted.

723.    By taking this approach, IDOC has created a cloud of uncertainty over what its protocol even is at any given point in time or when it might be modified.

724.    The question of drug-testing in particular underscores the sweeping ramifications of IDOC's obfuscation.

725.    IDOC has maintained that it need not tell the CHU essentially any information about execution drugs if it provides the results of chemical testing.

726.    However, IDOC simultaneously refuses to offer the CHU any meaningful information about the testing itself.

727.    For example, Idaho's execution-secrecy statute, Idaho Code § 19-2716A(4)(b), explicitly prohibits the disclosure of the identity of the person or entity who tests execution drugs.

728.    Without knowing the identity of the testing laboratory, Mr. Creech cannot confirm that it is reliable.

729.    If Mr. Creech cannot confirm that the testing laboratory is reliable, the results from it are meaningless.

THIRD AMENDED COMPLAINT – Page 86

730.   As described above, the COA regarding the Old Execution Drugs, which the State produced in discovery in Mr. Pizzuto's case, does not identify the standards or protocols used to test those chemicals.

731.   The COA regarding the Old Execution Drugs also does not identify the laboratory that tested those chemicals.

732.   The State takes the position that Section 19-2716A(4) shields it from having to disclose that information.

733.   The COA regarding the Old Execution Drugs also does not identify any person or company involved in testing those chemicals.

734.   The State takes the position that Section 19-2716A(4) shields it from having to disclose that information.

735.   IDOC likewise will not tell Mr. Creech anything about the testing protocols of the laboratory, its regulatory history, its training practices, and so forth.

736.   The State takes the position that Section 19-2716A(4) shields it from having to disclose that information.

737.   In these ways, Section 19-2716A(4) prevents Mr. Creech from adequately challenging his execution, and therefore violates due process.

738.   Without the information described above, Mr. Creech cannot confirm the reliability of the testing laboratory's results.

739.   IDOC's prior conduct reinforces these concerns about testing.

740.    With respect to the Rhoades and Leavitt executions, IDOC has insisted that it tested the lethal chemicals.

741.    However, IDOC never provided any test results to counsel for Mr. Rhoades or Mr. Leavitt.

742.    Moreover, IDOC now claims that it is unable to find the test results for the Rhoades and Leavitt execution drugs.

743.    In addition, IDOC has moved to quash a subpoena for the test results that Mr. Pizzuto issued to the testing laboratory in case number 1:21-cv-359.

744.    IDOC is thereby attempting to facilitate a situation in which no one will be able to see the test results from the Rhoades or Leavitt executions—or even to confirm that testing actually was done.

745.    The testing laboratory chosen for the Rhoades and Leavitt executions further increases concerns about the integrity of the process.

746.    For the Rhoades and Leavitt executions, IDOC chose Professional Compounding Centers of America (PCCA) to do the drug testing.

747.    Eagle Analytical ("Eagle") is the testing arm of PCCA.

748.    Regulatory authorities have found numerous violations at Eagle.

749.    For example, in 2013, the FDA determined that due to a host of deficiencies the companies "controls do not include the establishment of scientifically sound and appropriate specifications, standards, and test procedures designed to assure that components conform to appropriate standards of identity, strength, quality, and purity."

THIRD AMENDED COMPLAINT – Page 88

750.    Several of these deficiencies related to contamination, including the failure to "calculate endotoxin limits for drug product samples," the failure to properly test for "microbial contamination," and the failure to validate for potency assays.

751.    Eagle has also been identified as engaging in poor record keeping and having inadequately trained staff.

752.    Eagle's response to the FDA report was that it "does not hold itself out as compliant with current good manufacturing practices."

753.    The violations at Eagle are precisely the kind of problems—gaps in testing for contamination and endotoxins—that have cast doubt on the reliability of lethal injection protocols elsewhere.

754.    The fact that IDOC selected such a troubled testing laboratory for its most recent executions makes it even more problematic that defendants have now produced an undated and unsigned COA from a completely secret laboratory from an undisclosed location (which may not even be in the United States), provided no information about that laboratory, and then relied entirely on that unknown laboratory's deployment of its own secret protocols to produce unverifiable test results ostensibly proclaiming the reliability of the drugs.

755.    IDOC's engagement in such conduct with respect to the Old Execution Drugs means it likely will do the same with respect to the New Execution Drugs.

756.    As of the date of filing of the instant Complaint, the State has produced no COA or other test results regarding the New Execution Drugs.

THIRD AMENDED COMPLAINT – Page 89

757.   IDOC has been in possession of the New Execution Drugs since at least April of 2024.

758.   IDOC has also notably declined to bind itself in its protocol to the commitment of actually providing the test results to the inmate's counsel – which, again, it did not do for the executions of Messrs. Rhoades and Leavitt.

759.   In short, the testing does nothing to remedy the due process violation.

760.   The State's misleading and obstructionist conduct surrounding what execution method is available at which point in time and how it would be implemented prevented Mr. Creech from obtaining sufficient notice of the method and procedures to be used in his execution. This in turn means that the State will deprive Mr. Creech of his life both without his being able to adequately challenge the constitutionality of the procedures used to do so and in a manner incompatible with fundamental fairness.

761.   If the State obtains a new execution warrant for Mr. Creech before the issues raised in this Complaint are resolved, that means that he will be killed without ever receiving from the defendants at a time in which he can meaningfully challenge and litigate, at the very least, the following information, in violation of his right to Due Process: (1) how the drugs to be used in his execution were made; (2) how the drugs were/will be obtained, their source, amounts, expiration date, and how they were acquired/transported/stored/tested; (3) when IDOC will or did obtain the drugs, etc.; (4) when a new version of SOP 135 will be issued; (5) whether witnesses will be able to observe the insertion of the IVs, including the placement of

THIRD AMENDED COMPLAINT – Page 90

a central line; (6) procedures for IV placement/length, including central line placement procedures and safeguards; (7) who will participate in the execution, what is their training/qualifications, and how will they be chosen; (8) whether there will be a consciousness check and the procedure for it; and (9) procedures put into place to avoid further botched executions.

762.    The principles of fundamental fairness and due process prohibit the state from suppressing information about how a condemned prisoner's death sentence will be carried out. Without access to such information, Mr. Creech has no way to know whether his execution will comport with the Eighth Amendment's limitations on gratuitous infliction of pain and suffering. He is further denied any effective remedy to enforce compliance with constitutional commands. Without reliable information about the manner in which the prisoner will be executed, the courts cannot meaningfully review a state's execution procedure to ensure it complies with the commands of the Constitution.

763.    By depriving Mr. Creech of information necessary to challenge the execution procedures to be used and by misleading him, the Legislature, the public, and this Court about how it intends to execute him, the defendants have violated his rights to Due Process.

## VII.    Prayer for Relief

764.    In light of the above, Mr. Creech respectfully requests that the Court:

   a)  Enjoin the defendants from proceeding toward and carrying out an execution of Mr. Creech with pentobarbital;

THIRD AMENDED COMPLAINT – Page 91

b)  Declare that any execution of Mr. Creech with pentobarbital is
    unconstitutional;

c)  If a drug other than pentobarbital is selected, enjoin the defendants
    from executing Mr. Creech until a new drug has been chosen and
    there has been sufficient time for his counsel to investigate and to
    raise any challenges to it;

d)  Enjoin the defendants from executing Mr. Creech until the State
    can demonstrate that it is able to do so constitutionally;

e)  Enjoin the defendants from attempting to execute Mr. Creech until
    the Court orders otherwise;

f)  Enter a declaratory judgment that the defendants' refusal to
    provide the information described above is unconstitutional;

g)  Enjoin the defendants from proceeding toward and carrying out an
    execution of Mr. Creech until the State discloses the information
    described above and there has been sufficient time for him to
    investigate and litigate any issues raised by the information;

h)  Enjoin the defendants from executing Mr. Creech until the Idaho
    Legislature has provided adequate guidance to IDOC on execution
    procedures;

i)  Enjoin the defendants from attempting to execute Mr. Creech until
    the Court orders otherwise;

j) Authorize appropriate and necessary discovery and an evidentiary hearing to permit Mr. Creech to prove his claims;

k) Grant any such other relief that is just and proper.

DATED this 5th day of August 2024.

/s/ *Mary E. Spears*
Mary E. Spears
Deborah A. Czuba

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of August 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

Kristina Schindele
krschind@idoc.idaho.gov

Karin Magnelli
kmagnell@idoc.idaho.gov

Michael Elia
mje@melawfirm.net

Tanner J. Smith
tanner@melawfirm.net

/s/ *Julie Hill*
Julie Hill

THIRD AMENDED COMPLAINT – Page 93