Nicole Owens
EXECUTIVE DIRECTOR
Mary E. Spears, Indiana Bar No. 27353-49
Deborah A. Czuba, Idaho Bar No. 9648
ASSISTANT FEDERAL DEFENDERS
Federal Defender Services of Idaho
702 W. Idaho Street, Suite 900
Boise, ID 83702.
Telephone: (208) 331-5530
Facsimile: (208) 331-5559
ECF:   Mary_Spears@fd.org
         Deborah_A_Czuba@fd.org

Attorneys for Plaintiff Thomas Eugene Creech

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **THOMAS EUGENE CREECH,**<br><br>  Plaintiff,<br>v.<br><br>**JOSH TEWALT**, Director, Idaho Department of Correction; **RANDY VALLEY**, Warden, Idaho Maximum Security Institution; **CHAD PAGE**, Chief, Division of Prisons, Idaho Department of Correction; **LIZ NEVILLE**, Deputy Chief, Division of Prisons, Idaho Department of Correction; and **Unknown Employees, Agents, or Contractors of the Idaho Department of Correction**,<br><br>  Defendants. | CASE NO. 1:20-cv-114-GMS<br><br>**REPLY IN SUPPORT OF RENEWED MOTION FOR PRELIMINARY INJUNCTION**<br><br>**EXECUTION SCHEDULED FOR NOVEMBER 13, 2024** |

Because Defendants misstate the law, obfuscate the facts, and continue to adhere to a policy of secrecy over all over considerations in this capital case, Plaintiff Thomas Eugene Creech respectfully asks the Court to reject their arguments and grant a preliminary injunction.

Reply in Support of Motion for Preliminary Injunction – Page 1

### I.  Defendants' consistent misstatements of the law render the Opposition unreliable.

As a preliminary matter, the State is incorrect in its persistent belief that previous preliminary-injunction rulings – by a now-recused judge, no less – bind the Court forevermore due to the law of the case doctrine. It claims that "all" prior legal conclusions are binding, Dkt. 171 at 4, but that is false; only "fully considered" conclusions on "*pure* issues of law[ ]" are later binding, *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1114 (9th Cir. 2007);[1] *see also* Dkts. 156 at 4-8; 165-1 at 2-6. The Opposition also pretends that the Court's prior decisions on mixed questions of law and fact are binding, Dkt. 171 at 5-6 – despite the fact that by the State's own lights, only *legal* conclusions are.[2]

The State also makes what it presents as binding Eighth Amendment law out of a single concurrence that finds no support elsewhere in Supreme Court or Ninth Circuit caselaw. Dkt. 171 at 3. And similarly, because it dislikes the controlling case on irreparable harm, *Towery v. Brewer*, 672 F.3d 650, 661 (9th Cir. 2012), it pretends that precedent is abrogated by a Middle District of Alabama case, *see* Dkt. 171 at 7-8.

Continuing, the State artificially truncates a quote from a dissenting opinion to make it appear as if a preliminary injunction in a death penalty case is the same as a stay of execution request, *see* Dkt. 171 at 4, when in fact the full quote makes clear that these are merely two different examples of equitable relief, *see Ramirez v. Collier*, 595 U.S. 411, 450 (2022) (Thomas, J., dissenting).

---

[1] In this pleading, unless otherwise noted, all internal quotation marks and citations are omitted, and all emphasis is added.

[2] For this reason also, the Court's prior rulings on the injunction factors other than likelihood of success on the merits – irreparable harm, balance of equities, and public interest – are likewise not binding, contrary to Defendants' implication. Dkt. 171 at 7. Mr. Creech's argument on them remains the same, and those factors continue to favor injunctive relief. *See* Dkt. 165-1 at 7.

Reply in Support of Motion for Preliminary Injunction – Page 2

And it pretends that *Nance v. Ward*, 597 U.S. 159, 169 (2022), *requires* capital litigants to provide "veritable blueprint[s]" for how to carry out alternative methods, Dkt. 171 at 5, and that the Supreme Court has held that an alternative is not "reasonable" if the State cannot at that very moment carry it out, *id.* at 6. In fact, *Nance*'s "veritable blueprint" language was not a requirement; it was praise for the inmate in that case for going *above and beyond* what he needed to do in setting forth a reasonable alternative. 597 U.S. at 164; *see also id.* at 175-76 (Barret, J., dissenting). Moreover, the entire premise of *Nance* was that a reasonable alternative need *not* be immediately implementable: the method the inmate proposed there would have necessitated a change in Georgia law, but even that was not seen as a barrier to the inmate's proposal. *See id.* at 169-70.

As an initial matter, then, given Defendants' persistent misunderstanding (if not outright misstatement) of the law, their objection to injunctive relief cannot be taken at face value.

## II. Mr. Creech's Due Process claim is likely to succeed on the merits, as the State's sloppiness means he now knows less about the drugs intended for use in his execution than he did seven days ago.

But accurately stating the law is not the only thing with which the State has been sloppy. From April 17, 2024, until four days ago, Mr. Creech believed the State had purchased two batches of pentobarbital: the Old Execution Drugs (or "Old Drugs"), purchased in October 2023 for use in the February 2024 execution; and the New Execution Drugs (or "New Drugs"), the purchase of which was confirmed by Defendants in discovery in Mr. Gerald Pizzuto's case on April 17th. *See* Ex. 1 at 7. Since almost all of the Old Execution Drugs were drawn and made unusable in the February 28th botched execution, Mr. Pizzuto sought – and Defendants disclosed – months' worth of information about the New Execution Drugs in discovery. But because no one from the State bothered to check the expiration date of the New Execution Drugs, all of that information turned out to be either false or irrelevant. So nine days ago the Defendants got rid of the New Execution

Reply in Support of Motion for Preliminary Injunction – Page 3

Drugs and just bought another round of pentobarbital, about which Mr. Creech – and possibly the State itself – knows less than nothing.

As the February preliminary-injunction filings demonstrate, the Old Execution Drugs, which the State asserts were 15 grams of manufactured pentobarbital, were purchased for $50,000 some time in 2023. Dkts. 126-2, 132 at 6 n.3. A simple check of the packaging reveals that those drugs have an expiration date of February 2025. Dkt. 123-10 at 3. The drugs also ostensibly came with a Certificate of Analysis ("COA"), Dkt. 124-8, provided by the manufacturer, Ex. 2 at 14.

Redacted - Filed Under Seal

The morning of February 28, 2024, the Old Execution Drugs – in the form of six bottles, each containing 2.5 grams of pentobarbital – were transferred from the Warden to Defendant Liz Neville. Ex. 5 at 1. After the botch, just two bottles (5 grams total) were returned to the Warden's

Reply in Support of Motion for Preliminary Injunction – Page 4

custody, *id.*, because the execution team filled only two sets of syringes – four bottles' worth, or 10 grams – with chemicals. Ex. 1 at 3.

In mid-April, the State informed Mr. Pizzuto and his counsel (in discovery in his case) that it had purchased New Execution Drugs, *id.* at 7, for which it claimed it also had a COA, Ex. 2 at 14. A purchase order obtained by the *Idaho Statesman* near the end of May 2024 reveals the State paid double the amount for the New Drugs than what it paid for the Old – $100,000. Ex. 6 at 4. In *Pizzuto* discovery, the State swore that the New Execution Drugs had an expiration date later than February 28, 2025, Ex. 2 at 6, and that it had obtained a COA for the new chemicals, *id.* at 14.

But the New Execution Drugs don't show up on any chain of custody until June 24, 2024. At that point, a chain of custody form (only disclosed to Mr. Creech on October 29th – three days after he filed his Renewed Motion for Preliminary Injunction) reveals that the New Drugs appeared out of nowhere in the form, not of six 2.5-gram bottles, but of fifteen 1-gram vials. Ex. 5 at 2. These fifteen vials, plus the two bottles left over from February, were transferred into the custody of now-IMSI Warden Valley this summer. Curiously, under oath Defendant Valley can offer nothing about the purchase of the fifteen vials, saying only that IDOC somehow just "had" them. Dkt. 171-3 ¶ 18.

Exactly four months later – October 24th, nine days ago as well as nine days after the State obtained the latest death warrant for Mr. Creech – a new entry shows up in the chain of custody. "(15) 20mL vials Pentobarbital removed Expired returned to supplier[,]" it says. *Id.* The entry further reflects a handoff of these fifteen vials from Warden Valley to a black box. *Id.*

In other words, the New Execution Drugs that the State was planning to use on Mr. Creech after the botched execution – which the State swore under penalty of perjury had an expiration date in *2025* – could never have been used in the November 13, 2024, planned execution of Mr.

Creech, because they were already expired. All of the information provided about them in Mr. Pizzuto's case – much like the COA for the Old Drugs, *see* Dkt. 165-1 at 17; 165-4 ¶¶ 21-22, and despite the State's trumpeting of *Pizzuto* discovery as addressing all of Mr. Creech's own lack-of-information concerns, *see* Dkt. 169 at 16 n.3 – is therefore meaningless.

This failure was entirely within the State's control. As anyone who has ever taken medication knows, and as Defendant Tewalt admitted in *Pizzuto* discovery, *see* Dkt. 123-10 at 3, a simple glance at a manufactured drug's packaging will tell you when it expires. But no one acting on behalf of the State of Idaho and charged with carrying out its most profound and solemn duty ever bothered to do so much as *look once at the execution chemicals*.³

To add insult to injury, this whole time – from June 10, 2024, when the State revealed it had "obtained" a COA for the New Execution drugs, until today – neither Mr. Pizzuto nor Mr. Creech ever saw a certificate reflecting any alleged testing for the New Execution Drugs. Rather, on September 18, 2024, the State admitted in a telephone call with Mr. Pizzuto's counsel that contrary to its sworn answer in the *Pizzuto* discovery response, it did not actually have possession of such a certificate. Ex. 7 at ¶¶ 4-7.

Faced with the loss of the New Execution Drugs through their own carelessness, and saddled also with a death warrant it had to carry out lest it face another embarrassing preliminary-injunction order, as is true in Mr. Pizzuto's case,⁴ the State had to come up with a plan on the fly.

---

³ This failure is all the more notable given that the State was asked about the New Execution Drugs' expiration date multiple times in *Pizzuto* discovery, over the course of several months. *See* Exs. Ex. 3 at 4 (sent to Mr. Pizzuto's counsel in September of 2024); Ex. 2 at 6 (sent in June of 2024).
⁴ On October 24, 2023, this Court enjoined the State from obtaining any death warrants for Mr. Pizzuto unless and until it could demonstrate to the Court that it possessed lethal injection chemicals and the ability actually to carry out an execution. *See Pizzuto v. Tewalt*, No. 1:23-cv-81-BLW (D. Idaho), Dkt. 31.

Reply in Support of Motion for Preliminary Injunction – Page 6

So, nine days ago, according to a purchase order that again was only disclosed on October 29th, it spent another $50,000 of Idaho taxpayer money on yet more drugs ("Last Week's Drugs"). Ex. 8. These chemicals were received on October 25th, and like the Old Drugs took the form of six 2.5-gram bottles of pentobarbital. Ex. 5 at 2.

Mr. Creech knows nothing about Last Week's Drugs. To be sure, on October 29th the State "disclosed" a COA to both the undersigned and counsel for Mr. Pizzuto, Dkt. 171-3 at 13-14, which it now represents reflects testing performed on Last Week's Drugs, *see* Dkt. 171-1 ¶ 2. These drugs, Defendants say, are "certified pentobarbital and tested in the same manner as the last set of chemicals[.]" Dkt. 171 at 19. Only "in the same manner," such that some test results might vary slightly? No. Unfortunately for the State, this "new" COA, ostensibly representing testing performed on Last Week's Drugs, is just the old one reprised.

A comparison of the Old Drugs COA (Dkt. 124-8) with this new one (Dkt. 171-3 at 13-14) reveals that the text is word-for-word and number-by-number the same – down to the identical number of miniscule particles (103) visible in both sets of drugs under a microscope, *compare* Dkt. 124-8 at 2 *with* Dkt. 171-3 at 13. And close attention reveals that the same printer artifacts visible in the Old Drugs COA:

| Color of Solution | TP69530.02 | The solution is not more intensely colored than reference solution B9 | | Conforms<br>The solution is not more intensely colored than reference solution B9 |
|---|---|---|---|---|
| Identification by | TP69477.04 | The retention time of the Pentobarbital peak in the | | |

Dkt. 124-8 at 1, are repeated in the "new" one:

| Color of Solution | TP69530.02 | The solution is not more intensely colored than reference solution B9 | | Conforms<br>The solution is not more intensely colored than reference solution B9 |
|---|---|---|---|---|
| Identification by | TP69477.04 | The retention time of the Pentobarbital peak in the | | Conforms |

Reply in Support of Motion for Preliminary Injunction – Page 7

Dkt. 171-3 at 13. The only difference between the two is that the redaction boxes have been slightly changed. The State, in other words, believes any duty to provide information about the chemicals it intends to use to kill Mr. Creech are met by its "disclosure" of a "new" COA that is simply a photocopy of the old one.

Although there are a few possible explanations for this, the State offers none, implying it was merely by coincidence that two sets of drugs magically yielded the exact same test numbers. This is, of course, virtually impossible. *See* Ex. 9 at ¶ 11. Rather, "it appears that the same CoA was copied and provided twice. That is inappropriate, and it raises serious questions about whether the results in the CoAs accurately pertain to the chemicals that they are supposed to be associated with." *Id.* ¶ 12.

Redacted - Filed Under Seal

Moreover, the Old Execution Drugs expire in February of next year. Dkt. 123-10 at 3. If Last Week's Drugs and the Old Drugs are from the same lot, they share an expiration date. That would mean the State has just four months to figure out how to do surgery in the execution facility

Reply in Support of Motion for Preliminary Injunction – Page 8

and push through its execution of Mr. Creech before all of its remaining chemicals expire and they too must be either disposed of or "returned to supplier[.]" Ex. 5 at 1. The only way to confirm or deny whether this is the case would be to compare the lot numbers of the Old Drugs and Last Week's Drugs, *see* Ex. 9 at ¶¶ 7-8 which the State will not do and will not permit Mr. Creech to do.

None of the information recounted above should reassure the Court that the State can be relied upon to safely and constitutionally carry out an execution of Mr. Creech, whether via central line or not, with reliable and safe chemicals that have not degraded or expired and actually are what the State says they are. Rather, it should lead the Court to conclude that Claim Three is likely to succeed on the merits. A preliminary injunction is thus necessary in order to prevent the State from rushing through an execution substantially likely to cause Mr. Creech severe harm while preventing him access to any information that might put a stop to it.

**III.   Mr. Creech's Eighth Amendment claim is also likely to succeed on the merits, as the State's behavior surrounding its lethal injection chemicals shows the State cannot be trusted merely on its own say-so to insert a central line without a substantial risk of severe pain.**

The fact that the State has treated its search for lethal injection chemicals like some kind of pentobarbital shell game speaks ill of its ability to carry out a central-line lethal injection within the confines of the Eighth Amendment. Nothing in its Opposition defeats that notion.

First and foremost, Defendants cite *Bucklew v. Precythe*, 587 U.S. 119, 144 (2019), for the blanket claim that the Supreme Court has found "the use of a central line is constitutional." Dkt. 171 at 11. They would benefit from reading that case a bit further: Mr. Bucklew "had ample opportunity to conduct discovery and develop a factual record concerning exactly what procedures

Reply in Support of Motion for Preliminary Injunction – Page 9

the State planned to use." *Bucklew*, 587 U.S. at 144. Of course, that is precisely what the State is arguing against here.

Note also that the State presents a declaration from Alvin Perry, a doctor who works for St. Alphonsus Regional Medical Center, a Catholic hospital in Boise, who in turn vouches for the anonymous central-line volunteer ("Dr. X"). Dkt. 171-2. In this declaration Dr. Perry recounts how he spoke once to Dr. X, *id.* ¶ 27, and that ameliorates any possible concerns about Dr. X's ability to perform a central line insertion, *see generally id.* Yet Dr. Perry is careful not to provide any actual information that can be checked by any other expert or confirmed objectively. The "steps and procedures" Dr. X will allegedly undertake to ensure that Mr. Creech is not unconstitutionally executed are not listed. *See, e.g.*, *id.* ¶ 29. Nor are they required by any part of the State's execution protocol, *see id.* at 16-63; rather, they are entirely within Dr. X's discretion, *see, e.g.*, *id.* ¶¶ 28-29. And that discretion is worrisome, given that the State refers to sedating someone before inserting a needle into their jugular as a "luxury[.]" Dkt. 170 at 10.

The State also appeals to "the fact that central lines are routine procedures utilized almost daily by medical professionals[,]" Dkt. 171 at 10, but then almost immediately rejects the notion that executioners can be held to any medical standard of care, *id.* at 13. Why then does its doctor's declaration make so many references to the execution procedures allegedly aligning with "the standard of care[ ]"? *See* Dkt. 171-2 ¶¶ 29, 31, 38-39. Surely it cannot be because the State is concerned there could be significant issues with a central line execution.

Again, the State's "proof" that this is not a possible outcome is a declaration based solely on hearsay from an anonymous person; much like when the warden took the word of someone in a vehicle that the chemicals were supposed to be refrigerated, *see supra* Part II., Dr. Perry's declaration can be summed up as, "I talked to this person and he said he could do it." *See* e.g. Dkt.

Reply in Support of Motion for Preliminary Injunction – Page 10

171-2 ¶ 27. That is not a valid basis for any kind of useful expert opinion. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) (expert opinion is properly excludable when connected to data "only by the *ipse dixit* of the expert.") (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Relatedly, Defendants extensively attack Mr. Creech for engaging in "speculation that the medical doctor volunteer may not be qualified[.]" Dkt. 171 at 12. That is because Mr. Creech has no actual evidence that Dr. X is qualified, apart from the State's say-so. *See generally* Dkt. 171-2. Indeed, Dr. Perry attacks Dr. Heath's declaration point by point, but at no point sets forth Dr. X's credentials or addresses Dr. Heath's concerns over not knowing those credentials, a conspicuous omission. Instead, Dr. Perry was satisfied with his conversation with Dr. X, Dkt. 171-2 ¶ 27, and that, the State insinuates, is enough.

Yet when it comes to whether their doctors can actually carry out executions, states are often wrong. Dr. Heath has personal experience with this fact, most relevantly in *Taylor v. Crawford*, No. 08-4173-CV-C-FJG, 2006 WL 1779035, at *2 (W.D. Mo. June 26, 2006). There, Dr. Heath learned of the importance of the federal judge in a lethal injection case being able to hear from the execution doctor himself, not from hearsay from a person reporting on him. In *Taylor*, until an in-person (anonymous) deposition at which the court was present, the judge was unaware that Missouri's execution doctor, despite being "solely responsible for correctly mixing the drugs which will be responsible for humanely ending the life of condemned inmates[,] ha[d] a condition which causes him confusion with regard to numbers." *Id.* at *2, *7. Learning this left the judge so "gravely concerned[,]" *id.* at *7, that he went on to write a law review article about his experience: "As I considered the issues in *Taylor v. Crawford*, both before and during the initial handling of this case, I made certain assumptions. . . . [including] that the state of Missouri had . .

Reply in Support of Motion for Preliminary Injunction – Page 11

. trained medical personnel [who] implemented [lethal injection] properly and consistently." Fernando J. Gaitan, Jr., *Challenges Facing Society in the Implementation of the Death Penalty*, 35 Fordham Urb. L.J. 763, 765 (2008). "Those assumptions did not withstand the rigors of discovery and examination." *Id.* Rather, it was only litigation brought by a condemned which "forced the state of Missouri, and perhaps other states, for the first time to scrutinize their execution protocols and ensure that they fell within the framework of the Eighth Amendment." *Id.*

And as *Taylor* demonstrates, any concerns the State may have about confidentiality could long ago have been accommodated while still providing useful information for Mr. Creech to verify via his own experts. Why not submit an anonymized declaration from Dr. X? Or better yet, why not offer to produce Dr. X for anonymous testimony? If he could provide credible answers, that would likely end the instant lawsuit, and be much quicker than having to go through all of this litigation. And rational security concerns would not prevent such a tactic. *See* Carol Rosenberg, *Odd Guantanamo Episode Derails Defense of Detainee Healthcare*, Miami Herald (Apr. 26, 2014) (describing the in-court appearance of an anonymous Guantánamo prison doctor, wearing his Army uniform and "identified in court only as Dr. M", without apparent confidentiality concerns).

But Dr. X is not the only problematic doctor on which the State relies. Dr. Perry, who to Mr. Creech's knowledge has never acted as an expert witness anywhere,[5] apparently only ended his training in 2017 and, despite the State making much of how he alone can know the "standard of care" in Idaho, Dkt. 170 at 8-11, has for four of the last seven years lived and practiced medicine in states other than the state of Idaho, Dkt. 171-2 ¶¶ 2-15. The bulk of his declaration also discusses

---

[5] He was, however, poorly rated by at least one patient for his "SEVERE lack of empathy." https://doctor.webmd.com/doctor/alvin-perry-iii-c7ccbbb2-4620-45ee-b45a-8e1e6039982c-overview (emphasis in original).

Reply in Support of Motion for Preliminary Injunction – Page 12

areas outside any expertise Dr. Perry might have; in Idaho, an expert is not competent to evaluate whether another medical practitioner is qualified to meet or exceed a standard of care unless it is clear to what "class" or "field[s] of medical specialization" that medical practitioner belongs. *See* Idaho Code § 6-1012; *Trujillo v. United States*, 786 F. App'x 124, 125 (9th Cir. 2019) (where state law requires expert testimony to speak to a specific class of healthcare provider to prove a malpractice case, an expert from a different specialty is unable to opine on standards of care that govern providers who allegedly engaged in malpractice). Because Dr. Perry, a surgeon, makes no such disclosure about Dr. X – indeed, he may not even know what kind of physician Dr. X actually is – he is not competent to judge Dr. X's suitability to perform Dr. Perry's own job.

Next, Dr. Perry insinuates that complications in central lines are rare and essentially can be counted on not to occur. *See* Dkt. 171-2 ¶¶ 47-55. This may be true in the clinical or hospital context, but in executions or outside of competent hands, *they do*. *See* Dkt. 165-2 ¶¶ 32-33. Again, that is the problem: this is not a hospital setting but an execution chamber, and we know nothing about the hands performing this procedure. And although Dr. Perry waves off the likelihood of a complication occurring – "I have never heard of anyone sustaining a bladder injury from attempted femoral access until reading Dr. Heath's Declaration[,]" he says, Dkt. 171-2 at 12 – this only shows his lack of familiarity with just how many things can go wrong in central line executions; what the state of Alabama did to Mr. Doyle Hamm is not only graphically depicted in Dr. Heath's declaration, Dkt. 165-2 ¶ 32, but is well known in the capital community, *see, e.g.*, Alabama Death-Row Prisoner Doyle Hamm, Who Survived Botched Execution Attempt, Dies of Cancer (Nov. 29, 2021), *available at* https://deathpenaltyinfo.org/alabama-death-row-prisoner-doyle-hamm-who-survived-botched-execution-attempt-dies-of-cancer.

Finally, Mr. Creech notes three final points with respect to Claim One. *First*, the State fundamentally misunderstands Mr. Creech's point regarding his profound trauma as he faces another execution attempt. The claim is not that it is an Eighth Amendment violation to feel the trauma of "facing one's lawful death sentence[.]" Dkt. 171 at 15. Rather, the violation is that the trauma of being subjected to a failed lethal injection *and then being subjected to lethal injection again*. Dkt. 165-1 at 12-13. *Second*, the State's execution protocol does not, contrary to its argument now, "adequately ensure[ ]" that IDOC will successfully carry off a constitutional execution. Dkt. 171 at 15. The State points to the fact that the February attempt ended in failure as a sign of the protocol's success, *id.*, but that end was *discretionary*, not directed or provided for by anything in the protocol. *See* Dkt. 165-2 at 18-65. And *third*, the State attacks Mr. Creech for "disingenuous[ly]" claiming there has been no investigation of why it couldn't access his veins despite allegedly "know[ing] that IDOC investigated the events of that day[.]" Dkt. 171 at 15. Why, then, was the State unable to access his veins on February 28th? Surely the State would not literally go for the jugular without fully understanding what went wrong the last time. Mr. Creech eagerly awaits the results of that investigation. He suspects, however, that they will not be forthcoming.

All of the above shows the State cannot be taken on its word alone when it waves off any possibility of a severely painful execution of Mr. Creech. That in turn points to a likelihood of success on Claim One. The Court should issue the preliminary injunction on this ground as well.

### IV. The State's repeated carelessness in procuring, storing, learning about, and providing information about its execution chemicals shows that the Court cannot deny a preliminary injunction without an evidentiary hearing.

The discussion above should also make clear to the Court that, contrary to Defendants' argument now, *see* Dkt. 171 at 19-20, an evidentiary hearing on the preliminary injunction is necessary before the Court can allow the execution of Mr. Creech to proceed.



Redacted - Filed Under Seal

The State has also been circumspect about what it knew or should have known about how to properly store the Old Execution Drugs, which again were improperly refrigerated and likely invisibly degraded in the process. *See* Dkt. 165-1 at 16-17. In September of 2024, the State informed Mr. Pizzuto's counsel that there is a range of temperatures at which the Old Execution Drugs were supposed to be stored, that range was room temperature, and the drugs' package insert said so. Ex. 3 at 7. A month later, though, asked to admit that the refrigerator storage of the Old Drugs violated the instructions on the package insert, Defendants suddenly no longer understand what "room temperature" means, claiming they did not violate the storage instructions because the



Redacted - Filed Under Seal

Reply in Support of Motion for Preliminary Injunction – Page 15

package insert did use the word "refrigeration." Ex. 10 at 4. They continue to adhere to that tack today. Dkt. 171 at 10.

Defendants also claim that nearly seven weeks in cold storage would have no effect on the drugs because "temperature fluctuations" are acceptable and because they will look at the drugs to see if any particles visible to the naked eye appear, *see generally* Ex. 10, ignoring not only that the only pharmacological expert ever to opine in this case has sworn under oath that visible inspection is not sufficient, Dkt. 165-4 ¶ 24, but also that temperature "excursions" should be limited to *twenty-four*, not 1,128, hours, *id.* ¶ 12. And finally, although they claim again and again that the temperature logs (Dkt. 165-5) "speak for [themselves,]" *see generally* Ex. 10, those logs cannot be trusted: the thermometer they used to obtain them was not calibrated for medication storage, *id.* at 23, although it should have been, Dkt. 165-4 ¶ 9.

When it comes to the matter of a central line, Defendants are no more forthcoming. Normally a highly scientific case such as this involves a battle of the experts, in which each side's expert has access to the same information. Here, however, the battle is taking place where one side completely gatekeeps access to any knowledge and data and then relies upon that gatekeeping to score points on the other side; hence Defendants' attacks on Mr. Creech's experts' opinions for being based on "speculation and conjecture." Dkt. 171 at 9, 19. It is incredible – as in, it is not credible – to attack those experts for not having access to information Defendants are keeping so close-hold that they would rather kill a man than divulge it. To take the most egregious example (apart from the attack on Dr. Heath for pointing out that Dr. X's unknown credentials are unknown, *see supra* Part III.), Defendants attack Dr. Almgren for not speaking to the exact contents of a

medication label, *see* Dkt. 170 at 13-15, that they literally keep under lock and key with no one allowed to see it, Dkt. 171-3 at 4-5.[8]

Finally, there is the matter of the questionable representations provided under oath to Mr. Pizzuto's counsel in discovery, which again is the only source of information Mr. Creech has about the drugs that might be used to kill him. Defendants represented that they had a COA for the New Execution Drugs. They didn't. Defendants have produced a new chain of custody form, ostensibly to show that it is careful about the movement and management of its execution chemicals. But the New Execution Drugs show up on that form out of nowhere, and then disappear into the black box when the State discovered they were expired and returned them. And Defendants swore under oath that the New Execution Drugs expired after February of next year. That wasn't true.

Once again, *see also* Dkt. 165-1 at 19-20, all of the above demonstrates why an evidentiary hearing is necessary before the Court can decide on the injunction. Judge Gaitan, with whom Dr. Heath has experience in Missouri, underlines the importance in general of hearing from experts in person. But in this case in particular, the questions raised are too critical to be decided without a hearing. Whatever execution drugs the State now has in its possession cannot be believed reliable absent testing and rigorous adversarial examination. Indeed, they cannot even be believed to be *unexpired* without inspection and/or live witness testimony; Defendants have shown they cannot be trusted to provide an accurate answer to even that basic question under oath. Therefore, even if the Court is unwilling to grant the preliminary injunction on the basis of the papers, it should not *deny* injunctive relief before it can hold a hearing at which Mr. Creech can seek answers to the very basic questions he asks here: What are the drugs? Have they been tested? When do they

---

[8] In practice, of course, no one from the State actually did bother to see it. *See supra* Part II.

Reply in Support of Motion for Preliminary Injunction – Page 17

expire? Does the State actually have someone who can manage to inject them into Mr. Creech's body without severe and catastrophic complications? Such basic scrutiny is all he asks for. And it is scrutiny the Court should permit before Mr. Creech's execution can go forward.

DATED this 2nd day of November 2024.

      /s/ Mary E. Spears
Mary E. Spears

      /s/ Deborah A. Czuba
Deborah A. Czuba

Federal Defender Services of Idaho
*Attorneys for Plaintiff Thomas Eugene Creech*

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of November 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which is designed to send a Notice of Electronic Filing to persons including the following:

| | |
|---|---|
| Kristina Schindele<br>krschind@idoc.idaho.gov | Karin Magnelli<br>kmagnell@idoc.idaho.gov |
| Michael Elia<br>mje@melawfirm.net | Tanner Smith<br>tanner@melawfirm.net |

      /s/ Julie Hill
Julie Hill